UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------XF

**PATRICK DONOHUE**, Individually and on Behalf of **S.J.D.,**
a Student with Disabilities;

**ANGELA NOLAN** Individually and on Behalf of **S.N.,**
a Student with Disabilities in New York State;

**MARIE FARRELL** Individually and on Behalf of **E.F.,**
a Student of New York City; and

all Others Similarly Situated,

        Plaintiffs,

  -against-

**KATHLEEN HOCHUL**, in her official capacity as
Governor of New York;

**BILL de BLASIO**, in his official capacity as
the Mayor of New York City;

**HOWARD ZUCKER,** in his official capacity as
the New York State Commissioner of Health;

**BETTY ROSA**, in her official capacity as the New York
State Commissioner of Education;

**LESTER YOUNG, JR.,** in his official capacity as
Chancellor of the New York State Board of Regents;

**MEISHA PORTER**, in her official capacity as the
Chancellor of New York City Department of Education;

**DAVE CHOKSHI**, in his official capacity as
Commissioner of New York City Department of Health;

**NEW YORK DEPARTMENT OF HEALTH**;

**NEW YORK DEPARTMENT OF EDUCATION;**

**NEW YORK BOARD OF REGENTS**;

**NEW YORK CITY DEPARTMENT OF EDUCATION;**

**NEW YORK CITY DEPARTMENT OF HEALTH;**

       Defendants.

  ------------------------------------------------------------------------X

**CASE NO.: 21 - CV -**

**CLASS ACTION
COMPLAINT FOR
DECLARATORY AND
INJUNCTIVE RELIEF**

Plaintiffs are Parents and Natural Guardians of school-aged children who attend elementary and/or secondary schools throughout the City and State of New York, as well as the Students themselves, including Students with disabilities, who bring this action on their own behalf and on behalf of all other similarly situated school-aged children attending elementary and secondary school in the City and State of New York, on a common basis, against KATHLEEN HOCHUL ("Governor Hochul"), in her official capacity as the Governor of New York State; HOWARD ZUCKER ("Commissioner Zucker"), in his capacity as Commissioner of New York State Department of Health; BETTY ROSA ("Commissioner Rosa"), in her official capacity as the Commissioner of New York State Department of Education; LESTER YOUNG, JR. ("Chancellor Young"), in his official capacity as Chancellor of the New York State Board of Regents; BILL de BLASIO, in his official capacity as the Mayor of New York City; MEISHA PORTER ("Chancellor Porter"), in her official capacity as the Chancellor of New York City Department of Education; DAVE CHOKSHI ("Commissioner Chokshi"), in his official capacity as Commissioner of New York City Department of Health; the NEW YORK STATE HEALTH DEPARTMENT ("NYS DOH"); the NEW YORK STATE EDUCATION DEPARTMENT ("NYS DOE"); the NEW YORK STATE BOARD OF REGENTS ("NYS BOR"); the NEW YORK CITY DEPARTMENT OF EDUCATION ("NYC DOE"); and the NEW YORK CITY DEPARTMENT OF HEALTH ("NYC DOH"), (collectively "Defendants"), and allege the following upon information and belief:

## PRELIMINARY STATEMENT

Plaintiffs bring this action on their behalf and all others similarly situated to assert the claims alleged in this Complaint. Plaintiffs seek a judgment declaring that Defendants violated their rights by implementing a mask mandate in elementary and secondary schools throughout the City and State of New York in violation of the First, Eighth, Ninth, and Fourteenth Amendments of the

United States Constitution, Article XI of the New York State Constitution, several federal regulations and statutes, including the Individuals with Disabilities Education Act ("IDEA"), Section 504 of the Rehabilitation Act of 1973; the Americans with Disabilities Act ("ADA."), and 42 U.S.C. § 1983, as well as regulations, laws, and statutes of the State of New York. Plaintiffs seek an Order enjoining Defendants from implementing and continuing to implement their unconstitutional, unlawful, and unnecessary mask mandate relative to elementary and secondary school students throughout the City and State of New York, and from imposing their personal political and "religious" beliefs onto the Plaintiffs — the Parent/Plaintiffs as well as their Students attending elementary and secondary school throughout the City and State of New York.

In this proposed class action, the primary and predominant class, consists of all elementary and secondary school students attending school in New York City and throughout the State of New York who are subject to Defendants' mask mandate. Plaintiffs' proposed subclasses consist of four classes of Students attending school in the State of New: 1) all Students attending school outside New York City with an Individualized Education Program ("IEP"); 2) all Students attending school outside New York City that do not have an IEP (neuro-typical, or "non-disabled"); 3) all Students attending school in New York City with an IEP; and 4) all students attending school in New York City that do not have an IEP (neuro-typical).

The 2019 Coronavirus (COVID-19) disease causes mild to severe respiratory symptoms, including fever, cough, and difficulty breathing. People infected with COVID-19 have had symptoms ranging from those that are mild (like a common cold) to severe pneumonia that requires medical care in a general hospital and can be fatal, with a disproportionate risk of severe illness for older adults and/or those who have serious underlying medical health conditions.

On January 30, 2020, the World Health Organization (WHO) designated the COVID-19 outbreak as a Public Health Emergency of International Concern. On a national level, the Secretary of Health and Human Services determined on January 31, 2020, that as a result of confirmed cases of COVID-19 in the United States, a public health emergency existed and had existed since January 27, 2020, nationwide. After that, the situation rapidly evolved throughout the world, with many countries, including the United States, quickly progressing from identifying travel-associated cases to person-to-person transmission among close contacts of travel-associated cases, and finally to widespread community transmission COVID-19.

New York State first identified cases on March 1, 2020, and after that became the national epicenter of the outbreak. On March 7, 2020, with widespread transmission rapidly increasing within some regions of the state, Governor Andrew M. Cuomo issued an Executive Order declaring a state disaster emergency to aid in addressing the threat COVID-19 poses to the health and welfare of New York State residents and visitors, which ended June 24, 2021, due to the success in vaccination rates, and declining hospitalization and positivity statewide. Defendant Hochul was sworn in as Governor Cuomo's successor on August 24, 2021. On the same day, Defendant Hochul announced that she would be utilizing federal funds to implement the mask mandate as set forth herein. The funds would be used to provide surgical masks to students.

Defendants' current mask mandate for all children in attendance at New York State elementary and secondary schools, both public and private, should be declared unconstitutional and enjoined for the following reasons set forth below.

The mask mandate cannot survive any Constitutional standard of review – not Strict Scrutiny, Intermediate Scrutiny, or Rational Basis – as the mandate itself is vague and does not

require the students to wear any specific type of mask, which has been found to prevent the

transmission of COVID-19. The current mask mandate is problematic for numerous reasons:

     i.    Other than mandating a mask, the mandate does not require a specific type of mask that has been proven or found in any way to reduce or prevent the spread/transmission of COVID-19;

    ii.    The proposed mask-mandate is ambiguous—for instance, a "mask" or "face covering" is required, but there are no further clarifications as to what type of mask(s) should be worn, which sort of masks are effective, which are not, and which kind of mask and/or face covering satisfies and/or complies with the mandate;

   iii.    By its very definition, a "mask" is a medical device. The implementation of a mask-mandate alters the terms of a special education student's Individual Education Plan ("IEP") and would require local educational agencies to follow the procedures and regulations of the IDEA in implementing such a mandate, which the Defendants did not do in the instant matter;

   iv.    As a mask is worn over the nose and mouth and restricts a student's breathing and form of communication, it qualifies as a "restraint," defined by the federal Office of Civil Rights, and its mandated use on school-aged children is otherwise unlawful;

    v.    The mandate segregates the public into political and moral factions, infringing on the Plaintiffs' freedoms – political, religious, social, familial, autonomy, and otherwise;

   vi.    Defendants' mask mandate is an unconstitutional/unlawful violation and/or infringement of the Plaintiffs' rights as its use as proscribed by the mandate is not supported by any credible scientific evidence or evidence that would stand up to the rigid *Frye* (New York) and/or Daubert (federal) test(s).

   vii.    The current mask mandate requires all school-aged children to wear a mask at all times while attending school. The present mask mandate does not provide an alternative method of educating those school-aged children/students who cannot, or choose not to, comply with said mandate, in accordance with the New York State Constitution.

## JURISDICTION AND VENUE

1.    The instant case arises under the First, Fourth, Eighth, Ninth, and Fourteenth Amendments

of the United States Constitution, Article XI of the New York State Constitution, several

federal statutes, including the Individuals with Disabilities Education Act ("IDEA"), 20

U.S.C. § 1400, et seq., including but not limited to § 1415(j) and United States Department

of Education the regulations, which were promulgated pursuant to authority granted by statute (34 C.F.R. Part 300), Section 504 of the Rehabilitation Act of 1973 ("Section 504"), 29 U.S.C. § 794, et seq.; the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101, et seq. and 42 U.S.C. § 1983.

2.    This Court has subject matter jurisdiction under 28 U.S.C. § 1331, which confers original jurisdiction on federal district courts to hear suits arising under the Constitution, laws, or treaties of the United States, as well as 28 U.S.C. § 1343(a).

3.    This Court has supplemental jurisdiction under 28 U.S.C. § 1367 over Plaintiffs' state law/constitutional claims, which are closely related to Plaintiffs' federal claims falling within this Court's original jurisdiction under 28 U.S.C. § 1331 28 U.S.C. § 1343(a). For example, N.Y. Const. art. XI, § 1 states, "A system of free common schools, wherein all the children of this state may be educated."

4.    Pursuant to 28 U.S.C. § 1391(b), venue is appropriately placed within the Southern District of New York because at least Defendants reside or transact business in the Southern District; specifically, Governor Hochul, Commissioner Zucker, Commissioner Rosa, Mayor de Blasio, Chancellor Porter, Commissioner Chokshi, NYS DOH, NYS DOE, City of New York, NYC DOE and NYC DOH, maintain business offices in New York County.

5.    This Court has the authority to award the requested declaratory and injunctive relief under 28 U.S.C. § 2201 and 2202 and costs and attorneys' fees under 42 U.S.C. § 1988(b).

6.    Patrick Donohue, a New York City resident, is the Parent and Natural Guardian of S.J.D., who is is classified as a student with a traumatic brain injury – a disability defined by the IDEA, 20 U.S.C. § 1401(3), and Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, and a resident of New York, New York.

7.    Defendant New York City Department of Education, as the Local Educational Agency ("LEA"), and Defendant New York State, as the State Education Agency ("SEA") are obligated to provide S.J.D. with a free appropriate public education ("FAPE") pursuant to the IDEA for every school year as outlined in her Individual Education Plan ("IEP").

8.    Pursuant to both Section 504 and the ADA, S.J.D. is a qualified individual with a disability who was denied benefits as per her IEP from the LEA solely because of their disability.

9.    Such denial of educational benefits was in bad faith or a gross misjudgment.

10.   S.J.D. is a 16-year-old female student who is currently fully vaccinated from COVID-19 and, therefore, according to the science, has little to no risk of either catching COVID-19 or developing serious or life-threatening illness if a breakthrough case occurs.

11.   S.J.D. has been attending a private educational program, The International Institute for the Brain ("iBRAIN"), before, during, and throughout the COVID-19 pandemic.

12.   iBRAIN was the first educational program in the United States to reopen on May 4, 2020, and S.J.D. was one of the first two students in America to return to school.[1]

13.   Since S.J.D.'s return to iBRAIN, she has not been required to wear a mask at any time during her educational program at iBRAIN.

14.   Wearing a mask would significantly interfere with S.J.D.'s breathing, and since S.J.D. is non-verbal and has a limited range of fine motor skills, she would be unable to communicate if she was having difficulty breathing.

15.   Wearing a mask would significantly interfere with her ability to participate in her educational and related service program throughout the school day at iBRAIN.

---

[1] https://abc7ny.com/ibrain-blood-drive-covid-pandemic/10616170/

16.   As per S.J.D.'s IEP, she requires a full-time 1:1 nurse to monitor her throughout the day. Due to her brain injury and subsequent seizure disorder, she is more susceptible to aspiration, leading to pneumonia and possible death.

17.   According to S.J.D.'s IEP, none of her education and related service program includes wearing a mask.

18.   S.J.D.'s iBRAIN IEP for the 2021-2022 school year is attached as **EXHIBIT 1**.

19.   Marie Farrell, a New York resident, is the Parent and Natural Guardian of E.F., who is classified as a student with Autism – a disability defined by the IDEA 20 U.S.C. § 1401(3) and Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, and a resident of Staten Island, New York.

20.   Defendant New York City Department of Education, as the LEA, and Defendant New York State Department of Education, as the SEA, are obligated to provide E.F. with a FAPE pursuant to the IDEA for every school year as outlined in her IEP.

21.   Pursuant to both Section 504 and the ADA, E.F. is a qualified individual with a disability who was denied benefits as per her IEP from the SEA and LEA solely because of their disability.

22.   Such denial of educational benefits was in bad faith or a gross misjudgment. E.F. is a 16-year-old female student who is *not* vaccinated, as tests have shown that she possesses COVID-19 antibodies. Her doctor has advised her parents that a vaccine at this time is not appropriate. According to science, she has little to no risk of catching COVID-19 or developing a severe or life-threatening illness if a breakthrough case occurs.

23.   E.F. has attended a public education program in Staten Island before, during, and throughout the COVID-19 pandemic.

24. E.F. currently has difficulty communicating; she frequently uses one-word utterances. Donning a mask would further inhibit her speech progress and cause further dysregulation, triggering maladaptive behaviors such as elopement, bouncing, screaming, etc.

25. E.F. also struggles to identify body language, which becomes increasingly difficult for her to identify facial features and language while her teachers and peers wear masks.

26. Wearing a mask would significantly interfere with her ability to participate in her educational and related service program throughout the school day.

27. According to E.F.'s IEP, none of her education and related service program includes wearing a mask.

28. E.F.'s (present) IEP for the 2020-2021 school year is attached as **EXHIBIT 2.**

29. Angela Nolan, a New York resident, is the Parent and Natural Guardian of S.N., who is classified as a student with a learning disability – a disability defined by the IDEA 20 U.S.C. § 1401(3) and Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, and a resident of New York, New York.

30. Defendant New York City Department of Education, as the LEA and New York State Department of Education, as the SEA, are obligated to provide S.N. with a FAPE pursuant to the IDEA for every school year as outlined in his Individual Education Plan ("IEP").

31. Pursuant to both Section 504 and the ADA, S.N. is a qualified individual with a disability who was denied benefits as per his IEP from the LEA solely because of their disability. Such denial of educational benefits was in bad faith or a gross misjudgment.

32. S.N. is a 12-year-old (soon to be 13-year-old) young man who is currently fully vaccinated from COVID-19 and, therefore, according to the science, has little to no risk of either

catching COVID-19 or developing serious or life-threatening illness if a breakthrough case occurs.

33.   S.N. has attended a public education program in Staten Island before, during, and throughout the COVID-19 pandemic.

34.   S.N. struggles with forming intelligible speech. According to IEP, "[l]ow jaw sounds continue to be a target at the connected speech level along with sound substitutions noted for voice/voiceless [] and controlled vowels.

35.   Wearing a mask would significantly interfere with his ability to participate in her educational and related service program throughout the school day, especially when attempting to "model" teachers or related service providers to reach his goal of "low jaw" sounds.

36.   According to S.N.'s IEP, none of her education and related service program includes wearing a mask.

37.   S.N.'s (present) IEP for the 2020-2021 school year is attached as **EXHIBIT 3.**

38.   Defendant KATHLEEN HOCHUL is the Governor of the State of New York ("Governor Hochul") with a business office located at 633 Third Avenue, 38th floor, New York, NY 10017.

39.   Defendant HOWARD ZUCKER is the Commissioner of the New York State Department of Health ("Commissioner Zucker"). Commissioner Zucker's principal place of business is located at Empire State Plaza, Corning Tower, Albany, New York 12237.

40.   Defendant NEW YORK STATE DEPARTMENT OF HEALTH ("NYS DOH") is the department of the New York State government responsible for public health. Defendant NYS DOH includes The New York State Public Health and Health Planning Council ("NYS

PHPC"). NYS DOH's principal place of business is located at Empire State Plaza, Corning Tower, Albany, New York 12237.

41. Defendant LESTER YOUNG, JR. ("Chancellor Young"), is the Chancellor of the New York State Board of Regents.  Chancellor Young's principal place of business is located at 89 Washington Avenue, Albany, New York 12234.

42. Defendant NEW YORK STATE BOARD OF REGENTS ("NYS BOR") and its members are responsible for determining the policies governing New York's schools and adopting rules and regulations to effectuate State education laws and policies. Education policies set by the Board of Regents govern State learning and promotion standards, State examinations, teacher licensing, and educational accountability. The NYS BOR elects the New York State Commissioner of Education.  NYS BOR's principal place of business is located at 89 Washington Avenue, Albany, New York 12234.

43. Defendant BETTY ROSA ("Commissioner Rosa"), in her official capacity as the Commissioner of New York State Department of Education, and as the chief executive officer of New York State's education system and NYS BOR, is responsible for enforcing all laws relating to the educational system of New York State, executing all State educational policies, and has general supervisory authority over all schools subject to the New York State Education Law, including NYC DOE. N.Y. Educ. Law § 305(1)-(2) (McKinney). Commissioner Rosa's principal business place is at 89 Washington Avenue, Albany, New York 12234.

44. Defendant NEW YORK STATE EDUCATION DEPARTMENT ("NYS DOE") is the official State Education Agency ("SEA") that exercises general supervision over all programs in the State that provide educational services to disabled students, including NYC

DOE. It must ensure that all programs meet State education standards. 20 U.S.C. § 1412(a)(11).

45. Upon information and belief, NYS DOE is the recipient of federal funding under the IDEA, and as such, has the responsibility to establish and maintain procedures . . . to ensure that children with disabilities and their parents are guaranteed procedural safeguards concerning the provision of free appropriate education." 20 U.S.C. § 1415(a). NYS DOE is a state government entity in Albany. Its principal place of business is at 89 Washington Avenue, Albany, New York 12234.

46. Defendant BILL de BLASIO ("Mayor de Blasio") is the Mayor of the City of New York and directs the New York City Department of Education through the appointment of the Chancellor.  Mayor DeBlasio's principal place of business is located at City Hall, New York, New York 10007.

47. Defendant MEISHA PORTER ("Chancellor Porter") is the Chancellor of the NYC DOE, and as such, is entrusted with the specific powers and duties outlined in N.Y. Educ. Law § 2590-h (McKinney), including oversight of D.O.E. regarding students with disabilities under the IDEA and Section 504.  The Chancellor's principal place of business is located at 52 Chambers Street, New York, New York 10007.

48. Defendant NYC DOE is the official body (the LEA) charged with developing and enforcing policies concerning the administration and operation of public schools in the City of New York, including programs and services for students with disabilities.

49. Upon information and belief, NYC DOE receives federal and state funds to educate students with disabilities and must comply with state and federal statutory requirements under Section

504 of the Rehabilitation Act. See 29 U.S.C. § 794. NYC DOE's principal place of business is located at 52 Chambers Street, New York, New York 10007.

50.     Defendant DAVE CHOKSHI ("Commissioner Chokshi") is the Commissioner of the New York City Department of Health and Mental Hygiene. Commissioner Chokshi's principal place of business is located at 42-09 28th St, Long Island City, NY 11101.

51.     Defendant NYC DOH is the department of the New York City government responsible for public health and issuing birth certificates and dog licenses, and conducting restaurant inspections and enforcement. NYC DOH's principal place of business is located at 42-09 28th St; Long Island City, NY 11101.

## CLASS ALLEGATIONS

### General Class Action Allegations

52.     Plaintiffs bring this action on behalf of themselves and all other similarly situated school-aged children, both with disabilities and without, in the State of New York.

53.     Plaintiff Students herein represent all students in the State of New York; all Students in the State of New York with Disabilities as outlined in the IDEA; all New York City Students; and all New York City Students with Disabilities as outlined in the IDEA.

54.     A class action is a superior means, and the only practicable means, by which Plaintiffs and unknown class members can challenge Defendants' actions as set forth herein.

55.     The action is brought, and may properly be maintained, as a class action under Fed. R. Civ. P. 23(a) and 23(b)(2).

56.     This action satisfies the numerosity, commonality, typicality, and adequacy requirements of Fed. R. Civ. P. 23(a), as well as the requirements of Fed. R. Civ. P. 23(b)(2).

<div align="center">Fed. R. Civ. P. 23(a)(1):  Numerosity</div>

57.     The class is so numerous that joinder is impracticable.

58.     All putative class members are elementary and/or secondary school students, and their Parents, in the City and State of New York, including students with IEPs.

59.     The number of individuals affected by Defendants' (collectively) unlawful acts likely ranges in the millions.

<div align="center">Fed. R. Civ. P. 23(a)(2):  Commonality</div>

60.     Common questions of law and fact exist as to all members of the classes.

61.     All class members present common factual questions in pursuit of declaratory and injunctive relief relative to the Defendants' mask mandate as it applies to elementary and/or secondary school students, and their Parents, in the City and State of New York, including students with IEPs.

62.     All class members present common factual questions relative to the Defendants' mask mandate. The factual and legal issues are common as to all Plaintiffs and all Defendants.

63.     All class members seek declaratory and injunctive relief relative to the Defendants' mask mandate as it applies to elementary and/or secondary school students, and their Parents, in the City and State of New York, including students with IEPs. The factual and legal issues are common as to all Plaintiffs and all Defendants.

<div align="center">Fed. R. Civ. P. 23(a)(3):  Typicality</div>

64.     Plaintiffs' claims are typical of the claims of other respective class members.

65.     Like all class members, Plaintiffs attend school (elementary or secondary) in the City and State of New York; they are disabled students who have IEPs in accordance with the IDEA.

66.   All Plaintiffs and class members were denied their procedural and substantive due process rights under state and federal law, as well as the Constitutions of the United States and the State of New York.

67.   All Plaintiffs and class members class seek the same injunctive and declaratory relief.

68.   All members of the class, including named Plaintiffs, seek a judgment declaring that defendants' actions were unlawful and an injunction preventing defendants from committing such actions in the future.

69.   There is nothing distinctive about the putative Plaintiffs' claims for declaratory, injunctive, or pendency relief that would lead to a different result in their case than in any case involving other class members.

<p style="text-align:center;"><u>Fed. R. Civ. P. 23(a)(4):  Adequacy</u></p>

70.   Plaintiffs are adequate representatives of the class because their interest in the vindication of their rights is aligned with the interests of the other class members.

71.   Plaintiffs are members of the class, and their interests do not conflict with those of the other class members concerning any claims.

72.   Class counsel has developed and continues to develop relationships with Plaintiffs and others similarly situated.

<p style="text-align:center;"><u>Fed. R. Civ. P. 23(b)(2):  Declaratory and Injunctive Relief Class</u></p>

73.   A class action is appropriate for declaratory and injunctive relief under Fed. R. Civ. P. 23(b)(2) because Defendants' actions generally apply to the class. All elementary and secondary school students in the City and State of New York are subject to the Defendants' mask mandate. The implementation of Defendants' mask mandate in New York State, to be

worn by all students and staff in attendance – without complying with Plaintiffs' rights under the Constitution, federal law, and state law as provided herein.

74.     The class seeks declaratory and injunctive relief to enjoin Defendants herein from denying the rights guaranteed under the provided by Constitution, federal law, and state law as provided herein to all students in New York State, including those students with disabilities as defined by the IDEA and their parents.

75.     Specifically, Plaintiffs seek a judgment declaring a mask mandate would qualify as a "restraint" as defined by the relevant state and education laws and thus creates a "change in educational placement" for those students with disabilities under the IDEA. Plaintiffs also seek an injunction to prevent Defendants herein from unilaterally changing the Plaintiffs' educational placement through a mask mandate.

76.     Class status is particularly appropriate because there is a risk that any individual member's claim for declaratory or injunctive relief will become moot before the litigation is resolved.

<u>Fed. R. Civ. P. 23(b)(3):  Damages Class</u>

77.     Plaintiffs only seek nominal damages, declaratory, and injunctive relief at this time. However, no claims for damages should be deemed waived where otherwise available.

## FACTUAL ALLEGATIONS

"*I TURNED 18 IN FEB 2020. I LOST MY FRIENDS, MY EDUCATION, THE FIRST YEAR OF MY ADULT LIFE, MY MENTAL HEALTH, AND 20LBS. I DIDN'T MAKE SACRIFICES. **I WAS SACRIFICED.***"

**-Jane Kitchen**, 18[2]

---

78.    When COVID-19 swept the United States in March of 2020, panic emerged, and sacrifices were made. Students all over the country faced a new, complicated obstacle: learning from home with little to no resources, limited outside interactions with the "real" world, missed proms, birthdays, and graduations—the list is exhaustive. Fueled by incessant media coverage and polarizing political stances of government officials on federal and local levels, COVID-19 has come to represent perhaps the most significant entanglement of science, misinformation, religion, and politics of this century.

79.    Lost in the sea of executive orders and lock-downs were the students of New York State. Forced to learn and interact with their peers behind a screen at the behest of government officials focused solely on furthering their own political and at times religious agendas, the educational and individual rights of elementary and secondary school students in New York State were sacrificed to the pandemonium of political power and purported "science" of those obligated and sworn to protect their rights.

80.    Although Defendants herein remain steadfast that a mask mandate is necessary for light of potential exposure to the COVID-19 virus, Defendants make these baseless allegations that, when and if tried before a court of law, simply would not meet the legal standards required

---

[2] https://twitter.com/janesays22/status/1415354369126457346?lang=en

to implement such a mandate when balancing the interest of public safety with a vague and

ambiguous mandate that violates Plaintiffs' individual rights under State and federal law.

## I. DEFENDANT HOCHUL LACKS THE EXECUTIVE POWER TO IMPLEMENT A MANDATE, AS PROVIDED BY STATE LEGISLATURE.

81.   As background, on March 7, 2020, former Governor of New York State, Andrew Cuomo

("Governor Cuomo") declared a State Disaster Emergency (Executive Order 202) due to the

COVID-19 pandemic ("NYS COVID-19 Disaster Declaration").

82.   Nearly a year later, on March 5, 2021, the New York State Legislature ("N.Y.S.

Legislature") stripped Governor Cuomo of his emergency powers by:

1)   Revoking Governor Cuomo's authority to issue any new directives;

2)   Allowing the directives in place at that time to continue for another thirty (30) days; however, any new extensions or modifications of directives would require five (5) days notice to the N.Y.S. Legislature or local elected officials before that extension or modification went into effect;

3)   Requiring Governor Cuomo to respond publicly to any comments received from the N.Y.S. Legislature or local leaders if a directive was extended;

4)   Requiring Governor Cuomo to create a searchable database of all executive actions that remained in force to inform lawmakers and the public with the then-current state of the law; and

5)   Allowing the N.Y.S. Legislature to terminate a state disaster emergency by concurrent resolution.[3]

83.   When Governor Hochul took office, she did not possess any emergency powers that the

legislature had previously granted to Governor Cuomo.

84.   In a N.Y. Senate press release, Senate Leader Rob Ortt stated, "We are in a state of

recovery—not emergency—and it is time for New Yorkers to return to their daily routines

---

[3] https://www.nysenate.gov/legislation/bills/2021/s5357

and a sense of normalcy. The process has been long. Many lessons have been painful, but it

is finally time to move on."[4]

85.    At or about the same time, Carl, Heastie, Speaker of the New York State Assembly, stated:

"A year ago, as New York was being ravaged by COVID-19, we passed legislation to give the governor temporary emergency powers that would allow the state to nimbly react to a constantly evolving, deadly situation,"

"These temporary emergency powers were always meant to be that — temporary. By immediately repealing the temporary emergency powers, allowing no new directives to be issued, and bringing transparency and oversight to the standing directives, we can establish better communication and collaboration with our local communities and help preserve the health and wellbeing of New Yorkers as we see the light at the end of the tunnel of this devastating and deadly healthcare crisis."[5]

86.    Plaintiffs allege that to appreciate the gravity of Defendants' unlawful acts fully, one must

pay close attention to the "shell game" (also referred to as a thimblerig) at hand.

87.    **MARCH 2, 2021**: As set forth above, the N.Y.S. Legislature stripped Governor Cuomo of his

emergency powers, with all existing Executive Orders then-in effect to expire within thirty

(30) days of the bill's passage (S03537).

88.    **MAY 26, 2021:** By and through Executive Order 202 (dated March 7, 2021), the DOH and

PHPC enacted and/or updated 8 NYCRR 66-3.1: *Duration and Applicability*. This also

extended the regulation relative to the Governor's emergency powers and the authorization

to declare an emergency. The provision read:

"The provision of this Subpart shall apply for the duration of any state disaster emergency declared pursuant to sections 28 and 29-a of the Executive Law* related to the outbreak of COVID-19 in New York State. To the extent any provision of this Subpart becomes inconsistent with any Executive Order, the remainder of the provisions in this Subpart shall remain in effect and shall be interpreted to the maximum extent possible as consistent with such Executive Orders."

*These provisions were expressly revoked by N.Y.S. Legislature on March 5, 2021, by Bill No. S05357 (March 2, 2021).

---

[4] https://www.nysenate.gov/newsroom/press-releases/robert-g-ortt/senate-assembly-republicans-end-disaster-emergency-declaration
[5] https://nyassembly.gov/Press/?sec=story&story=95786

89.   As an emergency Order, this remained effective for ninety (90) days until August 23, 2021.

90.   **JUNE 23, 2021**: In a last-minute effort to assemble a long-term plan and perhaps alerted to

the impending future, Defendants DOH and PHPC met and "amended" 8 NYCRR 66-3.1:

*Duration and Applicability* to an entirely made-over and gutted 8 NYCRR 66-3.1: *Face*

*Coverings*.

91.   Absent from the "amended" provision was any trace of the previous regulation. The

provision now read, in pertinent part:

> Any person who is over age two and able to medically tolerate a face-covering shall
> be required to cover their nose and mouth with a mask or face-covering when in a
> public place and unable to maintain, or when not maintaining, social distance,
> unless such person is fully vaccinated, meaning two or more weeks have elapsed
> since such person received the final dose of any COVID-19 vaccine approved by
> the United States Food and Drug Administration (F.D.A.) or authorized by the
> F.D.A. for emergency use; ***provided the person is not present in a pre-***
> ***kindergarten to twelfth-grade school***, public transit, homeless shelter, correctional
> facility, nursing home, health care setting, or other settings where mask use is
> otherwise required by federal or state law or regulation.

92.   Black's Law Dictionary defines "amendment" as the correction of an error. Indeed

"amendments" do not present themselves by way of insertion of numerous paragraphs and

additional provisions *unrelated to the previous text.*

93.   Not only is this prima facie evidence of a flagrant disregard for the political and legislative

process(es), it is on its face ***unconstitutional*** and usurps the power of the legislative branch.

94.   Defendants intentionally utilized a section of the code that was expiring and simply ***re-wrote***

the section law to circumvent the legislative process of re-adoption and subjecting the matter

to the contemplation of the legislative bodies.

95.   It is important to note that Executive Orders classified as "emergency" in nature are typically

instituted for ninety (90) days before they must be re-adopted. With the "amendment" passed

on June 23, 2021, the "amended" 66-3.1: *Face Coverings* would expire August 26, 2021, as

an extension of Executive Order 202.

96.   This marks the introduction of the third shell of the "shell game"; this "amendment" for a

mask mandate (albeit implemented unlawfully) had an *exception* for students in schools and

the deception about Executive Order 202.

*97.*   **J̲U̲N̲E̲ 2̲4̲, 2̲0̲2̲1̲:** In the wake of scandal and political pressure, Governor Cuomo signs

Executive Order 210, rescinding all Executive Orders, including 202 and 205, ***effective June***

***25, 2021.***

98.   Although it remains unclear as to how these subsequent events occurred without proper

executive or legislative authority, Plaintiffs allege, upon information and belief, that the

following events occurred under the misconception that the expiration of Executive Order

202 on June 25, 2021, did not affect the validity or duration of its arterial regulations

(including 8 NYCRR 66-3.1, et seq.). Plaintiffs reiterate that this is a severe

misapprehension, but such details give insight to the larger game at hand.

99.   **A̲UGUST 2, 2021:** In response to a question whether he can issue a statewide mask mandate

Governor Cuomo stated:

> "The Legislature would have to come back, they'd have to pass a law to do that.
> So I don't have any legal authority to mandate.  The best I can do is say I strongly
> recommend that they do that."[6]

100.   **A̲UGUST 1̲2̲, 2̲0̲2̲1̲:** The "shell game" continues, and the shells begin to move. Defendant

Hochul announced her belief that masks should be worn in schools, despite the then-current

regulations allowing students to be exempt from donning a mask. She stated:

> "That's just an opinion right now. I don't have the authority to make that the policy,
> and we're gonna leave it up to the school districts . . . It's not going to be top-down.

---

[6] https://apnews.com/article/lifestyle-business-health-coronavirus-pandemic-97863fa563eadaad177e0ccba8000cb4

It's going to be much more collaborative, and I will listen to everyone before I make decisive decisions."[7] [8]

127.  **AUGUST 12, 2021**: Defendants NYS DOE, Chancellor Young, and Commissioner Rosa issued a "Health and Safety Guide for the 2021-2022 School Year,"[9] including the following instructions regarding mask mandates in schools:[10]

> "Per the CDC guidance, schools that require people to wear a mask should consider:
>
> • The ***possibility*** of reasonable accommodation[11] for individuals who are not fully vaccinated and/or who are unable to wear or have difficulty wearing certain types of masks because of a disability.
>
> • Relevant workplace safety guidelines or federal regulations." (emphasis added)
>
> *It should be noted, there is no reference to mandating masks in schools throughout the entire guidance.*

101.  On the same day, Defendants NYS DOE, Chancellor Young, and Commissioner Rosa issued a "Health and Safety Guide for the 2021-2022 School Year"[12] (hereinafter, "Health and Safety Guide" or "Guide"), including the following instructions regarding mask mandates in schools.

102.  However, the *Health and Safety Guide* sets forth a mask-mandate for those students in attendance. The *Guide* provides that:

> • Consistent and correct mask use is particularly important indoors and when physical distancing cannot be maintained in areas of high transmission of COVID-19. When teachers, staff, and students (ages 2 years and older) consistently and correctly wear a mask, they protect others as well as themselves.

---

[7] https://abc7ny.com/kathy-hochul-lt-governor-ny-gov-lieutenant/10946670/
[8] https://nypost.com/2021/08/12/ny-governor-in-waiting-kathy-hochul-wants-masks-in-schools/
[9] http://www.nysed.gov/common/nysed/files/programs/back-school/nysed-health-and-safety-guide-for-the-2021-2022-school-year.pdf
[10] Id.
[11] The hyperlink included in this guidance from CDC refers only to workplace accommodations and nothing regarding students or children: https://www.eeoc.gov/wysk/what-you-should-know-about-COVID-19-and-ada-rehabilitation-act-and-other-eeo-laws#D
[12] http://www.nysed.gov/common/nysed/files/programs/back-school/nysed-health-and-safety-guide-for-the-2021-2022-school-year.pdf.

- The C.D.C.'s Order regarding masks, issued in January 2021, requires that "[a]ll passengers on public conveyances ... traveling into, within, or out of the United States ... regardless of their vaccination status, are required to wear a mask over their nose and mouth." It applies to all forms of public transportation, including school buses. Passengers and drivers must wear a mask on school buses, including on buses operated by public and private school systems, regardless of vaccination status, subject to the exclusions and exemptions in C.D.C.'s Order.

- Masks are recommended for school events and athletics while indoors, per the C.D.C.

- The C.D.C. recommends that people who are not fully vaccinated wear a mask in crowded outdoor settings or during activities that involve sustained close contact with other people. Fully vaccinated people might choose to wear a mask in crowded outdoor settings if they or someone in their household is immunocompromised.

- The C.D.C. recommends that schools should have a sufficient supply of masks for students and staff who forget their own or need a replacement, including on buses.

- The Occupational Health and Safety Administration has established masking requirements that apply to school districts."[13]

103. Absent from the *Guide* is the authority to implement a mask mandate for students in elementary and/or secondary schools, as well as a scientific or medical basis for radically altering the previous mask mandate, enacted in the height of the pandemic, which expressly excepted children attending elementary and secondary schools.

104. Significantly, the *Guide* references a general need for masking in school and on public transportation, and recommends providing masks to students who board the bus without them.

105. The preceding occurred on the same day Defendant Hochul announced her intention to run for a full term as Governor in 2022. What may seem like a benign coincidence or innocuous happenstance was, in truth, part of a contrived scheme calculated to spark Defendant Hochul's ascension to New York's office on high – the Office of the Governor.

---

[13] Id.

106. AUGUST 18, 2021: As the number of women who came forward with credible accounts of sexual abuse and harassment at the hands of Governor Cuomo grew, so did the calls for Cuomo's resignation.

107. As Governor Cuomo descended from his post in shame, Lieutenant Governor Hochul ascended to her new position with zeal. Defendant Hochul was a politician with an agenda, like a zealot on a mission – a political, social, and religious zealot on a holy mission, to bend the masses to her will with the help of her apostles.

108. Only six days after her last public statement about the mask mandate, on August 18, 2021, Governor Hochul, while still serving as Lt. Governor, announced *she* would impose a statewide mask mandate for all schools.  In her public statements, she completely reversed herself from just a few days earlier:

> "I believe we need a mask mandate for children to go back to school," Governor Hochul told reporters following a tour of a public school in New York City. "And that will have to be universal. It will be statewide.  In a matter of days, I'll be able to say we will have mask mandates. I just don't have that authority at this time when I'm not going to overstep.  Mask mandates are something that the Department of Health has the authority to call for.  I believe that we'll need mask mandates for children to go back to schools, and that'll have to be universal, it'll be statewide."[14]

109. Defendant Hochul hoisted herself onto the scene and the political stage by seizing the conversation of the moment – she decreed that the then-current mask mandate did not go far enough. A more restrictive, all-inclusive mandate was necessary for Defendant Hochul. The key to battling the pandemic and its lingering variant was to require elementary and secondary school children to all wear masks, at all times, in all schools (public and private) without exception. Soon to be Governor, Hochul prophesized the coming of such a mandate.

---

[14] https://apnews.com/article/andrew-cuomo-health-new-york-education-coronavirus-pandemic-bd2377b3a96051e10a543881d0dbf5d3

110. ***Before even transitioning into the role of Governor***, Hochul publicly announced that she would implement a state-wide mask mandate without disclosing the scientific and/or medical basis for her decision.

111. AUGUST 18, 2021: In response to governors from various states blocking school mask mandates from being implemented in local school districts, Defendant Secretary Cardona announced in an interview in the New York Times that Defendant US DOE will "use its broad powers — including taking possible legal action — to deter states from barring universal masking in classrooms."[15]

112. Defendant Secretary Cardona stated he would ***deploy*** the Defendant US DOE's Office of Civil Rights ("OCR") to investigate states that block school mask mandates. Letters from Defendant Secretary Cardona were sent to eight states, Arizona, Florida, Iowa, Oklahoma, South Carolina, Tennessee, Texas, and Utah, admonishing the governor's efforts to ban school mask mandates and threatening legal action.[16]

113. AUGUST 24, 2021: Defendant Hochul is sworn into office and succeeds Governor Cuomo as New York's Governor.

114. Displeased with the limitations of the then-current mask mandate, the shell game began: Defendant Hochul was determined to make the then-current mask mandate more restrictive – as revised 8 NYCRR 66-3.1 contained numerous exceptions to, including students at school, is set to expire August 26, 2021.

115. Within the first fifteen hours of her ascension to the Governor's office, Defendant Hochul fulfilled her prior prophecy, now-Governor Hochul tweeted from her verified account:

> @GovKathyHochul: "Getting children back to school safely is one of my highest priorities. ***To that end, I am immediately directing the Department of Health to***

---

[15] https://www.nytimes.com/2021/08/18/us/politics/biden-masks-schools-civil-rights.html
[16] Id.

***institute universal masking for anyone entering our schools.***"[17] (August 24, 2021, at 3:51 PM).

116. On the same day, Defendant Hochul also announced that she would be utilizing federal funds to implement her mask mandate and that funds would be used to provide surgical masks to students.

117. Not only did Defendant Hochul use (and likely continues to use) federal funds to implement an unlawful and illegal mandate, but she advocates for the use of non-surgical cloth masks, which is not explicitly mentioned in her mandate.

118. The unlawful mandate requires "masks" or "face coverings" but fails to specify which face coverings are effective and which were not--or put another way, the mandate fails to provide the public with the information necessary to adhere to the mandate (i.e., surgical masks, N95 respirator, bandanas, face masks, toilet paper, etc.) and to avoid incurring the penalties set forth. *See* **Part VIII**.

119. **AUGUST 26, 2021:** Upon information and belief, Defendant PHPC assembles for a meeting. According to the publicly released minutes, the meeting was convened and adjourned without notable results.

120. Also important to note, 8 NYCRR 66-3.1: *Face Coverings* is set to expire at the stroke of midnight. As noted above, 66-3.1 bases its authority in Executive Order 202.

121. **AUGUST 27, 2021**: The repeal of 8 NYCRR 66-3.1 et seq. is effective, and 10 NYCRR 2.60 is amended to require mandatory masking.

122. On the same day, August 27, 2021, Defendant Commissioner Zucker issued his determination as follows:

---

[17] https://twitter.com/GovKathyHochul/status/1430256476895993863?s=09

"Pursuant to 10 NYCRR 2.61, I hereby issue the following determination, which includes findings of necessity, to support the face masking/covering requirements set forth below:

Findings of necessity:

. . . .

Certain settings and areas (e.g., healthcare, _schools_, and public places located in CDC-identified areas of substantial or high community transmission) pose increased challenges and urgency for controlling the spread of this disease because of the vulnerable populations served, the disproportionate percentage of individuals (e.g., children) who are not yet eligible for the COVID-19 vaccination, and/or the substantial to high levels of community transmission.

The above findings _demonstrate the necessity for the implementation of layered prevention strategies, which includes face coverings/masks_. COVID-19 spreads through respiratory droplets, and several studies have shown that appropriate face coverings/masks reduce the spray of droplets when worn correctly, fully covering one's nose and mouth . . .

### Face Covering/Masking Requirements[18]

P-12 school settings: After careful review and consideration of C.D.C. recommendations for face coverings/masks in school settings, _I hereby adopt such recommendations, imposing them as requirements_, where applicable, until this determination is modified or rescinded.[19]

Accordingly, universal masking of teachers, staff, students, and visitors to P-12 schools over age two and able to medically tolerate a face-covering/mask, regardless of vaccination status, is required until this determination is modified or rescinded. Such requirement is subject to applicable CDC-recommended exceptions.

Updates to the above referenced C.D.C. recommendations will not necessarily require the issuance of a revised or modified determination. However, such C.D.C. recommendations will be continuously monitored by the Department, and updated determinations issued, as appropriate."

123. In response to criticism of the statewide school mandate, Defendant Governor Hochul responded, "We'll take bold, dramatic action to protect individuals in the state, but

---

[18] Defendant Commissioner Zucker included the following footnote #1: "Nothing in this determination shall be interpreted as inconsistent with the Americans with Disabilities Act (ADA), workplace safety guidelines, or applicable federal regulations."

[19] Defendant Commissioner Zucker included the following footnote #2: "Guidance from American Academy of Pediatrics was also reviewed when making a face-covering/masking determinations in school settings, which is consistent with the above referenced CDC recommendations." https://www.aap.org/en/pages/2019-novel-coronavirus-COVID-19-infections/clinical-guidance/cloth-face-coverings/

particularly our children as we start schools. ***Kids are resilient. They can handle a mask on their face.*** We'll do it now, and we'll assess because there'll be parts of our state where the numbers drop, you get the vaccination nods, and we get the vaccine out to children."[20] (emphasis added)

124. **SEPTEMBER 1, 2021:** The NYS Legislature returned to Albany for an emergency session to address specific COVID-19 matters.[21]   However, to date, the NYS Legislature did not convey additional emergency powers to Defendants Governor Hochul, NYS DOH, or NYS DOE, and the NYS Legislature did not pass any law requiring children to wear masks in schools.

125. **SEPTEMBER 2, 2021**: Defendant NYS DOH issued "Interim NYS DOH Guidance for Classroom Instruction in P-12 Schools During the 2021-2022 Academic Year."[22] The guidance stated:

> "Please note that the following guidance applies to P-12 elementary and secondary, public, charter, private, and state-operated schools, including residential schools and programs serving students with disabilities, as regulated by the NYS Education Department."[23]

126. With regards to its school mask mandate, the guidance stated, "People with medical or developmental conditions that prevent them from wearing a mask ***may*** be exempted from mask requirements, as documented by a medical provider."[24] (emphasis added)

127. **SEPTEMBER 8, 2021:** Parent "Jane Doe," on behalf of her 11-year old child, filed a motion for emergency relief in the Eastern District Federal Court against the Franklin Square Union

---

[20] Id.
[21] https://www.nysenate.gov/calendar/sessions/september-01-2021/extraordinary-session-912021
[22] https://coronavirus.health.ny.gov/system/files/documents/2021/09/school-guidance.pdf
[23] Id.
[24] Id.

Free School District and New York Health Commissioner Howard Zucker. The lawsuit claimed "Sarah Doe" suffers from asthma and other serious underlying conditions.

128. Sarah's pediatrician determined it is unsafe for Sarah to wear a mask all day and wrote her a medical exemption. On September 2, the School District rejected it.[25]  According to the complaint, Jane received a call from Jared T. Bloom, the Superintendent of the School District ("Superintendent Bloom"), who stated that the district had a policy not to give any child a mask exemption. Jane called Defendant NYS DOH and the Nassau County local health department, and both confirmed that they do not have a policy of reviewing or denying mask exemption requests.[26]

129. As an administrative agency, Defendant NYS DOH does not have the authority to write its own legislation on a clean slate, creating its own comprehensive set of rules without the benefit of legislative guidance. *See Matter of Vapor Tech. Assn. v. Cuomo*, 66 Misc 3d 800, 807 [Sup. Ct., Albany County 2020].[27]

130. Subsequently, Defendant NYC DOE issued its policy[28] for the 2021-2022 school year:

> "All students and staff must wear a face covering when riding on school buses and anywhere on school property, indoors and outdoors, regardless of vaccination status, unless they have a medical exemption. Students who are not medically able to tolerate masks will be provided with alternative accommodations."[29]

131. However, there are no clear guidelines to describe what a "medical exemption" means or the process for which parents can secure a "medical exemption" for their child, or what

---

[25] https://www.newsday.com/long-island/education/school-mask-mandate-lawsuit-franklin-square-1.50355384
[26] https://childrenshealthdefense.org/wp-content/uploads/Dkt-1-2021-9-7-Complaint.pdf
[27] No provision of PHL §§ 201, 206, and/or 225 provides statutory authority for the school mask mandate contained in 10 NYCRR § 2.60 and/or in the Commissioner's Guidance.
[28] https://www.silive.com/coronavirus/2021/08/nyc-releases-guidelines-for-2021-2022-school-year-10-things-you-need-to-know.html
[29] https://www.schools.nyc.gov/school-life/health-and-wellness/covid-information/health-and-safety-in-our-schools

constitutes "medically able to tolerate masks." There is also no explanation of what "alternative accommodations" will be provided.[31]

132. For those students who do not receive a "medical exemption" but are unable to "respond to a positive intervention plan" to wear a mask throughout the entire school day, they will be "transitioned to remote learning," i.e., kicked out of in-person learning.[32]

133. **SEPTEMBER 12, 2021:** Governor Hochul delivered a sermon at Abyssinian Baptist Church in Harlem, where she made her first appearance as the Prophet – of all things COVID. She told the congregation to be her "apostles" and spread the "good word" about masks and vaccines. Defendant Hochul's sermon is further explored below in **Part II**.

134. **SEPTEMBER 15, 2021:** Upon information and belief, Defendants DOH and PHPC convened a meeting to discuss the then-expired 8 NYCRR 66-3.1: Face Coverings provision. Following the meeting 10 NYCRR 2.60: *Face Coverings for COVID-19 Prevention* was newly minted.

135. Upon information and belief, Defendants rescinded 8 NYCRR 66-3.1 et seq., but retroactively dated its repeal to August 27, 2021.

136. Plaintiffs make these allegations upon information and belief, and a review of the history of the regulations on Westlaw and otherwise, as there are no notices, agendas, minutes, or evidence of the meeting, except as Plaintiff claims herein.

137. Defendants' failure to post the documents mentioned above on the State's website for the public to view violated state rules and regulations and further illustrates Defendants' deceitful acts and attempts to conceal their illicit behavior.

---

[31] https://www.schools.nyc.gov/about-us/messages-for-families
[32] Id.

138. The result was precarious: following the meeting, 10 NYCRR 2.60: *Face Coverings for COVID-19 Prevention* was amended to include a ***mandatory mask*** provision, with virtually no exceptions. Students in all elementary and secondary schools would now be required to wear masks in the classrooms, the hallways, on buses, and elsewhere.

139. Although 10 NYCRR 2.60 was amended at a meeting held on September 15, 2021 (the same meeting at which 8 NYCRR 66-3.1, et seq. was repealed), ***it became effective retroactively on August 27, 2021*** – not coincidentally, the minute following the expiry of the 66-3.1: *Face Masks* amendment on August 26, 2021.

140. Defendants' were committed to their cause and would not let the rules, the law, or science stand in their way.

141. Defendant Hochul did not have the legislative support to get mask mandate through the legislature, and she lacked the lawful authority to create, amend, or alter an existing regulation or rule.

142. Even if Defendant Hochul could enact a new regulation creating a more restrictive mask mandate, there was a problem. Enacting a new mask mandate would result in two statutory mask mandates – 10 NYCRR 2.60 and 8 NYCRR 66-3.1), with the same subject matter requiring entirely different mandates in effect on the same day. Accordingly, Defendants "did the best they could" and implemented the new amendment on the back of the dying one in an attempt to breathe new life into the provision set to expire at midnight, August 26, 2021.

143. It is clear that to further Governor Hochul's mask mandate, Defendants created the perception that Executive Order 202 was in effect beyond June 25, 2021 – the day Executive Order 202 was rescinded by Governor Cuomo under Executive Order 210.

144.   Accordingly, Defendants made excruciating efforts, including unlawful amendments, secret meetings, and otherwise, to implement the political (and religious) agenda of Defendant Governor Hochul relating to the mask mandate.

128.   **SEPTEMBER 21, 2021:** US DOE OCR launched an investigation into Texas's ban on schools' mask mandates.  This comes three weeks after Defendant US DOE OCR opened investigations into Iowa, Oklahoma, South Carolina, Tennessee, and Utah.[33]

129.   **SEPTEMBER 23, 2021:** The U.S. Department of Education[34] awarded its first Project to Support America's Families and Educators (Project SAFE) grant in the amount of $147,719 to a Florida school district after the state withheld funding because the district imposed a mask mandate, part of a broader effort by the federal government to fight state-level bans on school mask orders. Project SAFE was announced in early September to provide federal funds to schools that have had funding withheld or been financially penalized for imposing Covid-19 mitigation measures like mask mandates.[35]

130.   **SEPTEMBER 30, 2021:** Defendant Secretary Cardona refused to acknowledge that parents should be the "primary" stakeholders in their children's education during the Senate Committee on Health, Education, Labor, and Pensions hearing.[36]

## II.   DEFENDANT HOCHUL'S VIOLATIONS OF THE ESTABLISHMENT CLAUSE

145.   Clearly, the underhanded implementation of the state-wide mask mandate was not enough for Defendant Hochul. To enforce the mandate and gain public favor, Defendant Hochul

---

[33] https://www.dallasnews.com/news/education/2021/09/21/federal-government-opens-investigation-into-texas-mask-mandate-ban-in-schools/
[34] https://www.ed.gov/news/press-releases/us-department-education-awards-project-safe-funds-florida-school-district-following-state-imposed-penalty-implementing-covid-19-safety-measures
[35] https://www.forbes.com/sites/alisondurkee/2021/09/23/biden-administration-doles-out-money-to-florida-schools-penalized-for-imposing-mask-mandates-against-state-rules/?sh=5d7f724a5466
[36] https://www.dailywire.com/news/biden-education-secretary-dodges-when-asked-if-parents-should-be-primary-stakeholder-of-childs-education

delivered a sermon at Abyssinian Baptist Church in Harlem, New York, on September 12, 2021, where she preached:

> "Throughout the whole experience of the pandemic, a lot of people prayed to God. . . He inspired the smartest scientists and doctors, and researchers to create a vaccine. God gave us that through men and women so we could be delivered from this pandemic. . . *And all of you have to be not be just true believers, but our apostles to go out there and spread the word that we can get this out once and for all if everyone gets vaccinated*." (emphasis added).[37]

146. In addition to abusing the authority of her position to solicit and recruit her "apostles" to further her cause and religious-like ideology, Defendant Hochul obfuscates the fine line that separates Church and State.

147. Defendant Hochul has launched an all-out holy war, of sorts, against COVID-19 and those who choose not to get vaccinated or wear a mask at all times in all places.

148. Defendant Hochul has used the power of the Governor's Office and the Executive Branch to create and impose an unduly burdensome and overly restrictive mask mandate on virtually everyone in the State of New York, without any recognized exception.

149. In order to enforce her mask and vaccine mandates, Defendant Hochul has taken to Churches and other houses of worship throughout the state, where, from the height of each pulpit, she enlists the help and assistance of the congregations' members, as **her Apostles**, to impose and enforce her mandates on those who have not yet complied.

150. Astonishingly, Governor Hochul *again* preaches from the pulpit, but this time at the Christian Cultural Center in Brooklyn, New York, on September 26, 2021.

151. She preaches, in pertinent part:

> "We are not through the pandemic. I wished we were but I prayed a lot to God during this time and you know what—God did answer our prayers. He made the smartest men and women, the scientists, the doctors, the researchers—he made

---

[37] https://www.governor.ny.gov/news/video-audio-photos-rush-transcript-governor-hochul-attends-services-abyssinian-baptist-church.

them come up with a vaccine. That is from God to us and we must say thank you, God. Thank you. And I wear my 'vaccinated' necklace all the time to say I'm vaccinated. *All of you, yes, I know you're vaccinated, you're the smart ones, but you know there's people out there who aren't listening to God and what God wants. You know who they are.*

*I need you to be my apostles.* I need you to go out and talk about it and say, we owe this to each other . . ."[38] (emphasis added).

152.   This is a clear violation of the Establishment Clause of the Constitution, which provides that there must be a separation between Church and State, as further discussed below, and violates the Supreme Court's holding in *Lynch v. Donnelly* (1984).[39]

153.   In Justice O'Connor's opinion, she opens with the following:

"The Establishment Clause prohibits the government from making adherence to a religion relevant in any way to a person's standing in the political community. Government can run afoul of that prohibition in two principal ways. One is excessive entanglement with religious institutions, which may interfere with the independence of the institutions, give the institutions access to the government or governmental powers not fully shared by non-adherents of the religion, and foster the creation of political constituencies defined along religious lines. [citation omitted]. The second and more direct infringement is government endorsement or disapproval of a religion. *Endorsement sends a message to non-adherents that they are outsiders, not full members of the political community, and in an accompanying message to adherents that they are insiders, favored members of the political community*."[40] *Lynch*, 465 U.S. 668 (1984) (emphasis added).

154.   In utilizing her official position of Governor to essentially "preach" to those she deems her "apostles," Defendant Hochul has violated the Establishment Clause. By framing the relief efforts of the COVID-19 pandemic as an "act of God" and urging congregation members to be her "apostles" to further her bidding, Defendant Hochul essentially "entangles" the two, endorsing the message that those congregation members willing to follow her principles are

---

[38]   https://www.governor.ny.gov/news/rush-transcript-governor-hochul-attends-service-christian-cultural-center
[39]   *Lynch v. Donnelly*, 465 U.S. 668, 104 S. Ct. 1355, 79 L. Ed. 2d 604 (1984).
[40]   *Id.*, citing *Larkin v. Grendel's Den, Inc.*, 459 U.S. 116, 103 S. Ct. 505, 74 L. Ed. 2d 297 (1982) and *Sch. Dist. of Abington Twp., Pa. v. Schempp*, 374 U.S. 203, 83 S. Ct. 1560, 10 L. Ed. 2d 844 (1963).

the adherents and "insiders," while those who remain skeptical of the contradictory guidance set forth (further described herein) by Dr. Fauci remain as "outsiders."

155. Even more disconcerting, Defendant Governor Hochul essentially calls upon her "apostles" to seek out and confront those not sharing in the same view, which borderlines incitement of possible violence, as well as a *clear* violation C.F.R. §2635.702 (Use of public office for private gain).

156. As set forth by C.F.R. §2635.702(c): "[a]n employee shall not use or permit the use of [her] Government position or title or any authority associated with his public office to endorse any product, service or enterprise except:

   (1)   In furtherance of statutory authority to promote products, services, or enterprises; or

   (2)   As a result of documentation of compliance with agency requirements or standards…"

157. Plaintiffs assert that Defendant Governor Hochul lacked the authority to utilize her public office in this way or, alternatively, lacked the authority to endorse the above messages in a non-secular venue. Plaintiffs also allege that utilizing a public office in this way is an abuse of power that offends the Constitution and the very spirit of this nation.

158. This abuse of authority is unlawful under the color of the Constitution, federal law, state law, and the previous holdings of the Supreme Court, including *Marsh v. Chambers*.[41]

---

[41] *Marsh v. Chambers*, 463 U.S. 783, 103 S. Ct. 3330, 77 L. Ed. 2d 1019 (1983) (promoting a particular religious expression).

### III.  THE MASK MANDATE EXCEEDS THE EXECUTIVE POWERS OF THE GOVERNOR AND THE EXECUTIVE AGENCIES SHE OVERSEES, INCLUDING THE DEPARTMENT OF HEALTH (DOH) AND THE N.Y.S. PUBLIC HEALTH AND PLANNING COUNCIL (PHPC)

159.  As set forth above, on June 23, 2021, the eve of the expiry of the NYS COVID-19 Disaster Declaration, Defendant NYS DOH, through Defendant NYS PHPC[42], amended its emergency regulations dealing with mask mandates as noted in 10 NYCRR § 66-3.1 (a).

160.  In accordance with N.Y.S. Public Health Law §201(1)(s), the N.Y.S. Department of Health ("DOH") "administer[s] to the medical and health needs of the ambulant sick and needy Indians on reservations", in addition to "supervising the work and activities of the local boards of health and health officers throughout the state, unless otherwise provided by law." N.Y.S. Public Health Law §201(a).

161.  Accordingly, the DOH is an executive agency of the State of New York and is under the management and control of the executive branch, managed by Governor Hochul.

162.  The NYS PHPC is governed by N.Y.S. Public Health Law, Chapter 45, Article 2, Title 2, and is an executive agency of the State of New York, under the management and control of the executive branch, headed by Governor Hochul.

163.  Accordingly, §224-b of the N.Y.S. Public Health Law sets forth the duties of the PHPC as follows:

> "The public health and planning council shall have such powers and duties as are set forth in this chapter, including the consideration of applications for the establishment and construction of health care facilities, home care agencies and hospices licensed under articles twenty-eight, thirty-six or forty of this chapter. In carrying out its powers and duties, the council shall take into account the impact of its actions and recommendations on the quality, accessibility, efficiency and cost-effectiveness of health care throughout the state. The council shall undertake a comprehensive review of regulations and council procedures governing the establishment and construction of such health care facilities, home care agencies

---

[42] These regulations were challenged in an Article 78 petition filed on June 29, 2021, in New York State Supreme Court, see *Blenker et al. v. State of New York et al., Index No. 905504-21*, and NYS DOH responded by claiming the updated regulations were "under review."

<u>and hospices and shall submit to the commissioner any recommendations for the
revisions of such regulations</u>." (emphasis added).

164.  N.Y.S. Public Health Law §224-b makes no reference to legislative abilities or actions the
      PHPC may take.

165.  More importantly, as set forth by the Public Health Law: "The public health and health
      planning council *<u>shall have no executive, administrative or appointive duties except as
      otherwise provided by law</u>*." N.Y.S. Public Health Law §225(3) (emphasis added).

166.  However, the PHPC does have the ability by the "affirmative vote of the majority of its
      members to establish, and from time to time, amend and repeal *<u>sanitary regulations</u>*, to be
      known as the sanitary code of the state of New York, <u>subject to approval by the
      commissioner</u>." N.Y.S. Public Health Law §225(4) (emphasis added).

167.  The New York State Health Commissioner, Dr. Howard Zucker ("Commissioner Zucker")
      has held this position since being appointed in 2015.

168.  Following Governor's Hochul's announcement that federal funding would be utilized for
      COVID-19 testing and masks in schools, but before the executive passing of the mask
      mandate, Commissioner Zucker released the following foreshadowing statement:

      "Based on incidence and prevalence, ***our findings demonstrate the necessity of
      layered prevention strategies, including this mask requirement.*** While a simple
      measure of prevention, requiring masks now is crucial for protecting the health of
      our children and ensuring we can get our students back in their schools this fall." [43]
      (emphasis added).

169.  Coincidentally, this announcement by Commissioner Zucker was three days before the NYS
      PHPC voted to implement the mask mandate.

---

[43] Id.

170. In enacting 10 NYCRR § 2.60, Defendant NYS DOH has unlawfully given one person, Defendant Commissioner Zucker, a member of its own administrative agency, the sole authority and power to dictate a mask mandate to millions of children, school staff, family members, and others who visit a P-12 school—an authority that it simply does not have. Thereafter, Defendant Commissioner Zucker delegates the details to the ever-vacillating Dr. Fauci.[44]

171. However, this is not the only state official seizing the opportunity to expand on the breadth of authority within their position. Secretary Cardona, when defending his stance on the mask mandate, refused to acknowledge that parents should be the "primary" stakeholders in their children's education during the September 30, 2021 hearing before the Senate Committee on Health, Education, Labor, and Pensions, despite the numerous case law, statutes, and regulations that set forth the rights of parents as stakeholders in their child's education.[45]

172. When asked about parents expressing anger and frustration at local school board meetings over mask mandates and the Critical Race Theory curriculum, Cardona attributed these expressions as "…a proxy for being mad that their guy didn't win."[46]

173. Once again, the state officials of New York attempt to frame the COVID-19 pandemic as a political issue, as opposed to a health issue involving one's autonomy, further sundering the public and chilling the speech of those "non-adherents" skeptical of the contradictory guidance.

---

[44] Defendant NYS DOH cites Public Health Law ("PHL") § 206 as the legal basis for delegation of its power to Defendant Commissioner Zucker; however, the statute does not authorize Defendant NYS DOH to convey its power to a single member of its agency. Additionally, relying on § 206 also contradicts the Constitutional separation of powers doctrine since the NYS Legislature has not passed any law providing such all-encompassing authority.
[45] https://www.theepochtimes.com/education-secretary-miguel-cardona-wont-say-parents-are-primary-stakeholders-in-childrens-education_4027466.html
[46]     https://www.help.senate.gov/hearings/school-reopening-during-covid-19-supporting-students-educators-and-families.

174. Additionally, New York State Commissioner of Education Dr. Betty A. Rosa released the

following statement:

> "With the increase in COVID variant cases around the state, Governor Hochul's
> action, ***taken after consultation with educators***, demonstrates her commitment to
> the health and wellbeing of our students and the importance of keeping our schools
> open. The State Education Department supports a consistent application of masking
> requirements in schools, easing the return to school with a common line of defense
> against the spread of the COVID variant."[47] (emphasis added).

175. Indeed, Commissioner Rosa's public statement confirms that the decision for the mask

mandate was not rooted in "science" as originally claimed, but in the preference of

unspecified "educators" who lack the knowledge and expertise to recommend such

restrictive measures, despite public claims.

A. THE DOH AND PHPC ARE EXECUTIVE AGENCIES AND LACKED LEGISLATIVE AUTHORITY
TO AMEND STATE LAW

176. Upon information and belief, on June 23, 2021, upon the expiry of Governor Cuomo's

Executive Order pertaining to the COVID-19 Emergency, the DOH, and PHPC, at the behest

of Governor Hochul, amended 10 NYCRR 66, entitled *Immunizations and Communicable*

*Diseases: Emergency Regulations* to implement §66-3.2, which mandates "face coverings."

177. However, §66-3.1 sets forth: "The provision of this Subpart shall apply for the duration of

any state disaster emergency declared pursuant to sections 28 and 29-a of the Executive Law

related to the outbreak of COVID-19 in New York State."

178. Not only have the DOH and PHPC usurped the power of the N.Y.S. Legislature, both

executive agencies enacted a law based on sections of the N.Y.S. Executive Law that relate

to the Governor's Emergency Executive Powers (sections 28 and 29-a), which were

---

[47] Id.

previously stripped from the Governor by the N.Y.S. Legislature through the passing of Legislature Bill No. S05357 on March 2, 2021.

179.  Additionally, even if the DOH and PHPC embodied legislative abilities, both agencies failed to follow the procedure set forth by law to amend and enact the purported legislation through an Open Meeting.

180.  The proposed amendment to 10 NYCRR 66-3.1 et seq. was not advertised as required by the Open Meetings law, nor was an agenda/minutes generated or made available to the public before its amendment, nor were minutes or a final agenda posted after the meeting.

181.  On August 24, 2021, Governor Hochul issued Executive Order No. 1, continuing the previous Executive Orders to remain in effect.[48] Governor Hochul did not and has not issued an Executive Order declaring a State Disaster Emergency related to COVID-19, which had previously expired on June 25, 2021.

182.  As set forth above, on August 26, 2021, Defendant NYS DOH, through NYS PHPC, held an emergency meeting[49] to discuss the NYS PHPC's Codes, Regulation, and Legislation Committee to approve of a Notice of Emergency Adoption[50] and recommend it to the NYS PHPC Full Council Committee which held its meeting immediately following to approve and adopt the Notice of Emergency Adoption.[51]

183.  On the same day, Defendant NYS DOH through NYS PHPC filed a Notice of Emergency Adoption with the New York Secretary of State regarding "Prevention of COVID-19

---

[48]  https://www.governor.ny.gov/news/no-1-review-continuation-and-expiration-prior-executive-orders
[49]  https://www.health.ny.gov/facilities/public_health_and_health_planning_council/meetings/2021-08-26/
[50]  https://www.health.ny.gov/facilities/public_health_and_health_planning_council/meetings/2021-08-26/docs/codes_committee_agenda.pdf
[51]  https://www.health.ny.gov/facilities/public_health_and_health_planning_council/meetings/2021-08-26/docs/full_council_agenda.pdf

Transmission."[52] A true and accurate copy of said Notice of Adoption is annexed hereto as **EXHIBIT 4.**

184. Even though there is no record of a NYS PHPC meeting on August 27, 2021 discussing the proposed amendment to the regulations mentioned above, Defendant NYS DOH's documents state that on August 27, 2021, Defendant NYS DOH, through NYS PHPC, filed a Notice of Emergency Adoption with the New York State Secretary of State to repeal 10 NYCRR § 66-3 and § 2.60 and replace them with a new 10 NYCRR § 2.60.[53]  A true and accurate copy of said Notice of Emergency Adoption is annexed hereto as **EXHIBIT 5**.

185. There is no record of NYS PHPC even considering this Notice of Emergency Adoption.

186. Though the Notice was drafted and filed as a result of the September 15, 2021 meeting, the repeal of 10 NYCRR 66-3.1 et seq. _and_ the revised 2.60 provision were backdated to be effective August 27, 2021. The reasoning for this is clear: backdating the effective dates of the regulations gives the appearance that they were a product of the meeting conducted on August 26, 2021, and were made effective the next day.

187. This not only attempts to conceal the deceptive conduct but allowed Defendants to essentially "reach back" and root the regulation in the last hours of the ninety (90) day implementation of Executive Order 210, which rescinded all previous emergency Executive Orders, including 202 and 205, to bestow power upon the DOH Commissioner, Defendant Zucker, to enact the mandatory mask mandate in schools single-handedly, and impose punishment and penalties upon the non-adherents.

---

[52] https://regs.health.ny.gov/sites/default/files/pdf/emergency_regulations/Prevention%20of%20COVID-19%20Transmission%20by%20Covered%20Entities.pdf
[53] https://regs.health.ny.gov/sites/default/files/pdf/emergency_regulations/Face%20Coverings%20for%20COVID%2019%20Prevention.pdf

188. Enacting the amendment to 10 NYCRR 2.60 underscores Defendants' intention to continue their conduct indefinitely. For instance, the amended 10 NYCRR § 2.60 (a) reads:

> "*As determined by the Commissioner* based on COVID-19 incidence and prevalence, as well as any other public health and/or clinical risk factors related to COVID-19 disease spread, any person who is over age two and able to medically tolerate a face-covering may be required to cover their nose and mouth with a mask or face-covering when: (1) in a public place and unable to maintain, or when not maintaining, social distance; or (2) in certain settings as determined by the Commissioner, which may include schools, public transit, homeless shelters, correctional facilities, nursing homes, and health care settings, and which may distinguish between individuals who are vaccinated against COVID-19 and those that are not vaccinated. *The Commissioner shall issue findings regarding the necessity of face-covering requirements at the time such requirements are announced.*"[54] (emphasis added)

189. With 8 NYCRR 66-3.1 et seq. repealed, the new 10 NYCRR 2.60 empowers Defendant Commissioner Zucker to implement regulations with consequential monetary penalties for failing to adhere to same ($1,000 per violation), in a nature patently inconsistent with the intentions of N.Y.S. Legislature to push forward Defendant Governor Hochul's political agenda for her 2022 campaign and/or her religious agendas.

190. Once again, the regulation was ambiguous on its face as to what kind of mask would enable members of the public to achieve compliance with the regulations. For instance, 10 NYCRR § 2.60 (e) stated:

> "For purposes of this section, face-coverings shall include, but are not limited to, cloth masks, surgical masks, and N-95 respirators that are worn to completely cover a person's nose and mouth."[55]

191. New York State's rulemaking procedures, including provisions for notice, comments, public participation, and transparency, are outlined by the State Administrative Procedure Act §§ 201-207.

---

[54] Id.
[55] Id.

192. State Administrative Act § 202(6) outlines the specific and strict procedures for emergency adoption of regulations on an expedited basis to prevent the abuse of the process.

193. Specifically, Defendant NYS DOH through NYS PHPC attempted to use State Administrative Act § 202(6)(a) to enact the updated mask mandates (10 NYCRR § 2.60) as an emergency, which states:

> "[i]f an agency finds that the immediate adoption of a rule is necessary for preservation of the public health, safety or general welfare and that compliance with the [non-emergency rulemaking] requirements of subdivision one of this section would be contrary to the public interest, the agency may dispense with all or part of such requirements and adopt the rule on an emergency basis."

194. The August 26, 2021, Notice of Emergency Adoption filed by Defendant NYS DOH failed to contain the findings required by State Administrative Act § 202(6)(a) since it did not include any explicit statements regarding the factors outlined in the regulation nor any statements with specificity. The only sentence included in the Emergency Justification section of the notice states, "Accordingly, pursuant to the State Administrative Procedure Act Section 202(6), a delay in the issuance of these emergency regulations would be contrary to public interest." The August 27, 2021, Notice of Emergency Adoption contained the same flaws.

195. Defendant NYS DOH failed to comply with State Administrative Act § 202(6)(d), specifically, § 202(6)(d)(iv), which requires more than conclusory findings and not the boilerplate and inaccurate statements regarding the current situation in New York State.[56] It specifically requires "[a] statement fully describing the specific reasons for such findings

---

[56] An example of the inaccurate statement in the Emergency Justification states that "New York State first identified cases on March 1, 2020, and has since become the national epicenter of the outbreak," which is outdated by more than a year.

and the facts and circumstances on which such findings are based," including, "at a minimum:

> a description of the nature and, if applicable, location of the public health, safety or general welfare need requiring adoption of the rule on an emergency basis; a description of the cause, consequences, and expected duration of such need; an explanation of why compliance with the requirements of subdivision one of this section would be contrary to the public interest; and an explanation of why the current circumstance necessitates that the public and interested parties be given less than the minimum period for notice and comment provided for in subdivision one of this section."

196. The Emergency Justification relies on the NYS COVID-19 Disaster Declaration that expired on June 24, 2021.   Assuming *arguendo* that the Disaster Declaration did not expire, the N.Y.S. Legislature's revocation of the governor's sweeping executive powers in March 2021 would not have permitted this new regulation, as Governor Cuomo and Governor Hochul previously publicly acknowledged.

197. Defendants NYS DOH and NYS DOE were already found to have established arbitrary and capricious rules regarding COVID-19 and school mandates.   In *Hensley v Williamsville Cent. Sch. Dist.* 2021 N.Y. Slip Op 21153 Decided on May 20, 2021, Supreme Court, Erie County, Judge Emilio Colaiacovo recognized Courts around the country were dealing with similar legal challenges when States were adopting "rigid and inflexible standards that are used to measure whether children should attend school full-time." Judge Colaiacovo cited California Superior Judge Cynthia A. Freeland, who acknowledged the "State agencies … compelling interest in preventing the spread of COVID-19", however, the Court found "the framework permitting a return to in-person instruction provided was 'selective in its applicability, vague in its terms and arbitrary in its prescription'." *A.A. et al. v. Gavin Newsom*, (Superior Court, County of San Diego, Case No. 37-2021-00007536), p. 9.  Judge Colaiacovo further highlighted, "Judge Freeland concluded that the State failed to submit

specific, admissible evidence in support of its contention that elementary school students are not similarly situated with middle and high school students. Further, she found that the State failed to offer any admissible evidence to justify that disparate treatment of elementary schools and secondary schools serves the purpose of slowing the spread of COVID-19." Judge Colaiacovo determined Defendants NYS DOH and NYS DOE's insistence to defend regulations dealing with social distancing between elementary and secondary school students had "no rational basis." Thus, Judge Colaiacovo invalidated such regulations.[57]

198.   By enacting 10 NYCRR § 2.60 and bypassing legislative oversight, Defendant NYS DOH has unlawfully given one person, Defendant Commissioner Zucker, who is part of its own administrative agency, the sole authority and power to dictate a mask mandate to millions of children, school staff, family members and others who visit a P-12 school.   Thereafter, Defendant Commissioner Zucker delegates the details to an unaccountable CDC.[58]

199.   The repercussions of this unchecked power are endless. For example, on August 17, 2021, the Locust Valley School Board in Long Island, New York, voted to allow parents to decide whether their child would wear a mask to school.  On August 31, 2021, the Locust Valley School Board voted to reaffirm the mask-optional policy.[59] [60]However, immediately after the local school board's decision, Defendant Commissioner Rosa sent a threatening letter to Locust Valley School Board President Brian Nolan.

---

[57] https://law.justia.com/cases/new-york/other-courts/2021/2021-ny-slip-op-21153.html
[58] Defendant NYS DOH cites Public Health Law ("PHL") § 206 as the legal basis for delegation of its power to Defendant Commissioner Zucker; however, the statute does not authorize Defendant NYS DOH to convey its power to a single member of its agency. Relying on § 206 also contradicts the Constitutional separation of powers doctrine since the NYS Legislature has not passed any law providing such all-encompassing authority.
[59] https://abc7ny.com/health/li-school-board-votes-in-favor-of-mandatory-mask-policy/10991188/
[60] https://www.liherald.com/stories/locust-valley-board-of-education-vote-to-defy-mask-wearing-mandate,134393

200. On September 1, 2021, the Locust Valley School Board met again and read the letter from the New York State Education Commissioner, Defendant Commissioner Rosa. The letter said:

> "It is my expectation that the Board will set an example for its students by following the law. If not, however, you have been fairly warned of the potential consequences. School officers take an oath to obey all legal requirements, not just those which they deem expedient. Absent change in the board's position . . . the Department of Health and the Nassau County Department of Health will not hesitate to enforce the provisions of the public health law . . . which includes the assessment of civil and criminal penalties." <u>A willful violation would result in Nolan's removal from office and the withholding of state aid from the district.</u>" (emphasis added).

201. Locust Valley School Board Vice President Margaret Marchand asked the district's attorney, Edward McCarthy, if there were any way to determine when the mask mandate would end. Mr. McCarthy stated the current mandate is in effect for 90 days but, "They offer no metric, no date, no science. How will the Department of Health operate for the next 90 days, and what happens after that?" The Locust Valley School Board reversed its position from the previous day and voted to abide by the mask mandate, with Ms. Marchand voting against the mask mandate.[61]

202. The mandate, coupled with severe monetary penalties and threats to cut funding, are a clear abuse and overstep of the executive branch.

203. The underlying theme of *Boreali v. Axelrod*[62] could not ring truer: "an administrative agency exceeds its authority when it makes difficult choices between public policy ends, rather than find[ing] a means to an end chosen by Legislature."[63]

---

[61]  https://www.liherald.com/oysterbay/stories/lv-schools-will-abide-by-state-mandate,134479
[62]  *Boreali v. Axelrod*, 71 N.Y.2d 1, 517 N.E.2d 1350 (1987).
[63]  *Id. See also, New York Statewide Coal. of Hisp. Chambers of Com. v. New York City Dep't of Health & Mental Hygiene*, 23 N.Y.3d 681, 700, 16 N.E.3d 538 (2014).

204. It is also well-founded that "[a]gencies [such as the DOH and PHPC], as creatures of Legislature, act pursuant to specific grants of authority conferred by their creator." *Campagna v. Shaffer*, 73 N.Y.2d 237, 242, 536 N.E.2d 368 (1989).

205. "Thus, a legislature may enact a general statute that reflects its policy choice and grants authority to an executive agency to adopt and enforce regulations that expand upon the statutory text by *filling in details* consistent with that enabling legislation." *LeadingAge New York, Inc. v. Shah*, 32 N.Y.3d 249, 260, 114 N.E.3d 1032 (2018) (emphasis added).

206. However, "if an agency promulgates a rule beyond the power it was granted by the legislature, it usurps the legislative role and violates the doctrine of separation of powers." *Id.*

207. Although Defendants may argue they are within their right to promulgate such laws, in *Matter of Levine v. Whalen*, the Court of Appeals held that "[b]ecause of the constitutional provision that '[t]he legislature power of this State shall be vested in the Senate and the Assembly' (N.Y. Const. art. III, § 1), the Legislature cannot pass on its law-making functions to other bodies . . . but there is no constitutional prohibition against the delegation of power, with *reasonable safeguards and standards*, to an agency or commission to administer the law as enacted by the Legislature.'" Id. (emphasis added).

208. As Defendants DOH and PHPC are, by statutory definition, agencies within the executive branch, Defendants DOH and PHPC lack the authority, by express legislative prohibition, to enact said regulations.

## IV.  NEW YORK CITY MASK MANDATE

209. In February 2021, Defendants NYC DOE and NYC DOH published a study conducted during eight weeks between October 9, 2020, and December 18, 2020, measuring the prevalence of COVID-19 infection rates within the New York City public school system and

the community at large. The results demonstrated that in-person learning in school was not associated with an increase in COVID-19 transmission[64], and in half of the period measured, the prevalence was lower in schools than in the community.  In other words, this study affirmed that schools were generally safer from COVID-19 for students and staff than being in the community, and that was before the availability of the COVID-19 vaccination.[65]

210.   From June through July 2021, after the CDC announced it was revising its COVID-19 guidance stating that vaccinated students and teachers can attend school without a mask and Defendant NYS DOH removed the mask requirement in schools[66], Defendant NYC DOE[67] and Defendant Mayor de Blasio stated that all New York City public schools would require a universal mask mandate for all students and staff in school, regardless of vaccination status.[68]

211.   In *Restaurant Owners Association Rescue, et al. v. DeBlasio, et al.*, Judge Colon held that:

"[T]his Court recognizes a State's authority encompasses those limited and enumerated powers pertaining the government to protect the rights of the people— which *may* include reasonable steps to protect their health and welfare. *However, this Court knows of no common law power in New York State granting an individual acting in the capacity as the local Executive branch the "authority" to "protect the public in the event of an emergency."* Index No. 85155/2021, Decision and Order (dated September 10, 2021), p. 5.

212.   After exploring the many acts of authority that the Mayor possesses, Judge Colon notes that,

"[t]he current pandemic status, despite its worldwide impact, does not seem to meet the first element necessary to declare a state of emergency under the quoted language of New York City's code ("an act of violence or a flagrant and substantial defiance of or resistance of a lawful exercise of public authority . . .). *Id.* P. 6-7.

---

[64] The study showed transmission within schools was not common.
https://pediatrics.aappublications.org/content/147/5/e2021050605
[65] Id.
[66] https://www.politico.com/states/new-york/newsletters/weekly-new-york-education/2021/06/07/new-york-scraps-school-masking-mandate-344698
[67] https://ny.chalkbeat.org/2021/6/4/22519516/school-mask-mandate-lifted-new-york-city
[68] https://nypost.com/2021/07/12/nyc-to-uphold-school-mask-requirement-despite-new-cdc-guidance/

213. On July 13, 2021, the current Brooklyn Borough President and Democratic-nominee for Mayor of New York City, Eric Adams,[69] was asked, "Do you agree with de Blasio's decision to keep a mask mandate for all students, even those above the age of 12?"  His response,

> "No, I do not. *I believe what we must do is follow the science*. If the CDC states that we don't need masks and we don't have to wear them, that's fine. But let's always give people the option. Because there's a level of comfortability that we should look at. Like, I still wear my mask when I'm in certain locations because I believe it's crowded and I feel comfortable in doing so. So, let's not take away that comfortability."[70] (emphasis added)

214. Subsequently, Defendant NYC DOE issued its policy[71] for the 2021-2022 school year, "All students and staff must wear a face covering when riding on school buses and anywhere on school property, indoors and outdoors, regardless of vaccination status, unless they have a medical exemption. Students who are not medically able to tolerate masks will be provided with alternative accommodations."[72]

215. However, there are no clear guidelines to describe what a "medical exemption" means or the process for which parents can secure a "medical exemption" for their child, or what constitutes "medically able to tolerate masks."   There is also no explanation of what "alternative accommodations" will be provided.[73]

216. For those students who do not receive a "medical exemption" but are unable to "respond to a positive intervention plan" to wear a mask throughout the entire school day, they will be "transitioned to remote learning," i.e., kicked out of in-person learning.[74]

---

[69] Mr. Adams is the likely next Mayor of New York City and would sworn into office in January 2022. See https://www.reuters.com/world/us/new-results-expected-new-york-citys-democratic-mayoral-race-2021-07-06/
[70] https://satrnnews.com/eric-adams-disagrees-with-de-blasio-school-mask-mandate-need-to-follow-the-science/
[71] https://www.silive.com/coronavirus/2021/08/nyc-releases-guidelines-for-2021-2022-school-year-10-things-you-need-to-know.html
[72] https://www.schools.nyc.gov/school-life/health-and-wellness/covid-information/health-and-safety-in-our-schools
[73] https://www.schools.nyc.gov/about-us/messages-for-families
[74] Id.

217.  Yet, Defendant NYC DOE provides a medical exemption form for students to be exempt

from COVID-19 testing in schools.[75]

## V.   THE MASK MANDATE CREATES AN ENTANGLEMENT OF THE STATE AND RELIGIOUS PRINCIPLES OF HUMANISM

218.  Although 'Humanism' is not a term that comes to mind when discussing traditional notions

of religion, it is prevalent and practiced worldwide in different forms, including Christian

Humanism, Humanistic Judaism, and others.

219.  Humanism emerged with a following after the publication of the *Humanist Manifesto* in

1933.[76] Later, it was recognized by the United States Supreme Court as a religion in the

decision of *Torasco v. Watkins*.[77]

220.  It is not uncommon for "humanism" to be confused or interchanged with "humanitarianism,"

however, there is a stark difference between the two. Whereas the term "humanitarianism"

usually refers to a person who promotes human welfare and social reform, "humanist" refers

to one who believes that human beings are capable of solving their own problems and

determining their own destiny.[78] The religion of Humanism is "nontheistic" and is opposed

to the notions of traditional theism doctrines.[79]

221.  Humanism is said to be a doctrine that is centered on human values and interests and

ultimately defies man.[80]

---

[75] https://www.schools.nyc.gov/docs/default-source/default-document-library/student-medical-exemption-form
[76] Humane, Humanities, Humanitarian, and Humanism," Kenneth A. Penman & Samuel H. Adams, THE CLEARING HOUSE, Vol. 55, No. 7 (Mar. 1982) (p. 308-310) accessed at: https://www.jstor.org/stable/30186123.
[77] *Torcaso v. Watkins*, 367 U.S. 488, 81 S. Ct. 1680, 6 L. Ed. 2d 982 (1961) ("Among religions in this country which do not teach what would generally be considered a belief in the existence of God is Buddhism, Taoism, Ethical Culture, *Secular Humanism*, and others.")
[78] Humane, Humanities, Humanitarian, and Humanism," Kenneth A. Penman & Samuel H. Adams, THE CLEARING HOUSE, Vol. 55, No. 7 (Mar. 1982) (p. 308-310) accessed at: https://www.jstor.org/stable/30186123
[79] Id.
[80] Id.

222.   The Humanism dogma includes a fifteen-point belief system filled with socialist propaganda opposing "acquisitive and profit-motivated society" and outlining a worldwide egalitarian society based on voluntary mutual cooperation through the "equitable distribution of the means of life."  Other passages included:

> "The time has come for widespread recognition of the radical changes in religious beliefs throughout the modern world . . . To establish such a religion is a major necessity of the present . . . Religious humanists regard the universe as self-existing and not created . . . A socialized and cooperative economic order must be established to the end that the equitable distribution of the means of life be possible . . . So stand the theses of religious humanism."[81]

A.   HISTORY OF HUMANISM AND ITS INFLUENCE ON THE U.S. GOVERNMENT

223.   The Humanist movement in the United States was organized initially as the "Humanist Fellowship" in 1927, changing into the "Humanist Press Association" in 1935, and finally being reorganized as "The American Humanist Association" ("The A.H.A.") in 1941.  The A.H.A. has a network of over 250 local affiliates and chapters around the country,[82] including the Humanist Chaplaincy at Harvard.[83] In 1952, the A.H.A. became a founding member of the International Humanist and Ethical Union[84] and subsequently joined with the American Ethical Union and in the late 1960s established itself as a _religious tax-exempt organization_ allowing Humanist ministers to legally officiate at weddings, perform

---

[81] https://americanhumanist.org/what-is-humanism/manifesto1/

[82] https://americanhumanist.org/get-involved/find-or-start-a-chapter/

[83] The Humanist Chaplaincy at Harvard (HCH) became the world's first university-based Humanist Chaplaincy upon its founding in the 1970s by former Catholic Priest Tom Ferrick. HCH now has its own Humanist community center in Harvard Square and employs a talented professional staff of young Humanist leaders who facilitate its many programs.  The Humanist Chaplain, Greg Epstein, was recently appointed as the President of Harvard's Chaplains, overseeing all 40 religious denominations on campus.  See https://humanistchaplaincies.org/harvard-university/, https://chaplains.harvard.edu/filter_by/humanist-chaplaincy-humanistagnosticatheist1 and The New Chief Chaplain at Harvard? An Atheist. By Emma Goldberg, Aug. 26, 2021, https://www.nytimes.com/2021/08/26/us/harvard-chaplain-greg-epstein.html

[84] This umbrella organization, now referred to as Humanists International, has more than 160 member organizations from more than 80 countries. See https://humanists.international/2019/02/humanists-international/

chaplaincy functions, and other traditional clergy activities.[85] In 1991, the A.H.A. took control of another religious Humanist organization, the Humanist Society, and merged it into its operations.[86]

224. Humanism has seen significant growth worldwide since its founding.[87] The Humanist Manifesto II was written in 1973[88]and Humanist Manifesto III was published in 2003.[89] Several prominent Humanists created their own Ten Commandments since its founding, including Bertrand Russell, Michael Schmidt-Salomon, Richard Dawkins, Christopher Hitchens, and John Figdor. *See also,* APPENDIX A.

225. In 1953, the A.H.A. established its highest honor, The Humanist of the Year Award, bestowed upon "a person of national or international reputation, who, through the application of humanist values, has made a significant contribution to the improvement of the human condition."[90]

226. In 2021, the A.H.A. conferred its highest honor, the Humanist of the Year Award, to Dr. Anthony S. Fauci, M.D. ("Dr. Fauci"), the Director of the National Institute of Allergy and Infectious Diseases ("NAID"), within the United States National Institutes of Health ("N.I.H.").[91]

227. Subsequently, on December 3, 2020, Dr. Fauci announced he accepted the position of Chief Medical Advisor to then-President-elect Joe Biden.

[85] ttps://www.azmirror.com/2019/07/19/phoenix-humanists-to-claim-tax-break-to-tax-code/
[86] https://web.archive.org/web/20120412091912/http://humanist-society.org/
[87] The World's Newest Major Religion: No Religion.  As secularism grows, atheists and agnostics are trying to expand and diversify their ranks.  By Gabe Bullard, April 22, 2016, https://www.nationalgeographic.com/culture/article/160422-atheism-agnostic-secular-nones-rising-religion
[88] In this updated version, sexuality and abortion were emphasized as well as deploring "the division of humankind on nationalistic grounds" while looking forward to "a world order based upon transnational federal government."
[89] Evolving Humanist Manifestos: https://www.icr.org/article/evolving-humanist-manifestos
[90] https://americanhumanist.org/awardees/
[91] Id.

- 52 -

228.  In announcing its selection, the A.H.A. proudly highlighted that Dr. Fauci has publicly identified himself as a Humanist since 2003. [92] Dr. Fauci accepted the award on July 25, 2021, through a video presentation.

229.  Dr. Fauci becomes the newest recipient in a long line of controversial Humanists, including Margret Sanger, best known for establishing Planned Parenthood and advocating for the elimination of the African-American population. *See,* **APPENDIX A**. Brock Chisolm was the 1959 award recipient, best known for advocating the dangers of parents allowing their children to believe in Santa Claus, followed by Dr. Linus Pauling in 1961, a known eugenicist and advocate for marking persons with "defective genes" with a uniform mark, such as a forehead tattoo. **APPENDIX A,** *Humanism Award of the Year Recipients*.

230.  It is understood that Humanism is a religion[93] rooted in a "nontheistic" dogma, in that no other supreme being exists except man himself. However, just as the government may not impose a religion upon the People, the government cannot impose those principles that align with a "religion" and infringe upon the rights of Plaintiffs without due process of law.

B.  <u>THE ENTANGLEMENT OF HUMANISM AND GOVERNMENT MANDATES</u>

<u>*Dr. Fauci, in his Official Capacity as U.S. Chief Medical Advisor*</u>

231.  Dr. Fauci's religious (or "nontheistic") beliefs did not become problematic until he took the stance that a challenge to his guidance regarding COVID-19 was an attack on "science." In an interview with NBC News, Dr. Fauci responded to criticisms of his management of COVID-19 by stating, "[i]f you are trying to, you know, get me as a public health official

---

[92] C-SPAN interview of Dr. Fauci announcing himself a humanist: https://www.c-span.org/video/?c4873572/user-clip-fauci-humanist&fbclid=IwAR1dM0Ra65nIrnZ_XQu1PRRjFSRS3wkYHicmw0D0sKrB93DRMr5ru9yaDo4
[93] *Torcaso*, 367 U.S. 488 ("Among religions in this country which do not teach what would generally be considered a belief in the existence of God is Buddhism, Taoism, Ethical Culture, Secular Humanism, and others.").

and a scientist, *you are really attacking not only Anthony Fauci—you are attacking science.* And anybody that looks at what is going on clearly sees that."[94] (emphasis added).

232.   Clearly, Dr. Fauci took the criticisms about his recent contradictory remarks as an attack on "science" and seemingly began a crusade to create a schism of the general public - those who would abide by his advice and those who attacked "science."

233.   Through these public statements, it is also apparent that Dr. Fauci, as representative of the federal government and acting in his official capacity as the U.S. Chief Medical Advisor to the President, intended to classify the public into two major groups; those who would follow the advice and guidelines of the government, and those opposed to "science" by questioning his constant controversial and contradictory advice, which changed weekly, as elaborated below.

### *Dr. Fauci's History of Inconsistent Guidance*

234.   As the COVID-19 pandemic emerged, on February 5, 2020, Dr. Fauci sent an internal email (although this email was not released to the public until May 2021) stating that "[t]he typical mask you buy in the drug store is not really effective in keeping out virus, which is small enough to pass through material. It might, however, provide some slight benefit in keep out gross droplets if someone coughs or sneezes on you."[95]

235.   In a public statement on March 8, 2020, Dr. Fauci stated in an interview of CBS' 60 Minutes:

"When you're in the middle of an outbreak, wearing a mask might make people feel a little bit better and it might even block a droplet, but it's not providing the perfect protection that people think that it is. And, often, there are unintended consequences — people keep fiddling with the mask and they keep touching their face."  He continued during the interview to state, "Right now in the United States,

---

[94] https://www.businessinsider.com/fauci-attack-on-science-gop-criticism-2021-6
[95]  https://www.foxnews.com/health/faucis-controversial-60-minutes-interview-about-mask-wearing-was-one-year-ago

people should not be walking around with masks. ... There's no reason to be walking around with a mask."[96]

236.   Less than a month later, on April 3, 2020, Dr. Fauci states just the opposite:

"And, importantly, I think what people don't fully appreciate is that putting a mask on yourself is more to prevent you from infecting someone else. And if everybody does that, we're each protecting each other, because the data is, it's more efficient to prevent transmitting to others than it is to prevent transmission to yourself. But you can completely cover that ballpark if, essentially, universally, when people go out and are in a situation where they might come into closer contact, that they wear that mask."[97]

237.   The contradiction and confusion does not end there. On January 25, 2021, in an interview on NBC's Today Show, Dr. Fauci tells viewers that two masks are better than one, and states:

"So, if you have a physical covering with one layer, you put another layer on, it just makes common sense that it likely would be more effective. That's the reason why you see people either double masking or doing a version of an N95 [respirator]."[98]

238.   Two days later, on January 27, 2021 during a CNN Town Hall segment, Dr. Fauci said, "The CDC does not recommend that you should wear two masks, nor does the CDC recommend that you have to wear an N95 mask. They just say, 'The most important thing is get everybody to wear a mask.'"[99]

239.   Even more perplexing, the next day, January 28, 2021 during a live stream Q&A with the American Federation of Teachers ("AFT") and the National Education Association ("NEA"), Dr. Fauci is asked about his recommendation of "double masking," to which he replies, "There's no data that indicates that that is going to make a difference."[100]

---

[96] Id.
[97] https://www.pbs.org/newshour/show/what-dr-fauci-wants-you-to-know-about-face-masks-and-staying-home-as-virus-spreads#transcript
[98] https://www.cnbc.com/2021/01/25/dr-fauci-double-mask-during-covid-makes-common-sense-more-effective.html
[99] https://www.newsweek.com/fact-check-did-dr-anthony-fauci-advise-wearing-two-masks-then-reverse-course-1565961
[100] Id.

240. Accordingly, there is _no clear guidance_ from the purported expert on the matter as to whether or not masking is effective in mitigating the spread of the virus. Dr. Fauci's contradictions continue _ad nauseum_, ranging from the use of PPE; eye shields;[101] N96/KN95[102] masks; whether the public should or should not worry about infection rates; whether the virus remains a threat; the use of vaccines; the use of a mask in combination with the vaccine, and so on.

241. In the interest of efficacy, Plaintiffs do not list all of the contradictory guidance issued by Dr. Fauci and other executive agencies; however, Plaintiffs are ready, willing, and able to provide further documentation of the contradictory guidance not addressed above.

242. Dr. Fauci's inconsistencies are one of the main contributing factors to the public confusion, fostering skepticism and thus empowering government officials, such as Governor Hochel and Commissioner Zucker, to abuse the authority of their respective offices to infringe upon the individual rights and freedoms of the students of New York.

## VI.  VIOLATIONS OF THE ESTABLISHMENT CLAUSE BY AND THROUGH THE FOURTEENTH AMENDMENT

243. As reiterated above, the Constitution provides that the government may not establish a religion in the United States.

244. As described in **Part III** above, Humanism is a recognized religion that embodies the principle of "non-theism" and that man alone is the supreme being. As such, those followers of Humanism subscribe to the notion that people should (and must, to be Humanist) give up their religious beliefs and principles to be fully successful in life.

---

[101] https://www.webmd.com/lung/news/20200731/fauci-suggests-wearing-goggles-for-full-protection
[102] bin-Reza F et al. The use of mask and respirators to prevent transmission of influenza: A systematic review of the scientific evidence. Resp Viruses 2012;6(4):257-67. https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5779801/

245. Other major religions of the world consist of Christianity, Islam, Hinduism, Buddhism, Sikhism, and Judaism.

246. As described in **Part II** above, Defendant Governor Hochul violated the Establishment Clause *twice* by delivering sermons to the Abyssian Baptist Church in Harlem, on September 12, 2021, and the Christian Center in Brooklyn on September 21, 2021, by calling upon the congregation to "be [her] apostles" and to address those that remain skeptical about the masking and vaccine mandates.

247. As set forth above, this type of conduct from a public official is prohibited, as "[e]ndorsement sends a message to non-adherents that they are outsiders, not full members of the political community, and in an accompanying message to adherents that they are insiders, favored members of the political community."[103] *Lynch v. Donnelly* (1984).

248. In the case of *Lemon v. Kurtzman*, the Supreme Court expanded on the definition and application of the Establishment Clause, holding that a law "respecting the proscribed result, that is, the establishment of religion, is not always easily identifiable as one violative of the Clause. A given law might not establish a state religion *but nevertheless be one respecting that end in the sense of being a step that could lead to such establishment and hence offend the First Amendment.*" *Lemon v. Kurtzman*, 403 U.S. 602, 612-13 (1971) (Burger, C.J.) (emphasis added).[104]

249. However, in addressing the Establishment Clause in a school setting, in *Lee v. Weisman*, 505 U.S. 577, 112 S. Ct. 2649, 120 L. Ed. 2d 467 (1992), the Supreme Court explores "the subtle coercive pressures [that] exist and where the student had no natural alternative which would have allowed [her] to avoid the fact or appearance of participation.

---

[103] *Id.*, citing *Larkin*, 459 U.S. 116 and *School Dist. of Abington Tp., Pa.*, 374 U.S. 203.
[104] *See also*, Bouvier Law Dictionary: Establishment Clause.

250.  In *Lee,* the Supreme Court held that:

> "The First Amendment's Religion Clauses mean that religious beliefs and religious expression are too precious to be either proscribed or prescribed by the State. <u>The design of the Constitution is that preservation and transmission of religious beliefs and worship is a responsibility and a choice committed to the private sphere, which itself is promised freedom to pursue that mission</u>. It must not be forgotten then, that while concern must be given to define the protection granted to an objector or a dissenting nonbeliever, these same Clauses exist to protect religion from government interference.  **[*590]**  James Madison, the principal author of the Bill of Rights, did not rest his opposition to a religious establishment on the sole ground of its effect on the minority. A principal ground for his view was: "Experience witnesseth that ecclesiastical establishments, instead of maintaining the purity and efficacy of Religion, have had a contrary operation." Memorial and Remonstrance Against Religious Assessments (1785), in 8 Papers of James Madison 301 (W. Rachal, R. Rutland, B. Ripel, & F. Teute eds. 1973)."

*Lee*, 505 U.S. 577 (emphasis added).

251.  As described above, Defendant Governor Hochul's sermon before the Christian Center in Brooklyn and Abyssian Baptist Church in Harlem undoubtedly violated the Establishment Clause. *See supra,* ¶ 106-110.

252.  With this predicate context, Defendant Hochul, DOH, and PHPC then implemented the mandatory mask mandate in school settings, creating a situation that the Supreme Court in *Lee* expressly tried to prevent in holding that "[t]he degree of school involvement here made it clear that the [conduct] bore the imprint of the State and thus put school-age children who objected in an untenable position."

253.  Dr. Fauci also engaged in acts violating the Establishment Clause.

254.  In a 2015 interview, Dr. Fauci stated:

> "I think that there are a lot of things about organized religion that are unfortunate, and I tend to like to stay away from that and think more in terms of the principles that I learned from the Jesuits, from the Catholic religion, the principles that I run my life by. But the idea about the organization of religion is not something that I adhere to very much."[105]

---

[105] https://ifyc.org/article/dr-anthony-fauci-named-2021-humanist-year

255. Dr. Fauci's association with the American Humanist Association (AHA) is undisputed. The Constitution protects each American's individual right to freely practice the religion of their choice by and through the free exercise clause of the First Amendment. By utilizing his government position to influence the public and endorse mandates restricting the public under Humanist principles, Dr. Fauci is violating the Establishment Clause and depriving the public, including the plaintiff students, of their liberties and fundamental human rights without due process of law. *See Cantwell v. State of Connecticut*, 310 U.S. 296, 60 S. Ct. 900, 84 L. Ed. 1213 (1940).

256. As described in detail above, Dr. Fauci is seen on national television making the following statement: "[i]f you are trying to, you know, get me as a public health official and a scientist, *you are really attacking not only Anthony Fauci—you are attacking science.* And anybody that looks at what is going on clearly sees that." (emphasis added).[106]

## VII. THE "SCIENCE" BEHIND COVID-19

### A. THE MINISTRY OF SCIENCE

257. This subtle form of public control is not new; this principle is eerily similar to George Orwell's classic *1984*, where the four Ministries of the dystopian government of Oceania utilize different tactics, opposite of their name, to exercise power and control over the general public of Oceania. For instance, the Ministry of Peace supported a perpetual war; the Ministry of Truth controlled the public through lies; the Ministry of Plenty rationed food, goods, and other domestic productions; and the Ministry of Love performed covert operations that identified, monitored, arrested, and converted dissidents. *See* **APPENDIX C**, *1984 Ministries*.

---

[106] *Supra,* ¶98.

258. When first published, the book was arguably meant to be an ironic musing based on dystopian fiction. However, in light of the facts at hand, the book's premise has become a shocking modern-day parallel.

259. If George Orwell wrote a modern-day sequel, he would likely include a "Ministry of Science" that seeks to control the public through the dissemination of contradictions and misinformation rooted in public health, inciting public panic and fear, and creating a divide between those "apostles" that believe the unproven, contradictory proclamations of "science" and those who are deemed immoral for questioning the 'narrative' and refusing to accept contradictory statements as truth.

### B.  WHAT IS "SCIENCE" AS DEFINED BY LAW?

260. Where individual rights and freedoms collide with those principles rooted in science, one must look to the legal definition of "scientific knowledge" to properly establish the theories and techniques being presented to the court.

261. As set forth by the Supreme Court in *Daubert v. Merrell Dow Pharms., Inc.*,[107] there are four main components to establish a "theory or technique" as "scientific knowledge": (1) testability; (2) peer review; (3) known or potential rate of error; and (4) general acceptance. *Id.*

262. "Additionally, in the case of a particular scientific technique, the court ordinarily should consider the known or potential rate of error" [*see*, e.g., *United States v. Smith*, 869 F.2d 348, 353–354 (7th Cir. 1989) (surveying studies of the error rate of spectrographic voice identification technique)], and the existence and maintenance of standards controlling the technique's operation. *See*, *United States v. Williams*, 583 F.2d 1194, 1198 (2d Cir. 1978).

---

[107] *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993).

*Testability & Peer-Reviewed Studies*

263. Studies into the effectiveness of cloth facemasks in preventing the spread of airborne droplets from respiration and coughing often find that cloth masks are ineffective, especially compared to medical-grade masks.

264. Studies into the effectiveness of cloth facemasks in preventing the spread of airborne droplets from respiration and coughing often find cloth masks considerably ineffective compared to medical-grade masks.

265. The World Health Organization has also issued guidelines about children wearing masks that contradict Defendant NYS DOH and Defendant NYC DOH.

    1. Should children wear a mask?

        i.    Children aged 5 years and under should not be required to wear masks. This is based on the safety and overall interest of the child and the capacity to appropriately use a mask with minimal assistance;

        ii.    Children aged 6-11 should only wear a mask based on six factors[108];

        iii.    Children 12 and older should follow the same guidance as adults.[109]

    2. Should children with developmental disabilities wear masks?

        i.    The use of masks for children of any age with developmental disorders, disabilities or other specific health conditions should not be mandatory and be assessed on a case by case basis by the child's parent, guardian, educator, and/or medical provider. In any case, children with severe cognitive or respiratory impairments with difficulties tolerating a mask should not be required to wear masks.[110]

    3. Should children wear a mask when playing sports or doing physical activities?

---

[108] WHO and UNICEF have identified these factors: 1) Whether there is widespread transmission in the area where the child resides, 2) The ability of the child to safely and appropriately use a mask, 3) Access to masks, as well as laundering and replacement of masks in certain settings (such as schools and childcare services), 4) Adequate adult supervision and instructions to the child on how to put on, take off and safely wear masks, 5) Potential impact of wearing a mask on learning and psychosocial development, in consultation with teachers, parents/caregivers and/or medical providers, and 6) Specific settings and interactions the child has with other people who are at high risk of developing serious illness, such as the elderly and those with other underlying health conditions
[109] https://www.who.int/news-room/q-a-detail/q-a-children-and-masks-related-to-covid-19
[110] Id.

i.  Children should not wear a mask when playing sports or doing physical activities, such as running, jumping, or playing on the playground, to not compromise their breathing. When organizing these activities for children, it is important to encourage all other critical public health measures: maintaining at least a 1-metre distance from others, limiting the number of children playing together, providing access to hand hygiene facilities, and encouraging their use.[111]

### *Beijing, China (2020)*

266.  A study conducted in March of 2020 in Beijing by Wang *et al.* demonstrated that, within the family setting, masks, disinfectants, and social distancing are effective strategies to minimize the risk of disease transmission. The study follows 124 families with at least one confirmed case of Covid-19 and tracks the disease's transmission to others who live in the same household.

267.  This peer-reviewed and generally accepted study found that wearing masks reduced the transmission of Covid-19 to others in prolonged close proximity by 79%. The study shows that the "secondary attack rate" of Covid-19 in children is nearly half that of adults in the household setting[112]This is a retrospective study using documentation as the primary data source. The study focuses on the household setting, and participants are families aged young to old. The type of masks used is not specified.

### *Denmark (2020)*

268.  Studies show that cloth masks are relatively ineffective when considering variables and the comparison to surgical masks.

269.  A study from Denmark demonstrated that inconsistent community usage of masks on top of other health measures did not reduce the risk of Covid-19 transmission by a considerable

---

[111] Id.
[112] https://gh.bmj.com/content/5/5/e002794

percentage. In this study, researchers followed participants who spent three or more hours outside of the home and encouraged them to follow social distancing.

270. Half of the participants were asked to wear masks, and half were asked not to wear masks.

271. The study concluded that "the recommendation to wear surgical masks to supplement other public health measures did not reduce the SARS-CoV-2 infection rate among wearers by more than 50% in a community with modest infection rates, some degree of social distancing, and uncommon general mask use."

272. The Denmark study did not examine the use of commonly used cloth masks.[113] This study is a controlled study with two groups who were either instructed to wear a mask outside the home or instructed not to. The study focuses on an adult population with no specific location other than the country of Denmark. The type of masks used are surgical masks. The study is peer-reviewed and generally accepted.

### *Vietnam, 2020*

273. A study in fourteen hospitals in Vietnam compared the efficacy of cloth masks versus medical masks in usage by hospital workers. The study assigned a group to wear cloth masks, a group to wear medical masks, and a control group that wore masks per their usual practice.

274. The study found that the cloth mask wearers had a higher rate of contraction of illness than the medical mask users. In addition, it was noted that "penetration of cloth masks by particles was almost 97% and medical masks 44%."

275. The study authors concluded that "the results caution against the use of cloth masks."[114] This study is a controlled study with three groups—one with "usual masking practice," one with cloth masks, and one with medical masks.

---

[113] https://pubmed.ncbi.nlm.nih.gov/33205991/
[114] https://bmjopen.bmj.com/content/5/4/e006577

276.  The study focuses on healthcare workers over the age of 18 in the hospital setting in Vietnam. The type of masks used are cloth and surgical masks. The study is peer-reviewed and generally accepted.

### *Center for Evidence-Based Medicine*

277.  According to Carl Heneghan and Tom Jefferson from the Center for Evidence-Based Medicine, the more recent studies that find usage of cloth masks effective in reducing the transmission of COVID-19 contradict the findings of older, less hastily constructed studies that found cloth masks to be detrimental to the health of the wearer:

> "It would appear that despite two decades of pandemic preparedness, there is considerable uncertainty as to the value of wearing masks. For instance, high rates of infection with cloth masks could be due to harms caused by cloth masks, or benefits of medical masks.  The numerous systematic reviews that have been recently published all include the same evidence base so unsurprisingly broadly reach the same conclusions. However, recent reviews using lower quality evidence found masks to be effective. Whilst also recommending robust randomized trials to inform the evidence for these interventions."[115]

278.  The Heneghan and Jefferson study summarizes peer-reviewed and generally accepted studies that focused primarily on healthcare workers and students using surgical masks and cloth masks.

### *Massachusetts General Hospital: Brigham (2020)*

279.  Wang *et al.* assessed the masking policy of the Mass General Brigham hospital system in Massachusetts. The researchers identified a decrease in cases of COVID-19 in healthcare workers after implementing universal masking policies in hospitals.

280.  The researchers concluded that their "results support universal masking as part of a multipronged infection reduction strategy in health care settings." The recommendation

---

[115] https://www.cebm.net/covid-19/masking-lack-of-evidence-with-politics/

justified here is only applicable to healthcare settings. Because all healthcare workers and patients wore surgical masks, this study cannot justify requiring typical cloth masks to reduce COVID-19 transmission.[116]

281.   This study is conducted using health records and documentation provided by the hospitals studied. The study focuses on adult healthcare workers in the hospital environment. The type of masks used is surgical masks. The study is peer-reviewed and generally accepted.

### *Mask-wearing: A Cross-Sectional Study*

282.   "Mask-wearing and control of SARS-CoV-2 transmission in the USA: A Cross-Sectional Study" makes clear that although evidence suggests that masks help to curb the spread of the disease, there is little empirical research at the population level, and investigates the association between self-reported mask-wearing; physical distancing; and SARS-CoV-2 transmission in the USA, along with the effect of statewide mandates on mask uptake.

283.   Researchers found that "[a]n increasing trend in reported mask usage across the USA was observed, although uptake varied by geography. Communities with high reported mask-wearing and physical distancing had the highest predicted probability of transmission control. Segmented regression analysis of reported mask-wearing showed no statistically significant change in the slope after mandates were introduced; however, the upward trend in reported mask-wearing was preserved. The widespread reported use of face masks combined with physical distancing increases the odds of SARS-CoV-2 transmission control."[117]

---

[116] https://jamanetwork.com/journals/jama/fullarticle/2768533
[117] https://pubmed.ncbi.nlm.nih.gov/33483277/

284. The Cross-Sectional Study was conducted using surveys that focused on age groups 13 years and older with no specific location and did not specify the type of masks used.  The study was peer-reviewed and generally accepted.

### *Other Mask Studies*

285. Studies rarely specifically focused on mask mandates in the school setting or in settings where individuals are in close proximity for prolonged periods of time. Most CDC studies used to justify mask mandates focus on adult populations or are too broad to relate to the school setting directly.

### *Springfield, Missouri*

286. A study by Hendrix *et al.* looks retroactively at a successfully contained outbreak of COVID-19 at a hair salon in Springfield, MO.

287. Two hairstylists at the salon contracted symptoms of COVID-19 and tested positive for the virus. The stylists worked for eight days between becoming symptomatic and receiving their positive test results. During this period, the hairstylists worked with 139 clients, and all clients and hairdressers in the salon wore masks for the duration of each appointment.

288. None of the clients serviced by the symptomatic hairstylists or their secondary contacts experienced symptoms of COVID-19.

289. The study concludes "implementation of masking policies could mitigate the spread of infection in the general population." However, the instance described in this study sees short-term exposure of masked individuals to symptomatic carriers. In the school setting, children spend hours out of the day in close proximity.

290. This study holds no insight into the efficacy of masks in preventing the spread of the virus among individuals in *prolonged* contact.[118]

291. The Hendrix study is a retrospective study using surveys as its primary data source. The study focuses on the business setting, where the mean participant age is 52. The type of masks used are cloth and surgical masks. The study is peer-reviewed and generally accepted.

### *Washington, D.C.*

292. One study provides evidence from a natural experiment on the effects of state government mandates for face mask use in public issued by fifteen states plus Washington, D.C., between April 8 and May 15, 2020.

293. The research design is an event study examining changes in the daily county-level COVID-19 growth rates between March 31 and May 22, 2020.

294. This study also identified the effects of states' public face mask mandates on the daily COVID-19 growth rate, using an event study that examined the effects over different periods. The study considered the impact of mask mandates targeting employees in some work settings rather than community-wide mandates.

295. Mandating face mask use in public is associated with a decline in the daily COVID-19 growth rate by 0.9, 1.1, 1.4, 1.7, and 2.0 percentage points in 1–5, 6–10, 11–15, 16–20, and 21 or more days after state face mask orders were signed, respectively.

296. This study projected the number of averted COVID-19 cases with the mandates for face mask use in public by comparing actual cumulative daily cases with daily cases predicted by the model if none of the states had enacted the public face cover mandate at the time they

---

[118] ] https://pubmed.ncbi.nlm.nih.gov/32673300/

did. This is an event study using documentation and statistics from the entire population as the primary data source.

297.   The study does not focus on any particular age group within the general population and relies heavily upon insubstantial estimations rather than hard data. The type of masks used is not specified. The study is peer-reviewed and generally accepted.

## _Germany_

298.   Mitze _et al._ identified the time frame when different German regions began to implement mask mandates in public places and compared it with the trend in COVID-19 cases from those regions. In particular, the study followed Jena, the first region of Germany to implement face mask requirements.

299.   The researchers found that the usage of face masks reduced the growth of COVID-19 infections. Conscious of its boundaries, however, the study cited limitations that prevent its findings from a universal application:

> "First, Germany is only one country. Different norms or climatic conditions might change the picture for other countries. Second, we have ignored spatial dependencies in the epidemic diffusion of Covid-19. This might play a role. Third, there are various types of face masks. We cannot identify differential effects since mask regulations in German regions do not require a certain type."

300.   The Mitze study is too broad to apply to a school-specific setting.[119] This retrospective study observes data after the fact, focuses on one German town, and its participants are aged 15 and older. The type of masks used is not specified. The study is peer-reviewed and generally accepted.

---

[119] ttp://ftp.iza.org/dp13319.pdf

*Testability & Peer Review Studies of COVID-19 and Masks in Schools*

301. Since the start of the COVID-19 crisis, the data and science have demonstrated less risk of spreading COVID-19 among students and staff in school than in the general community. This was a fact before the introduction of vaccinations. Safety is increased where many school staff and children are eligible for vaccinations and other well-established treatments for COVID-19.[120]

302. *British Medical Journal*, one of the oldest general medical journals in the world, published an article in April 2020 emphasizing the need for children to return to school. The authors' fundamental argument is that children are not COVID-19 super spreaders. This argument is supported by data from China, South Korea, and Ireland on children and COVID-19. "Some regions have implemented widespread community testing, such as South Korea and Iceland. Both countries found that children were significantly underrepresented. In Iceland, this is true both in targeted testing of high-risk groups compared with adults (6.7% positive compared with 13.7%), and in (invited) population screening, there were no children under 10 found to be positive for SARS-CoV-2 compared with 0.8% of the general population." Using their cumulated data, the authors deduce that "Governments worldwide should allow all children back to school."[121]

303. *Eurosurvelliance*, Europe's journal on infectious disease surveillance, epidemiology, and control, published a study on the secondary transmission of COVID-19 from children attending school in Ireland. The study examined three pediatric cases and three adult cases of COVID-19 with a history of school attendance. The available epidemiological data for all cases indicated that they had not been infected with SARS-CoV-2 in the school setting. One

---

[120] https://www.nytimes.com/2021/08/23/nyregion/nyc-schools-vaccine-mandate.html
[121] https://adc.bmj.com/content/105/7/618

pediatric case attended a primary school, while the other two cases attended secondary schools. One of the adult cases was a teacher, while the other adult cases conducted educational sessions in schools that were up to 2 hours in duration. A total of 1,155 contacts of these six cases were identified. They were exposed at school in the classroom, during sports lessons, music lessons, and during choir practice for a religious ceremony, which involved a number of schools mixing in a church environment. Their findings show that among 1,001 child contacts of these six cases there were no confirmed cases of COVID-19. In the school setting, among 924 child contacts and 101 adult contacts identified, there were no confirmed cases of COVID-19. "The results moreover echo the experience of other countries, where children are not emerging as considerable drivers of transmission of COVID-19."[122]

304.   The National Center for Immunization Research and Surveillance (NCIRS) investigated all COVID-19 cases in New South Wales, Australia schools in April 2020. The report shows that from March to mid-April 2020, 18 individuals (9 students and 9 staff) from 15 schools were confirmed as COVID-19 cases. A total of 735 students and 128 staff were close contacts of these initial 18 cases. Of these, no teacher or staff member contracted COVID-19 from any of the initial school cases. The report concluded that "Our investigation found no evidence of children infecting teachers...SARS-CoV-2 transmission in children in schools appears considerably less than seen for other respiratory viruses."[123]

305.   The Public Health Agency of Sweden published a report comparing the effect of different approaches regarding school closure in Sweden and Finland as a response to the COVID-19

---

[122] https://www.eurosurveillance.org/content/10.2807/1560-7917.ES.2020.25.21.2000903#html_fulltext
[123] http://ncirs.org.au/sites/default/files/2020-04/NCIRS%20NSW%20Schools%20COVID_Summary_FINAL%20public_26%20April%202020.pdf

pandemic. Sweden is one of the few countries that decided to keep daycare and primary schools open during the pandemic.  In Finland, on the other hand, all schools were closed from March 18th until May 13th except children in grades 1-3 who could participate in regular on-site teaching if their caretakers were working in areas considered critical for society. Primary schools were reopened between May 14 and May 31. There were 23 primary school exposures (index cases) in 21 primary schools during this reopening period. Of the index cases, 16 were pupils and seven adults. There were 392 pupils and 54 adults placed under quarantine, and the last quarantine ended on June 12. Primary school closure and re-opening did not significantly impact the weekly number of laboratory-confirmed cases in primary school-aged children.

306. Chief Physician at the Finnish Institute for Health and Welfare stated, "Coronavirus infections with serious symptoms are rare among children and young people in both Finland and Sweden. Neither country has reported a single coronavirus-related death in the under-20 age group. According to current information, children also pass on the virus less frequently than adults." The report concluded, "The negative effects of closing schools must be weighed against the possible positive indirect effects it might have on the mitigation of the COVID-19 pandemic."[124]

307. In February and March 2020, a study published by the Oxford University Press, in correlation with the Infectious Diseases Society of America (IDSA) and the HIV Medicine Association (HIVMA), within the newly issued volume of Clinical Infectious Diseases, depicted the low risk of transmission in school settings. The study was achieved in Singapore as part of the country's public health strategy to undergo nationwide surveillance and contact

---

[124]  https://www.folkhalsomyndigheten.se/contentassets/c1b78bffbfde4a7899eb0d8ffdb57b09/COVID-19-school-aged-children.pdf

tracing. The clinical and epidemiological data and the contacts of potential cases of SARS-CoV-2 within three separate educational settings were all obtained and analyzed. A 12-year-old student and a 5-year-old student were both diagnosed with COVID-19 and subsequently isolated after acquiring symptoms. In both the secondary school and preschool #1, all close contacts were placed under quarantine 14 days from their last exposure and subsequently examined and isolated if they experienced any respiratory symptoms or fevers. They were only discharged if they received at least 2 negative nasopharyngeal swabs taken on 2 individual days.

308. Although schools were not closed during this period, they continued to take precautionary health measures. Eight (8) students in secondary school and thirty-four (34) in preschool #1 became symptomatic, but all were tested negative for the virus. In preschool #2, the same measures were taken, except that schools were closed for 14 days following the detection of staff members with COVID-19, and a single NP swab for SARS-CoV-2 among asymptomatic children was also taken.

309. Although 77 children became symptomatic, all tested negative. Based on the study's results, there was no evidence of disease transmission, which entails that children may be more resistant at a cellular level. "Based on these findings, more targeted control measures for preschool settings (such as keeping symptomatic children away from schools instead of blanket closures) could be considered."[125]

310. *The Journal of Pediatrics and Child Care* published an article in June 2020 that prefaced the French Pediatric Society, and various pediatric specialties support children returning to school. The authors concluded that there is no scientific evidence regarding the role of

---

[125] https://academic.oup.com/cid/article/doi/10.1093/cid/ciaa794/5862649?searchresult=1

children in transmitting COVID-19. "Children today are paying a heavy price for the initial assumption that they were the primary vector for the circulation of the COVID-19 virus, by analogy with other viruses. We now know that this is not the case and that almost all of the children infected with COVID-19 were in contact with adults. Finding your playmates should not be considered as exposing them to particular risks. It is urgent to recall that communities of children, nurseries or classes, continued to exist during confinement, especially for the children of nursing staff. No epidemic was noted in these groups of children, while viral circulation was high among adults."[126]

311. *Nature Medicine*, a monthly peer-reviewed journal, published an article riddled with age-structured epidemic data from China, Italy, Japan, Singapore, Canada, and South Korea that concludes individuals under 20 years of age are less susceptible than adults to become infected with COVID-19. Moreover, the authors found that interventions aimed at children might have a relatively small impact on reducing COVID-19 transmission. "Understanding the role of age in transmission and disease severity is critical for determining the likely impact of social-distancing interventions on SARS-CoV-2 transmission, especially those aimed at schools, and for estimating the expected global disease burden." To explore school closure effects, the authors simulated three months of school closures with varying infectiousness of subclinical infections.  Their study found that school closures in response to COVID-19 did not have a substantial effect on cases. "...There were more clinical cases per capita projected in cities with older populations, and more subclinical infections projected in cities with younger populations. Among the three cities analyzed here, school closures had the least impact in Bulawayo, which has both the youngest population and the

---

[126] https://www.sciencedirect.com/science/article/pii/S0987798320300438?via%3Dihub

fewest contacts in school relative to the other cities (19% of contacts for 0- to 14-year-olds occurring in school, compared with 39% in Birmingham and 48% in Milan)." Based on their simulation, the authors conclude, "In countries with younger population structures—such as many low-income countries—the expected per capita incidence of clinical cases would be lower than in countries with older population structures."[127]

*Potential Rate of Error & General Acceptability*

312.  "Additionally, in the case of a particular scientific technique, the court ordinarily should consider the known or potential rate of error. *See, e.g.*, *Smith*, 869 F.2d at 350 (surveying studies of the error rate of spectrographic voice identification technique), and the existence and maintenance of standards controlling the technique's operation. See *Williams*, 583 F.2d 1194 (noting professional organization's standard governing spectrographic analysis).

313.  Finally, "general acceptance" can have a bearing on the inquiry. A "reliability assessment does not require, although it does permit, explicit identification of a relevant scientific community and an express determination of a particular degree of acceptance within that community." *United States v. Downing*, 753 F.2d 1224, 1238 (3d Cir. 1985). See also 3 Weinstein & Berger P702[03], pp. 702-41 to 702-42. Widespread acceptance can be an essential factor in ruling particular evidence admissible, and "a known technique which has been able to attract only minimal support within the community," *Downing*, 753 F.2d at 1238, may properly be viewed with skepticism."

## VIII. DEFENDANT'S PURPORTED "SCIENCE" DOES NOT SUPPORT THE USE OF MASKS TO PREVENT COVID-19

314.  There is currently **_no_** science, as the U.S. Supreme Court has defined it, which validates forcing a child to wear **_any_** mask throughout an entire school day to prevent the spread of

---

[127] https://www.nature.com/articles/s41591-020-0962-9

COVID-19 or prevent the child from contracting COVID-19.  The research includes ***all*** of the research cited by the CDC and others who recommend schools mandate the wearing of masks by children in schools.  It also includes additional research and studies, ***all*** of which demonstrate either mandating masks in schools for children has no statistical impact on the spread of COVID-19 or shows it has a negative impact.

315.  According to the American Medical Association:

> "Face masks should be used only by individuals who have symptoms of respiratory infection such as coughing, sneezing, or, in some cases, fever. Face masks should also be worn by healthcare workers, by individuals who are taking care of or are in close contact with people who have respiratory infections, or otherwise as directed by a doctor. Face masks should not be worn by healthy individuals to protect themselves from acquiring respiratory infection because there is no evidence to suggest that face masks worn by healthy individuals are effective in preventing people from becoming ill. Face masks should be reserved for those who need them because masks can be in short supply during periods of widespread respiratory infection. Because N95 respirators require special fit testing, they are not recommended for use by the general public."[128]

316.  A literature review of the seventeen (17) top studies was analyzed and concluded that "None of the studies established a conclusive relationship between mask/respirator use and protection against influenza infection."[129]

A.  CHILDREN ARE NOT "LITTLE ADULTS"

317.  Age-adjusted statistical analysis is conducted because almost all diseases or health outcomes occur at different rates in different age groups.[130] The National Institutes of Health published a review of clinical data in 2017 declaring, ***"Children are not simply little adults. As a result,***

---

[128] Journal of the American Medical Association (JAMA); April 21, 2020 Volume 323, Number 15 https://jamanetwork.com/journals/jama/fullarticle/2762694
[129] } bin-Reza F et al. The use of mask and respirators to prevent transmission of influenza: A systematic review of the scientific evidence. Resp Viruses 2012;6(4):257-67. https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5779801/
[130]  https://www.health.ny.gov/statistics/cancer/registry/age.htm

*extrapolating results from adult clinical trials to the treatment of children may be inappropriate and, possibly, harmful."* (emphasis added)[131]

318.    From the beginning of the COVID-19 pandemic until today, the data and science have continued to demonstrate that children have a significantly low chance of becoming infected with COVID-19, and if infected, the outcomes are not likely to be severe compared to older adults and specific at-risk individuals.[132] "Children are very much adapted to respond — and very well equipped to respond — to new viruses," says Donna Farber, an immunologist at Columbia University in New York City. Even when they are infected with SARS-CoV-2, children are most likely to experience mild or asymptomatic illness."[133] A new model from researchers in Israel found that kids are half as susceptible to COVID-19 compared to adults.[134]

319.    As of September 15, 2021, 439 American children ages zero to 17 heartbreakingly died due to COVID-19, representing 0.0666% of the 658,754 total deaths in the United States.[135] Specifically in New York State, there have tragically been 17 children aged zero to nine and 15 children aged ten to 19 who have died due to COVID-19.  This represents 0.0725% of the 44,133[136] total New Yorkers who have passed away due to COVID-19.[137]

320.    It has been reported that children under the age of 15 have a greater chance of being struck by lightning than dying of COVID-19.[138]

---

[131] tps://pubmed.ncbi.nlm.nih.gov/29191349/
[132]  https://adc.bmj.com/content/106/5/429
[133] https://www.nature.com/articles/d41586-020-03496-7
[134] https://www.healthline.com/health-news/kids-are-half-as-likely-get-COVID-19-as-adults-heres-what-we-know
[135] https://www.statista.com/statistics/1191568/reported-deaths-from-covid-by-age-us/
[136] The NYS DOH tracker has not been updated since Defendant Governor Hochul added more than 12,000 additional deaths due to COVID-19, from 43,400 to 55,400, from what former Governor Cuomo and NYS DOH under his leadership had reported: https://www.foxnews.com/politics/kathy-hochul-adds-12k-deaths-to-covid-death-count
[137] https://covid19tracker.health.ny.gov/views/NYS-COVID19-Tracker/NYSDOHCOVID-19Tracker-Fatalities?%3Aembed=yes&%3Atoolbar=no&%3Atabs=n
[138] https://www.telegraph.co.uk/politics/2020/06/09/school-age-children-likely-hit-lightning-die-coronavirus-oxbridge/?fbclid=IwAR0CjevkUPW3TFy8i_QPolumu_O-1ratcMUWJxP4I6EHr8EPFa3FFGB-gpw

321.  Early epidemiologic reports on COVID-19 in children showed they are less likely than adults to be infected and have a severe illness.

    a.  In a large study published in *Pediatrics*, the official peer-reviewed journal of the American Academy of Pediatrics, researchers conducted the first retrospective epidemiologic analysis of disease spread and severity in 2,143 confirmed or possible pediatric COVID-19 infections reported to the Chinese Center for Disease Control and Prevention.

    b.  The study analyzed children hospitalized in Wuhan, China (children were defined as being less than 18 years old). "Only one child died, and most cases were mild, with much fewer severe and critical cases than adult patients," the study reported.

    c.  The findings suggest that compared with adult patients, clinical manifestations of children's COVID-19 may be less severe.[139]  In fact, only one child (with cerebral palsy) died during the initial COVID-19 outbreak in Wuhan, China. Yan Cheng, a 16-year-old boy, died due to neglect because his sole caregiver contracted COVID-19 and was hospitalized. [140]

322.  The *New England Journal of Medicine*, one of the most prestigious peer-reviewed medical journals, published an article outlining the dubious nature of children contracting and transmitting COVID-19 to adults.

    a.  The study tested people living in Iceland who were at high risk for infection along with a population screening that utilized two strategies: 1) open invitation to 10,797 people, 2) random invitations sent to 2283 people. A total of 1221 of 9119 people who were recruited for targeted testing had positive results. 87 people in the open-invitation and 13 people in the random population screening tested positive for the virus.

    b.  Children under 10 years of age were less likely to receive a positive result than were persons 10 years of age or older. Out of 564 children under the age of 10 years in the targeted group testing, 38 tested positive, in contrast to positive test results of 1183 of 8635 people who were 10 years of age or older.

    c.  The study found that "[i]n the population-screening group, the difference was even more marked: none of the 848 children under the age of 10 years tested positive…." Based on the study's results, the article concluded that children are underrepresented in COVID-19 cases, especially severe and fatal cases.[141]

---

[139] https://pediatrics.aappublications.org/content/pediatrics/early/2020/03/16/peds.2020-0702.full.pdf
[140] https://www.bbc.com/news/world-asia-china-51362772
[141] https://www.nejm.org/doi/pdf/10.1056/NEJMoa2006100

323.   In late April 2020, scientists at France's Institute Pasteur, an international research and education institution founded in 1887, with the support of the Hauts-de-France Regional Health Agency and the Amiens Education Authority, carried out an epidemiological survey on 1,340 people linked to primary schools in Crépy-en-Valois, in the Oise department. "Overall, the results of this study are comparable to those of studies carried out in other countries, which suggest that children aged between 6 and 11 are generally infected in a family environment rather than at school. The main new finding is that the infected children did not spread the virus to other children or teachers or other school staff," commented Arnaud Fontanet, lead author of the study, Head of the Epidemiology of Emerging Diseases Unit at the Institute Pasteur and a Professor at the CNAM.[142]

324.   A report by McKinsey and Company, one of the most prominent management consultants globally, notes that children have a much lower risk of contracting COVID-19 than adults.

325.   Researchers found that:

> "The most critical question is whether reopening schools will lead to a resurgence of infection among students, staff, and the broader community. The evidence here is still nascent. Children's risk of contracting COVID-19 appears to be lower than that of adults. In China and the United States, the countries with the largest number of confirmed COVID-19 cases, children represent 2 percent of cases. Emerging evidence also suggests that children are more likely to be asymptomatic, less likely to be hospitalized, and much less likely to die if they do develop COVID-19."

326.   The McKinsey report also underscored the importance of in-person schooling:

> "Every year, students in the United States lose a month's worth of learning over the summer, with the sharpest learning declines in math, seen especially in low-income students. One recent analysis projects that students could return in the fall, having progressed only 70 percent of a grade in reading and less than 50 percent of a grade in math during the 2019–20 school year. If closures extend beyond the fall, this shortfall could be even greater, with negative consequences for individual students and society. Beyond academics, schools provide important social support,

---

[142] https://www.pasteur.fr/en/press-area/press-documents/COVID-19-primary-schools-no-significant-transmission-among-children-students-teachers

especially to vulnerable students. Indeed, 19 percent of reports of child abuse or neglect in the United States come through education personnel, and school closures have resulted in a steep drop in such reports. This change suggests that school closures have shut down support sources for victims of abuse. Reports of domestic violence increased more than 30 percent in France, 50 percent in India, and 60 percent in Mexico. With such high stakes, systems that can consistently deliver remote student services—nutrition, safety, and mental health support—can likely weather longer closures than those who cannot."[143]

327.  *The Journal of Pediatrics*, the official peer-reviewed journal of the American Academy of Pediatrics, published a Commentary that explores the scientific complexities of children transmitting COVID-19. The following represent the salient points of the commentary:

   a.  The authors deduced that children infrequently transit COVID-19 to adults, basing their conclusions on a new study published in Pediatrics, "COVID-19 in Children and the Dynamics of Infection in Families," and four other recent studies that examine COVID-19 transmission by and among children.

   b.  Referencing cases in China, Japan, France, and Australia, the authors further elaborate that children are not "driving the pandemic." For example, contact tracing of 40 children under 16 years of age with confirmed cases of SARS-CoV-2 at the Geneva University Hospital in Geneva, Switzerland, from March 10 to April 10, were identified along with their infected household contacts.

   c.  In only 3 cases did children exhibit symptoms of illness before their adult household contacts. In all other cases, the children exhibited symptoms after, or concurrent with, their adult household contacts.

   d.  This alludes to the notion that the child was not the primary source of the virus's transmission, therefore more often obtaining COVID-19 from adults, rather than being the transmitters themselves.

   e.  This study coincides with investigations performed in China, where 68 children confirmed with COVID-19 were admitted into Qingdao Women's and Children's Hospital from January 20 to February 27, 2020. 65 of these infected cases were household contacts of previously affected adults, which amounts to 95.59% of the total number of cases.

   f.  An understanding of these studies demonstrates that the transmission of SARS-CoV-2 in schools is not as profound a predicament as initially considered.

   g.  As the authors state, "Almost 6 months into the pandemic, accumulating evidence and collective experience argue that children, particularly school-aged children, are far less important drivers of SARS-CoV-2 transmission than adults."

---

[143] https://www.mckinsey.com/industries/social-sector/our-insights/safely-back-to-school-after-coronavirus-closures

h.  School re-opening in the fall is imperative to children's well-being and healthy development, the authors say. "Therefore, serious consideration should be paid toward strategies that allow schools to remain open, even during periods of COVID-19 spread. In doing so, we could minimize the potentially profound adverse social, developmental, and health costs that our children will continue to suffer until an effective treatment or vaccine can be developed and distributed or, failing that until we reach herd immunity," the article concludes.[144]

328.  *The Indian Journal of Pediatrics* published a scientific letter that assesses the intricacies of transmission of COVID-19 in children.  The authors affirmed that a notable feature of the COVID-19 pandemic is that children account for less than 2% of total cases, and most develop only mild illness. "Even when children with comorbidities are being reported at risk of severe disease, mortality was very rare. Many asymptomatic infections were noted.  Most acquired infection from close contact with adults in family clusters. However, transmission from children to others was rare," the letter stated.

329.  Pulling data from cases in China, Spain, and Sweden, the authors conclude that "it might be prudent to anticipate an optimistic scenario when schools open."[145]

330.  On June 24, 2020, at an emergency local school board meeting to discuss reopening schools, Dr. Mark McDonald, a psychiatrist who specialized in children and at-risk youth, stated:

"Children are not dying from COVID-19.  Children are not passing the disease on to adults.  So the only question is, "Why are we even having this meeting tonight?" We're meeting because we adults are afraid.

As parents, we will face many moments of anxiety: seeing our children off on their first day of kindergarten, their first day of camp, their first year of college.  We may want to keep them home to protect them from the world, which can indeed be a frightening place.  But let's be clear, when we do that, we are not really protecting our children.  We are only attempting to manage our own anxiety, and we do that at their expense.  We are acting as negligent parents.  We are harming our children. We are failing them.

We must agree to make decisions in the best interest of the children.  If we do not - if, paralyzed by fear, we continue to act purely out of self-interest - we will ensure

---

[144] https://pediatrics.aappublications.org/content/pediatrics/early/2020/07/08/peds.2020-004879.full.pdf
[145] https://link.springer.com/article/10.1007/s12098-020-03401-0#author-information

an entire generation of traumatized young adults, consigned to perpetual adolescence and residency in their parents' garages, unable to move through life with independence, courage, and confidence.  They deserve better - we owe it to them as parents."[146]

331.   "What is truly driving the agenda to close schools," questions Daniel Horowitz, senior editor

of *The Conservative Review*. Horowitz wrote an article that compares and contrasts the flu

and COVID-19 in children while expounding on research that highlights the deadliness of

the flu season to children. "The reality is that every flu season, many more children die from

this common ailment than have from COVID-19," Horowitz claimed. He argued that, unlike

the flu, COVID-19 presents rare pediatric deaths and severe conditions among children.

"Even those who suffer no serious consequences [of the flu] are often bedridden for a week

or longer with high fever, muscle ache, and incessant coughing, unlike COVID-19, where

almost every child who develops it is asymptomatic or very mildly symptomatic."

332.   Throughout the article, Horowitz cites specific examples of severe flu in children, and

questions discrepancies in its overall treatment (specifically in school settings) compared

with COVID-19 –

"… if we are going to limit or modify or schooling and mandate that kids wear suffocating masks all day, shouldn't this be done every year from November to April – by a factor of 10? And given that the flu does linger for all months of the year, at least at the threat level of COVID-19 to children during the off months, if schools are closed for COVID-19, shouldn't they always be closed because of the flu?"[147]

333.   Even vaccination research and protocols separate adults from children and further

distinguish various age brackets within children.[148]

---

[146] ttps://www.markmcdonaldmd.com/?s=09.
[147]  https://www.conservativereview.com/news/horowitz-panicmongers-consistent-wed-close-schools-every-flu-season/
[148] https://theconversation.com/kids-arent-just-littler-adults-heres-why-they-need-their-own-clinical-trials-for-a-COVID-19-vaccine-162821; *See also* https://www.cedars-sinai.org/blog/COVID-19-vaccine-trials-children.html; *see also* https://www.sciencedirect.com/science/article/pii/S0264410X15010634?via%3Dihub

B.  POTENTIAL LONG-TERM DETRIMENTS OF MASKING CHILDREN OUTWEIGHS THE
PURPORTED BENEFITS OF PREVENTING THE SPREAD OF COVID-19.

334.  There are well-established negative Behavioral, Physiological, and Psychological Effects of wearing masks in children. Face masks are proven to be relatively ineffective in preventing the wearer from becoming infected by the virus that causes COVID-19, according to a study of over 6,000 subjects.[149]

335.  However, masks do cause significant behavioral, physiological, and psychological effects, especially when masks are mandated among and around children.

336.  A German survey asked 20,353 parents if their children (nearly 26,000 children in total) experienced adverse side effects of mask usage.

337.  In the study, 68% of the parents reported that their children experienced impairments, including 60% reporting irritability, 53% reporting headaches, 50% reporting difficulty concentrating, 42% malaise, 37% reporting learning fatigue, and 38% reporting impaired learning.[150]

338.  Adults are also proven to experience adverse side effects of mask usage. A study of healthcare workers showed that 91.3% of subjects using PPE with existing headache diagnoses claimed that the PPE affected their headaches and diminished their work performance.[151] A similar study showed that 81% of healthcare workers studied developed headaches from wearing masks.[152]

339.  Other research has shown that extensive wearing of masks decreases oxygen to the brain. Many children may experience learning impairment, and adults may experience headaches

---

[149] https://www.lifesitenews.com/opinion/study-shows-how-masks-are-harming-children/
[150] https://www.researchsquare.com/article/rs-124394/v2
[151] https://headachejournal.onlinelibrary.wiley.com/doi/full/10.1111/head.13811
[152] ttps://www.technocracy.news/blaylock-face-masks-pose-serious-risks-to-the-healthy/

when forced to wear masks because of a lack of oxygen in the bloodstream. The same study showing 81% of healthcare workers developed mask-related headaches acknowledged that the cause of the headaches was likely "hypoxia or hypercapnia" (decrease in blood oxygen or increase in blood CO2). Many studies have proven that mask usage is related to a significant decrease in blood oxygen levels—up to 20% decrease in some cases.[153]

340. Furthermore, this decrease in blood oxygen can be incredibly dangerous for children and detrimental to their proper development. The Japan Pediatric Association warns that masks on infants can impair their breathing, increase the burden on their hearts, and increase the risk of heatstroke.[154]

341. Additionally, Dr. Margarite Griesz-Brison, a German Consultant Neurologist and Neurophysiologist, has warned that all children are at risk of adverse developmental effects when made to wear masks – "Children and adolescents have an extremely active and adaptive immune system, and they need constant interaction with the microbiome of the Earth. Their brain is also incredibly active, as it has so much to learn. The child's brain or the youth's brain is thirsting for oxygen. The more metabolically active the organ is, the more oxygen it requires.  In children and adolescents, every organ is metabolically active."[155]

342. Dr. Griesz-Brison notes that children are more negatively impacted by the lack of oxygen and the inability to interact with pathogens to develop strong immune systems than they are assisted by them. *Id.*

343. Masks become even more dangerous once saturated from saliva, dirt, sweat, or other substances. While completely dry and functioning as intended, masks still reduce the

---

[153] https://www.technocracy.news/blaylock-face-masks-pose-serious-risks-to-the-healthy/; *see also* https://pubmed.ncbi.nlm.nih.gov/15340662/; *see also*  https://pubmed.ncbi.nlm.nih.gov/18500410/
[154] https://www.japantimes.co.jp/news/2020/05/27/national/masks-children-coronavirus/
[155] https://perma.cc/Q568-Y2H2

wearer's oxygen intake and increase their take in of $CO_2$. However, masks, as used by the public, are rarely dry and functioning as intended.

344.   Research shows that masks become even more dangerous and constricting when they are wet, dirty, or overused. A study of the efficacy of cloth masks versus surgical masks found that cloth masks were inadvisable because "[m]oisture retention, reuse of cloth masks and poor filtration may result in increased risk of infection."[156] Accordingly, the moisture retention of cloth masks blocks respiration and increases the $CO_2$ trapped in the mouth-space, further endangering the wearer.

345.   The dangers of this saturation were seen in China when three schoolchildren in different regions died due to respiration-related difficulties while wearing masks during gym class. A report cited the events suggesting that mask saturation may have been a cause for the deaths:

> "Temperatures in China's southern provinces have risen in recent days, with students having gym class during the hottest hours of the day. Yin Zhenhe, a professor in the department of preventative medicine at Yonsei University Hospital in Seoul, told CCTV that once a mask is saturated (from sweat), a person's breathing capability decreases by up to 20%."[157]

346.   COVID-19 deaths have also been connected with secondary fungal infection. A recent study from India found that cloth mask use significantly increases the risk of developing Coronavirus disease-associated mucormycosis ("CAM") (a deadly fungal infection of the lungs seen primarily in COVID-19 patients in India sometimes referred to as "Black Fungus" infection). "Use of surgical or cloth masks for prolonged periods was found to be associated with an increased risk of CAM." [158]

---

[156]  https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4420971/
[157] https://www.thatsmags.com/china/post/31100/student-deaths-lead-schools-to-adjust-rules-on-masks-while-exercising
[158] Umang Arora et al., Novel risk factors for Coronavirus disease-associated mucormycosis (CAM): a case-control study during the outbreak in India, MEDRXIV (forthcoming 2021), available at https://doi.org/10.1101/2021.07.24.21261040.

347.   Ironically, Dr. Anthony Fauci and other scientific and medical professionals published a study in 2008 establishing that most of the deaths in the pandemic of 1918 were not from influenza; instead, the deaths were caused by secondary bacterial infections that developed into pneumonia.[159]

C.   THE EFFECTS OF MASKS ON THE SOCIAL DEVELOPMENT OF STUDENTS

348.   Other studies show that repeated and extensive wearing of masks in children impairs child recognition and language development.

349.   The physical dangers that masks pose to children also threaten severe developmental challenges. Child psychologists have studied the relationship between child development of recognition abilities through exposure to the facial expressions of adults around them since long before the COVID-19 pandemic.

350.   Kang Lee, a professor of applied psychology and human development at the University of Toronto, says that children under 12 rely mostly on facial features to recognize people.[160]

351.   David Lewkowicz, senior scientist at Haskins Laboratories and professor adjunct at the Yale Child Study Center, verifies:

> "There's general agreement now that somewhere between four to five years of age is where the ability to start to perceive faces as holistic objects begins to emerge .... Now, if you imagine that those kids are now living in a world where half the face is blocked, that is clearly going to have an effect on the development of this ability, which is really really important for face recognition."[161]

352.   Similarly, Lee suggests that speech recognition is developed in young children through the child's watching of lips and facial movements as well as facial recognition.

---

[159] Morens D.M., et al., Predominant role of bacterial pneumonia as a cause of death in pandemic influenza: implications for pandemic influenza preparedness, 198 J Infect Dis. 962 (2008), available at https://pubmed.ncbi.nlm.nih.gov/18710327/.
[160] https://www.advisory.com/daily-briefing/2020/09/17/masks
[161] https://www.cbc.ca/news/science/children-masks-language-speech-faces-1.5948037

353.   Lewkowicz has demonstrated this with his research tracking the eye movements of children when watching a woman speak to them:

> "What we discovered, in a nutshell, was that at four months of age babies were really interested in the eyes of the talker. But then at eight months of age there was a really dramatic shift … where they started to look much more at the mouth region of the person that was talking to them."

354.   When masks obscure these features of the nose and lips, the communication development of young children can be delayed. Amy Learmonth, professor of Psychology at William Patterson University, concurs that young children need visual cues to learn language and communication skills "because learning a new word when you don't have any is complicated."[162]

355.   Learmonth also warns about the harms that delay in the development of these skills due to the usage of masks in the COVID-19 pandemic can cause: "Anyone who is just a little behind in language development or a little behind in understanding social cues -- what concerns me is that they will fall further behind."

356.   Facial expressions are essential for gathering information about the people you interact with to understand how they feel and guide one's interaction.[163]

357.   This interpretive skill is essential to successful emotional and language development in adolescence. Children who are better at reading facial expressions perform better in school, socially and are more popular with their peers.

358.   Alternatively, children less adept at interpreting facial expressions are prone to "peer problems and learning difficulties."[164]

---

[162] ttps://www.cnn.com/2021/08/11/health/masks-child-development-effects-covid-pandemic-wellness/index.html
[163] https://www.verywellmind.com/understanding-emotions-through-facial-expressions-3024851
[164] https://parentingscience.com/facial-expressions-for-kids/

359. Children exhibit more expressive control the older they get – meaning that they try to hide negative emotions from appearing in their facial expressions as they age and understand the effect their facial expressions have on the people around them.[165] The development of these skills lasts through the majority of adolescence, as children only reach an adult-level of facial expression recognition around the age of eleven.[166]

360. Studies suggest that culture is also vital to developing a child's face-reading abilities because different cultures read expressions differently based on their cultural context.[167]

361. David Lewkowicz of the Yale Child Study Center demonstrates the necessity of facial expressions to child development in a study of lip-reading in babies. Lewkowicz says that babies begin looking at the mouth around 6-8 months old: "they spend a lot of time looking at that person's mouth, trying to master their own native speech, getting not only auditory cues but visual."[168] The fact that very young babies instinctively look for the mouth of the person communicating with them shows how essential seeing the mouth is to communicating with facial expressions.

362. Kang Lee of the Development Lab at the University of Toronto suggests that reading facial expressions is a part of human evolution: "As humans evolved from primates, we shed a lot of facial hair. There's good reason for it—it highlights the eyes and other facial features so we can read important information about another person. By just looking at a face you can see what group or race they belong to, their age, and whether they are male or female."[169] Lee highlights the importance of the most subtle aspects of facial expression to emotional

---

[165] ttps://www.jstor.org/stable/1130411
[166] https://pubmed.ncbi.nlm.nih.gov/25492258/; *see also* https://pubmed.ncbi.nlm.nih.gov/16472321/
[167] Crivelli C, Jarillo S, Russell JA, Fernández-Dols JM. 2016. Reading emotions from faces in two indigenous societies. J Exp Psychol Gen. 145(7):830-43.
[168] https://www.nytimes.com/2020/09/14/well/family/Masks-child-development.html
[169] https://dana.org/article/losing-face/

communication: "Once you make social contact, the face also is a source of emotional information. The brain can very efficiently manipulate the facial muscles to convey different kinds of emotions, even extremely subtle changes in our emotions. It's not a surprise that the brain has set aside a special area so we can quickly perceive and process this information."

363. The information communicated through the face is so important to human communication that an entire section of the brain is dedicated to interpreting the faces around us. When these faces are masked, however, this facial communication essential to human expression is blocked.

364. Facial expressions, and therefore the ability to freely speak and express one's self are blocked by masks. In a study by Claus-Christian Carbon, a perceptual psychologist at the University of Bamberg, participants aged 19-87 viewed photos of faces depicting different emotions with medical masks covering their mouths and noses and were asked to identify what emotions they perceived.

365. Participants reported that they had difficulty judging the emotions of the faces - especially the "happy" emotions - when the faces were covered with masks. Carbon concluded that masks covering the face make perception of emotion much more difficult even for adults with fully developed facial recognition abilities: "If you don't have as much information about the face, it makes sense that processing will be hampered. But what we also saw was that participants had lower confidence in their own perceptual ability when reading those faces. Given that emotional expressions are one of the most efficient ways of communicating to other people, this is something that does have an impact."[170]

---

[170] https://dana.org/article/losing-face/

366.  A similar experiment was conducted in Wisconsin with children as participants rather than adults. The results of this study found that "participants were less accurate at reading emotions on masked compared to unmasked faces, but their accuracy was still above chance."[171] This means that children, whose facial recognition abilities are still developing, can use context to make educated guesses about what emotion a masked face is expressing; however, their ability to recognize emotion is still considerably hindered when the face is covered.

367.  The effect of this masking is a decrease in the personal ability to share emotions with others, as others have a proven impaired ability to read emotion on masked faces, but also a decrease in child ability to develop emotional health and communication abilities through the essential interaction with facial expressions in their environment.

368.  The conclusion to be reached is that masks are detrimental to a child's development, health, and ability to communicate. According to Dr. Michael Unger, a family therapist and researcher at Dalhousie University: "With widespread masking, we may unintentionally be disadvantaging younger children from developing the necessary skills to discern emotions and the neurological changes that make it possible to distinguish one face from another."[172]

369.  Unger cautions, "It is likely that younger children are not being exposed to the many different facial expressions which stimulate good neurocognitive development" when they live in a social environment in which the faces and emotions around them are masked and made more difficult to perceive and learn from."

---

[171] https://pubmed.ncbi.nlm.nih.gov/33362251/
[172] https://www.psychologytoday.com/us/blog/nurturing-resilience/202012/will-wearing-masks-affect-children-s-emotional-development

370. This underdevelopment in younger kids is met with an even more alarming negative emotional effect of masked social communities on older children.

371. According to Ashley Ruba, a postdoctoral fellow in the Child Emotion Lab at the University of Wisconsin-Madison, "People are focused on the mask-wearing as something that will hurt kids, but what may be of more concern is that so many children are isolated from their friends or struggling with virtual school. We don't know yet what may have long-term effects on development or mental health. These are things that we should be looking at carefully as we move forward."[173]

372. Older children are suffering from the lack of communication and the ability to express themselves when they are kept out of social environments or put in social environments in which they are masked and cannot properly communicate or gauge the emotions of those around them.

373. This physical and emotional isolation has led to increased child suicide rates in the last year, with many children citing social isolation as a stressor in their life leading to the decision to commit suicide.[174]

374. *JAMA Pediatrics* published a research letter approved by the Ethics Committee of Tongji Medical College and Huazhong University of Science and Technology. Using Hubei Province, China as its case study, this research investigated the mental health status of children in home confinement during COVID-19. Depression and anxiety symptoms were two driving health risks identified among students in Hubei. A total of 2330 students in grades 2 through 6 in 2 primary schools in Hubei province, of whom 845 were from Wuhan

---

[173] https://dana.org/article/losing-face/
[174] https://www.cbs58.com/news/3-out-of-5-teens-who-died-by-suicide-in-milwaukee-county-last-year-cited-virtual-learning-as-a-stressor

and 1485 were from Huangshi, were invited to complete a survey between February 28 and March 5, 2020. The information included sex, school grade, optimism about the epidemic, whether they worried about being infected by COVID-19, and depressive and anxiety symptoms measured by the Children's Depression Inventory–Short Form (CDI-S) and the Screen for Child Anxiety Related Emotional Disorders, respectively. The study concluded: "22.6% of students reported having depressive symptoms, which is higher than other investigations in primary schools of China (17.2%). During the outbreak of COVID-19, the reduction of outdoor activities and social interaction may have been associated with an increase in children's depressive symptoms. Our study found that 18.9% of students reported anxiety symptoms, which is higher than the prevalence in other surveys."[175]

375.  There are many other public health concerns such as increases in child abuse and neglect[176] malnutrition,[177] mental health,[178] as well as increases in alcohol and drug use[179] associated with keeping kids out of school.[180]

D.  THE EFFECTS OF MASKS ON THE EMOTIONAL DEVELOPMENT OF STUDENTS

376.  Research also reveals that mask-wearing impairs a child's emotional development, which is arguably even more important than the development of recognition and language abilities.

---

[175] https://jamanetwork.com/journals/jamapediatrics/fullarticle/2765196
[176] https://www.nytimes.com/2020/06/09/nyregion/coronavirus-nyc-child-abuse.html; *see also* https://www.usatoday.com/story/news/nation/2020/05/13/hospitals-seeing-more-severe-child-abuse-injuries-during-coronavirus/3116395001/
[177] https://www.nejm.org/doi/full/10.1056/NEJMp2005638; *see also* https://www.forbes.com/sites/alexandrasternlicht/2020/05/06/the-number-of-mothers-reporting-food-insecurity-has-jumped-more-than-200-since-start-of-pandemic/amp/?__twitter_impression=true.
[178]  https://www.washingtonpost.com/health/2020/05/04/mental-health-coronavirus/
 See also https://www.today.com/parents/mental-load-coronavirus-pandemic-means-moms-take-more-t179021.
[179] https://www.cdc.gov/coronavirus/2019-ncov/daily-life-coping/stress-coping/alcohol-use.html; *see also* https://www.shatterproof.org/blog/why-COVID-19-perfect-storm-addiction-world
[180] https://www.mckinsey.com/industries/public-sector/our-insights/COVID-19-and-student-learning-in-the-united-states-the-hurt-could-last-a-lifetime; *see also:* https://www.today.com/parents/parents-children-disabilities-discuss-remote-school-t187677; *see also* https://www.nbcnews.com/business/consumer/what-do-working-parents-do-when-coronavirus-closes-local-schools-n1150671

377.   According to psychologists, emotional development is dependent on the child's ability to see the communication of emotions through the facial expressions of the adults around them. Kang Lee explains that "face masks obscure the 'facial musculature' people use to communicate 'emotional information.'"

378.   Because of this, "children will likely have problems with 'emotional recognition and social interaction'" as a result of mask mandates during the COVID-19 pandemic.[181]

379.   A group of 70 doctors in Belgium found this threat to emotional development severe enough to sign a petition asking Ben Weyts, the Minister of Education in Belgium, to repeal his mask mandate in schools. The complaint of these physicians on behalf of children states:

> "The mandatory mouth mask in schools is a major threat to their development. It ignores the essential needs of the growing child. The well-being of children and young people is highly dependent on the emotional connection with others. (…). The aim of education is to create an optimal context so that a maximum development of young people is possible. The school environment must be a safe practice field. The mouth mask obligation, on the other hand, makes the school a threatening and unsafe environment, where emotional connection becomes difficult."[182]

## IX.   A MASK MANDATE FOR STUDENTS WITH DISABILITIES IS A VIOLATION OF THE IDEA, ADA, §504, §1983, AND OTHER FEDERAL LAW

380.   The effects of wearing masks are heightened for children with disabilities. Dominique Payment, an Autism Canada family support representative, says that children and adults with autism "have trouble with sensory processing, as well as tactile, olfactory, and nervous-system hypersensitivity that wearing a mask could aggravate."[183]

---

[181] https://www.advisory.com/daily-briefing/2020/09/17/masks
[182] ] https://www.world-today-news.com/70-doctors-in-open-letter-to-ben-weyts-abolish-mandatory-mouth-mask-at-school-belgium/
[183] https://globalnews.ca/news/6967625/coronavirus-canada-face-masks-disabilities/

381. This, coupled with Amy Learmonth's statement that "anyone who is just a little behind in language development or a little behind in understanding social cues … will fall further behind" demonstrates the way that mask mandates negatively impact students with disabilities in a more heightened way than it impacts able children.[184]

382. Children with disabilities are not only negatively impacted when they are made to wear a mask, impairing their physical well-being, but they are negatively impacted when their able classmates are made to wear masks, impairing their development of essential recognition, language, and emotional abilities even more so than those wearing the masks are impaired.

383. As further described below, the mask-mandate also directly violates the rights of students with disabilities under the IDEA, the ADA, §504, and other relevant federal and state laws.

384. As further described below, the mask-mandate also directly violates the rights of students with disabilities under the IDEA, the ADA, §504, and other relevant federal and state laws.

A.  A MASK, BY DEFINITION, IS A "MEDICAL DEVICE"

385. Under the 1976 Medical Device Amendments, the Food Drug and Cosmetics Act ("FDCA") defines a medical device as:

> "an instrument, apparatus, implement, machine, contrivance, implant ... or other similar or related article ... intended for use in the diagnosis of disease or other conditions, or in the cure, mitigation, treatment, or prevention of disease . . . [or] intended to affect the structure or any function of the body of man.., and which does not achieve any of its principal intended purposes through chemical action within or on the body."[185]

386. Under federal law, masks (surgical and otherwise), as well as face coverings, are regulated devices and require FDA approval or authorization when used for a medical purpose. Mitigating the spread of an infectious disease is defined as a medical purpose.

---

[184] https://www.cnn.com/2021/08/11/health/masks-child-development-effects-covid-pandemic-wellness/index.html.
[185] Lanier, Veronica, *Medical Device Eligibility for the Statutory Experimental Use Exception to Patent Infringment,* HASTINGS COMMUNICATIONS AND ENTERTAINMENT LAW JOURNAL, Vol. 17, No. 3 (1995); see also, PL 94–295 (S 510), PL 94–295, May 28, 1976, 90 Stat 539

387. None of the masks currently available for COVID-19 are approved or licensed by the federal government for children to use.

388. Accordingly, those masks available to the general public outside hospitals are made available on a conditional basis through an Emergency Use Authorization ("EUA").[186]

389. By the express terms of their EUA letters and the governing statutes that regulate EUA products, a primary condition is that masks may not be mandated.

390. The EUA letters issued by the FDA clarify that masks, even surgical masks, have not been established as safe or effective for use in mitigating infection.

391. In fact, the FDA has labeled masks experimental devices requiring, *inter alia*, that the user must be advised of his right to refuse to use the experimental device or product. See 21 U.S.C. § 360bbb-3(e)(1)(A) ("Section 360bbb-3").

392. The FDA takes the position that the terms and conditions of EUAs preempt state and local laws. See 21 U.S.C. § 360(k)(a):

> "GENERAL RULE. Except as provided in subsection (b), no State or political subdivision of a State may establish or continue in effect with respect to a device intended for human use any requirement that would impose obligations that are inconsistent with those terms and conditions."

> See, also, Emergency Use Authorization of Medical Products and Related Authorities: Guidance for Industry and Other Stakeholders:

> "FDA believes that the terms and conditions of an EUA issued under section 564 preempt state or local law, both legislative requirements and common-law duties, that impose different or additional requirements on the medical product for which the EUA was issued in the context of the emergency declared under section 564…To the extent state or local law may impose requirements different from or in addition to those imposed by the EUA for a particular medical product within the scope of the declared emergency or threat of emergency (e.g., requirements on prescribing, dispensing, administering, or labeling of the medical product), such law 'stands as an obstacle to the accomplishment and execution of the full purposes

---

[186] https://www.fda.gov/medical-devices/coronavirus-disease-2019-covid-19-emergency-use-authorizations-medical-devices/personal-protective-equipment-euas#surgicalmasks.

and objectives of Congress,' and 'conflicts with the exercise of Federal authority under [§ 564].'"[187]

393. The Mask EUAs each specify that "emergency use of face masks must be consistent with, and may not exceed, the terms of this letter….".

394. Further, the Mask EUA's state that the products must not be labeled in such a manner that would misrepresent the product's intended use; for example, the labeling must not state or imply that the product is intended for antimicrobial or antiviral protection or related uses or is for use such as infection prevention or reduction.

395. Similarly, in its Enforcement Policy for Face Masks and Respirators During the Coronavirus Disease (COVID-19) Public Health Emergency (Revised),[188] the FDA stated in three instances that masks are not intended to reduce or prevent infection: The product is not intended for any use that would create an undue risk in light of the public health emergency, for example, the labeling does not include uses for antimicrobial or antiviral protection or related uses or uses for infection prevention or reduction or related uses and does not include particulate filtration claims.

B. THE IMPLEMENTATION OF A MASK MANDATE FUNDAMENTALLY ALTERS THE TERMS OF THE STUDENT'S INDIVIDUAL EDUCATION PLAN (IEP) AND THUS VIOLATES THE IDEA AND TRIGGERS PENDENCY

396. Under the Individuals with Disabilities Education Act ("IDEA"), The IDEA contains a so-called "stay put" or "pendency" provision that provides as follows: "during the pendency of any proceedings conducted pursuant to this section, unless the State or local educational agency and parent otherwise agree, the child shall remain in the then-current educational

---

[187] See guidance at 39-40 available at https://www.fda.gov/regulatory-information/search-fda-guidance-documents/emergency-useauthorization-medical-products-and-related-authorities
[188] FOOD AND DRUG ADMINISTRATION, Enforcement Policy for Face Masks and Respirators During the Coronavirus Disease (COVID-19) Public Health Emergency (Revised May 2020), https://www.fda.gov/media/136449/download.

placement of the child . . . until all such proceedings have been completed." 20 U.S.C. §

1415(j); *see also* 34 C.F.R. § 300.518(a) and in New York State, N.Y. EDUC. L. § 4404(a).

397.  The pendency provision evinces the Congressional intent that all disabled children,

"regardless of whether their case is meritorious or not, are to remain in their current

educational placement until the dispute with regard to their placement is ultimately

resolved." *Mackey ex rel. Thomas M. v. Bd. of Educ. For Arlington Cent. Sch. Dist.*, 386

F.3d 158, 160 (2d Cir.), *supplemented sub nom. Mackey v. Bd. of Educ. for Arlington Cent.

Sch. Dist.*, 112 F. App'x 89 (2d Cir. 2004).

398.  "The purpose of this provision is 'to maintain the educational status quo while the parties'

dispute is being resolved.'" *Avaras v. Clarkstown Central School District, et al.,* 18-CV-

6964 (NSR), Docket Entry No. 30 (S.D.N.Y. August 27, 2018); *Doe v. E. Lyme Bd. of Educ.*,

790 F.3d 440, 452 (2d Cir. 2015) (quoting, *T.M. ex rel. A.M. v. Cornwall Cent. Sch. Dist.*,

752 F.3d 145, 152 (2d Cir. 2014)).

399.  The "stay put" provision codifies a student's right to a stable learning environment during

what may become a lengthy administrative and/or judicial proceeding. *Avaras, supra*;

*Murphy v. Arlington Cent. Sch. Dist. Bd. of Educ.*, 297 F.3d 195, 199 (2d Cir. 2002).

Moreover, as alleged above, this "stay put" operates in a due process challenge "regardless

of whether the [underlying] case is meritorious or not." *Avaras, Id.; Doe*, 790 F.3d at 453;

*E. Z.-L. ex rel. R.L. v. New York City Dep't of Educ.*, 763 F. Supp. 2d 584, 598–99 (S.D.N.Y.

2011), *aff'd sub nom. R.E. v. New York City Dep't of Educ.*, 694 F.3d 167 (2d Cir. 2012).

400.  The IDEA's "stay put" provision is essentially an automatic preliminary injunction requiring

the school district to maintain the student's educational placement. *Murphy*, 297 F.3d 195.

In this regard, the IDEA:

substitutes an absolute rule in favor of the status quo for the court's discretionary consideration of the factors of irreparable harm, and either a likelihood of success on the merits or a fair ground for litigation and a balance of hardships. *See, Board of Educ. v. J.P.*, 2018 U.S. Dist. LEXIS 105102at *7 (E.D.N.Y. June 21, 2018) (citing *Zvi D. by Shirley D. v. Ambach*, 694 F.2d 904, 906 (2d Cir. 1982)); *see also* 34 C.F.R. § 300.518(a) and N.Y. Educ. Law § 4404(a).

401. The IDEA's "stay-put" codified at 20 U.S.C. § 1415(j) functions as an automatic preliminary injunction, without regard to factors such as irreparable harm or likelihood of success on the merits. *Strother v. S. California Permanente Med. Grp.*, 79 F.3d 859 (9th Cir. 1996), *as amended on denial of reh'g* (Apr. 22, 1996), *as amended on denial of reh'g* (June 3, 1996); *Casey K. ex rel. Norman K. v. St. Anne Cmty. High Sch. Dist. No. 302*, 400 F.3d 508, 511 (7th Cir. 2005) (comparing a stay put injunction to an automatic stay in a bankruptcy case); *Wagner v. Bd. of Educ. of Montgomery Cty.*, 335 F.3d 297, 301 (4th Cir. 2003) (noting that an "injunction is automatic").

402. The "stay-put" interim relief also includes the requirement to continue funding the disabled student's current educational placement until the proceedings are complete. *See Doe*, 790 F.3d at 452; *T.M. ex rel. A.M.*, 752 F.3d at 171; *E. Z.-L. ex rel. R.L.*, 763 F. Supp. 2d at 599. "This provision aims to preserve public funding for an educational placement 'consented to by the parent before the parent requested a due process hearing. To cut off public funds would amount to a unilateral change in placement, prohibited by the Act.'" *Mackey ex rel. Thomas M.*, 386 F.3d at 163 (quoting *Zvi D. v. Ambach,* 694 F.2d 904, 906 (2d Cir. 1982)).

403. A disabled student's right to a "stay put" or "pendency placement" arises when that student's parent initiates a due process complaint with the local school district. *See, Doe,* 790 F. 3d at 452. This statutory right exists to prevent school districts from unilaterally modifying a disabled student's educational placement during the pendency of a due process dispute.

404. A disabled student's "then-current educational placement," which must be maintained during the pendency of a due process challenge under the IDEA (related to the identification, evaluation, or placement of the student) and subsequent administrative and/or judicial proceedings, is not defined by statute or regulation.

405. Nevertheless, such educational placement has been interpreted to mean either:

   (1)  the educational placement set forth in the disabled student's most recently implemented Individualized Education Program ("IEP") (also referred to as the "last agreed upon" IEP);

   (2)  the operative placement actually functioning at the time that the due process proceeding was commenced; or

   (3)  the educational placement at the time of the previously implemented IEP. *See, Dervishi v. Stamford Bd. of Educ.*, 653 F. App'x 55, 57–58 (2d Cir. 2016); *T.M. ex rel. A.M.*, 752 F.3d at 170–71; *Mackey ex rel. Thomas M.*, 386 F.3d at 163.

406.  Although the IDEA has an "exhaustion" requirement, the Plaintiffs herein are not required to exhaust administrative remedies by alleging a violation of 20 U.S.C. § 1415(j). An action alleging the violation of the stay-put provision falls within one or more of the exceptions to the exhaustion prerequisite. *Murphy*, 297 F.3d at 199; *Doe*, 790 F.3d at 445; *Digre v. Roseville Sch. Indep. Dist. No. 623*, 841 F.2d 245, 250 (8th Cir. 1988) (holding federal courts have authority to enter injunctions regarding placement during the pendency of state administrative proceedings); see also *N.D. ex rel. parents acting as guardians ad litem v. Hawaii Dep't of Educ.*, 600 F.3d 1104, 1111 (9th Cir. 2010) (concluded that "exhausting the administrative process would be inadequate because the stay-put provision (and therefore the preliminary injunction) is designed precisely to prevent harm while the proceeding is ongoing.").[189]

---

[189] See *Honig v. Doe*, 484 U.S. 305, 326–27, 108 S. Ct. 592, 98 L. Ed. 2d 686 (1988) (noting that because "parents may bypass the administrative process where exhaustion would be futile or inadequate . . . we have no reason to believe that Congress meant to require schools alone to exhaust in all cases, no matter how exigent the circumstances").

407.     The term "educational placement" encompasses at least three components." *See* <u>Letter to Rieser</u>, EHLR 211:403 (July 17, 1986).[190] The first involves the type of placement – in the instant case, a self-contained classroom without the implementation of a medical device (i.e., mask/face covering); the second is the "educational program contained in the IEP including annual goals, short-term objectives and related services;" and, the "third and final component is the specific school or facility which the child attends." *Id.* <u>Letter to Rieser</u> continued that "these are all ingredients in the 'status quo' which the courts interpreting the statute have required be maintained during the pendency of proceedings."

408.    "To allow a new LEA to place the child in a regular education program or provide an interim IEP *without parental consent would defeat the purpose of the statutory provision* – 'to guarantee a coherent educational experience for a disabled child until conclusion of review of a contested IEP [emphasis added].'" *Letter to Rieser, supra.*

409.    Over the course of several decades, the Second Circuit has consistently defined "educational placement" as meaning the student's "educational program." *T.M. ex rel. A.M.*, 752 F.3d at 171 ("Under our precedent, the term 'educational placement' refers only to the general type of educational program in which the child is placed.") (quoting *Concerned Parents & Citizens for the Continuing Ed. at Malcolm X (PS 79) v. New York City Bd. of Ed.*, 629 F.2d 751, 753 (2d Cir. 1980)); *T.Y. v. New York City Dep't of Educ.*, 584 F.3d 412, 419 (2d Cir. 2009) ("Educational placement' refers to the general educational program - such as the classes, individualized attention and additional services a child will receive...").

410.    A student's educational placement does not mean the "bricks and mortar" of the school location but rather the elements of a student's educational program. *T.Y.*, 584 F.3d 412.

---

[190] See *Honig*, 484 U.S. 305 (deferring and adopting OSEP's construction of the term "change in placement" for purposes of pendency, finding that OSEP is the agency "charged with monitoring and enforcing the statute").

Thus, it has been held that a change from one school building to another (i.e., a change in location), without more, does not necessarily constitute a change in educational placement (*Concerned Parents & Citizens for the Continuing Ed. at Malcolm X (PS 79)*, 629 F.2d at 753–54).

411. In <u>Letter to Fisher</u>, 21 IDELR 992 [OSEP 1994], the United States Department of Education's Office of Special Education Programs ("OSEP") specifically addressed the question of what constitutes a "change in educational placement," opining that consideration should be given to whether a change in educational placement has occurred on a case-by-case basis, as it is a very fact-specific inquiry. (<u>Letter to Fisher</u>, 21 IDELR 992 [OSEP 1994]).

412. OSEP concluded that whether a change in educational placement has occurred turns on "whether the proposed change would substantially or materially alter the child's educational program." <u>Id.</u>

413. OSEP set forth the following factors to be considered in determining whether a change in educational placement has occurred:

  (1)  whether the educational program set out in the child's IEP has been revised;
  (2)  whether the child will be able to be educated with nondisabled children to the same extent;
  (3)  whether the child will have the same opportunities to participate in nonacademic and extracurricular services; and
  (4)   whether the new placement option is the same option on the continuum of alternative placements.

  *Letter to Fisher*, 21 IDELR 992, *supra.*

414. The "then-current educational placement" more generally refers to the educational program, which is a point along the continuum of placement options and, in many instances, does not refer to a particular institution or building where the program is implemented. *See, T.Y.*, 584

F.3d at 419–20; *L.M. v. Pinellas Cty. Sch. Bd.*, No. 810-CV-539-T-33TGW, 2010 WL 1439103, at *1–*2 (M.D. Fla. Apr. 11, 2010)).

415.  In New York State, it is noted in SRO Decision 14-098, "In this regard I note that a change from a BOCES-operated class in a public school to a district-operated class in a public school constitutes a "change in program" per New York State regulations (see 8 NYCRR 200.1[g]),[9] and a BOCES is also a different placement on the "continuum of placement options" in the State. *See, e.g.,* "Continuum of Special Education Services for School-Age Students with Disabilities," Office of Special Educ. Memo [Nov. 2013], at p. 3.[191]

416.  A "change in program" is defined as a "change in any one of the components of the [IEP] of a student as described in [8 N.Y.C.R.R.] section 200.4(d)(2)." (8 NYCRR 200.1[g]9. This includes a change in a student's placement (8 NYCRR 200.4[d][2][xii]).

417.  As noted in New York State Education Department ("SED") guidance, an assignment to a BOCES-operated classroom in a public school is considered a different "placement" than an assignment to a district-operated classroom. *See,* "Guide to Quality Individualized Education Program (IEP) Development and Implementation," Office of Special Educ. Mem. [Dec. 2010], at p. 57.[192] "Questions and Answers on Individualized Education Program (IEP) Development, the State's Model IEP Form and Related Requirements," Office of Special Educ. Mem. [Apr. 2011], at p. 47.[193]

418.  Courts have held that if a student's then-current educational placement becomes unavailable, then a district is required to provide a "similar" educational placement. *Knight by Knight v. D.C.*, 877 F.2d 1025, 1028 (D.C. Cir. 1989); *McKenzie v. Smith*, 771 F.2d 1527, 1533 &

---

[191] Available at http://www.p12.nysed.gov/specialed/publications/policy/continuum-schoolage-revNov13.pdf).
[192] Available at: http://www.p12.nysed.gov/specialed/publications/iepguidance/IEPguideDec2010.pdf
[193] Available at:  http://www.p12.nysed.gov/specialed/publications/IEP/training/QA-411.pdf

n.13 (D.C. Cir. 1985); *see also*, *Wagner*, 335 F.3d at 301–02 (holding that it is not appropriate to direct a district to provide an "alternative placement" if the task at hand is to identify a student's then-current educational placement).   Other courts have stated that a change in educational placement has been defined as a "fundamental change in, or elimination of, a basic element of the educational program." *See*, *Sherri A.D. v. Kirby*, 975 F.2d 193, 206 (5th Cir. 1992); *see also Erickson v. Albuquerque Pub. Sch.*, 199 F.3d 1116, 1121 (10th Cir. 1999).

419.   District Courts have the equitable power to review and enjoin administrative "stay-put" orders immediately, notwithstanding the fact that they are interim orders.   *See M.K. v. Roselle Park Bd. of Educ.*, No. CIV A 06-4499 JAG, 2006 WL 3193915, at *9 (D.N.J. Oct. 31, 2006), citing *Murphy*, 297 F.3d at 199.

420.   The IDEA permits disabled children to vindicate their educational rights through other statutes, including 42 U.S.C. § 1983.   *See* 20 U.S.C. § 1415(l).

421.   As the Supreme Court stated in *Honig*, 484 U.S. 305, the court has the equitable power to order a change in placement upon a sufficient showing. *Id.* at 327–28 (interpreting the "stay put" provision of the EHA – former name of the IDEA).

422.   At the outset of the COVID-19 pandemic in March and April of 2021, School districts across the country requested the Secretary of Education to grant waivers from IDEA requirements and providing FAPE during the coronavirus crisis.[194] While US DOE provided great flexibility in providing educational services during the coronavirus crisis, there has been no change in federal or state law.

---

[194] https://edsource.org/2020/disability-rights-groups-school-administrators-spar-over-possible-changes-to-special-education-laws/628376

423. On April 27, 2020, US DOE presented a Report to Congress from the United States Education Secretary at the time, Betsy DeVos ("Secretary DeVos"), which expressly did not recommend providing school districts with the option to bypass significant parts of federal special education law.[195] "While the Department has provided extensive flexibility to help schools transition, there is no reason for Congress to waive any provision designed to keep students learning," Secretary DeVos said in a statement.[196]

424. The US DOE issued updated guidance for special education students in June 2020, reaffirming previous guidance about including parents in the decision-making process:

> "Timely communication between *parents and* public agency staff can often help resolve disagreements that may arise regarding the educational services provided to a child with a disability during the pandemic," according to the Q&A. "However, when those informal efforts prove unsuccessful, IDEA's three dispute resolution mechanisms — mediation, state complaint, and due process complaint procedures — are available."[197]

425. Defendants blatantly disregarded these procedural safeguards and failed to comply with these long-established federal laws and regulations with Plaintiff-Parents.

426. Because the statewide school mask mandate has now been in effect for more than ten cumulative days, Defendants have altered the educational program of the Plaintiff-Students, thus denying them a FAPE under IDEA.[198]

427. Defendants unilaterally, substantially, and materially altered the Students' "status quo" educational program related to the Plaintiff-Students' pendency rights.  The IDEA includes

---

[195] https://www2.ed.gov/documents/coronavirus/cares-waiver-report.pdf?utm_content=&utm_medium=email&utm_name=&utm_source=govdelivery&utm_term=
[196] https://www.ed.gov/news/press-releases/secretary-devos-reiterates-learning-must-continue-all-students-declines-seek-congressional-waivers-fape-lre-requirements-idea
[197] https://www.disabilityscoop.com/2020/06/23/ed-department-new-guidance-special-education-pandemic/28517/
[198] The maximum amount of time a school district can displace a student and change the educational program without triggering a violation of 20 U.S.C. § 1415(j) is 10 school days based on *Honig*, 484 U.S. at 325, 325–26 n.8. However, this unilateral action of a suspension by the school district may create a "change in placement," and by the terms of the IDEA, a change in placement can only occur with the parents' consent, or after written notice, and the opportunity for a hearing.

numerous procedural safeguards "that guarantee parents both an opportunity for meaningful input into all decisions affecting their child's education and the right to seek review of any decisions they think inappropriate." *Honig*, 484 U.S. at 311–12.

428.   Defendants unilaterally, substantially, and materially altered the type of educational program of the Plaintiff-Students by illegally adding restraints and creating a more restrictive environment.  This unilateral change further violates the Supreme Court's express preference for educating students in the least restrictive environment with their typically developing peers. *Honig*, 484 U.S. at 313.

429.   This unilateral, substantial, and material change in the delivery of academic and related services constitutes an improper change of educational program as discussed in *T.Y.*, 584 F.3d at 419:

> "The United States Department of Education ("USDOE") expressly considered this question in its commentary to the 1997 amendments to the IDEA. In that commentary, the USDOE noted, that some commenters requested that the term "location" be defined as the placement on the continuum and not the exact building where the IEP service is to be provided . . . . Other commenters similarly stated that a note be added clarifying that 'location' means the general setting in which the services will be provided, and not a particular school or facility."
> Assistance to States for the Education of Children With Disabilities and the Early Intervention Program for Infants and Toddlers With Disabilities, 64 FR 12406, 12594, 64 FR 12406-01, 12594.

430.   In resolving this issue, the USDOE concluded that "[t]he location of services in the context of an IEP generally refers to the *type of environment that is the appropriate place* for provision of the service. For example, is the related service to be provided in the child's regular classroom or resource room?" *Id.*  This conclusion comports with the Senate's commentary, which states that "[t]he location where special education and related services will be provided to a child influences decisions about the nature and amount of these services and when they should be provided to a child." S. REP. 105-17, 21 (1977). "For example, the

appropriate place for the related service may be the regular classroom, so that the child does not have to choose between a needed service and the regular educational program." *Id*. "For this reason," the commentary continues, "in the bill the committee has added 'location' to the provision in the IEP that includes 'the projected date for the beginning of services and modifications, and the anticipated frequency, location, and duration of those services.'" *Id.* (emphasis omitted). We interpret these statements to indicate that the term 'location' does not mean the specific school location, but the general environment of the overall program."

431. There is no "pandemic exception" to the IDEA. If a student's educational program becomes unavailable, the school district must find a comparable alternative placement. *See, Knight by Knight*, 877 F.2d at 1028 ("This court has held that if a student's 'then current educational placement' becomes unavailable, [the school board] must provide him with a 'similar' placement pending administrative and judicial approval of its eventual plans."). When a student's educational program becomes unavailable, the stay-put provision requires that a similar program be found for the student. *See McKenzie*, 771 F.2d at 33; *F.S. ex rel. Snyderman v. D.C.*, No. CIV.A.06 923 EGS, 2007 WL 1114136 (D.D.C. Apr. 13, 2007).

432. Pursuant to the IDEA, Plaintiff-Parents sent statutory Ten-Day notices to their respective LEAs advising that the LEA improperly modified Plaintiff-Students' IEPs, denied their pendency rights under Section 1415(j) of the IDEA, and requesting relief for such violations.

433. Pursuant to the IDEA, Plaintiff-Parents filed due process complaints with their LEAs alleging violations of the IDEA and Section 504 by unilaterally modifying the Plaintiff-Students' IEPs and failing to maintain their pendency programs and placements.

434. Defendants discriminated against Plaintiff-Students, who are qualified individuals under the ADA, by prohibiting the provision of in-person academic and related services the opportunity to participate or benefit from such services. Attending school while wearing a

mask all day is not "equal" to the "aid, benefit or service," nor is it as effective as services provided without wearing a mask.

435. Plaintiff-Parents shall also seek other relief as equitable 20 U.S.C. § 1415(i)(2)(C)(iii), §1439(a)(1).

## X. MASKS AS A "RESTRAINT" AS DEFINED BY THE UNITED STATES DEPARTMENT OF EDUCATION'S OFFICE OF CIVIL RIGHTS ("OCR")

436. US DOE's Office of Civil Rights ("OCR") defined the term "restraint" in a letter dated December 28, 2016, which outlined a list of questions and answers as guidance to school districts, concerning the usage of "restraints":

"In general, OCR uses the following definitions for mechanical restraint and physical restraint.[199] Mechanical restraint refers to the use of any device or equipment to restrict a student's freedom of movement.[200]

The term does not include devices implemented by trained school personnel, or utilized by a student that have been prescribed by an appropriate medical or related services professional and are used for the specific and approved purposes for which such devices were designed, such as:

-   Adaptive devices or mechanical supports used to achieve proper body position, balance, or alignment to allow greater freedom of mobility than would be possible without the use of such devices or mechanical supports;

-   Vehicle safety restraints when used as intended during the transport of a student in a moving vehicle;

-   Restraints for medical immobilization; or

---

[199] *See, e.g.*, OCR, 2015-16 CRDC School Form, www.ed.gov/ocr/docs/crdc-2015-16-all-schools-form.pdf.

[200] For example, suppose a school relies on law enforcement personnel to handcuff students to obtain compliance (but not for the sole purpose of arrest). In that case, such students are "subjected to mechanical restraint" under OCR's definition. See OCR, 2015-16 CRDC School Form, Section X, www.ed.gov/ocr/docs/crdc-2015-16-all-schools-form.pdf. Further, stakeholders have reported that mechanical restraints such as tape, straps, tie-downs, ropes, weights, weighted blankets, and a wide variety of other devices have been used by educators to attempt to control student behavior. See Council for Children with Behavioral Disorders, Council for Exceptional Children, The Use of Physical Restraint Procedures in School, 2 (July 2009), http://casecec.org/pdf/seclusion/Accepted,%20CCBD%20on%20Use%20of%20Restraint,%207-8-09.pdf

- Orthopedically prescribed devices that permit a student to participate in activities without risk of harm.[201]

Physical restraint refers to a personal restriction that immobilizes or reduces the ability of a student to move his or her torso, arms, legs, or head freely. The term physical restraint does not include a physical escort. Physical escort means a temporary touching or holding of the hand, wrist, arm, shoulder or back for the purpose of inducing a student who is acting out to walk to a safe location."[202]

437. Forcing students to wear masks all day in schools is not only a violation of New York State Law as a deliberately inappropriate use of restraints, it is a violation of federal Medicaid regulations, a violation of Federal law, and it violates The American Medical Association's Code of Medical Ethics.

438. The American Medical Association advocates that people "have a fundamental right to be free from unreasonable bodily restraint" and that restraints should only be imposed when "in the best interest of the patient." American Medical Association, Use of Restraints, Code of Medical Ethics, Section E-8.17.

439. More than a decade ago, New York State regulations banned corporal punishment and the use of mechanical restraints. In September 2009, Defendant NYS DOE circulated a memorandum to ALL school personnel and impartial hearing officers "to publicize the regulations and guidance of the New York State Education Department (NYSED) governing the policies relating to the use of restraints and seclusion in schools."

440. Specifically, the memorandum stated, NYSED:

"Prohibit[s] the use of aversive interventions, with limited exceptions [8 NYCRR §§19.5 and 200.22];

Authorize[s] the use of reasonable physical force, including the use of physical restraints only in emergency situations in which alternative procedures and methods

---

[201] Note that items used therapeutically for a particular student in one context could be used as a mechanical restraint in a different context; the proper inquiry, therefore, to determine whether an item is a mechanical restraint is not based solely on what the item is, but also how the item is used.
[202] https://www2.ed.gov/about/offices/list/ocr/letters/colleague-201612-504-restraint-seclusion-ps.pdf

not involving the use of physical force cannot reasonably be employed [8 NYCRR §§19.5 and 200.22(d)].”[203]

441. After that, Defendant NYS DOE issued a Q&A with guidance specifically for the proper development of IEPs and in the section “Special Needs Related to Special Factors” answered Question #7 as follows:

442. **“For students with severe needs, where do items such as harnesses and helmets belong on the new IEP forms?**

If a student needs an intervention that is medically necessary for the treatment or protection of the student (such as a soft helmet for a student with a seizure disorder), these needs could be appropriately identified under the Present Levels of Performance section of the IEP. Devices needed to address special transportation needs of the student would be documented under the ‘Special Transportation’ section of the IEP. However, a Committee *may not recommend and a school may not use* movement limitation, including helmets and harnesses, to address student behavior.[204]

443. Additionally, “movement limitation” is not further defined; Plaintiffs assert that the term “movement limitation” includes, without limitation, the movement of students’ mouths, lips, and airways, which are limited, inhibited, and interfered with by the donning of a mask or face covering.

444. Deliberately misusing restraints is a violation of New York State Law and is defined as:

“ ‘Deliberate inappropriate use of restraints,’ which shall mean the use of a restraint when the technique that is used, the amount of force that is used or the situation in which the restraint is used is deliberately inconsistent with a service recipient's individual treatment plan or behavioral intervention plan, generally accepted treatment practices and/or applicable federal or state laws, regulations or policies, except when the restraint is used as a reasonable emergency intervention to prevent imminent risk of harm to a person receiving services or to any other person.  For purposes of this subdivision, a ‘restraint’ shall include the use of any manual, pharmacological or mechanical measure or device to immobilize or limit the ability of a person receiving services to freely move his or her arms, legs or body.”[205]

---

[203] http://www.p12.nysed.gov/specialed/publications/policy/BI-909.pdf
[204] *Citing,*  http://www.p12.nysed.gov/specialed/publications/policy/BIattach-909.htm (emphasis added).
[205] 11 N.Y. Soc. Serv. Law § 488(1)(d) (McKinney)

445. The exceptions to the use of aversion and restraints are so limited that New York State regulations only authorize physical restraints in emergencies where alternative procedures not involving the use of physical force cannot reasonably be used. *See,* 8 NYCRR 19.5[a][3]; 200.22[d][2][i]).

446. "Emergency" is defined in the regulation as a situation requiring "immediate intervention." 8 NYCRR 200.22[d]. Emergency interventions may not be used as a punishment or substitute for "systemic behavioral interventions that are designed to change, replace, modify or eliminate a targeted behavior." 8 NYCRR 200.22[d][2][ii]). Staff must be trained in safe restraint procedures, and the school must document the use of emergency interventions for each student and notify the parent. 8 NYCRR 200.22[d][3]-[4]. Documentation shall include, among other things, the location of the incident, the name of those involved, a description of the incident and intervention used, a statement as to whether the student has a current BIP, and details of any injuries sustained by the student or others as a result of the incident. 8 NYCRR 200.22[d][4]).[206]

447. The terms "intentionally" and "recklessly" are defined by Social Services Law as having the same meanings as New York State Penal Law. SSL § 488(16). New York State Penal Law states that "[a] person acts intentionally with respect to a result or to conduct… when his conscious objective is to cause such result or to engage in such conduct." PL § 15.05(1).

448. New York State Penal Law states that "[a] person acts recklessly with respect to a result or to a circumstance… when he is aware of and consciously disregards a substantial and unjustifiable risk that such result will occur or that such circumstance exists." PL § 10.05 (3).

---

[206] 8 NYCRR § 200.22(d)(1-4).

449. The Centers for Medicare and Medicaid Services (CMS), in their issuance of a final rule

related to consumers rights in the hospital setting, defined seclusion and restraint as follows:

> Restraint is any manual method, physical or mechanical device, material, or equipment that immobilizes or reduces the ability of a person to move his or her arms, legs, body, or head freely. 42 C.F.R. § 482.13(e)(1)(i)(A). See also 42 C.F.R. § 483.352.

450. On May 15, 2012, then-Secretary of US DOE issued the following report:

> "As education leaders, our first responsibility must be to ensure that schools foster learning in a safe and healthy environment for all our children, teachers, and staff. To support schools in fulfilling that responsibility, the U.S. Department of Education has developed this document that describes 15 principles for States, school districts, schools, parents, and other stakeholders to consider when developing or revising policies and procedures on the use of restraint and seclusion."

451. In this report, Principle #7 provides,

> "Restraint or seclusion ***should never*** be used in a manner that ***restricts a child's breathing*** or harms the child. Prone (i.e., lying face down) restraints or other restraints that restrict breathing should never be used because they can cause serious injury or death. Breathing can also be restricted if loose clothing becomes entangled or tightened or if the child's face is covered by a staff member's body part (e.g., hand, arm, or torso) or through pressure to the abdomen or chest. Any restraint or seclusion technique should be consistent with known medical or other special needs of a child. School districts should be cognizant that certain restraint and seclusion techniques are more restrictive than others, and use the least restrictive technique necessary to end the threat of imminent danger of serious physical harm. ***A child's ability to communicate*** (including for those children who use only sign language or other forms of manual communication or assistive technology) also ***should not be restricted*** unless less restrictive techniques would not prevent imminent danger of serious physical harm to the student or others.  In ***all circumstances***, the use of restraint or seclusion ***should never harm a child.***"(emphasis added).[207]

452. Annexed hereto is a copy of the United States Department of Education's Office for Civil

Rights ("OCR") Fact Sheet, detailing the many ways in which the implementation of

restraints is a denial of FAPE under the IDEA. **EXHIBIT 6.**

---

[207] https://www2.ed.gov/about/offices/list/ocr/docs/dcl-factsheet-201612-504-restraint-seclusion-ps.pdf

453. Accordingly, implementing a mask mandate without adhering to the procedural safeguards is a denial of FAPE for those students with qualifying disabilities under the IDEA.

454. Moreover, this alarming fact emphasizes the necessity and urgency of the Plaintiffs' claims.

455. The conduct alleged herein, in the aggregate, parallels the long-lived practice of child sacrifices. The custom of sacrificing human life to the gods arose undoubtedly from the belief, which under different forms has manifested itself at all times and in all nations that the nobler the sacrifice and the dearer to its possessor, the more pleasing it would be to the gods.[208]

456. The most notable instance of child sacrifice took place approximately 550 years ago, in 1450 A.D., in pre-Columbian Peru. The leaders of Chimú brought hundreds of children from different regions of the Chimú Empire to the beautiful beach town of Huanchaco for a Chimú ceremony seeking relief from El Niño, which had ravaged the area.  Along a wind-swept bluff overlooking the Pacific Ocean, during this ceremony, the children's faces were smeared with a bright red pigment made from cinnabar, and thereafter, their chests were cut open to remove their hearts (evidenced by cut marks to the bones, including the sternum, the bone in the center of the chest, while many ribs were also damaged - indicating the heart was removed).  The children were likely killed during wet weather and were buried facing the sea, meaning they were probably sacrificed to appease the Chimú's gods.  More than 200 young llamas, all under 18 months, were sacrificed alongside the children - all of which were killed in a single event.  Sacrifice was common within the Chimú spiritual ceremonies.  This is considered the largest single incident of mass child sacrifice in recorded history.

---

[208] https://penelope.uchicago.edu/Thayer/E/Roman/Texts/secondary/SMIGRA*/Sacrificium.html

457. Dr. Patrick Ryan Williams is one of the premier anthropological archaeologists who has studied early South American cultures.   When presented with the details of the most significant child sacrifice known in recorded history by the Chimú in Peru, he observed:

> "We have to remember that the Chimú had a very different world view than Westerners today. They also had very different concepts about death and the role each person plays in the cosmos, perhaps the victims ***went willingly*** as messengers to their gods, or perhaps Chimú society believed this was the only way to save more people from destruction." (emphasis added).

458. However, we do not have to wait 500 years to determine the "willingness" of the sacrifices children made during the COVID-19 pandemic to alleviate adult fears.   Fortunately, we already know the answer to this question from 18-year-old Jane Kitchen, who revealed her feelings on Twitter (via @janesays22) July 14, 2021:

> "I turned 18 in Feb 2020.  I lost my friends, my education, the first year of my adult life, my mental health, and 20lbs. I didn't make sacrifices. ***I was sacrificed.***"

## CAUSES OF ACTION

### AS AND FOR A FIRST CAUSE OF ACTION

VIOLATIONS OF THE FIRST (AND FOURTEENTH) AMENDMENTS
42 U.S.C. § 1983
(All Plaintiffs against all Defendants)

395. Plaintiffs reallege and incorporate by reference all of the allegations and the paragraphs above as is fully set forth herein.

396. As and for the first cause of action, Plaintiffs allege that Defendants herein have violated the First Amendment by:

1.   Excessive entanglement with religion;

2.  Inciting a breach of the peace through the deliverance of sermons by government officials utilizing the authority of their public positions, that included language such as "be our apostles" and "you know who they are";

3.  Through false speech made thoughtlessly and/or deliberately;

4.  Implementing a vague and/or ambiguous regulation without clear terms that "man of common intelligence must necessarily guess at its meaning and differ as to its application," as the term "mask" and/or "face covering" remains undefined, yet the regulation imposes a penalty for violation of same (*see Connally v. Gen. Const. Co.*, 269 U.S. 385, 391, 46 S. Ct. 126, 70 L. Ed. 322 (1926));

5.  Interfering with Plaintiff's First Amendment right to freedom of association, and Interfering with Plaintiff's First Amendment freedom to enter and maintain human relationships.

397.  Defendants' mandate and enforcement of students to wear a mask throughout the school day amounts to the endorsement and advancement of religion in violation of the elements and protections of the First Amendment as mentioned above.

398.  However, there is no requirement that a religion meet any organizational or doctrinal test to qualify for First Amendment protection, as orthodoxy is not an issue. Additionally, the First Amendment "forbids alike preference of religious doctrine or prohibition of theory which is deemed agnostic to particular dogma." *Altman v. Bedford Cent. Sch. Dist.*, 245 F.3d 49 (2d Cir. 2001).

399.  Defendants' mandate and enforcement of students to wear a mask throughout the school day lacks a secular, independent purpose and fosters entanglement in violation of the Establishment Clause of the First Amendment to the United States Constitution, nor does it cite to a compelling interest for the mandate. Moreover, the language of the mandate is not "narrowly tailored" to achieve the same.

400.  Additionally, the mandate, conceived in secret and by unlawful means, infringes upon the freedoms and privileges outlined in the First Amendment of the Constitution, including the freedom of association, the freedom of religion, and the practice thereof, by inciting a breach

of the peace through the deliverance of speeches and/or sermons including language such as "be our apostles" and "[y]ou know who they are"(*supra,* **Part II**, ¶107) by way of a false speech made thoughtlessly and/or deliberately to misguide the public and incite unnecessary panic, in addition to interfering with Plaintiffs' rights to association and to maintain intimate human relationships.

401.  By perpetuating false information and translating the management of the COVID-19 situation as a political affiliation. Defendants' actions have promulgated and cultivated an atmosphere where those who don masks are the "apostles" in the government's favor, while those who opt not to (even those who are fully vaccinated) are presented as the enemy and immoral.

402.  Thus, Defendants have acted under color of state law in violating the First Amendment and Fourteenth as described herein in violation of 42 U.S.C. § 1983.

<div align="center">

**<u>AS AND FOR A SECOND CAUSE OF ACTION</u>**
VIOLATIONS OF THE EIGHTH (AND FOURTEENTH AMENDMENTS)
42 U.S.C. § 1983
(All Plaintiffs against all Defendants)

</div>

403.  Plaintiffs reallege and incorporate by reference all of the allegations and the paragraphs above as is fully set forth herein.

404.  Because of the acts mentioned above, policies, practices, procedures, and/or customs, created, adopted, and enforced under color of state law, Defendants have deprived Plaintiffs of their right to be free of cruel and unusual punishment as set forth by the Eighth Fourteenth Amendments to the United States Constitution and 42 U.S.C. § 1983.

405.  The Eighth Amendment provides:

"Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted."

406. Generally, infliction of suffering can be found to violate the Eighth Amendment _only if_ infliction is either <u>deliberate or reckless</u> in the criminal law sense.

407. Here, Defendants have undoubtedly engaged in deliberate and reckless conduct by usurping the powers of the Legislature and promulgating a mask mandate that not only has infringed upon the constitutional rights of Plaintiffs but also caused an injury.

408. Courts have recognized that officials cannot simply remain deliberately indifferent to the serious medical needs of <u>prisoners and pre-trial detainees</u>. Indeed, as children of this nation, Plaintiffs and other students of New York would receive the same, if not more, protection than prisoners and pre-trial detainees.

409. Additionally, relevant case law provides that "lasting harm" need not be alleged to prevail on an Eighth Amendment claim—it is sufficient if significant injuries have been caused by vindictive and punitive, unprovoked attack.

**<u>AS AND FOR A THIRD CAUSE OF ACTION</u>**
VIOLATIONS OF THE NINTH (AND FOURTEENTH) AMENDMENT
42 U.S.C. § 1983
(All Plaintiffs against all Defendants)

410. Plaintiffs reallege and incorporate by reference all of the allegations and the paragraphs above as is fully set forth herein.

411. The Ninth Amendment provides:

The enumeration in the Constitution of certain rights shall not be construed to deny or disparage others retained by the people.

412. Accordingly, the Ninth Amendment protects the right to family integrity.

413. Fundamental integrity of the family unit must be preserved absent a showing of a compelling government interest—it has also been held that protecting the child from harm is a requisite government interest.

414. Here, the "harm" that the government seeks to protect students from is simply not "compelling." Defendants will likely cite the transmissibility of COVID-19. However, as reiterated above, on June 25, 2021, Governor Cuomo himself found that the Emergency Declaration was unnecessary and rescinded the same.

415. Additionally, Defendant Zucker was Commissioner of the DOH during Governor Cuomo's tenure and held this position when the 8 NYCRR §66-3.1 *Face Coverings* amendment was made, which created an <u>exception</u> for school students. Zucker also held this position on the day Governor Cuomo rescinded his Emergency Declaration and emergency Executive Orders, including Executive Order 202 and 205. However, upon the repeal of the Executive Orders, Defendant Zucker took no action to implement a mask mandate in schools until, upon information and belief, prompted by Governor Hochul.

416. Because of the acts as mentioned above, policies, practices, procedures, and/or customs, created, adopted, and enforced under color of state law, Defendants have deprived Plaintiffs of their rights to familial integrity secured by the Fourteenth Amendment to the United States Constitution and 42 U.S.C. § 1983 and discriminated against those students with disabilities protected by the IDEA in violation of Section § 504 of the Rehabilitation Act of 1973 ("§ 504"),  29 U.S.C. § 794(a), 34 C.F.R. § 104.4(a), Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12132, and Title XI of the NYS Constitution.

417. The right to privacy protects the Plaintiffs' personal autonomy and bodily integrity from intrusion by the government. The mask mandate violates the Plaintiffs' right to privacy.

418. As a direct and proximate result of Defendants' violation of the Ninth and Fourteenth Amendment(s) as outlined in this Complaint, Plaintiffs have suffered harm, including the loss of their fundamental constitutional rights, entitling them to be declaratory and injunctive relief.

## AS AND FOR A FOURTH CAUSE OF ACTION

VIOLATIONS OF THE FOURTEENTH AMENDMENT—DUE PROCESS CLAUSE

42 U.S.C. § 1983

(All Plaintiffs against all Defendants)

419.  Plaintiffs reallege and incorporate by reference all of the allegations and the paragraphs above as is fully set forth herein.

420.  Under the Due Process Clause of the Fourteenth Amendment:

No State shall "deprive any person of life, liberty, or property, without due process of law."

421.  The fundamental liberties extend to certain personal choices central to individual dignity and autonomy, including intimate choices that define personal identity and beliefs. *See* Obergefell v. Hodges, 576 U.S. (2015), *citing Eisenstadt v. Baird*, 405 U.S. 438, 92 S. Ct. 1029, 31 L. Ed. 2d 349 (1972).

422.  Here, Defendants have unlawfully implemented a mandate requiring all elementary and secondary school students in New York to wear a mask – without exception.

423.  However, it is crucial to note that the initial mask mandate contained an <u>exception</u> for students attending school. But upon Defendant Hochul's swearing-in as Governor, the provision was revised to a State-wide mandate (§2.60), empowering Defendant Commissioner Zucker to implement restrictions rooted in Executive Order 202, which Governor Cuomo expressly rescinded on June 25, 2021.

424.  Interestingly, NY DOE has set forth on their website homepage that:

Please be advised that the COVID-19 Disaster Emergency declared by former Governor Andrew Cuomo, pursuant to Executive Order 202 issued on March 7, 2020, and each successor Executive Order to Executive Order 202 have expired as of June 25, 2021. While the several exceptions and authorizations relevant to the Title VIII statutes and regulations contained within Executive Order 202 and each successor Executive Order to Executive Order 202 have now expired, Title VIII professionals should return to compliance with all Title VIII statutory and regulatory requirements without delay unless specifically suspended or waived under Executive Order 4.

- 117 -

425. However, Defendants NY DOE and Defendant Betty Rosa have made it clear that they intend to implement the mandate, even though it lacks authority as Executive Order 202 is no longer in effect.

426. Instead, Defendants would rather violate the rights and freedoms bestowed upon Plaintiffs at birth and guaranteed as a matter of law by the Constitution, as well as relevant State and federal laws.

427. Through the IDEA and related statutes, Congress has bestowed the right to education upon S.J.D., Plaintiffs, and other students with disabilities across the country.

428. Accordingly, Defendants cannot simply circumvent the Legislature to implement a mandate wholly inconsistent with Congress's intentions.

429. As a direct and proximate result of Defendants' violations as outlined in this Complaint, Plaintiffs have suffered irreparable harm, including the loss of their fundamental constitutional rights, entitling them to declaratory and injunctive relief.

### AS AND FOR A FIFTH CAUSE OF ACTION
VIOLATIONS OF THE FOURTEENTH AMENDMENT—SUBSTANTIVE RIGHTS & EQUAL PROTECTION
42 U.S.C. § 1981, 1983
(All Plaintiffs against all Defendants)

430. Plaintiffs reallege and incorporate by reference all of the allegations and the paragraphs above as is fully set forth herein.

431. The Equal Protection Clause of the Fourteenth Amendment provides:

"All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens…."

432. Plaintiffs assert that for the reasons set forth above, those students of New York State that are disabled and protected under the IDEA essentially have a guaranteed right to be free of

the mask mandate until such conclusion of these judicial proceedings. However, there is no enumerated right for education for those non-disabled students outside the protections of the IDEA.

433. Accordingly, Plaintiffs bring this claim on behalf of all non-disabled students, who shall enjoy the same liberties as their disabled peers under the Equal Protection Clause.

434. Concerning the substantive rights at bar, in *Troxel v. Granville*, 530 U.S. 57, 120 S. Ct. 2054, 147 L. Ed. 2d 49 (2000), the Supreme Court held that the "liberty of parents and guardians" includes the right "to direct the upbringing and education of children under their control." The Court then cites to *Pierce v. Soc'y of the Sisters of the Holy Names of Jesus & Mary*, 268 U.S. 510, 45 S. Ct. 571, 69 L. Ed. 1070 (1925), explaining that "[t]he child is not the mere creature of the State; those who nurture him and direct his destiny have the right, coupled with the high duty, to recognize and prepare him for additional obligations." *Pierce*, 268 U.S. at 534–535. "It is cardinal with us that the custody, care and nurture of the child reside *first in the parents*, whose primary function and freedom include preparation for obligations the state can neither supply nor hinder." *Prince v. Massachusetts*, 321 U.S. 158, 64 S. Ct. 438, 88 L. Ed. 645 (1944). ("It is plain that the interest of a parent in the companionship, care, custody, and management of his or her children 'come[s] to this Court with a momentum for respect lacking when appeal is made to liberties which derive merely from shifting economic arrangements'" (citation omitted)); *Wisconsin v. Yoder*, 406 U.S. 205, 232, 92 S. Ct. 1526, 32 L. Ed. 2d 15 (1972).

435. "In a long line of cases, we have held that, in addition to the specific freedoms protected by the Bill of Rights, the 'liberty' specially protected by the Due Process Clause includes

the righ[t] ... *to direct the education and upbringing of one's children*" *Washington v. Glucksberg*, 521 U.S. 702, 117 S. Ct. 2258, 138 L. Ed. 2d 772 (1997) (emphasis added).

436.   Defendants have directly infringed upon the rights of Plaintiffs—both students and parents, as well as those similarly situated, to exercise their judgment regarding what is best for their child.

437.   This runs afoul of the relevant law without a compelling state interest nor a regulation narrowly tailored to achieve the same.

438.   As a result, Plaintiffs have suffered, and continue to suffer, irreparable harm as those students with disabilities' health and welfare are put at risk, while those non-disabled students are harmed by direct infringement upon their rights as Americans.

439.   Plaintiffs do not contend that masks would not be useful for some students with disabilities; however, a mask quite literally acts as a restraint, is unnecessary where the student is vaccinated, and masking one's child should remain the parents' decision, not the State's.

440.   As outlined in *Gamble v. United States*, 139 S. Ct. 1960, 204 L. Ed. 2d 322 (2019), "No subjective balancing test can justify such a wholesale disregard of the People's individual rights protected under the Fourteenth Amendment. *Gamble*, 139 S. Ct. at 1988–1989.

### AS AND FOR A SIXTH CAUSE OF ACTION
Violations of the New York State Education Law
§313: Unfair Educational Practices
(All Plaintiffs against all Defendants)

441.   The Plaintiffs realleges and incorporates by reference all of the allegations and the paragraphs above as is fully set forth herein.

442.   NYS Education Law §313 provides that:

"It shall be an unfair educational practice for an educational institution after September fifteenth, nineteen hundred forty-eight:

**(a)** To exclude or limit or otherwise discriminate against any person or persons seeking admission as students to such institution or to any educational program or course operated or provided by such institution because of race, religion, creed, sex, color, marital status, age, sexual orientation as defined in section two hundred ninety-two of the executive law, gender identity or expression as defined in section two hundred ninety-two of the executive law, or national origin; except that nothing in this section shall be deemed to affect, in any way, the right of a religious or denominational educational institution to select its students exclusively or primarily from members of such religion or denomination or from giving preference in such selection to such members or to make such selection of its students as is calculated by such institution to promote the religious principles for which it is established or maintained."

443. Plaintiffs assert that as a result of Defendants' unlawful conduct, those students sent home for failing to adhere to the mask-mandate have been discriminated against, arguably on the grounds of religion (because they are not one of Defendant Hochul's "apostles") and/or political association (i.e. those who do not wear masks attack "science" and are immoral, as deemed by federal and State officials in public comments).

<u>**AS AND FOR A SEVENTH CAUSE OF ACTION**</u>
Violations of the New York State Constitution
Title XI
(All Plaintiffs against all Defendants)

444. Plaintiffs reallege and incorporate by reference all of the allegations and the paragraphs above as is fully set forth herein.

445. Title XI of the New York State Constitution provides:

"The legislature shall provide for the maintenance and support of a system of free common schools, wherein all children of this state may be educated."

446. As such, this provision clearly sets forth that _legislature_ shall provide for the _maintenance_ of schools, where _all children_ may be educated, not just those willing and able to adhere to the mask mandate.

447. Accordingly, turning students away who are unable or unwilling to don a mask without an alternative means for educating said student (i.e., by remote learning, in-home sessions, etc.) is a direct violation of Title XI.

<div align="center">

**AS AND FOR AN EIGHTH CAUSE OF ACTION**
VIOLATIONS OF THE CIVIL RIGHTS ACT
42 U.S.C. § 1983
(All Plaintiffs against all Defendants)

</div>

448. Plaintiffs reallege and incorporate by reference all of the allegations and the paragraphs above as is fully set forth herein.

449. Defendants' failure to maintain Plaintiff-Students' educational program, as per their IEPs deprived Plaintiff-Students of their rights to a free appropriate public education and without due process of law, as secured by the New York State Constitution or Statute, in violation of their Due Process Clause of the Fourteenth Amendment of the United States Constitution. Such actions by Defendants deprive Plaintiffs of rights secured by federal law in violation of 42 U.S.C. § 1983.

450. Additionally, Defendants have directly infringed upon the substantive and due process rights as set forth by the Fourteenth Amendment, as set forth above.

451. Plaintiffs-Students are entitled to declaratory relief, temporary, preliminary, and permanent injunctive relief, to restore their educational programs and related services.

<div align="center">

**AS AND FOR A NINTH CAUSE OF ACTION**
VIOLATIONS OF THE INDIVIDUALS WITH DISABILITIES EDUCATION ACT (IDEA)
20 U.S.C. § 1401, et seq., 34 C.F.R. Part 300
(All Plaintiffs against all Defendants)
*Failure to Provide Pendency Under IDEA*

</div>

452. Plaintiffs reallege and incorporate by reference all of the allegations and the paragraphs above as is fully set forth herein.

453. Defendants violated Plaintiffs' pendency rights under 20 U.S.C. § 1415(j) by failing to provide an educational program and placement that maintained the Plaintiff-Students' educational program as described herein.

454. As a result, Defendants have also denied those students with IEPs a FAPE, as required by law, by subjecting these students to mandatory masking, contrary to the terms of their IEPs.

455. Based on the preceding, Plaintiff-Parents rights and those of their Plaintiff-Students were violated under IDEA, 20 U.S.C. § 1401, et seq., 34 C.F.R. part 300.

## AS AND FOR A TENTH CAUSE OF ACTION
VIOLATIONS OF SECTION 504 OF THE FEDERAL REHABILITATION ACT (SECTION 504)
29 U.S.C. § 794, et seq.
(All Plaintiffs against all Defendants)
*Punitive Damages*

456. Plaintiffs reallege and incorporate by reference all of the allegations and the paragraphs above as is fully set forth herein.

457. Due to Defendants' intentional and willful failure to provide the Plaintiff-Students with a FAPE, the Plaintiff-Parents and Plaintiff-Students were injured in fact.

458. Based on the preceding, Plaintiff-Parents rights and those of the Plaintiff-Students were violated under Section 504, 29 U.S.C. § 794, et seq.

## AS AND FOR AN ELEVENTH CAUSE OF ACTION
VIOLATIONS OF TITLE II OF THE AMERICANS WITH DISABILITY ACT (ADA)
42 U.S. Code § 12101, et seq.
(All Plaintiffs against all Defendants)

459. Plaintiffs reallege and incorporate by reference all of the allegations and the paragraphs above as is fully set forth herein.

460. By implementing a mandatory "restraint," as defined by the Office of Civil Rights (i.e., a mask), Defendants have violated the civil rights of the Plaintiff-Students as per Title II of the Americans with Disabilities Act ("ADA"), 42 U.S. Code § 12101, et seq.

- 123 -

461. Based on the preceding, Plaintiff-Parents rights and those of their Plaintiff-Students were violated under the ADA, 42 U.S.C. § 12101, et seq.

## AS AND FOR A TWELFTH CAUSE OF ACTION
MONELL CLAIM – UNLAWFUL POLICY AND PRACTICE
(42 U.S. Code § 1983)
(All Plaintiffs against all Defendants)

462. The Plaintiffs realleges and incorporates by reference all of the allegations and the paragraphs above as is fully set forth herein.

463. The actions of NYC Defendants and NYS Defendants were undertaken under policies, practices, and customs of NYC Defendants and NYS Defendants, described above and below.

464. At all times material to this complaint, NYC Defendants and NYS Defendants have interrelated de facto policies, practices, and customs related to school mask mandate.

465. The inter-related policies, practices, and customs alleged above were well known.

466. The inter-related policies, practices, and customs alleged above were the direct and proximate cause of the unconstitutional acts committed by NYC Defendants and NYS Defendants and the injuries suffered by Plaintiffs.

## AS AND FOR A THIRTEENTH CAUSE OF ACTION
FOURTH AMENDMENT VIOLATION
(42 U.S. Code § 1983)
(All Plaintiffs against all Defendants)

467. The Plaintiffs realleges and incorporates by reference all of the allegations and the paragraphs above as is fully set forth herein.

468. The Plaintiffs realleges and incorporates by reference all of the allegations and the paragraphs above as is fully set forth herein.

469. NYC Defendants and NYS Defendants have committed constitutional violations against Plaintiffs under color of law.

470. Under 42 U.S.C. § 1983: Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia,  subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceedings for redress.

471. NYC Defendants and NYS Defendants have deprived Plaintiffs of their Fourth and Fourteenth Amendment rights under color of law by subjecting them to unlawful seizures, denying them due process of law, and denying them educational opportunities equal to non-disabled students.

472. The Fourth Amendment provides the right to be free from "unreasonable searches and seizures[.]." U.S. Const. IV. amend.

473. NYC Defendants and NYS Defendants' actions relating to Plaintiffs constitute unlawful seizures that are objectively unreasonable under the circumstances, and in light of the educational objectives, NYC Defendants and NYS Defendants purport to be trying to achieve. NYC Defendants and NYS Defendants' staff, employees, and contractors are acting under color of law under § 1983 and are directly and proximately responsible for the deprivation of Plaintiffs' Fourth Amendment rights.

474. The Fourteenth Amendment mandates that all persons born in the United States are entitled to due process before restricting their liberty and equal protection of the laws. U.S. Const. XIV. amend.

475. Under the Fourteenth Amendment, a state entity assumes a duty to provide reasonable care to protect a child with whom it has formed a special relationship, such as a child entrusted in the care of a school system.

476. The preceding actions and omissions of NYC Defendants and NYS Defendants constitute a policy, practice, pattern, and/or custom of discriminating against Plaintiffs in violation of the constitutionally protected liberty and privacy interests.

477. Specifically, Defendants have violated 42 U.S.C. § 1983 in two ways. First, NYC Defendants and NYS Defendants are responsible for ensuring that students with disabilities are treated equally to their non-disabled peers.

478. Although NYC Defendants and NYS Defendants have written guidelines on the use of restraint and seclusion, they have blatantly ignored these guidelines as applied to students with disabilities, all while failing to adequately document this information to shield it from public scrutiny.

479. NYC Defendants and NYS Defendants were deliberately indifferent and encouraged the illegal use of mask restraints effectuated against students with disabilities by their school mask mandates did not have an automatic exemption for students with disabilities.

480. Second, NYC Defendants and NYS Defendants have violated 42 U.S.C. § 1983 by failing to adequately train their staff in any methods to effectively respond to disability-related behaviors dealing with the use of mask restraints for students with disabilities.

481. NYC Defendants and NYS Defendants' actions have violated Plaintiffs' rights to due process and equal protection by subjecting them to unnecessary and unreasonable restraints because of their disabilities. NYC Defendants and NYS Defendants' mask restraint system

lacks transparency and accountability and deprives Plaintiffs of due process, including

adequate notice regarding students' unlawful seizures, and denies them equal protection.

482. NYC Defendants and NYS Defendants' actions have violated Plaintiffs' right to due process

by restricting their liberty through unnecessary restraint in non-emergency situations without

any process or even notice to parents.

483. NYC Defendants and NYS Defendants acted intentionally or with reckless indifference to

the constitutional rights of the Plaintiffs.

## **PRAYER FOR RELIEF**

**WHEREFORE,** Plaintiffs pray for the following relief:

1. Assert jurisdiction over this matter;

2. Certify this action as a class action under Fed. R. Civ. P. 23(a) and (b)(2);

3. Issue a Temporary Restraining Order (TRO) and/or mandatory injunction enjoining Defendants from implementing the mask mandate at bar;

4. Issue a judgment declaring that Defendants' conduct is unconstitutional under the First, Eighth, Ninth, and Fourteenth Amendments of the United States Constitution;

5. Issue a judgment declaring that Defendants' conduct is unlawful under the Individuals with Disabilities Education Act, 20 U.S.C. § 1400, et seq. ("IDEA") and the regulations of the United States Department of Education, which were promulgated pursuant to authority granted by the statute (34 C.F.R. Part 300), Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, et seq. ("Section 504"); and the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101, et seq. ("ADA"); and 42 U.S.C. § 1983 with regard to those Plaintiffs that represent students with disabilities in attendance of New York schools;

6. Order Defendants to comply with the procedural safeguards and due process(es) as provided by law.

7. Require Defendants herein to comply with the Individuals with Disabilities Education Act, 20 U.S.C. § 1400, et seq. ("IDEA") and the regulations of the United States Department of Education, which were promulgated pursuant to authority granted by the statute (34 C.F.R. Part 300), Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, et seq. ("Section 504"); and the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101, et seq.

("ADA"); and 42 U.S.C. § 1983 with regard to those Plaintiffs that represent students with disabilities in attendance of New York schools, in the event of an emergent need for masking students in schools;

8.  Enjoin Defendants from implementing the instant mask mandate;

9.  Enjoin Defendants from convening and conferring in secret, and requiring Defendants to adhere to the Open Meetings Act for all meetings, especially those in which law-making and/or promulgation takes place;

10. Allow Plaintiffs to seek punitive damages for those claims herein to the extent that such damages are not barred by federal and state law;

11. Direct Defendants to pay for the costs and expenses for maintaining this action, including reasonable attorneys' fees pursuant to 20 U.S.C. § 1415(i)(3)(B);

12. Award attorneys' fees pursuant to the Rehabilitation Act, the Americans with Disabilities Act, and 42 U.S.C. § 1988;

13. Retain jurisdiction over this action until such time as this Court is satisfied that the systematic violations of the laws and regulations complained herein have been rectified; and

14. Grant such other and further relief that this Court deems just and proper.

Dated:      October 13, 2021
            New York, New York


                              Respectfully submitted,
                        Brain Injury Rights Group, Ltd.
                            *Attorney for Plaintiffs*


                     By: _____/S/_____
                         **Patrick B. Donohue, Esq.**
                         95th Street, Suite 130
                         New York, NY 10128
                         (646) 850-5035
                         Patrick@pabilaw.com

APPENDIX A

## HUMANIST OF THE YEAR AWARD RECIPIENTS

### 1957: MARGARET SANGER

The 1957 Humanist of the Year was bestowed upon Margaret Sanger.  Ms. Sanger, an active socialist throughout her life, founded Planned Parenthood Federation of America as part of her controversial birth control "Negro Project" and advocated for a eugenics approach to breeding for "the gradual suppression, elimination and eventual extinction, of defective stocks – those human weeds which threaten the blooming of the finest flowers of American civilization."  In a 1939 letter to Dr. C.J. Gamble, Ms. Sanger urged him to get over his reluctance to hire "a full-time Negro physician" as the "colored Negroes…can get closer to their own members and more or less lay their cards on the table which means their ignorance, superstitions and doubt."  She wrote, "We do not want word to go out that we want to exterminate the Negro population, and the minister is the man who can straighten out that idea if it ever occurs to any of their more rebellious members."  Ms. Sanger went on to write in an article titled, "A Better Race Through Birth Control," that "given birth control, the unfit will voluntary eliminate their kind." [209]

### 1959: BROCK CHISHOLM

The 1959 Humanist of the Year was bestowed upon Brock Chisholm.  As a Canadian psychiatrist and Deputy Minister of Health, Dr. Chisholm drew wide criticism for declaring it was harmful for parents to encourage their children to believe in Santa Claus, the Bible, or anything else he regarded as supernaturalism. He was rewarded with his public perception as "Canada's most

---

[209] https://www.usatoday.com/story/opinion/2020/07/23/racism-eugenics-margaret-sanger-deserves-no-honors-column/5480192002/

famously articulate angry man" with being appointed the first Executive Director of the World Health Organization ("WHO"). [210],[211]

### 1960: LEO SZILARD

The 1960 Humanist of the Year was bestowed upon Leo Szilard.  Dr. Szilard is most remembered as a Hungarian-American physicist who conceived the nuclear chain reaction in 1933 and patented the idea of a nuclear fission reactor in 1934 that resulted in the Manhattan Project, which built the atomic bomb.  What is not widely known is that Dr. Szilard wanted to create a group of humans of high intelligence, whom he called "The Bund – the League or Alliance." [212]  This group would guide the politics of the world through subtle interventions.  It would start with university students, beginning with only a small "seed" number of talented individuals that would coalesce around a more significant movement.  At first, the influence would be among fellow students, and then by taking career positions in essential fields, they could eventually shape the policies of governments.[213]

### 1961: LINUS PAULING

The 1961 Humanist of the Year was bestowed upon Linus Pauling.  Dr. Pauling is known as the only person to have been awarded two unshared Nobel Prizes.  He advocated a "limited" form of eugenics by suggesting that human carriers of defective genes be given a compulsory visible mark, such as a forehead tattoo, to discourage potential mates with the same defect.  He proposed this to reduce the number of babies with diseases such as sickle cell anemia.[214]  He became primarily responsible for the widespread misbelief that high doses of Vitamin C were effective against colds

---

[210] https://news.gallup.com/poll/7468/santas-hoax-canadians-say-they-believe.aspx
[211] https://www.thecanadianencyclopedia.ca/en/article/brock-chisholm
[212] https://palladiummag.com/2021/03/16/leo-szilards-failed-quest-to-build-a-ruling-class/
[213] http://www.dannen.com/lostlove/
[214] https://www.independent.co.uk/news/uk/home-news/revered-and-ridiculed-linus-pauling-twice-a-nobel-winner-dies-at-93-1384816.html

and cancer.[215]  He also led the health-food industry's campaign to weaken the Food and Drug Administration's (FDA) protection of consumers. His involvement in the National Health Foundation (NHF) scandal resulted in many receiving prison sentences.  He was subsequently sued by his own Executive Director of his Pauling Institute, who claimed Dr. Pauling fabricated his Vitamin C research results.  The case was eventually settled with Dr. Pauling paying over $500,000 to his former lieutenant.[216]

## 1962: JULIAN HUXLEY

The 1962 Humanist of the Year was bestowed upon Julian Huxley.  As the first Director of UNESCO, Dr. Huxley was the President of the British Eugenics Society and the first President of the British Humanist Association.[217]  He believed eugenics was necessary for removing undesirable variants from the human gene pool, and the lowest class in society was genetically inferior.  His philosophy was "no one doubts the wisdom of managing the germplasm of agricultural stocks, so why not apply the same concept to human stocks?"  He posed, "The lowest strata, allegedly less well-endowed genetically, are reproducing relatively too fast.  Therefore birth-control methods must be taught them; they must not have too easy to relief or hospital treatment lest the removal of the last check on natural selection should make it too easy for children to be produced or to survive; long unemployment should be a ground for sterilization, or at least relief should be contingent upon no further children being brought into the world; and so on.  That is to say, much of our eugenic programme will be curative and remedial merely, instead of preventative and constructive."[218]

---

[215] https://quackwatch.org/related/pauling/
[216] https://www.vox.com/2015/1/15/7547741/vitamin-c-myth-pauling
[217] Kevles D. J. 1995. In the Name of Eugenics: Genetics and the Uses of Human Heredity. Harvard 1995.
[218] Hubback D. "Julian Huxley and eugenics." 1989. In Keynes M. and Harrison G. A. (eds) Evolutionary Studies: A Centenary Celebration of the Life of Julian Huxley. Macmillan, London

### 1963: HERMANN J. MULLER

The 1963 Humanist of the Year was bestowed upon Hermann J. Muller.  During his time, Professor Muller was an active socialist and one of the leaders in the eugenics and human genetic fields.  He carried out a study of twins separated at birth that indicated a strong hereditary component of I.Q.  In 1932 at the Third International Eugenics Congress, Professor Muller's presentation stated, "eugenics might yet perfect the human race, but only in a society consciously organized for the common good."[219],[220]

### 1966: ERICH FROMM

The 1966 Humanist of the Year was bestowed upon Erich Fromm.  Mr. Fromm was one of the founders of the socialist/Marxist humanism movement, promoting the early writings of Karl Marx.  He joined the Socialist Party of America in the mid-1950s.[221]

### 1963: HERMANN J. MULLER

The 1968 Humanist of the Year was bestowed on Benjamin Spock.  Dr. Spock was a pediatrician whose book, "Baby and Child Care," initially published in 1946, became one of the best-selling volumes in history.  The book was the second-most-selling book during the time, only behind the Bible.  However, the book was filled with controversial and unsubstantiated advice.  For example, Dr. Spock advocated that infants should not be placed on their back when sleeping, stating, "If an infant vomits, he's more likely to choke on the vomitus."  This advice was extremely influential on healthcare providers until the 1990s, when actual empirical studies found there is a significantly increased risk of sudden infant death syndrome (SIDS) associated with infants sleeping on their abdomens.  Research estimated that as many as 50,000 infant deaths occurred in Europe, Australia,

---

[219] https://integrativebio.utexas.edu/about/history/hermann-j-muller-part-ii
[220] https://www.pbs.org/wgbh/americanexperience/films/eugenics-crusade/#part01
[221] https://jacobinmag.com/2020/08/erich-fromm-frankfurt-school-marxism-weimar-germany

and the United States, which could have been prevented if changes to this policy had been adopted by 1970 when the evidence became available.  Dr. Spock was the People's Party nominee for President of the United States in 1972 and their nominee for Vice President in 1976 as Margaret Wright's running mate.[222]

### 1970: A. PHILIP RANDOLPH

The 1970 Humanist of the Year was bestowed upon A. Philip Randolph.  Mr. Randolph was one of the most consistently radical figures in black politics and one of the most prominent socialists of the twentieth century. [223]

### 1974: JOSEPH FLETCHER

The 1974 Humanist of the Year was bestowed upon Joseph Fletcher.  As an Ordained Episcopal Priest, Professor Fletcher was a pioneer in bioethics and was a leading proponent of the potential benefits of abortion, infanticide, euthanasia, eugenics, and cloning.  As one of the Humanist Manifesto II signers in 1973, he eventually served as President of the Euthanasia Society of America (renamed the Society for the Right to Die), a member of the American Eugenics Society, the Association for Voluntary Sterilization.  "People [with children with Down's syndrome]... have no reason to feel guilty about putting a Down's syndrome baby away, whether it's "put away" in the sense of hidden in a sanitarium or a more responsible lethal sense. It is sad; yes. Dreadful. But it carries no guilt. True guilt arises only from an offense against a person, and a Down's is not a person."[224]

### 1975: HENRY MORGENTALER & BETTRY FRIEDAN

___

[222] https://www.history.com/news/8-unusual-presidential-candidates
[223] https://www.jacobinmag.com/2020/05/a-philip-randolph-socialist-civil-rights-march-bscp
[224] http://www.riverbendds.org/index.htm?page=fletcher.html

APPENDIX A - 5 -

The 1975 Humanist of the Year was bestowed upon Henry Morgentaler and Betty Friedan.  Dr. Morgentaler was a Jewish Polish-born Canadian physician and abortion proponent.  He opened his first abortion clinic in 1969 in Montreal and became the first doctor in North America to use vacuum aspiration for abortions.  He eventually opened twenty clinics and trained more than 100 abortion doctors.  In challenging abortion laws in Canada, he proclaimed he conducted over 5,000 abortions during his career.[225]  Ms. Friedan was an American feminist activist.  She co-founded the National Organization for Women (NOW) and founded the National Association for the Repeal of Abortion Laws (NARAL). [226]

### 1977: CORLISS LAMONT

The 1977 Humanist of the Year was bestowed upon Corliss Lamont.  Mr. Lamont was an American socialist who was Chairman of the National Council of American-Soviet Friendship beginning in the 1940s and was one-time Chairman of the Friends of Soviet Union.[227]

### 1979: EDWIN H. WILSON

The 1979 Humanist of the Year was bestowed upon Edwin H. Wilson.  As an Ordained American Unitarian, Reverend Wilson helped draft the Humanist Manifesto as the managing editor of The New Humanist.  He was one of the founders of the AHA, and he participated in the foundation of the International Humanist and Ethical Union.[228]

### 1986: FAYE WATTLETON

---

[225] https://www.thecanadianencyclopedia.ca/en/article/henry-morgentaler
[226] https://www.womenshistory.org/education-resources/biographies/betty-friedan
[227] https://www.nytimes.com/1995/04/28/obituaries/corliss-lamont-dies-at-93-socialist-battled-mccarthy.html
[228] https://www.latimes.com/archives/la-xpm-1993-04-02-me-18030-story.html

The 1986 Humanist of the Year was bestowed upon Faye Wattleton.  Ms. Wattleton is an American feminist activist who was the first African American and the youngest President of Planned Parenthood of America.[229]

### 1989: HERMANN J. MULLER

The 1989 Humanist of the Year was bestowed upon Gerald A. Larue.  Mr. Larue co-founded the Hemlock Society and British author Derek Humphry and his wife Ann Wickett, which advocated for assisted suicide and right-to-die.[230]

### 1963: HERMANN J. MULLER

The 1998 Humanist of the Year was bestowed upon Barbara Ehrenreich.  Ms. Ehrenreich is a socialist feminist author who co-founded The Democratic Socialists of America (DSA).  DSA is a socialist organization whose roots stem from the Socialist Party of America (SPA).[231]

### 2003: SHERWIN T. WINE

The 2003 Humanist of the Year was bestowed upon Sherwin T. Wine.  He was a rabbi and a founding figure in the Humanist Judaism movement.[232]

---

[229] https://www.thehistorymakers.org/biography/alyce-faye-wattleton-40
[230] https://www.latimes.com/local/obituaries/la-me-gerald-larue-20140921-story.html
[231] https://www.nytimes.com/1972/12/31/archives/socialist-party-now-the-social-democrats-usa.html
[232] https://www.nytimes.com/2007/07/25/us/25wine1.html

APPENDIX B

CURRENT SCHOOL MASK MANDATES
(BY STATE)

State-by-state comparison.  As of August 31, 2021, below is a summary of the mask mandate policies for each state.[233],[234]  The states are listed in alphabetical order and demonstrate a wide variety of public health policies.

1. **Alabama.**  Alabama's mask mandate expired on April 9. The state's latest COVID-19 public health order encourages but does not require residents to wear masks within 6 feet of someone from another household. Municipal mask mandates in Birmingham and Montgomery expired in May.[235]

2. **Alaska.** Alaska's Department of Health Social Services "strongly encourages the wearing of masks in public," but the state has not required it. Anchorage, Alaska's largest city, ended its face-covering order in May; the capital of Juneau continues to mandate masking for unvaccinated people in indoor public spaces and large crowds outdoors.[236]

3. **Arizona.** Governor Doug Ducey issued an executive order on March 25, lifting all state COVID-19 restrictions on businesses and barring cities and counties from enforcing mask mandates except in government buildings and on public transit. Previously, Arizona

---

[233] This is a recent report with updated listings for each state mask mandate: https://www.usnews.com/news/best-states/articles/these-are-the-states-with-mask-mandates
[234] This report includes school mask policies and school district variations by state: https://districtadministration.com/track-school-mask-rules-requirements-state-by-state/
[235] Read Alabama's new "Safer Apart" health order.
[236] Read the Alaska health department's mask guidance.

required face-covering for employees and customers of barbers and cosmetologists, and several jurisdictions, including the state's largest counties, had full mask orders in place.[237]

4. **Arkansas.** Governor Asa Hutchinson lifted his 8-month-old mask mandate on March 31, saying the state had met targets for COVID-19 case counts set out several weeks earlier as a basis for rescinding the order. Health officials continue to recommend that Arkansans wear masks in public when unable to maintain 6 feet of distance from people outside their households. A new state law set to take effect this summer bars local governments from imposing mask mandates.[238]

5. **California.** Face-covering is required statewide for unvaccinated individuals in indoor public settings and workplaces and all people aged 2 and over in schools, health care, long-term care facilities, correctional facilities, homeless and emergency shelters, and public transit. Several of the state's largest jurisdictions have reinstated local indoor mask mandates covering all residents, regardless of vaccination status, including Los Angeles County, San Francisco, six surrounding Bay Area counties, and Sacramento County.[239]

6. **Colorado.** Governor Jared Polis announced an end to Colorado's mandate on May 14, saying the state is shifting from "mask-wearing requirements to mask-wearing suggestions," particularly for unvaccinated people in indoor settings. Face-covering may still be required for those without proof of vaccination in some settings, including medical facilities and prisons.[240]

---

[237] Read Ducey's order ending COVID-19  restrictions.
[238] Read the Arkansas health department's mask guidance.
[239] Read California's updated state face-covering guidance.
[240] Read the Colorado health department's updated mask guidance.

7. **Connecticut.** Masks are required for unvaccinated people age 2 and over in indoor public places and for all people in school buildings, health care facilities, group residential settings such as nursing homes and prisons, and on public transit. The city of New Haven instituted an indoor mask mandate covering both vaccinated and unvaccinated people on Aug. 9, four days after Governor Ned Lamont signed an executive order allowing local governments to impose rules more stringent than the state's.[241]

8. **Delaware.** Governor John Carney lifted Delaware's general mask order on May 21. The state continues to require face-covering in schools, state-owned buildings, and settings where the CDC recommends maintaining mask rules, such as public transit and healthcare facilities. Otherwise, masking is recommended for unvaccinated and partially vaccinated Delawareans in public places. [242]

9. **District of Columbia.** Mayor Muriel Bowser dropped the District's exemption for fully vaccinated individuals amid a sharp rise in COVID-19 cases. As of July 31, masks are required in indoor public places for all people over age 2, whether vaccinated or not. Face-covering is also required for all residents in schools, healthcare facilities, district government buildings, and public transit.[243]

10. **Florida.** Florida recommends but has not required face coverings for the general public. Several cities and large counties, including Miami-Dade, Palm Beach, and Hillsborough (Tampa), had mask requirements. Still, Governor Ron DeSantis issued an executive order

---

[241] Read Connecticut's current mask guidance.
[242] Read Delaware's updated mask policy.
[243] Read the D.C. health department's mask guidance (which has not yet been updated to reflect new mandate).

APPENDIX B - 3 -

on May 3 that barred local governments and school systems from imposing COVID-19
restrictions, including mask rules.[244]

11. **Georgia.** The governor's office and the state Department of Public Health recommend
masking in public to prevent the spread of COVID-19. Governor Brian Kemp sought last
summer to bar local mask mandates but eased his order in August 2020 to allow cities and
counties to impose limited face-covering rules. Atlanta Mayor Keisha Lance Bottoms
announced on July 28 that the city is reinstating mask requirements for all people in public
settings indoors.[245]

12. **Hawaii.** Governor David Ige lifted the state's outdoor mask mandate on May 25. Hawaii's
amended mask directive still requires residents ages 5 and up to wear a face-covering in
most indoor public settings. It requires businesses to refuse admission or service to
maskless patrons in most circumstances.[246]

13. **Idaho.** Idaho's latest "Stay Healthy Guidelines," dated May 11, recommends that
employers determine how masks and other protective gear "may be required" in their places
of business. Boise, Idaho's capital and largest city, dropped its mask mandate in May, as
did several other jurisdictions. Governor Brad Little signed an executive order on May 28
restoring local governments' authority to make their own mask rules, reversing a move by
Lt. Governor Janice McGeachin to strip such local control in an order she issued while
Little was at a conference out of state.[247]

---

[244] Read Florida's order barring local mask mandates.
[245] Read the Georgia Department of Public Health's COVID-19 guidance.
[246] Read Hawaii's amended face-covering order.
[247] Read Idaho's updated COVID-19 health guidelines.

APPENDIX B - 4 -

14. **Illinois.** Chicago is reinstituting a citywide indoor mask mandate covering all ages 2 and over starting Aug. 20, 2021. Masks are required for unvaccinated people in indoor public settings and outdoors when unable to maintain 6 feet of distance from others, and for all people in state government buildings; schools, and day-care centers; "congregate facilities" such as nursing homes, homeless shelters, and prisons; health care facilities; and public transit vehicles and hubs.[248]

15. **Indiana.** The state's 8-month-old mask mandate became a "mask advisory" on April 6. Hoosiers age 8 and up are encouraged to wear masks in all indoor public settings and outdoors when they cannot maintain 6 feet of distance from others. Face-covering remains mandatory in state buildings, K-12 schools, and at COVID-19 vaccination and testing sites. Local mask orders in Indianapolis and surrounding Marion County expired on June 7.[249]

16. **Iowa.** Governor Kim Reynolds lifted the state's mask mandate on Feb. 7, issuing a new emergency order that drops rules on face-covering and social distancing in favor of encouraging "reasonable public health measures" to reduce COVID-19 transmission in public places and private gatherings. Reynolds signed legislation May 20 restricting schools' and local governments' authority to require masks.[250]

17. **Kansas.** Kansas lawmakers revoked the state's mask requirement on April 1, hours after Governor Laura Kelly issued an executive order[251] intended to extend it. In March, a state law gave a panel of top legislators authority to overturn the governor's emergency orders. Kansas had a statewide mask rule in place for nine months, but it was not uniformly

---

[248] Read the Illinois Department of Public Health's mask guidance.
[249] Read Governor Eric Holcomb's executive order relaxing mask rules.
[250] Read Iowa's latest public health order and mask guidance.
[251] https://governor.kansas.gov/wp-content/uploads/2021/04/EO-21-14-Executed.pdf

enforced due to another state law curbing Kelly's emergency powers, which allowed counties to opt-out of the mandate. [252]

18. **Kentucky.** Kentucky's general mask mandate ended June 11, along with the state's remaining COVID-19 health restrictions. Masks are still required for people over age 5 in specific settings, including schools and child-care centers, medical and long-term care facilities, prisons, homeless shelters, and public transit.[253]

19. **Louisiana.** Face-covering is required in indoor public places for all people age 5 and older, regardless of vaccination status. Governor John Bel Edwards cited Louisiana's "insufficient vaccination rate" and rapid rise in COVID-19 cases and hospitalizations in reinstating the state mask order three months after it was lifted. The mandate will be in effect until at least Sept. 1.[254]

20. **Maine.** As of May 24, "Maine is no longer requiring masks in most settings," according to the state's face-covering FAQs. Under Governor Janet Mills ' latest face-covering order, people ages 5 and older must mask up indoors at schools and child-care facilities. The state continues to recommend masking for people who are not yet fully vaccinated.[255]

21. **Maryland.** Governor Larry Hogan ended Maryland's statewide mask mandate and all other COVID-19 emergency orders on July 1. Masking remains the rule on public transportation and in transit hubs, per a federal mandate. The city of Baltimore and Montgomery County

---

[252] Read the Kansas health department's mask guidance.
[253] Read a statement from Governor Andy Beshear's office on lifting COVID-19 restrictions.
[254] Read Louisiana's new mask mandate.
[255] Read Maine's mask FAQs.

outside Washington, D.C., have re-imposed local orders requiring most people, vaccinated or not, to wear face coverings in indoor public settings.[256]

22. **Massachusetts.** The state's general face-covering order was lifted on May 29 and replaced with an advisory recommending that people not fully vaccinated mask up in public places. Masks are still required for people age 5 and older in some settings, including K-12 schools, health care, and long-term care facilities, emergency shelters, prisons, and public transportation.[257]

23. **Michigan.** Michigan's mask mandate ended June 22, along with all COVID-related capacity limits on gatherings. The state had already lifted mask orders for fully vaccinated Michiganders in indoor public places and all people outdoors. Face-covering will still be required to "protect vulnerable populations" in long-term care facilities, prisons, and housing for farmworkers.[258]

24. **Minnesota.** Governor Tim Walz ended the state's mask mandate on May 14, moving up his timetable in response to the CDC guidelines. He had previously announced plans to lift the order July 1 if at least 70 percent of Minnesota's 16-and-older population was vaccinated. Masks are still required in schools and child care settings. Minneapolis and St. Paul lifted municipal indoor mask orders on June 1 and 2, respectively.[259]

25. **Mississippi.** Governor Tate Reeves lifted Mississippi's statewide mask requirement on September 30, 2020, about two months after it was imposed. He subsequently issued a new order mandating masks in counties with high COVID-19 case rates in indoor public

---

[256] Read a statement and FAQs from the governor's office on ending Maryland's emergency orders.
[257] Read Massachusetts' updated guidance on face-covering.
[258] Read Governor Gretchen Whitmer's June 17 announcement on rescinding COVID restrictions.
[259] Read the governor's announcement on lifting the mask order.

settings. That directive, which eventually covered most of the state, expired on March 3. Face-covering is still required at K-12 schools.[260]

26. **Missouri.** The state Department of Health and Senior Services recommends that all people age 2 and older mask up in public to help prevent the spread of COVID-19. The city and county of St. Louis reimposed a local mask mandate on July 26, covering all people age 5 and over in indoor public places, regardless of vaccination status. A similar order took effect in Kansas City on Aug. 2.[261]

27. **Montana.** Governor Greg Gianforte rescinded the state's mask mandate on Feb. 12. In July, the previous order, issued by then-Governor Steve Bullock, directed Montana residents age 5 and up to wear masks in indoor public spaces and at outdoor gatherings where social distancing could not be maintained. Gianforte signed legislation in May invalidating local mask mandates, effectively ending face-covering orders in Gallatin, Missoula, and other counties.[262]

28. **Nebraska.** Masks are required for both clients and staff at barbershops, salons, and other personal-care businesses. They are recommended for restaurant employees and the general population when in public. Broader local mask orders in Lincoln and Omaha were lifted in May.[263]

29. **Nevada.** Nevada ended most face-covering requirements for fully vaccinated people in May in accordance with a directive from Governor Steve Sisolak aligning state policy with CDC mask guidance. With the federal agency's new recommendations, Sisolak amended

---

[260] Read Mississippi's mask order repeal.
[261] Read the Missouri health department's COVID-19 prevention guidance.
[262] Read a statement from the governor's office on lifting the mask mandate.
[263] Read the Nebraska health department's COVID-19 guidance for the public.

the state order to require indoor masking for all people over age 9, regardless of vaccination status, in counties with substantial or high COVID-19 transmission rates. The new mandate took effect July 30 and covers 12 of Nevada's 16 counties — including Clark County, home to Las Vegas — and the independent capital, Carson City.[264]

30. **New Hampshire.** Governor Chris Sununu allowed the state's mask mandate to expire on April 16, six months after implementation. With the risk of COVID-19 transmission declining, the state Department of Public Health updated its face-covering guidance on June 17, saying people who are not showing symptoms "can choose to go without face masks in most indoor and outdoor locations, regardless of vaccination status." Masking is still encouraged for immunocompromised people or those at high risk of infection when in crowds indoors.[265]

31. **New Jersey.** The state's general face-covering order was lifted on May 28, along with many COVID-19 restrictions. Masking is encouraged in public places for people who are not fully vaccinated and required for all those over age 2 in schools, child-care centers, summer camps, state offices, and sites where the CDC mandates masking, such as health care facilities and on public transit. Masks are also required for unvaccinated employees in workplaces that are not open to the public.[266]

32. **New Mexico.** Effective Aug. 20, New Mexicans must wear face coverings in indoor public settings, regardless of their vaccination status, except when eating or drinking. The order applies to people age 2 and over and will be in force until at least Sept. 15. The new mandate

[264] Read Nevada's updated mask order.
[265] Read New Hampshire's latest mask guidance.
[266] Read Governor Phil Murphy's executive order lifting most COVID-19 restrictions.

replaces a May state health department order that required indoor masking only for individuals who were not yet fully vaccinated.[267]

33. **New York.**

34. **North Carolina.** Governor Roy Cooper ended the state's general mask mandate on May 14. Face-covering is still recommended for unvaccinated people and everyone in large venues but is only required in schools, child-care facilities, children's camps, and settings designated by the CDC for continued maskings, such as hospitals and transit hubs. Where masks are required, children under age 5 are exempt. Charlotte and Raleigh; Durham County; and Guilford County, which includes Greensboro, have instituted indoor mask mandates covering vaccinated and unvaccinated people.[268]

35. **North Dakota.** Gov. Doug Burgum instituted a statewide mask requirement on Nov. 14 amid a rapid rise in the state's COVID-19 case count. After extending the mandate in December, Burgum allowed it to lapse when it expired on Jan. 18, citing a decline in case numbers.[269]

36. **Ohio.** The state's mask mandate expired June 2 as the Ohio Department of Health lifted most other pandemic health orders. COVID-19 safety precautions remain in place in nursing homes and other group residential settings with a heightened risk of contracting the coronavirus. State officials recommend that unvaccinated people continue to wear masks indoors.[270]

---

[267] Read New Mexico's new mask order.
[268] Read North Carolina updated mask guidelines.
[269] Read the North Dakota Department of Health's mask guidance.
[270] Read Governor Mike DeWine's statement on ending COVID-19 health orders.

37. **Oklahoma.** Governor Kevin Stitt has called on Oklahomans to wear masks in public but rejected calls for a state mandate. In the state's largest cities, Oklahoma City and Tulsa, local mask mandates ended April 30 and May 1, respectively.[271]

38. **Oregon.** As of Aug. 13, Oregonians must mask up in indoor public places, regardless of vaccination status. Six weeks after lifting Oregon's COVID-19 restrictions, Governor Kate Brown cited the delta surge in hospitalizations and a looming statewide shortage of intensive-care beds in reinstating the face-covering order.[272]

39. **Pennsylvania.** Pennsylvania's mask mandate was rescinded on June 28. Face-covering is required in health care facilities, group residential settings such as long-term care facilities, prisons, homeless shelters, and on public transit, as directed by the CDC. The city of Philadelphia implemented a local mask order on Aug. 12, mandating face-covering at indoor businesses and institutions unless the establishment requires vaccination for all employees and patrons.[273]

40. **Puerto Rico.** Masks are required in public places indoors, regardless of vaccination status, by order of the territorial Department of Health, to which Governor Pedro Pierluisi ceded authority for establishing COVID-19 protocols in early July. Children under age 2 are exempt. The order took effect July 28, less than a month after the governor had lifted the mask rule for fully vaccinated individuals.[274]

41. **Rhode Island.** Governor Dan McKee terminated the state's mask mandate and several other COVID-19 health orders in a July 6 executive order. The Rhode Island Department

---

[271] Read the Oklahoma health department's COVID-19 guidance.
[272] Read Oregon's new mask order.
[273] Read the Pennsylvania health department's mask FAQs.
[274] Read the Puerto Rico health department's COVID-19 prevention page (Spanish).

of Health continues to recommend face-covering for people who are not fully vaccinated when indoors with people outside their household and outdoors in crowded settings.[275]

42. **South Carolina.** Governor Henry McMaster issued an executive order on May 11 prohibiting local governments and school districts from requiring masks, invalidating local rules in Charleston, Columbia, and other jurisdictions. The new order encourages South Carolinians who have not been fully vaccinated to wear masks in public settings but says mandates "are no longer necessary or appropriate to address and mitigate the existing public health threats."[276]

43. **South Dakota.** The South Dakota Department of Health recommends "wearing cloth face coverings in public settings where other social distancing measures are difficult to maintain, especially in areas of significant community-based transmission."[277]

44. **Tennessee.** In late April, Governor Bill Lee did not impose a statewide mandate and issued an executive order barring local mask orders in the 89 counties where the state directs public health policies. The six counties with independent health departments — Davidson, Hamilton, Knox, Madison, Shelby, and Sullivan — have all lifted local face-covering orders.[278]

45. **Texas.** Governor Greg Abbott lifted the state's 8-month-old mask mandate on March 10. His new directive says Texans are "strongly encouraged" to wear masks in public, but it bars local governments from enforcing their face-covering mandates.[279]

---

[275] Read the Rhode Island health department's mask guidance.
[276] Read South Carolina's order banning mask mandates.
[277] Read the state health department's COVID-19 information page.
[278] Read the Tennessee health department's **mask guidance.**
[279] Read Texas' mask order repeal.

46. **Utah.** Utah's 5-month-old order requiring masks in most public settings ended April 10 under state legislation that phases out various COVID-19 public health restrictions. Face-covering requirements in state government buildings and K-12 schools were lifted in May and June, respectively.[280]

47. **Vermont.** Governor Phil Scott lifted Vermont's mask mandate and all other COVID-19 restrictions on June 15 as the state crossed a threshold of 80 percent of eligible residents receiving at least one vaccine dose. Masks are required for all people, fully vaccinated or not, on public transportation and in health care and long-term care facilities.[281]

48. **Virginia.** Governor Ralph Northam's order ending statewide COVID-19 restrictions took effect May 28, two weeks after he effectively lifted Virginia's universal mask mandate to align with the CDC guidance. Employees at retail stores, restaurants, gyms, and other businesses directly serving customers are still required to wear masks; patrons are encouraged to do so. Face-covering also remains the rule in schools.[282]

49. **Washington.** Since mid-May, the state has operated under the CDC guidance, eliminating most mask requirements for fully vaccinated people. Under Governor Jay Inslee's June 30 reopening order, which ended social distancing rules and business capacity limits, unvaccinated Washingtonians age 5 and over are directed to wear masks in indoor public settings and workplaces, and face-covering is universally required in schools, health care facilities, prisons, and homeless shelters.[283]

---

[280] Read Utah's state law curbing mask mandates and other pandemic emergency orders.
[281] Read Vermont mask requirements here.
[282] Read Virginia's latest mask order.
[283] Read the state Department of Health's updated mask order.

50. **West Virginia.** Governor Jim Justice signed an executive order on June 20 revoking the state's 11-month-old mask mandate. In its final weeks, the directive had covered unvaccinated people age 9 and up in indoor public spaces. Face-covering is still required in specific settings per CDC guidelines, including medical facilities and transportation hubs, and West Virginia businesses and school systems may require people to mask up.[284]

51. **Wisconsin.** The Wisconsin Supreme Court struck down Governor Tony Evers' mask mandate on March 31. In a 4-3 vote on a case brought by Republican state legislators, the court ruled that Evers, a Democrat, overstepped his authority by repeatedly extending pandemic-related emergency orders without lawmakers' approval. The governor had renewed the mask order several times since issuing it in August. Local face-covering rules in Milwaukee, Racine, and Kenosha and in Dane County, which includes Madison, were lifted between mid-May and early June.[285]

52. **Wyoming.** Governor Mark Gordon rescinded the state's 3-month-old mask mandate on March 16. The state health department continues to recommend mask use in public places "when common-sense physical distancing cannot be maintained."[286]

---

[284] Read West Virginia's current and past face-covering orders.
[285] Read the Wisconsin health department's mask guidance.
[286] Read Wyoming mask requirements here.

A<span>PPENDIX</span> C

**1984 M<span>INISTRIES</span>**

**NOTE**: The following excerpts have been taken from George Orwell's *1984* novel to support the eerie similarities between Defendants' acts and the dystopian musings authored by Orwell.

**MINISTRY OF TRUTH**

"The Ministry of Truth—Minitrue, in Newspeak [Newspeak was the official language of Oceania. For an account of its structure and etymology, see Appendix.]—was startlingly different from any other object in sight. It was an enormous pyramidal structure of glittering white concrete, soaring up, terrace after terrace, 300 meters into the air. From where Winston stood, it was just possible to read, picked out on its white face in elegant lettering, the three slogans of the Party:

WAR IS PEACE
FREEDOM IS SLAVERY
IGNORANCE IS STRENGTH

The Ministry of Truth contained, it was said, three thousand rooms above ground level and corresponding ramifications below. Scattered about London, there were just three other buildings of similar appearance and size. So completely did they dwarf the surrounding architecture that you could see (p. 6), all four of them simultaneously from the roof of Victory Mansions. They were the homes of the four Ministries between which the entire apparatus of government was divided. The Ministry of Truth concerned itself with news, entertainment, education, and the fine arts. The Ministry of Peace concerned itself with war. The Ministry of Love, which maintained law and order. And the Ministry of Plenty, which was responsible for economic affairs. Their names, in Newspeak: Minitrue, Minipax, Miniluv, and Miniplenty.

The Ministry of Love was the frightening one. There were no windows in it at all. Winston had never been inside the Ministry of Love, nor within half a kilometer of it. It was impossible to enter except on official business, only by penetrating through a maze of barbed-wire entanglements, steel doors, and hidden machine-gun nests. Even the streets leading up to its outer barriers were roamed by gorilla-faced guards in black uniforms, armed with jointed truncheons." (p. 7)

## <u>MINISTRY OF PLENTY</u>

"As short a time ago as February, the Ministry of Plenty had issued a promise (a 'categorical pledge' were the official words) that there would be no reduction of the chocolate ration during 1984. Actually, as Winston was aware, the chocolate ration was to be reduced from thirty grammes to twenty at the end of the present week. All that was needed was to substitute for the original promise a warning that it would probably be necessary to reduce the ration at some time in April.

As soon as Winston had dealt with each of the messages, he clipped his speakwritten corrections to the appropriate copy of 'The Times' and pushed them into the pneumatic tube. Then, with a movement which was as nearly as possible unconscious, he crumpled up the original message and any notes that he had made, and dropped them into (p. 50) the memory hole to be devoured by the flames.

What happened in the unseen labyrinth to which the pneumatic tubes led, he did not know in detail, but he did know in general terms. As soon as all the corrections which happened to be necessary in any particular number of 'The Times' had been assembled and collated, that number would be reprinted, the original copy destroyed, and the corrected copy placed on the files in its stead. This process of continuous alteration was applied not only to newspapers, but to books, periodicals, pamphlets, posters, leaflets, films, sound-tracks, cartoons, photographs—to every kind of literature or documentation which might conceivably hold any political or ideological significance. Day by day and almost minute by minute the past was brought up to date. _In this way, every prediction made by the Party could be shown by documentary evidence to have been correct, nor was any item of news, or any expression of opinion, which conflicted with the needs of the moment, ever allowed to remain on record._ All history was a palimpsest, scraped clean, and reinscribed exactly as often as was necessary. In no case would it have been possible, once the deed was done, to prove that any falsification had taken place. The largest section of the Records Department, far larger than the one on which Winston worked, consisted simply of persons whose duty it was to track down and collect all copies of books, newspapers, and other documents which had been superseded and were due for destruction. A number of 'The Times' which might, because of changes in political alignment, or mistaken prophecies uttered by Big Brother, have (p. 51) been rewritten a dozen times still stood on the files bearing its original date, and no other copy existed

to contradict it. <u>Books, also, were recalled and rewritten again and again, and were invariably reissued without any admission that any alteration had been made.</u>[287] Even the written instructions which Winston received, and which he invariably got rid of as soon as he had dealt with them, never stated or implied that an act of forgery was to be committed: always the reference was to slips, errors, misprints, or misquotations which it was necessary to put right in the interests of accuracy.

But actually, he thought as he re-adjusted the Ministry of Plenty's figures, it was not even forgery. It was merely the substitution of one piece of nonsense for another. Most of the material that you were dealing with had no connexion with anything in the real world, not even the kind of connexion that is contained in a direct lie. Statistics were just as much a fantasy in their original version as in their rectified version. A great deal of the time, you were expected to make them up out of your head. For example, the Ministry of Plenty's forecast had estimated the output of boots for the quarter at 145 million pairs. The actual output was given as sixty-two million. Winston, however, in rewriting the forecast, marked the figure down to fifty-seven million so as to allow for the usual claim that the quota had been overfulfilled. In any case, sixty-two million was no nearer the truth than fifty-seven million or 145 million. Very likely, no boots had been produced at all.

Likelier still, nobody knew how many had been produced, much less (p. 52) cared. All one knew was that every quarter astronomical numbers of boots were produced on paper, while perhaps half the population of Oceania went barefoot. And so it was with every class of recorded fact, great or small. Everything faded away into a shadow-world in which, finally, even the date of the year had become uncertain." (p. 53)

. . .

"And the Records Department, after all, was itself only a single branch of the Ministry of Truth, whose primary job was not to reconstruct the past but to supply the citizens of Oceania with newspapers, films, textbooks, telescreen (p. 54) programs, plays, novels—with every conceivable kind of information, instruction, or entertainment, from a statue to a slogan, from a lyric poem to a biological treatise, and from a child's spelling-book to a Newspeak dictionary. And the Ministry

---

[287] Parallel: *See* August 26, 2021 and September 15, 2021 when Defendants PHPC, DOH, and presumably Defendant Hochul and Zucker, met to essentially "erase" and re-write 8 NYCRR §66-3.1, et seq, and 10 NYCRR §2.60.

had not only to supply the multifarious needs of the party, but also to repeat the whole operation at a lower level for the benefit of the proletariat. A whole chain of separate departments generally dealt with proletarian literature, music, drama, and entertainment. There were produced rubbishy newspapers containing almost nothing except sport, crime and astrology, sensational five-cent novelettes, films oozing with sex, and sentimental songs composed entirely by mechanical means on a special kind of kaleidoscope known as a versificator. There was even a whole sub-section—Pornosec, it was called in Newspeak—engaged in producing the lowest kind of pornography, which was sent out in sealed packets and which no Party member, other than those who worked on it, was permitted to look at." (p. 55)

## MINISTRY OF LOVE

"One did not know what happened inside the Ministry of Love, but it was possible to guess: tortures, drugs, delicate instruments that registered your nervous reactions, gradual wearing-down by sleeplessness and solitude and persistent questioning. Facts, at any rate, could not be kept hidden. They could be tracked down by enquiry, they could be squeezed out of you by torture. But if the object was not to stay alive but to stay (p. 210) human, what difference did it ultimately make? They could not alter your feelings: for that matter you could not alter them yourself, even if you wanted to. They could lay bare in the utmost detail everything that you had done or said or thought, but the inner heart, whose workings were mysterious even to yourself, remained impregnable." (p. 211)

## MINISTRY OF PEACE

"In the vast laboratories of the Ministry of Peace, and in the experimental stations hidden in the Brazilian forests, or in the Australian desert, or on lost islands of the Antarctic, the teams of experts are indefatigably at work. Some are concerned simply with planning the logistics of future wars; others devise larger and larger rocket bombs, more and more powerful explosives, and more and more impenetrable armour-plating; others search for new and deadlier gases, or for soluble poisons capable of being produced in such quantities as to destroy the vegetation of whole continents, or for breeds of disease germs immunized against all possible antibodies; others strive to produce a vehicle that shall bore its way under the soil like a submarine under the water, or an aeroplane as independent of its base as a sailing-ship; others explore even remoter possibilities

such as focusing the sun's rays through lenses suspended thousands of kilometres away in space, or producing artificial earthquakes and tidal waves by tapping the heat at the earth's centre.

But none of these projects ever comes anywhere near realization, and none of the three super-states ever gains a significant lead on the others. What is more remarkable is (p. 245) that all three powers already possess, in the atomic bomb, a weapon far more powerful than any that their present researches are likely to discover. Although the Party, according to its habit, claims the invention for itself, atomic bombs first appeared as early as the nineteen-forties, and were first used on a large scale about ten years later. At that time, some hundreds of bombs were dropped on industrial centres, chiefly in European Russia, Western Europe, and North America. The effect was to convince the ruling groups of all countries that a few more atomic bombs would mean the end of organized society, and hence of their own power. Thereafter, although no formal agreement was ever made or hinted at, no more bombs were dropped. All three powers merely continue to produce atomic bombs and store them up against the decisive opportunity which they all believe will come sooner or later. And meanwhile the art of war has remained almost stationary for thirty or forty years. Helicopters are more used than they were formerly, bombing planes have been largely superseded by self-propelled projectiles, and the fragile movable battleship has given way to the almost unsinkable Floating Fortress; but otherwise there has been little development. The tank, the submarine, the torpedo, the machine gun, even the rifle, and the hand grenade are still in use. And in spite of the endless slaughters reported in the Press and on the telescreens, the desperate battles of earlier wars, in which hundreds of thousands or even millions of men were often killed in a few weeks, have never been repeated.

None of the three super-states ever attempts any (p. 246) manoeuvre which involves the risk of serious defeat. When any large operation is undertaken, it is usually a surprise attack against an ally. The strategy that all three powers are following, or pretend to themselves that they are following, is the same. The plan is, by a combination of fighting, bargaining, and well-timed strokes of treachery, to acquire a ring of bases completely encircling one or other of the rival states, and then to sign a pact of friendship with that rival and remain on peaceful terms for so many years as to lull suspicion to sleep. During this time, rockets loaded with atomic bombs can be assembled at all the strategic spots; finally, they will all be fired simultaneously, with effects so devastating as to make retaliation impossible. It will then be time to sign a pact of friendship with the remaining worldpower, in preparation for another attack. This scheme, it is hardly necessary to say, is a mere

APPENDIX C - 5 -

daydream, impossible of realization. Moreover, no fighting ever occurs except in the disputed areas round the Equator and the Pole: no invasion of enemy territory is ever undertaken. This explains the fact that in some places the frontiers between the superstates are arbitrary. Eurasia, for example, could easily conquer the British Isles, which are geographically part of Europe, or on the other hand it would be possible for Oceania to push its frontiers to the Rhine or even to the Vistula. But this would violate the principle, followed on all sides though never formulated, of cultural integrity. If Oceania were to conquer the areas that used once to be known as France and Germany, it would be necessary either to exterminate the inhabitants, a task of great physical difficulty, or to (p. 247) assimilate a population of about a hundred million people, who, so far as technical development goes, are roughly on the Oceanic level. The problem is the same for all three superstates. It is absolutely necessary to their structure that there should be no contact with foreigners, except, to a limited extent, with war prisoners and coloured slaves. Even the official ally of the moment is always regarded with the darkest suspicion. War prisoners apart, the average citizen of Oceania never sets eyes on a citizen of either Eurasia or Eastasia, and he is forbidden the knowledge of foreign languages. If he were allowed contact with foreigners he would discover that they are creatures similar to himself and that most of what he has been told about them is lies. The sealed world in which he lives would be broken, and the fear, hatred, and self-righteousness on which his morale depends might evaporate. It is therefore realized on all sides that however often Persia, or Egypt, or Java, or Ceylon may change hands, the main frontiers must never be crossed by anything except bombs.

Under this lies a fact never mentioned aloud, but tacitly understood and acted upon: namely, that the conditions of life in all three super-states are very much the same. In Oceania the prevailing philosophy is called Ingsoc, in Eurasia it is called Neo-Bolshevism, and in Eastasia it is called by a Chinese name usually translated as Death-Worship, but perhaps better rendered as Obliteration of the Self. The citizen of Oceania is not allowed to know anything of the tenets of the other two philosophies, but he is taught to execrate them as barbarous outrages upon morality and common (p. 248) sense. Actually the three philosophies are barely distinguishable, and the social systems which they support are not distinguishable at all. Everywhere there is the same pyramidal structure, the same worship of semi-divine leader, the same economy existing by and for continuous warfare. It follows that the three super-states not only cannot conquer one another, but would gain no advantage by doing so.

APPENDIX C - 6 -

On the contrary, so long as they remain in conflict, they prop one another up, like three sheaves of corn. And, as usual, the ruling groups of all three powers are simultaneously aware and unaware of what they are doing. Their lives are dedicated to world conquest, but they also know that it is necessary that the war should continue everlastingly and without victory. Meanwhile, the fact that there IS no danger of conquest makes possible the denial of reality which is the special feature of Ingsoc and its rival systems of thought. Here it is necessary to repeat what has been said earlier, that by becoming continuous, war has fundamentally changed its character.

In past ages, a war, almost by definition, was something that sooner or later came to an end, usually in unmistakable victory or defeat. In the past, also, war was one of the main instruments by which human societies were kept in touch with physical reality. All rulers of all ages have tried to impose a false view of the world upon their followers, but they could not afford to encourage any illusion that tended to impair military efficiency. So long as defeat meant the loss of independence, or some other result generally held to be undesirable, the precautions against defeat had to be (p. 249) serious. Physical facts could not be ignored. In philosophy, religion, ethics, or politics, two and two might make five, but when one was designing a gun or an aeroplane, they had to make four. Inefficient nations were always conquered sooner or later, and the struggle for efficiency was inimical to illusions. Moreover, to be efficient it was necessary to learn from the past, which meant having a fairly accurate idea of what had happened in the past. Newspapers and history books were, of course, permanently colored and biased, but falsification of the kind that is practiced today would have been impossible. War was a sure safeguard of sanity, and so far as the ruling classes were concerned, it was probably the most important of all safeguards. While wars could be won or lost, no ruling class could be completely irresponsible.

But when war becomes continuous, it also ceases to be dangerous. When war is continuous, there is no such thing as military necessity. Technical progress can cease, and the most palpable facts can be denied or disregarded. As we have seen, researches that could be called scientific are still carried out for the purposes of war, but they are essentially a kind of daydreaming, and their failure to show results is not important. Efficiency, even military efficiency, is no longer needed. Nothing is efficient in Oceania except the Thought Police. Since each of the three super-states is unconquerable, each is, in effect, a separate universe within which almost any perversion of thought can be safely practised. Reality only exerts its pressure through the needs of everyday life—the need to eat and drink, to get shelter and (p. 250) clothing, to avoid swallowing poison or

stepping out of topstorey windows, and the like. There is still a distinction between life and death and between physical pleasure and physical pain, but that is all. Cut off from contact with the outer world and the past, the citizen of Oceania is like a man in interstellar space who has no way of knowing which direction is up and which is down. The rulers of such a state are absolute, as the Pharaohs or the Caesars could not be. They are obliged to prevent their followers from starving to death in numbers large enough to be inconvenient, and they are obliged to remain at the same low level of military technique as their rivals; but once that minimum is achieved, they can twist reality into whatever shape they choose.

The war, therefore, if we judge it by the standards of previous wars, is merely an imposture. It is like the battles between certain ruminant animals whose horns are set at such an angle that they are incapable of hurting one another. But though it is unreal, it is not meaningless. It eats up the surplus of consumable goods, and it helps to preserve the special mental atmosphere that a hierarchical society needs. War, it will be seen, is now a purely internal affair. In the past, the ruling groups of all countries, although they might recognize their common interest and therefore limit the destructiveness of war, did fight against one another, and the victor always plundered the vanquished. In our own day, they are not fighting against one another at all. The war is waged by each ruling group against its subjects, and the object of the war is not to make or prevent (p. 251) conquests of territory, but to keep the structure of society intact. The very word 'war', therefore, has become misleading. It would probably be accurate to say that by becoming continuous[,] war has ceased to exist. The peculiar pressure exerted on human beings between the Neolithic Age and the early twentieth century has disappeared and been replaced by something quite different. The effect would be much the same if the three super-states, instead of fighting one another, should agree to live in perpetual peace, each inviolate within its boundaries. For, in that case, each would still be a self-contained universe, freed for ever from the sobering influence of external danger. A truly permanent peace would be the same as a permanent war. This—although the vast majority of Party members understand it only in a shallower sense—is the inner meaning of the Party slogan: WAR IS PEACE." (p. 252)

## **DOUBLETHINK**

"A Party member is required to have not only the right opinions but the right instincts. Many of the beliefs and attitudes demanded of him are never plainly stated and could not be stated

without laying bare the contradictions inherent in Ingsoc. If he is a person naturally orthodox (in Newspeak a GOODTHINKER), he will, in all circumstances, know, without taking thought, what is the true belief or the desirable emotion. <u>But in any case[,] an elaborate mental training, undergone in childhood and grouping itself round the Newspeak words CRIMESTOP, BLACKWHITE, and DOUBLETHINK, makes him unwilling and unable to (p. 266) think too deeply on any subject whatever</u>[288]. (emphasis added)

<u>A Party member is expected to have no private emotions and no respites from enthusiasm. He is supposed to live in a continuous frenzy of hatred of foreign enemies and internal traitors, triumph over victories, and self-abasement before the power and wisdom of the Party. The discontents produced by his bare, unsatisfying life are deliberately turned outwards and dissipated by such devices as the Two Minutes Hate, and the speculations which might possibly induce a sceptical or rebellious attitude are killed in advance by his early acquired inner discipline.</u> The first and simplest stage in the discipline, which can be taught even to young children, is called, in Newspeak, CRIMESTOP. CRIMESTOP means the faculty of stopping short, as though by instinct, at the threshold of any dangerous thought. It includes the power of not grasping analogies, of failing to perceive logical errors, of misunderstanding the simplest arguments if they are inimical to Ingsoc, and of being bored or repelled by any train of thought which is capable of leading in a heretical direction. CRIMESTOP, in short, means protective stupidity.

But stupidity is not enough. On the contrary, orthodoxy in the full sense demands control over one's mental processes as complete as that of a contortionist over his body. Oceanic society rests ultimately on the belief that Big Brother is omnipotent and that the Party is infallible. But since, in reality, Big Brother is not omnipotent and the party is not infallible, there is a need for unwearying, moment-to-moment flexibility in the treatment of facts. <u>The keyword here is BLACKWHITE. Like so many (p. 267) Newspeak words, this word has two mutually contradictory meanings. Applied to an opponent, it means the habit of impudently claiming that black is white, in contradiction of the plain facts. Applied to a Party member, it means a loyal willingness to say that black is white when Party discipline demands this. But it also means the ability to BELIEVE that black is white, and more, to KNOW that black is white and forget that</u>

---

[288] Parallel: Parents speaking out against the proposed mandatory mask mandates have been targeted by the FBI, the US Attorney General's office and local law enforcement agencies as "domestic terrorists" for essentially "thinking too deeply" and advocating for their lawful rights.

one has ever believed the contrary. <u>This demands a continuous alteration of the past, made possible by the system of thought which really embraces all the rest and is known in Newspeak as DOUBLETHINK.</u>

The alteration of the past is necessary for two reasons: subsidiary and, so to speak, precautionary. The subsidiary reason is that the Party member, like the proletarian, tolerates present-day conditions partly because he has no standards of comparison. He must be cut off from the past, just as he must be cut off from foreign countries because it is necessary for him to believe that he is better off than his ancestors and that the average level of material comfort is constantly rising. But by far the more important reason for the readjustment of the past is the need to safeguard the infallibility of the Party. <u>It is not merely that speeches, statistics, and records of every kind must be constantly brought up to date in order to show that the predictions of the Party were in all cases right. It is also that no change in doctrine or in political alignment can ever be admitted. For to change one's mind, or even one's policy, is a confession of weakness.</u>[289] If, for example, Eurasia or Eastasia (whichever it may be) is the enemy today, then (p. 268) that country must always have been the enemy. And if the facts say otherwise, then the facts must be altered. Thus history is continuously rewritten. This day-to-day falsification of the past, carried out by the Ministry of Truth, is as necessary to the stability of the regime as the work of repression and espionage carried out by the Ministry of Love."[290] (p. 269) (emphasis added)

--

"It need hardly be said that the subtlest practitioners of DOUBLETHINK are those who invented DOUBLETHINK and know that it is a vast system of mental cheating. In our society, those who have the best knowledge of what is happening are also furthest from seeing the world as it is. In general, the greater the understanding, the greater the delusion; the more intelligent, the less sane. One clear illustration of this is that war hysteria increases in intensity as one rise in the social scale. Those whose attitude towards the war is most nearly rational are the (p. 271) subject peoples of the disputed territories. To these people, the war is simply a continuous calamity that sweeps to and fro over their bodies like a tidal wave.

---

[289] Parallel: Not only inconsistent guidance, but Dr. Fauci's public statements that criticisms of his inconsistency is an attack on "science," failing to admit that he may have been mistaken at some point.

[290] Parallel: Inconsistent guidance surrounding COVID-19 transmission (i.e. droplets v. airborne), prevention methods, and public restrictions

Which side is winning is a matter of complete indifference to them. They are aware that a change of overlordship means that they will be doing the same work as before for new masters who treat them in the same manner as the old ones. <u>The slightly more favoured workers we call 'the proles' are only intermittently conscious of the war. When necessary, they can be prodded into frenzies of fear and hatred, but when left to themselves, they are capable of forgetting for long periods that the war is happening.</u>[291] In the ranks of the Party, and above all of the Inner Party, genuine war enthusiasm is found. World-conquest is believed in most firmly by those who know it to be impossible. This peculiar linking-together of opposites—knowledge with ignorance, cynicism with fanaticism—is one of the chief distinguishing marks of Oceanic society. The official ideology abounds with contradictions even when there is no practical reason for them. <u>Thus, the Party rejects and vilifies every principle for which the Socialist movement originally stood, and it chooses to do this in the name of Socialism. It preaches a contempt for the working class unexampled for centuries past, and it dresses its members in a uniform which was at one time peculiar to manual workers and was adopted for that reason. It systematically undermines the solidarity of the family, and it calls its leader by a name that directly appeals to the sentiment of family loyalty. Even the names of the four Ministries by which we are governed exhibit a sort (p. 272) of impudence in their deliberate reversal of the facts. The Ministry of Peace concerns itself with war, the Ministry of Truth with lies, the Ministry of Love with torture, and the Ministry of Plenty with starvation. These contradictions are not accidental, nor do they result from ordinary hypocrisy; they are deliberate exercises in DOUBLETHINK.</u> For it is only by reconciling contradictions that power can be retained indefinitely. In no other way could the ancient cycle be broken. If human equality is to be forever averted—if the High, as we have called them, are to keep their places permanently—then the prevailing mental condition must be controlled insanity. (emphasis added).

<u>But there is one question which, until this moment, we have almost ignored. It is; WHY should human equality be averted? Supposing that the mechanics of the process have been rightly described, what is the motive for this massive, accurately planned effort to freeze history at a particular moment?</u> (emphasis added).

---

[291] Parallel: Governor Hochul's speeches in Brooklyn and Harlem, calling upon the congregation to be "our apostles."

Here we reach the central secret. As we have seen. The mystique of the Party, and above all of the Inner Party, depends upon DOUBLETHINK <u>But more profound than this lies the original motive. This never-questioned instinct first led to the seizure of power and brought DOUBLETHINK, the Thought Police, continuous warfare, and all the other necessary paraphernalia into existence afterwards. This motive really consists...</u>" (p. 273) (emphasis added).

## **THE MODERN-DAY PARALLELS**

1.  According to George Orwell, the Ministry of Plenty maintains a state of perpetual poverty, scarcity and food shortages, while convincing the populace that they are living in a state of unprecedented prosperity.  The intent was to implement socialism throughout society.

2.  "[T]he Ministry of Plenty had issued a promise ... that there would be no reduction of the chocolate ration during 1984. Actually, as Winston was aware, the chocolate ration was to be reduced from thirty grammes to twenty at the end of the present week. All that was needed was to substitute for the original promise a warning that it would probably be necessary to reduce the ration at some time in April."

3.  Throughout the pandemic, while governments used COVID-19 to lockdown society, it fed its people with stimulus checks, enhanced unemployment benefits and a lot of other government programs.[292]  Socialists have been claiming victory over capitalism, including taking credit for the creation of the vaccine.[293]  However, at the conclusion of an op-ed titled, "How socialism saved America", the author writes, "Admittedly, the above policies cost a lot of money — money that the U.S. treasury must borrow and pay interest on. The sums are both awesome and scary."[294]  In the end socialism will not pay the bills.

## **MINISTRY OF LOVE**

---

[292] https://www.courierherald.com/opinion/socialism-and-covid-19-in-focus/
[293] https://jacobinmag.com/2020/12/socialism-vaccine-capitalism-distribution
[294] https://thehill.com/opinion/finance/535885-how-socialism-saved-america

4.     According to George Orwell, The Ministry of Love serves as the government's interior ministry. It enforces loyalty to Big Brother through fear, buttressed through a massive apparatus of security, torture and repression, as well as systematic brainwashing. The Ministry of Love is a place where people deemed a threat to the state are starved, beaten, electrocuted, terrorized, and dehumanized.

5.     In the basement torture chamber of the Ministry of Love is Room 101, in which the Party attempts to subject a prisoner to their own worst nightmare, fear or phobia, with the objective of breaking down their resistance.

6.     There are many examples throughout the COVID-19 pandemic where governments, within the United States and around the world, have arrested or detained people, including students, for not wearing masks.

   a.   In May 2020, police arrested a man in Brooklyn and threatened others for not wearing a mask.[295]

   b.   In July 2020, a New York City mother announced a $10 million lawsuit against police for arresting her in front of her 5-year old son for improperly wearing face mask.[296]

   c.   In September 2020, a parent was watching a middle school football game outside in the bleachers by herself and she was tased for not wearing a mask.[297]

   d.   In September 2020, a New York City couple was handcuffed and removed from a ferry by police officers after they refused to wear a mask.[298]

---

[295] https://www.amny.com/new-york/brooklyn/police-violently-arrest-man-in-brooklyn-and-threaten-bystanders-for-not-wearing-masks/
[296] https://abcnews.go.com/US/york-city-mom-plans-10-million-lawsuit-police/story?id=71295263
[297] https://iotwreport.com/woman-tased-for-not-wearing-mask-at-middle-school-football-game-by-an-ahole-not-wearing-a-mask/
[298] https://abc7ny.com/couple-arrested-refuse-to-wear-face-masks-nyc-ferry-covid-19/6411823/

e.  In March 2021, a day after Texas rolled back its mask mandate, a woman was arrested at a bank for refusing to leave after being told she had to wear a mask inside.[299]

f.  In April 2021, the British Columbia Human Rights Tribunal announced that anyone thinking of filing a complaint because they were told to wear a mask in a store will actually have to prove they have a disability that prevents them from doing so.[300]

g.  In June 2021, Queensland, Australia Police arrested a man for not wearing a mask who collapsed to the ground, his body shaking uncontrollably due to a seizure.[301]

h.  In June 2021, Richmond, Rhode Island Police arrested a parent following his refusal to wear a mask at a Chariho School Committee meeting.[302]

i.  In July 2021, U.S. Capitol Police ("USCP") were ordered to arrest visitors and staff who refuse to wear a mask on the House side of the Capitol complex. Police were also advised not to arrest members of Congress for failing to wear masks but to report the lawmakers' noncompliance to the House sergeant-at-arms, who will subjected to fines starting at $500 for skirting mask rules.[303]

j.  In August 2021, Albemarle County, Virginia, schools began denying in-person learning access to students with disabilities who can't or won't wear a face covering — a group that should be exempted from the mask requirement. As part of a stepped

---

[299] https://www.kwwl.com/news/tx-watch-woman-arrested-for-not-wearing-a-mask/article_d2930b0e-dc63-5c15-b3bd-ff07bf3ea345.html
[300] https://www.cbc.ca/news/canada/british-columbia/bc-anti-mask-human-rights-tribunal-1.5972326
[301] https://www.sydneycriminallawyers.com.au/blog/man-has-seizure-after-being-arrested-for-not-wearing-a-mask/
[302] https://turnto10.com/news/local/its-not-the-law-parent-arrested-for-refusing-to-wear-mask-at-school-committee-meeting
[303] https://www.foxnews.com/politics/capitol-police-ordered-arrest-staff-visitors-not-wearing-masks

up enforcement, the school district says a student who isn't comfortable wearing a mask has three choices: virtual school, home school or a private school.[304]

k.  In August 2021, a Stillman Valley, Illinois mother was arrested at a school open house after she reportedly refused to wear a mask over her nose.[305]

l.  In September 2021, a Long Island parent called police after their child and five other middle school students were pulled out of class for not wearing masks. The six students at Islip Middle School were moved to the gym by a security guard over their non-compliance with the mask rule, according to Suffolk County Police.[306]

m.  In September 2021, Fayetteville, Arkansas Police arrested a man after he refused to wear a mask during the council's meeting Tuesday.[307]

7.  Throughout the COVID-19 pandemic, people have been shot and some killed due to the conflicts governments have created around mask mandates.

a.  In April 2020, Police in the Philippines shot dead a man for not wearing a mask and provoking officers. President Duterte has ordered police and military to kill anyone violating quarantine or causing trouble during the pandemic.[308]

b.  In May 2020, a Family Dollar store security guard was shot and killed in Flint, Michigan after telling a customer her child had to wear a face mask to enter the store.[309]

---

[304] https://dailyprogress.com/news/local/education/albemarle-mask-policy-keeps-some-students-with-disabilities-out-of-buildings/article_9dcbfb80-0aa4-11ec-acd4-7f94b0d3f587.html
[305] https://www.mystateline.com/news/local-news/stillman-valley-mom-arrested-after-not-wearing-mask-to-school-open-house/
[306] https://nypost.com/2021/09/03/parent-calls-cops-after-maskless-students-pulled-from-ny-school/
[307] https://www.arkansasonline.com/news/2021/sep/07/video-man-refusing-to-wear-mask-arrested-during/
[308] https://www.dw.com/en/man-shot-dead-for-flouting-coronavirus-rules/a-53018149
[309] https://www.washingtonpost.com/nation/2020/05/04/security-guards-death-might-have-been-because-he-wouldnt-let-woman-store-without-mask/

c.  In July 2020, a 43-year-old Michigan man died who was shot by police after he stabbed an elderly man who had confronted him for failing to wear a face mask.[310]

d.  In March 2021, a police officer working as a security guard for a high school basketball game in New Orleans was shot and killed after trying to stop a man who tried to enter a gymnasium without a mask.[311]

e.  In June 2021, a man shot and killed a supermarket cashier in Georgia after arguing with her about wearing a mask before shooting an off-duty law enforcement officer who tried to intervene.[312],[313]

f.  In June 2021, in India, a man was shot by a bank security guard following an argument over the guard asking him to wear a mask.[314]

g.  In July 2021, a policeman in the Democratic Republic of Congo shot a student for not wearing a mask while filming on the streets of the capital city.[315]

h.  In July 2021, a man who was wearing a mask was shot in the neck with a BB gun at an Omaha Aldi in a confrontation over masks.[316]

i.  In August 2021, a liquor store security guard in Chicago reportedly shot a man three times after a customer walked into the store without a mask on. The guard's

---

[310]    https://www.fox23.com/news/trending/man-shot-killed-by-police-after-fight-over-wearing-mask-reports-say/CE6ORWE6UVBBPGOLCZZTREBRQI/
[311]  https://thehill.com/homenews/state-watch/541015-man-shot-security-guard-at-high-school-basketball-game-during-argument
[312]  https://www.buzzfeednews.com/article/clarissajanlim/man-shot-kill-supermarket-cashier-georgia-mask
[313]  https://www.forbes.com/sites/jemimamcevoy/2021/06/15/killing-of-georgia-cashier-is-latest-in-a-string-of-fatal-shootings-over-mask-wearing-here-are-the-rest/?sh=d2c0617764eb
[314]  https://www.indiatvnews.com/news/india/up-man-shot-by-bank-security-guard-argument-over-not-wearing-mask-bareilly-latest-news-714641
[315]  https://www.wionews.com/world/dr-congo-policeman-shoots-student-for-not-wearing-mask-400575
[316]  https://journalstar.com/news/state-and-regional/crime-and-courts/man-shot-with-bb-gun-over-wearing-mask-at-omaha-aldi/article_354137e6-a359-52ef-a4e3-4c56e61ce30a.html

attorney stated during a bond court hearing that his client was acting in self-defense as the customer was "putting other's lives at risk by not wearing a mask."[317]

j.   In September 2021, in Germany, a young gas station clerk was shot and killed for asking a customer to wear a face mask.[318]

## <u>MINISTRY OF TRUTH</u>

8.   In 2012, the general manager of Twitter in the UK proclaimed itself as "the free speech wing of the free speech party" and Twitter takes a "neutral" view of messages posted by its users because of the company's founding principles.[319]

9.   Big Tech[320] and other social media behemoths has flexed its powerful information muscles by clamping down on any discussion it deems contrary to their world view dealing with COVID-19.[321]

10.   At first, it was China cracking down[322] to suppress information about the severity and origins of COVID-19[323] which they continued to do so throughout the international crisis.[324]

11.   While China was imposing its censorship might, they enlisted the World Health Organization and Big Tech to censor what it called "Infodemic"![325] When asked what constituted misinformation, YouTube, a subsidiary of Google, CEO Susan Wojcicki said

---

[317] https://brobible.com/culture/article/chicago-man-shot-for-not-wearing-mask/
[318] https://www.usatoday.com/story/news/world/2021/09/21/german-man-shot-after-asking-customer-wear-face-mask/5799571001/
[319] https://www.theguardian.com/media/2012/mar/22/twitter-tony-wang-free-speech
[320] Big Tech is a name given to the some of the largest and most dominant companies in the information technology industry of the United States—namely Amazon, Apple, Google (Alphabet), Facebook, Microsoft and Twitter. See https://www.politico.com/newsletters/morning-tech/2021/02/26/is-twitter-angling-to-become-big-tech-793630
[321] https://www.wsj.com/articles/truth-not-a-truth-ministry-will-set-us-free-11612810962
[322] https://chinamediaproject.org/the_ccp_dictionary/covid-19-and-covid-19/
[323] https://www.bbc.com/news/world-asia-china-51409801
[324] https://www.nytimes.com/2020/12/19/technology/china-coronavirus-censorship.html
[325] https://www.nytimes.com/2020/02/06/health/coronavirus-misinformation-social-media.html

her platform will remove "anything that is medically unsubstantiated", as well as "anything that goes against WHO [World Health Organisation] recommendations."[326]

12.      According to Human Rights Watch, at least 83 governments[327] worldwide have used COVID-19 to crack down on free speech[328] and expression, peaceful assembly and access to information.[329]

13.      As the COVID-19 pandemic spread across the globe, Russia and many other countries also instituted censorship tactics.[330]  One of the most glaring censorship actions by Big Tech and governmental actors was the blocking of any discussion surrounding the initial cause of COVID-19 coming from a lab leak in China.[331]

14.      In April 2020, Facebook began blocking users who wanted to organize protests against the draconian lockdowns (i.e., free association)[332], or as Facebook stated, gatherings which did not "follow the health parameters established by the government" and was "therefore unlawful".  This was government censorship outsourced to the private sector.

15.      Meanwhile, Facebook, Twitter, YouTube and other Big Tech supported and encouraged even larger political gatherings in the middle of the pandemic in response to George Floyd's death in May 2020.[333]

16.      Google censored any discussion supporting the Great Barrington Declaration which was spearheaded by some of the leading infectious-disease epidemiologists and public health

---

[326] https://www.bbc.com/news/technology-52388586
[327] https://www.hrw.org/news/2021/02/11/covid-19-triggers-wave-free-speech-abuse#
[328] https://www.voanews.com/a/press-freedom_coronavirus-new-scapegoat-media-censorship-rights-groups-say/6187505.html
[329] https://freedomhouse.org/report/report-sub-page/2020/information-isolation-censoring-covid-19-outbreak
[330] https://www.atlanticcouncil.org/blogs/new-atlanticist/russia-orders-tech-platforms-remove-coronavirus-fake-news/
[331] https://www.bloomberg.com/opinion/articles/2021-06-07/facebook-youtube-erred-in-censoring-covid-19-misinformation
[332] https://www.bbc.com/news/business-52352073
[333] https://www.nytimes.com/2020/06/19/technology/facebook-youtube-twitter-black-lives-matter.html

scientists in the world from Harvard Medical School, Oxford University and Stanford University Medical School.[334]  Censorship of the declaration also spread to Reddit. The two most popular subreddits for discussion of the coronavirus – r/COVID-19 and r/coronavirus – both removed links to the Great Barrington Declaration.[335]

17.     The YouTube censorship continued where the company disclosed it had pulled over 200,000 videos about the pandemic as of October 2020.[336]

18.     Amazon had twice tried to suppress self-published booklets former New York Times reporter Alex Berenson who wrote about Covid-19 and the response to it. These booklets didn't contain conspiracy theories. Like the scientists who wrote the Great Barrington Declaration, Mr. Berenson simply believed many measures to control the coronavirus have been damaging, counterproductive and unsupported by science.[337] Recently Twitter banned Mr. Berenson's account.[338]

19.     Many others followed Big Tech's censorship efforts, as was highlighted when Stanford University Medical Faculty targeted one of their own professors, Dr. Jay Bhattacharya, linking him to COVID deaths in Florida and circulated a petition among faculty members demanding the university president exercise his obligation "to clarify for the faculty the limits of public pronouncements when proclaiming on public health policy."[339]

20.     They also attacked public officials who disagreed with their own creed.  For example, after a March 18, 2021, roundtable discussion hosted by Florida Governor Ron DeSantis with

---

[334] https://www.spiked-online.com/2020/10/12/why-has-google-censored-the-great-barrington-declaration/
[335] https://www.aier.org/article/twitter-censors-famed-epidemiologist-martin-kulldorff/
[336] https://www.spiked-online.com/2020/07/30/big-tech-is-suppressing-science/
[337] https://www.wsj.com/articles/covid-and-the-new-age-of-censorship-11607381415
[338] https://thehill.com/homenews/media/569908-twitter-bans-conservative-author-Alex-Berenson
[339] https://thefederalist.com/2021/09/15/stanford-faculty-smear-professor-who-accurately-summarized-data-on-masks/

leading doctors, YouTube censored video of the conference[340] and Governor Ron DeSantis fought back by passing legislation to rebuke this arbitrary censorship.[341],[342]

21.     Local governments have also used these tactics. In Kent County, Michigan, a crowd of parents came out for a public meeting scheduled by the county health department to discuss their diktat that children must wear face masks in school.  However, the county health officer, Adam London, addressed the parents using a remote video connection and disconnected when he was finished so he was unable to hear the public comments.[343]

22.     The censorship has continued into the highest levels of the United States government.[344] The Biden White House has publicly acknowledged they have been engaged in censorship collusion with Big Tech.[345] In response, Journalist, author and Co-Founder of The Intercept, Glenn Greenwald issued a series of tweets on July 17, 2021:

"If you trust the Biden WH to decree what is 'misinformation,' these claims have been deemed as such:

   * COVID is transmitted human-to-human (Jan 2020)

    * You should wear masks to protect against COVID (March 2020)

    * It's possible COVID leaked from the Wuhan lab (all of 2020).

If, last March, you encouraged people to wear masks against COVID, the WHO/CDC/Fauci cabal said that was "disinformation."

---

[340] https://apnews.com/article/ron-desantis-youtube-removing-pandemic-video-misinformation-6231f16a98ba30cd376b98cd48c5c62e
[341] https://www.wfla.com/community/health/coronavirus/youtube-misinformation-policy-update-gov-desantis-office-promises-to-fight-censorship/
[342] https://floridaphoenix.com/2021/04/12/gov-ron-desantis-invites-same-panel-of-doctors-who-had-been-censored-we-are-not-going-to-be-silenced/
[343] https://www.michigancapitolconfidential.com/a-bad-look-for-a-county-health-department
[344] https://www.medpagetoday.com/infectiousdisease/covid19/85440
[345] https://chicago.suntimes.com/2021/7/21/22587266/president-biden-facebook-vaccine-misinformation-censorship-jacob-sullum

If, throughout 2020, you said it seems possible COVID came from a lab leak, you were banned from social media.

***Who trusts them to be the Ministry of Truth?"*** (emphasis added)[346]

In response the Deputy Editor of Real Clear Investigates, Senior Contributor to The Federalist and columnist for Newsweek and Epoch Times, Benjamin Weingarter responded, "Deeper point is that there should never, ever, ever be a ***Ministry of Truth*** in America. We cease to be anything resembling a free people once First Amendment is gone, and in some ways it's even more disturbing when it's being jettisoned by proxy through Gov't-Big Tech collusion." (emphasis added)[347]

23. In Justice Louis Brandeis' famous dissent in *Olmstead v. United States*, 277 U.S. 438, 479[348], his crystal ball warned us, "Experience should teach us to be most on our guard to protect liberty when the government's purposes are beneficent…The greatest dangers to liberty lurk in insidious encroachment by men of zeal, well-meaning but without understanding."

24. In August 2021, AFTER they proclaimed kids should wear masks in schools, the American Academy of Pediatrics was caught deleting sections from its website regarding early childhood development and facial cues for learning to enforce mask guidance on children.[349]

---

[346] https://www.newsweek.com/biden-big-tech-covid-censorship-collusion-tip-ruling-class-spear-opinion-1612355
[347] Id.
[348] This case was later overturned by *Katz v. United States*, 389 U.S. 347
[349] https://www.reuters.com/article/factCheckNew/idUSL1N2PR1QG

25.     Robert Dingwall, a sociologist and co-editor of the SAGE Handbook of Research Management, recently summarized the connection between the Ministry of Truth and mask mandates.[350]

26.     On September 27, 2021, Defendant CDC modified its definition of the words "vaccine" and "vaccination".   "Vaccination" went from "the act of introducing a vaccine into the body to produce immunity to a specific disease" to switching the word "immunity" to "protection" and now reads, "the act of introducing a vaccine into the body to produce protection to a specific disease", and the term "vaccine" changed from "a product that stimulates a person's immune system to produce immunity to a specific disease" to the current "a preparation that is used to stimulate the body's immune response against diseases."[351]

### **THE "Mask for Thee, but not for Me" CAUCUS OF HYPOCRISY**

27.     As part of the Ministry of Truth, many of these Prophets of Mask Mandates and their Disciples have also joined the "Do as I say, not as I do!" and "Mask for Thee, but not for Me" Caucuses of Hypocrisy throughout the COVID-19 pandemic.  The hypocrisy of these people in positions of power have not been lost on the public.[352],[353]

28.     The following elected officials and their staff who have been in a position of power over our society to impose mask mandates are part of these Caucuses of Hypocrisy

        a.  Defendant President Biden[354] was caught mingling indoors maskless with dozens of other maskless people as well as repeatedly walking away from his podium

---

[350] https://www.socialsciencespace.com/2021/08/covid-science-and-politics-the-case-of-face-masks/
[351] https://www.miamiherald.com/news/coronavirus/article254111268.html#storylink=cpy
[352] An entire website was set up to capture some Members of the Caucus of Hypocrisy:
https://datavisualizations.heritage.org/public-health/covid-hypocrisy-policymakers-breaking-their-own-rules/
[353] https://www.businessinsider.com/democratic-politicians-who-violated-covid-19-rules-guidance-list-2020-12
[354] https://twitter.com/RNCResearch/status/1420475708686716937

without a mask[355],[356]; the White House Deputy Press Secretary, Karine Jean-Pierre[357],[358]; and the White House Press Secretary, Jen Psaki[359], have repeatedly violated the White House mask mandate and the State Department Spokesman, Ned Price[360], has also been caught breaking the mask policy of Defendant President Biden; Defendant President Biden's "Climate Czar", John Kerry[361], was photographed maskless while walking through the airport, more than once[362];

b.  Speaker of the United States House of Representatives, Nancy Pelosi[363], has been publicly caught violating mask mandates in order to take photos[364], while getting her hair done in a San Francisco salon[365], answer questions[366],[367], in the White House[368], while simultaneously threating to arrest and fine other Members of the U.S. House of Representative for failing to comply[369]; meanwhile, other Members of Congress who have press the public to endure mask mandates have publicly violated themselves, such as Representative Rashida Tlaib[370] (MI) who was spotted dancing maskless at a large indoor gathering in an "orange zone" where CDC

---

[355] https://twitter.com/RNCResearch/status/1420858538876973064
[356] https://twitter.com/RNCResearch/status/1423674785888886788
[357] https://twitter.com/RNCResearch/status/1420830733611020288
[358] https://twitter.com/RNCResearch/status/1421194603068338176
[359] https://grabien.com/getmedia.php?id=1292727&key=2809b530d3bb4f46993ba66b1a347056&userid=17087
[360] https://grabien.com/getmedia.php?id=1292773&key=cd61cfe62c458e3cd0d2e22c5f53387d&userid=17087
[361] https://freebeacon.com/biden-administration/photos-john-kerry-flouts-mask-mandate-at-airport/
[362] https://www.bostonherald.com/2021/03/17/john-kerry-caught-without-a-mask-on-boston-to-dc-flight/
[363] https://twitter.com/M_McAdams/status/1421114963867934723
[364] https://twitter.com/RNCResearch/status/1421109603140620293
[365] https://www.foxnews.com/politics/pelosi-san-francisco-hair-salon-owner-calls-it-slap-in-the-face
[366] https://twitter.com/JakeSherman/status/1421239005413355527
[367] It should be noted, the store owner was forced to close after she got death threats from supporters of Speaker Pelosi. See https://www.dailymail.co.uk/news/article-9102387/Salon-owner-exposed-Nancy-Pelosis-maskless-visit-shop-poses-window.html
[368] https://ktrh.iheart.com/featured/michael-berry/content/2021-05-21-masks-for-thee-not-for-me-this-is-pelosi-dems-in-the-white-house/
[369] https://www.foxnews.com/politics/capitol-police-ordered-arrest-staff-visitors-not-wearing-masks
[370] https://www.foxnews.com/politics/rashida-tlaib-spotted-dancing-maskless-at-large-indoor-gathering-in-cdc-orange-zone

guidelines call for indoor masking; Representative Alexandria Ocasio-Cortez[371] (NY) was caught masking only for a photo-op and unmasked with a group of students and other Members of Congress[372], and Representative Jerold Nadler[373] (NY), who is Chairman of the Judiciary Committee was caught maskless in the public café within the Longworth House Office Building; it's not just the House side of the United States Congress who display their mask mandate hypocrisy as U.S. Senator Diane Feinstein[374] (CA) was photographed without a mask at Dulles International Aiport in Washington, D.C. (meanwhile, Defendant President Biden has doubled the fines for travelers who do not wear a mask in an airport[375]), and she was later caught walking the corridors of the U.S. Senate without a mask[376].

c.  Governors and state legislators from around the nation who are imposing mask mandates on their residents are blatantly ignoring their own mask mandates, the most famous example was the Governor of California, Gavin Newsom, who flaunted his mask mandate at a dinner at the French Laundry restaurant[377], however, less known is about him pulling his kids from a day camp where they were maskless in spite of the mask mandates for everyone else's children[378]; Michigan Governor Gretchen Whitmer was caught maskless in a restaurant in East Lansing[379]; and the current Governor of New York, Kathy Hochul, has flaunted the mask mandates

---

[371] https://twitter.com/TPostMillennial/status/1422915794640441356
[372] https://www.youtube.com/watch?v=0pyWyZ-ZYgc
[373] https://twitter.com/RepRosendale/status/1420753689120174087
[374] https://nypost.com/2020/09/29/tucker-carlson-reveals-photos-of-unmasked-feinstein-in-dc-airport/
[375] https://www.nytimes.com/2021/09/10/travel/mask-fine-costs-flights-tsa.html
[376] https://twitter.com/therecount/status/1328724072801431553?ref_src=twsrc%5Etfw">November 17, 2020</a></blockquote>
[377] https://www.latimes.com/california/story/2020-11-19/skelton-newsom-executive-power-covid-19-french-laundry-dinner
[378] https://www.sacbee.com/news/politics-government/capitol-alert/article253068523.html
[379] https://www.detroitnews.com/story/news/politics/2021/05/23/whitmer-apologizes-after-photo-shows-her-bar-violating-own-order/5234477001/

while Lt. Governor on March 12, 2021[380], alongside former Secretary of State Hillary Clinton, July 6, 2021, while visiting the Bronx Community College Early Childhood Center[381] while the students wore masks[382], and again on July 28, 2021[383], at a Bronx Democratic fund-raising event, and after she assumed the governorship from former Governor Andrew Cuomo and after she announced her statewide school mask mandate as she was maskless standing alongside maskless State Senator Brian Benjamin on August 26, 2021[384], in Harlem, while announcing Senator Benjamin as her Lt. Governor standing next to maskless Rev. Al Sharpton and maskless NAACP New York State Conference President Hazel Dukes, and again during a Democrat fund-raising event in August 2021 in Erie County[385]; meanwhile Texas Democratic Legislators hopped on a private plane maskless to avoid the Texas State Legislature from having a quorum[386].

   d. Mayors throughout the country who are commanding mask mandates on their citizens are unashamedly flouting their own mandates, such as the Mayor of Washington, D.C., Muriel Bowser[387], who celebrated her birthday maskless just hours before her own indoor mandate was set to go into effect, and the very next day she officiated a wedding indoors without her mask[388]; the Mayor of Chicago,

---

[380] https://twitter.com/kathyhochul/status/1105630569810063360
[381] https://factcheck.thedispatch.com/p/did-kathy-hochul-go-maskless-in-a
[382] https://qualitystarsny.org/lieutenant-governor-kathy-hochul-announces-35-million-expansion-of-qualitystarsny/
[383] https://twitter.com/kathyhochul/status/1420542256881274881
[384] https://buffalonews.com/news/local/gov-kathy-hochul-assembles-dream-team-of-downstate-diversity/article_7afcf2fa-0ceb-11ec-8e3c-271d1665020b.html
[385] https://dailycaller.com/2021/08/20/kathy-hochul-masks-fundraiser-event/
[386] https://www.foxnews.com/politics/donna-howard-texas-universal-mask-wearing
[387] https://www.foxnews.com/politics/mayor-muriel-bowser-party-mask-mandate
[388] https://twitter.com/TianaTheFirst/status/1421767411737534469

Lori Lightfoot[389], attended Lollapalooza music festival without her mask[390] along with tens of thousands of other attendees while publicly decrying the potential "super-spreader" event[391]; Defendant Mayor De Blasio[392] was spotted early on in the COVID-19 pandemic not wearing a mask despite CDC recommendations and soon thereafter was lambasting New York City police officers for not wearing their masks[393], meanwhile, recently Defendant Mayor De Blasio and Defendant Governor Hochul were photographed welcoming former British Royals Harry Windsor and Meghan Markle visited New York City all maskless![394]

29.   Public health officials who have been in a position of power over our society to impose mask mandates are part of these Caucuses of Hypocrisy including Dr. Anthony Fauci while lecturing United States Senators that his mask-wearing was not theatre and based on science[395] (and then admits to ABC News it was not based on science)[396], he was photographed by the Associated Press at a baseball game seated directly between his wife and another man without any spacing between them having a conversation with all three maskless.   When confronted about the situation, Dr. Fauci whined, "I think this is sort of mischievous with this thing going around. I had my mask around my chin, I had taken it down. I was totally dehydrated and I was drinking water trying to rehydrate myself.  I wear a mask all the time when I'm outside -- to pull it down, to take some sips of water and put

---

[389] https://www.foxnews.com/media/critics-attack-lori-lightfoot-holding-lollapalooza-amid-covid
[390] https://twitter.com/BauerJournalism/status/1421848867809681410
[391] https://www.politico.com/news/2021/08/02/coronavirus-mask-policy-biden-502026
[392] https://www.the-sun.com/news/641459/de-blasio-outside-without-mask-new-york-city/
[393] https://www.nydailynews.com/news/politics/ny-nypd-masks-bill-de-blasio-20200607-rew22xgcuva3tapmjac3eu4cwq-story.html
[394] https://www.nydailynews.com/news/politics/new-york-elections-government/ny-nyc-prince-harry-meghan-markle-de-blasio-hochul-20210923-rwur2prly5dz3klbuyhvf4gzvy-story.html
[395] https://www.courier-journal.com/story/news/politics/2021/03/18/rand-paul-vs-fauci-u-s-sen-doctor-clash-over-covid-vaccine-masks/4752513001/
[396] https://www.outkick.com/fauci-admits-his-mask-wearing-was-theatre-hardly-any-risk-of-catching-virus/

it back up again, I guess if people want to make something about that, they can. But to me, I think that's just mischievous." Meanwhile, Columnist and talk show host John Ziegler called Fauci a fraud, tweeting a second photo showing Fauci looking out at the field, also with his mask down. In another interview when asked about it on Fox News, Fauci told John Roberts he had tested negative for COVID-19 the day before the game and that the other man in the photo is a close friend.[397] Even Defendant Director Walensky's husband, who is a pediatric oncologist, has shown multiple maskless events in violation of Defendant CDC's own recommendations.[398] The Arizona State Superintendent of Schools, Kathy Hoffman, was pictured maskless, indoors, with a group of people, however, she faught against the state's ban on mask mandates and pushed for universal masking in schools.[399]

30.   The members of the media or the celebrities they cover who have been using their immense position of power to influence mask mandates are part of these Caucuses of Hypocrisy. These special people push mask mandates for the masses except for them; whether it was the Oscars[400] or CNN reporter Kaitlan Collins who was caught removing her mask when she thought camera was off[401] or even worse the international scandal when former President Barack Obama[402] originally planned a 700-person birthday party on Martha's Vineyard[403] which he scaled back to over 200 people[404] after the White House was having

---

[397] https://www.wusa9.com/article/news/health/coronavirus/anthony-fauci-face-mask-down-photo-coronavirus/507-e33379cb-d79e-479b-9960-13293c96572f

[398] https://redstate.com/scotthounsell/2021/08/12/cdc-director-walenskys-husband-ups-the-hypocrisy-game-with-maskless-party-game-n424743

[399] https://knst.iheart.com/featured/garret-lewis/content/2021-08-25-az-state-superintendent-of-schools-hoffman-caught-maskless-at-indoor-party/

[400] https://www.silive.com/news/2021/04/maskless-covid-hypocrisy-at-the-oscars-opinion.html

[401] https://nypost.com/2020/05/16/cnn-reporter-caught-removing-face-mask-when-she-thought-camera-was-off/

[402] https://www.dailymail.co.uk/news/article-9850927/Obama-inviting-500-people-60th-birthday-party-Marthas-Vineyard.html

[403] https://nypost.com/2021/08/02/obama-holding-huge-60th-birthday-bash-despite-covid-warnings/

[404] https://chicago.suntimes.com/columnists/2021/8/8/22616150/obama-throws-birthday-bash-at-marthas-vineyard-mansion-that-was-big-even-after-being-scaled-back

to defend this event (the headline says it all "Private Jets Jammed Airport for Presidential Birthday Party, Straining Resources"[405]); in the end the guests did not wear masks[406], only the servants![407]

### THE MASK MANDATE HERETICS / HEROES

131.    George Orwell called the underground resistance to the government's socialist actions, the "Brotherhood."

132.    The Great Barrington Declaration[408] is a statement issued on October 4, 2020, advocating for an alternative approach to the COVID-19 pandemic which called for individuals at significantly lower risk of dying from COVID-19, as well as those at higher risk who wish to do so, to be permitted to resume normal living, while creating a "Focused Protection" of those most at risk.   The three original authors were Jay Bhattacharya of Stanford University, Sunetra Gupta of the University of Oxford, and Martin Kulldorff of Harvard University.[409]   The declaration has over 860,000 signatories from around the world.

133.    Some of these Mask Mandate Heretics or Members of the Brotherhood include,

    a.  Dr Jay Bhattacharya is a professor of medicine at Stanford University. During the COVID-19 pandemic, Dr. Bhattacharya spoke against mask mandates and shutdowns. On May 7, 2021, a Newsweek article quotes Dr. Bhattacharya: "I would recommend the CDC tell vaccinated people, 'Live your life free.' I mean there's no

---

[405]   https://vineyardgazette.com/news/2021/08/09/private-jets-flooded-airport-presidential-birthday-party-put-strain-island-resources
[406]   https://gop.com/rapid-response/dance-the-masks-away/
[407]   https://twitter.com/nypost/status/1424275785687437316
[408]   https://gbdeclaration.org/
[409]   https://www.medpagetoday.com/infectiousdisease/covid19/89204

reason for vaccinated people—either for themselves or for others—to wear a mask, not really."[410]

b.  Dr. Martin Kulldorff, professor of medicine at Harvard University, a biostatistician, and epidemiologist with expertise in detecting and monitoring infectious disease outbreaks and vaccine safety evaluations. Dr. Sunetra Gupta, professor at Oxford University, an epidemiologist with expertise in immunology, vaccine development, and mathematical modeling of infectious diseases. These doctors, along with Dr. Jay Bhattacharya, created the "Great Barrington Declaration" on October 4, 2020 to push back against closures and mandates restricting freedoms during the COVID-19 crisis and encourage creation of herd immunity. The declaration states, "Those who are not vulnerable should immediately be allowed to resume life as normal. Simple hygiene measures, such as hand washing and staying home when sick should be practiced by everyone to reduce the herd immunity threshold. Schools and universities should be open for in-person teaching. Extracurricular activities, such as sports, should be resumed. Young low-risk adults should work normally, rather than from home. Restaurants and other businesses should open. Arts, music, sport and other cultural activities should resume. People who are more at risk may participate if they wish, while society as a whole enjoys the protection conferred upon the vulnerable by those who have built up herd immunity."[411]

c.  Joseph G Allen is an associate professor and director of the Healthy Buildings program at Harvard University's T.H. Chan School of Public Health. Allen wrote

---

[410] https://www.newsweek.com/stanfords-jay-bhattacharya-says-theres-no-reason-fully-vaccinated-americans-wear-masks-1589658
[411] https://gbdeclaration.org

on May 5, 2021about kids: "they don't need to wear a mask outside starting right now, and, after this school year is over, they shouldn't have to wear masks inside either. Why? Their risks of getting infected are lower than adults, and it will get even lower as the vast majority of adults are vaccinated." Allen added, "The truth is, for kids, COVID-19 is like the flu, and we don't make kids wear masks in school for that."[412]

d.  Vinay Prasad is a hematologist-oncologist and Associate Professor in the Department of Epidemiology and Biostatistics and the University of California San Francisco. On September 2, 2021, Prasad wrote, "The potential educational harms of mandatory-masking policies are much more firmly established, at least at this point, than their possible benefits in stopping the spread of COVID-19 in schools." Prasad acknowledges the detriment to child development that masks pose: "Early childhood is a crucial period when humans develop cultural, language, and social skills, including the ability to detect emotion on other people's faces. Social interactions with friends, parents, and caregivers are integral to fostering children's growth and well-being."[413]

e.  Monica Gandhi, a professor of medicine at University of California San Francisco and associate division chief of HIV, Infectious Diseases, and Global Medicine at San Francisco General Hospital,[414] stated on May 14, 2021, "There is immense collateral damage that comes from not easing restrictions after most people are

---

[412] https://www.washingtonpost.com/opinions/2021/05/05/americans-will-have-answer-remaining-questions-about-pandemic-themselves/
[413] https://www.theatlantic.com/ideas/archive/2021/09/school-mask-mandates-downside/619952/
[414] https://www.theatlantic.com/ideas/archive/2021/02/vaccines-are-banishing-any-debate-about-reopening-schools/618155/

vaccinated. It sends a message that there's still a danger when there isn't one, and then schools remain closed and businesses suffer. Some collateral damage from restrictions needed to occur when we didn't have vaccines, but now that we have them, there's no justification." Ghandi suggests that masking and keeping schools remote are both unnecessary: "If California doesn't adopt this new guidance even though it has a very high vaccination rate and the highest rate of children out of in-person learning, I think public sentiment will start swinging towards people believing the state took an approach that didn't follow science."[415]

f.   Dr. Jennifer Reesman is a neuropsychologist and assistant professor of psychiatry and behavioral sciences at the Johns Hopkins University School of Medicine. Reesman also founded and directs the Deafness Related Evaluations and More Clinic at the Kennedy Krieger Institute.[416] Reesman tweeted about the ridiculous nature of masks in schools on September 9, 2021: "My child was handed a "singing" mask to be used for chorus class in @MCPS it is a plain, adult surgical size mask and already the strap broke off so she stapled it back together. Do better @mocoboe."[417]

g.   John Brownstein is an epidemiologist at Boston Children's Hospital. Brownstein stated on August 13, 2021, "We have found time and time again is that masking can limit the spread of transmission. And especially indoor settings like schools." He continued, "What I'm especially concerned about for this school year is the

---

[415] https://www.msn.com/en-us/news/us/ucsf-expert-california-san-francisco-should-immediately-lift-mask-mandates-for-vaccinated/ar-BB1gJVuF
[416] https://www.hopkinsmedicine.org/profiles/details/jennifer-reesman
[417] https://twitter.com/jenreesman/status/1436056525215313929

gatherings that kids will take on in schools. So auditoriums, lunchrooms, gymnasiums, these are all places where you could see super-spreading events"[418]

h. Alasdair Munro is a senior clinical research fellow in pediatric infectious diseases at NIHR Clinical Research Facility Southampton and University of Southampton (UK).[419] On July 23, 2021, Munro tweeted, "Despite incessant claims of schools driving this wave, and Delta disproportionately affecting children scaring parents... Kids age 2 - 11y now lowest estimated prevalence of all ages<35, despite being totally unvaccinated, no masks anywhere and full time school for 4 months."[420]

i. Michael Mina, MD, PhD, is an assistant professor of epidemiology at the Harvard T.H. Chan School of Public Health and a core member of the School's Center for Communicable Disease Dynamics (CCDD).[421] Mina stated on September 1, 2021, "Kids have been out of school enough. The last thing we want to do in a pandemic is to have the societal ramifications be worse than the virus itself. We need to figure out and utilize the tools that we have available to us to ensure that children remain in school, to ensure that businesses keep running and we don't just keep using these brute force methods of closing things down and make major quarantines to solve a public health problem." He further defined his position against masks in schools: "I think masks are going to limit spreads. There's no doubt about that. The question is, especially with younger kids, what are the costs and benefits of it? Especially with kids, you just see the masks are on them and off them, or throughout the course of the day, they're off half the time. When you're sitting in a school, if you don't

---

[418] https://abc7chicago.com/masks-in-schools-covid-spread-delta-variant-face-for-kids/10949255/
[419] https://covid19commission.org/alasdair-munro
[420] https://twitter.com/apsmunro/status/1418550657854939140?lang=en
[421] https://www.hsph.harvard.edu/hii/people/michael-mina-md-phd/

have good ventilation and you're just certain that you're breathing in the same air in the same classroom all day long, it does make one wonder how much is a mask going to work in that setting where kids are really close together and breathing the same air all day along. That said, I think it's a pretty practical and simple layer of all of this. I'm personally in favor. of masking because I think the more we can do to keep schools from having to shut down because of massive outbreaks, the better. What masks will do is they'll ideally stop big super spreading kind of transmission. It might not stop Johnny from infecting his neighbor at the desk next to him, but it should do a good job of really preventing a super spreader from just spewing out tons of virus in the hallways and things along those lines."[422]

j.   Margery Smelkinson is a staff scientist with the National Institute of Allergy and Infectious Diseases at NIH.[423] On June 30, 2021, she stated the need for a return to normalcy for children, i.e. the dropping of mask mandates in schools: "Considering the rates of transmission currently in the county and around the state the chance of getting infected at this point is very, very low. The vaccines are amazing and we are such a highly vaccinated county, 80 percent of those over 12 are fully vaccinated, 89 percent with one dose, these vaccines are working miracles and it's time to return to normalcy."[424] Smelkinson then tweeted about research showing masks are unnecessary in schools on September 15, 2021: "Now peer-reviewed in

---

[422] https://www.wnyc.org/story/defense-home-rapid-test/
[423] https://sites.google.com/site/margerysmelkinson/home
[424] https://foxbaltimore.com/news/local/kids-and-masks-we-ask-an-infectious-disease-scientist-if-they-still-need-them

Lancet, study shows that, even in a delta world, few "close contacts" in school test pos."[425]

k.  Dr. Scott Atlas is a senior fellow at Stanford's Hoover Institution and the former chief of neuroradiology at Stanford University Medical Center and former Member of the Presidential COVID-19 Task Force.[426] In a March 7 speech, Atlas reviews the effectivity of universal masking: "Regarding universal masks: 38 states have implemented general-population mask mandates, most since at least the summer, with almost all the rest having mandates in their major cities. Widespread, general-population mask usage has shown little empirical utility for stopping cases, even though that evidence has been censored by Twitter and Amazon. Widespread mask usage showed only minimal impact in Denmark's randomized controlled study. *Those are facts. And facts matter. Here's the reality:* those who insist that universal mask usage is absolutely proven to be effective at controlling the spread of this virus and is universally recommended by "the science" are ignoring the published evidence to the contrary. One could say they are propagating false and misleading information; some might even call that, using a phrase from the JAMA opinion, "subverting science."[427]

---

[425] https://twitter.com/MSmelkinsonPhD/status/1438234731288662023
[426] https://townhall.com/tipsheet/scottmorefield/2021/06/05/dr-scott-atlas-excoriates-faucis-unconscionable-handling-of-pandemic-n2590524
[427] https://stanfordreview.org/scott-atlas-the-last-word/

## APPENDIX D

UNITED STATES DEPARTMENT OF EDUCATION
OFFICE OF CIVIL RIGHTS ("OCR")

**USE OF RESTRAINTS AND SECLUSION**

In December 2016, Defendant US DOE's Office for Civil Rights ("OCR") issued a Fact Sheet detailing a list of Q&A to inform school districts how the use of restraint and seclusion may result in discrimination against students with disabilities in violation of Federal laws, including Section 504 of the Rehabilitation Act of 1973 (Section 504).  Two of the questions asked and answered are relevant to this matter,

**"Can the use of restraint or seclusion deny a student's receipt of Section 504 FAPE?**

Yes. A school's use of restraint or seclusion may have a traumatic impact on a student, such that even if she were never again restrained or secluded, she might nevertheless have new academic or behavioral difficulties that, if not addressed promptly, could constitute a denial of FAPE. That traumatizing effect could manifest itself in new behaviors, impaired concentration or attention in class, or increased absences, any of which could, if sufficiently severe and unaddressed, result in a denial of FAPE for that student."

**"Does the parent or guardian of a student with a disability have a right to discuss the impact of restraint or seclusion on their child's access to FAPE?**

Yes. Section 504 requires that school districts establish and implement a system of procedural safeguards for parents or guardians to appeal district actions regarding the identification, evaluation, or educational placement of students with disabilities who need or are believed to need special education or related services. The school district must tell parents and guardians about this system, notify them of any evaluation or placement actions, allow them to examine their child's records, afford them an impartial hearing with opportunity for parent or guardian participation and representation by counsel, and provide them a review procedure."[428]

---

[428] https://www2.ed.gov/about/offices/list/ocr/docs/dcl-factsheet-201612-504-restraint-seclusion-ps.pdf

<u>**A**SSISTANT **S**ECRETARY'S **L**ETTER</u>

In the previously referenced December 28, 2016, Letter from Assistant Secretary for Civil Rights[429], additional questions were posited and answered as follows:

**"How does the use of restraint or seclusion of a student who was already identified as a student with a disability implicate a school's Section 504 reevaluation obligation?**

For a student already identified as a student with a disability, a school's use of restraint or seclusion could be[430] evidence that the student's current array of regular or special education and related aids and services is not addressing the student's needs. Because the Section 504 FAPE obligation is ongoing, when a school district has reason to believe that the student's educational needs are not being met, it must consider different or additional approaches or services to address the student's behavioral needs, and if necessary, reevaluate the student,[431] which could include evaluating the need for positive behavioral interventions and supports and other strategies to address the student's behavior that could mitigate or eliminate the need for restraint and seclusion.[432]"

**"When does Section 504 require a school to treat a student with a disability differently from students without disabilities?**

Section 504 requires different treatment of a student with a disability when different treatment is necessary to ensure that a student with a disability has an equal opportunity to obtain the same

---

[429] https://www2.ed.gov/about/offices/list/ocr/letters/colleague-201612-504-restraint-seclusion-ps.pdf

[430] As stated earlier, there could be circumstances in which a school restrains or secludes a student in an emergency for behavior not caused by or related to a disability, such as behavior in response to a personal crisis.

[431] 34 C.F.R. § 104.33(b). Section 504 requires placement decisions to be made by a group of knowledgeable persons often known as a Section 504 team (which, for an IDEA-eligible student, would be an IEP or placement team). 34 C.F.R. § 104.35(c). In this document, the Section 504 team refers to the group of knowledgeable persons that determines for a qualified student with a disability the appropriate Section 504 FAPE services and the appropriate setting to receive those services.

[432] The IDEA specifically requires IEP teams to consider the use of positive behavioral interventions and supports, and other strategies, to address behavior for any child with a disability whose behavior impedes his or her learning or that of others. 34 C.F.R. §§ 300.320(a)(4), 300.324(a)(2)(i) and (b)(2). For further discussion on positive behavioral interventions and supports, please see OSERS, Dear Colleague Letter: Ensuring Equity and Providing Behavioral Supports to Students with Disabilities (Aug. 1, 2016), http://www.ed.gov/policy/gen/guid/school-discipline/files/dcl-on-pbis-in-ieps--08-01-2016.pdf

result, to gain the same benefit, or to reach the same level of achievement as a student without a disability.[433]"

**"Could a school's use of restraint or seclusion have a discriminatory effect on students with disabilities in violation of Section 504?**

Yes. Section 504 prohibits a school from using criteria, policies, practices, or procedures that are neutral in language and evenhandedly implemented with respect to students with and without disabilities but that nonetheless have the effect of discriminating against students with disabilities on the basis of disability, or defeating or substantially impairing accomplishment of the objectives of the school's programs with respect to students with disabilities.[434] This prohibition applies even when schools adopt the criteria, policies, practices, and procedures without the intent to discriminate. The resulting discriminatory effect is commonly referred to as disparate impact discrimination.[435]"

**"Can the use of restraint or seclusion deny a student's receipt of Section 504 FAPE Services?**

Yes. There are multiple ways in which the use of restraint or seclusion might deny FAPE. For example, the use of restraint or seclusion may have a traumatic impact on that student,[436] such that even if she were never again restrained or secluded, she might nevertheless have new academic or behavioral difficulties that, if not addressed promptly, could constitute a denial of FAPE. Depending on the nature of his or her disability, a student with a disability may be especially physically or emotionally sensitive to the use of such techniques.[437] That traumatizing effect could manifest itself in new behaviors, impaired concentration or attention in class, or increased absences, any of which could, if sufficiently severe and unaddressed, result in a denial of FAPE

---

[433] 34 C.F.R. § 104.4(b)(1), (2)

[434] Recipients of Federal financial assistance are prohibited from utilizing criteria or methods of administration that have the effect of subjecting qualified students with disabilities to discrimination on the basis of disability, or that have the purpose or effect of defeating or substantially impairing accomplishment of the objectives of the recipient's program or activity with respect to persons with disabilities. 34 C.F.R. § 104.4(b)(4). See also 28 C.F.R. § 35.130(b)(3), (8).

[435] See, e.g., *Alexander v. Choate*, 469 U.S. 287, at 299 (1985)

[436] See National Center for Trauma-Informed Care and Alternatives to Seclusion and Restraint (last updated Oct. 26, 2015), http://www.samhsa.gov/nctic/about; see also Substance Abuse and Mental Health Services Administration, U.S. Dep't of Health & Human Services, The Business Case for Preventing and Reducing Restraint and Seclusion Use, HHS Publication No. (SMA) 11-4632 (2011), http://www.store.samhsa.gov/shin/content/SMA11-4632/SMA11-4632.pdf.

[437] See generally id.

for that student.[438] Other effects could include socially withdrawn behavior, or diminished interest or participation in class.[439]

Furthermore, the repeated use of restraint or seclusion in school could deny a student's receipt of FAPE in another way. Consider a student with a disability who engages in behavior in response to which the school secludes him for extended periods and on multiple occasions. While secluded, the student does not receive educational instruction or services. Cumulatively, the school's repeated use of seclusion with that student could result in the school's failure to comply with the Section 504 team's decision about the regular or special education, related aids and services, or supplemental services and modifications that the student needs, or the appropriate setting in which to receive those services and therefore may constitute a denial of FAPE."

**"How must a school respond if a student has been denied FAPE by the use of restraint or seclusion?**

When the Section 504 team or the IEP team determines that the use of restraint or seclusion resulted in a denial of FAPE for the student, the team must determine whether the provision of compensatory educational services or other appropriate relief is warranted in order to ensure the student's continued equal access to the school's educational program.[440] If compensatory services are warranted, the school must offer and provide them to the affected student.[441]"

---

[438] See National Child Traumatic Stress Network, Age-Related Reactions to a Traumatic Event (undated), http://www.nctsnet.org/sites/default/files/assets/pdfs/age_related_reactions_to_a_traumatic_event.pdf.
[439] Id.
[440] 34 C.F.R. §§ 104.4, 104.33(a).
[441] 34 C.F.R. § 104.33(a)