UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------x
**PATRICK DONOHUE**, Individually and on Behalf of **S.J.D**.,
a Student with Disabilities;
**ANGELA NOLAN** Individually and on Behalf of **S.N.,**
a Student with Disabilities in New York State;
**MARIE FARRELL** Individually and on Behalf of **E.F.,**
a Student of New York City; and
All Others Similarly Situated,

                                                    **CASE NO**.: **21 – CV -** _____

                              Plaintiffs,

             -against-


  **KATHLEEN HOCHUL**, in her official capacity as
Governor of New York;

  **BILL de BLASIO**, in his official capacity as the
Mayor of New York City;

  **HOWARD ZUCKER,** in his official capacity as
the New York State Commissioner of Health;

  **BETTY ROSA**, in her official capacity as the New
York State Commissioner of Education;

  **LESTER YOUNG, JR.,** in his official capacity as
Chancellor of the New York State Board of Regents;

  **MEISHA PORTER**, in her official capacity as the
Chancellor of New York City Department of
Education;

  **DAVE CHOKSHI**, in his official capacity as
Commissioner of New York City Department of
Health;

  **NEW YORK DEPARTMENT OF HEALTH**;

  **NEW YORK DEPARTMENT OF
EDUCATION;**

**NEW YORK BOARD OF REGENTS**;

**NEW YORK CITY DEPARTMENT OF EDUCATION;**

**NEW YORK CITY DEPARTMENT OF HEALTH,**

Defendants.

-------------------------------------------------------------------------x

# MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

BRAIN INJURY
RIGHTS GROUP, LTD.

By: _____/S/_____

Patrick B. Donohue, Esq.
*Attorneys for Plaintiffs*
300 East 95th Street, Suite 130
New York, NY 10128
(646) 850-5035

TABLE OF CONTENTS

*INTRODUCTION* .................................................................................................. *2*

*A.    Legal Standard for Preliminary Injunction* ...................................................... *15*

*B.    Plaintiffs are Likely to Succeed on the Merits* ................................................... *17*

*C.    The Mask Mandate Triggers a "Change in Educational Placement" UNDER the IDEA* ......... *17*

*[28 U.S.C. 1415, et seq.]* ........................................................................................ *17*

    i.    Common Masks and Face Coverings Are Not FDA Approved "Medical Devices" ............... 19

    ii.   Masks and Face Coverings are an Unlawful "Restraint" Harmful to All Students ............. 21

*D.    IDEA 20 U.S.C. § 1415 (j) –Automatic Injunction (Pendency)* ............................ *25*

*E.    Fourteenth Amendment Violations* .................................................................... *27*

   **Violations of Due Process & Plaintiffs' Substantive Rights** .................................. *27*

    i.    Conduct Pursuant To Established State Procedures vs. Random Unauthorized Conduct ....... 31

*F.    Ninth Amendment Violations* ............................................................................. *33*

*G.    First Amendment Violations* ............................................................................... *35*

*H.    Plaintiffs are Suffering and Will Continue to Suffer Irreparable Harm Without the Requested Relief* .. ........................................................................................................ *37*

    i.    Children are Not "Little Adults" ................................................................ 38

*I.    Direct Threats of Irreparable Harm* ................................................................... *51*

*J.    The Balance of the Equities Favors Plaintiffs* ................................................... *53*

**TABLE OF AUTHORITIES**

**Page(s)**

**Federal Cases**

*Abdul Wali v. Coughlin,*
    754 F.2d 1015 (2d Cir. 1985) ................................................................................ 16

*Altman v. Bedford Cent. Sch. Dist.,*
    245 F.3d 49 (2d Cir. 2001) ................................................................................... 35

*Araujo v. New York City Dep't of Educ.,*
    No. 20 CIV. 7032 (LGS), 2021 WL 1225503 (S.D.N.Y. Apr. 1, 2021) ........................... 25

*Arthur v. Associated Musicians of Greater New York, Loc. 802, AFM,*
    278 F. Supp. 400 (S.D.N.Y. 1967) ........................................................................ 52

*Avaras v. Clarkstown Cent. Sch. Dist.,*
    No. 15 CV 9679 (NSR), 2018 WL 4103494 (S.D.N.Y. Aug. 28, 2018)............................ 25

*Brewer v. W. Irondequoit Cent. Sch. Dist.,*
    212 F.3d 738 (2d Cir. 2000) ................................................................................ 36

*C.H. v. Cape Henlopen Sch. Dist.,*
    606 F.3d 59 (3d Cir. 2010) .................................................................................. 24

*Casey K. ex rel. Norman K. v. St. Anne Cmty. High Sch. Dist. No. 302,*
    400 F.3d 508 (7th Cir. 2005) ............................................................................... 24

*Chaplinsky v. State of New Hampshire,*
    315 U.S. 568, 62 S. Ct. 766, 86 L. Ed. 1031 (1942)................................................... 51

*Cochran v. D.C.,*
    660 F. Supp. 314 (D.D.C. 1987)........................................................................... 25

*Connally v. Gen. Const. Co.,*
    269 U.S. 385, 46 S. Ct. 126, 70 L. Ed. 322 (1926).................................................... 34

*Cronin v. Bd. of Educ. of E. Ramapo Cent. Sch. Dist.,*
    689 F. Supp. 197 (S.D.N.Y. 1988) ....................................................................... 25

*D.K. v. D.C.,*
    983 F. Supp. 2d 138 (D.D.C. 2013)....................................................................... 17

*D.M. v. New Jersey Dep't of Educ.,*
    801 F.3d 205 (3d Cir. 2015) ................................................................................ 26

*D.M. v. New Jersey Dep't of Educ.,*
    No. CIV.A. 14-4620 ES, 2014 WL 4271646 (D.N.J. Aug. 28, 2014).............................. 26

*Daubert v. Merrell Dow Pharms., Inc.*,
    509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993)............................................ 32, 33

*Doe v. E. Lyme Bd. of Educ.*,
    790 F.3d 440 (2d Cir. 2015) ....................................................................................... 25

*Drinker by Drinker v. Colonial Sch. Dist.*,
    78 F.3d 859 (3d Cir. 1996) .................................................................................. 16, 24

*Gamble v. United States*,
    139 S. Ct. 1960, 204 L. Ed. 2d 322 (2019).............................................................. 29, 30

*Gore v. D.C.*,
    67 F. Supp. 3d 147 (D.D.C. 2014)................................................................................. 17

*Honig v. Doe*,
    484 U.S. 305, 108 S. Ct. 592, 98 L. Ed. 2d 686 (1988).......................................... 16, 17, 20

*Jackson by Thompson v. Franklin Cty. Sch. Bd.*,
    765 F.2d 535 (5th Cir. 1985) ....................................................................................... 24

*James v. D.C.*,
    949 F. Supp. 2d 134 (D.D.C. 2013)............................................................................... 17

*Jeffrey S. by Ernest S. v. State Bd. of Educ. of State of Ga.*,
    896 F.2d 507 (11th Cir. 1990) ..................................................................................... 18

*Johnson ex rel. Johnson v. Special Educ. Hearing Off., State of Cal.*,
    287 F.3d 1176 (9th Cir. 2002) ............................................................................... 16, 24

*Jolly v. Coughlin*,
    76 F.3d 468 (2d Cir. 1996) ......................................................................................... 36

*JWJ Indus., Inc. v. Oswego Cty.*,
    No. 509CV0740NPMDEP, 2009 WL 10722459 (N.D.N.Y. June 30, 2009).................................... 36

*Kelly v. Honeywell Int'l, Inc.*,
    933 F.3d 173 (2d Cir. 2019) ....................................................................................... 15

*Klein v. City of San Clemente*,
    584 F.3d 1196 (9th Cir. 2009) ................................................................................... 52

*Lepore v. New York News Inc.*,
    365 F. Supp. 1387 (S.D.N.Y. 1973) ............................................................................. 15

*Ligon v. City of New York*,
    925 F. Supp. 2d 478 (S.D.N.Y. 2013) ......................................................................... 52

*Loc. 1814, Int'l Longshoremen's Ass'n, AFL-CIO v. New York Shipping Ass'n, Inc.*,
965 F.2d 1224 (2d Cir. 1992) .............................................................................. 14

*Mackey ex rel. Thomas M. v. Bd. of Educ. For Arlington Cent. Sch. Dist.*,
386 F.3d 158 (2d Cir.) ......................................................................................... 25

*Marsh v. Chambers*,
463 U.S. 783, 103 S. Ct. 3330, 77 L. Ed. 2d 1019 (1983) .................................. 13

*Meyer v. Nebraska*,
262 U.S. 390, 43 S. Ct. 625, 67 L. Ed. 1042 (1923) ..................................... 26, 29

*Mitchell v. Cuomo*,
748 F.2d 804 (2d Cir. 1984) ................................................................................ 36

*Morse v. Frederick*,
551 U.S. 393, 127 S. Ct. 2618, 168 L. Ed. 2d 290 (2007) .................................. 51

*N. Am. Soccer League, LLC v. United States Soccer Fed'n, Inc.*,
883 F.3d 32 (2d Cir. 2018) .................................................................................. 14

*N.D. ex rel. parents acting as guardians ad litem v. Hawaii Dep't of Educ.*,
600 F.3d 1104 (9th Cir. 2010) ............................................................................ 24

*Nat'l Ass'n of Letter Carriers, AFL-CIO v. Sombrotto*,
449 F.2d 915 (2d Cir. 1971) ................................................................................ 15

*Nat'l Socialist Party of Am. v. Vill. of Skokie*,
432 U.S. 43, 97 S. Ct. 2205, 53 L. Ed. 2d 96 (1977)......................................... 51

*New York State Ass'n for Retarded Child., Inc. v. Carey*,
466 F. Supp. 479 (E.D.N.Y. 1978) ................................................................ 17, 18

*O'Lone v. Est. of Shabazz*,
482 U.S. 342, 107 S. Ct. 2400, 96 L. Ed. 2d 282 (1987).................................... 16

*Overstreet v. Lexington-Fayette Urb. Cty. Gov't*,
305 F.3d 566 (6th Cir. 2002) ............................................................................... 36

*Parents of Student W. v. Puyallup Sch. Dist., No. 3*,
31 F.3d 1489 (9th Cir. 1994) ............................................................................... 17

*Parham v. J. R.*,
442 U.S. 584, 99 S. Ct. 2493, 61 L. Ed. 2d 101 (1979).................................... 27

*Parratt v. Taylor*,
451 U.S. 527, 101 S. Ct. 1908, 68 L. Ed. 2d 420 (1981).................................... 30

*Pierce v. Soc'y of the Sisters of the Holy Names of Jesus & Mary*,
   268 U.S. 510, 45 S. Ct. 571, 69 L. Ed. 1070 (1925)....................................................... 26, 29

*Prince v. Massachusetts*,
   321 U.S. 158, 64 S. Ct. 438, 88 L. Ed. 645 (1944).............................................. 26, 27, 29

*Quilloin v. Walcott*,
   434 U.S. 246, 98 S. Ct. 549, 54 L. Ed. 2d 511 (1978)...................................................... 29

*R.A.V. v. City of St. Paul, Minn.*,
   505 U.S. 377, 112 S. Ct. 2538, 120 L. Ed. 2d 305 (1992)................................................. 51

*R.B. v. Mastery Charter Sch.*,
   532 F. App'x 136 (3d Cir. 2013)............................................................................... 18, 24

*Rosenstiel v. Rosenstiel*,
   278 F. Supp. 794 (S.D.N.Y. 1967) ............................................................................... 52

*S.H. v. State-Operated Sch. Dist. of City of Newark*,
   336 F.3d 260 (3d Cir. 2003) ........................................................................................ 18

*Santosky v. Kramer*,
   455 U.S. 745, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982)............................................ 26, 29

*SmithKline Beecham Consumer Healthcare, L.P. v. Watson Pharms., Inc.*,
   No. 99 CIV. 9214 (DC), 1999 WL 34981557 (S.D.N.Y. Sept. 13, 1999) ......................... 52

*Stanley v. Illinois*,
   405 U.S. 645, 92 S. Ct. 1208, 31 L. Ed. 2d 551 (1972).................................................. 26

*Susquenita Sch. Dist. v. Raelee S. By & Through Heidi S.*,
   96 F.3d 78 (3d Cir. 1996) ...................................................................................... 20, 24

*Tinker v. Des Moines Indep. Cmty. Sch. Dist.*,
   393 U.S. 503, 89 S. Ct. 733, 21 L. Ed. 2d 731 (1969)..................................................... 51

*Troxel v. Granville*,
   530 U.S. 57, 120 S. Ct. 2054, 147 L. Ed. 2d 49 (2000)................................. 26, 27, 28, 29

*United States v. Smith*,
   869 F.2d 348 (7th Cir. 1989) ...................................................................................... 33

*United States v. Williams*,
   583 F.2d 1194 (2d Cir. 1978) ...................................................................................... 33

*Univ. of Texas v. Camenisch*,
   451 U.S. 390, 101 S. Ct. 1830, 68 L. Ed. 2d 175 (1981)................................................ 14

*V.D. v. State*,
   403 F. Supp. 3d 76 (E.D.N.Y. 2019) ............................................................... 26

*Ventura de Paulino v. New York City Dep't of Educ.*,
   959 F.3d 519 (2d Cir. 2020) ...................................................................... 24, 25

*Washington v. Glucksberg*,
   521 U.S. 702, 117 S. Ct. 2258, 138 L. Ed. 2d 772 (1997).................... 27, 28, 29

*Wisconsin v. Yoder*,
   406 U.S. 205, 92 S. Ct. 1526, 32 L. Ed. 2d 15 (1972)............................... 26, 29

*Zinermon v. Burch*,
   494 U.S. 113, 110 S. Ct. 975, 108 L. Ed. 2d 100 (1990).......................... 30, 32

**<u>Federal Statutes</u>**

20 U.S.C. § 1401 ............................................................................................... 2

20 U.S.C. § 1415(c)(1) ...................................................................................... 24

20 U.S.C. § 1415(j). ............................................................. …..17, 24, 25, 33

21 U.S.C. § 360(k)(a) ........................................................................................ 19

21 U.S.C. § 360bbb-3(e)(1)(A) .......................................................................... 19

28 U.S.C. 1415 .................................................................................................. 16

29 U.S.C. § 794(a)........................................................................................... 2, 3

42 U.S.C. § 1983 ............................................................................................... 1

42 U.S.C. § 12132 ........................................................................................... 2, 3

**<u>State Statutes</u>**

N.Y. Const. art. XI, § 1 ..................................................................................... 30

N.Y. Soc. Serv. Law § 488(1)(d) (McKinney)..................................................... 22

sections 28 and 29-a of the Executive Law ........................................................ 6

**<u>Federal Rules</u>**

Fed. R. Civ. P. 65 ............................................................................................. 25

Fed. R. Civ. P. 65(a)......................................................................................... 1

## **Federal Regulations**

34 C.F.R. § 104.4(a) ........................................................................................................... 2, 3

34 C.F.R. § 300.518 ............................................................................................................. 24

42 C.F.R. § 482.13(e)(1)(i)(A) ........................................................................................... 22

42 C.F.R. § 483.352 ............................................................................................................. 22

C.F.R. §2635.702 ................................................................................................................. 13

C.F.R. §2635.702(b) ............................................................................................................ 13

## **State Regulations**

8 N.Y.C.R.R. 200.4(d)(2) ................................................................................................... 22

8 NYCRR 66-3.1 ...................................................................................... 8, 10, 11, 12, 13

8 NYCRR 200.1 .................................................................................................................. 22

8 NYCRR §§19.5 and 200.22 ......................................................................... 22, 27, 28

10 NYCRR 2.60 ....................................................................................... 11, 12, 13

10 NYCRR 2.61 .................................................................................................................. 11

**INTRODUCTION**

Plaintiffs Patrick Donohue, individually and on behalf of S.J.D., a student with disabilities, Angela Nolan, individually and on behalf of S.N., a student with disabilities, and Marie Farrell, individually and on behalf of E.F., a student with disabilities, (hereinafter "Plaintiffs," "Students," and/or Parents") submit the within Memorandum of Law, and the accompanying Complaint with exhibits attached thereto support of their application for a Preliminary Injunction under Fed. R. Civ. P. 65(a) to enjoin Defendants from implementing a mask and/or face covering mandate for students enrolled in elementary and secondary schools in New York State and New York City,[1] including neuro-typical ("non-disabled") students and students classified as students with disabilities under the IDEA.

Plaintiffs bring this action on behalf of themselves and all other similarly situated school-aged children, both with disabilities and without, in the State of New York. Plaintiff Students herein represent all students in the State of New York; all Students in the State of New York with Disabilities as outlined in the IDEA; all New York City Students; and all New York City Students with Disabilities as outlined in the IDEA.

Plaintiffs and all others similarly situated seek a judgment declaring that Defendants violated their rights by implementing and enforcing a mandate requiring all elementary and secondary school students throughout the City and State of New York to wear a mask and/or face covering. Plaintiffs seek an Order enjoining Defendants from implementing and continuing to implement their unconstitutional, unlawful, and unnecessary mask mandate relative to elementary and secondary school students throughout the City and State of New York, and from imposing their personal political and "religious" beliefs on Plaintiffs and all others similarly situated throughout the State of New York. This application is brought under 42 U.S.C. § 1983 for violations of Plaintiffs' First, Ninth, and Fourteenth Amendments

---

[1] Plaintiffs challenge both the current New York State and New York City mask mandates relative to the elementary and secondary shcoo children – without exception.

of the United States Constitution, the Individuals with Disabilities Education Act (20 U.S.C. § 1401, *et seq.*) ("IDEA"), Section § 504 of the Rehabilitation Act of 1973 ("§ 504"),  29 U.S.C. § 794(a), 34 C.F.R. § 104.4(a), Title II of the Americans with Disabilities Act ("ADA"); 42 U.S.C. § 12132, Title XI of the NYS Constitution, and the accompanying implementing regulations, case law, and public policy.

The need for injunctive relief is urgent. As outlined in the Complaint, submitted herewith and incorporated herein by reference, Plaintiffs allege that Defendants unlawfully promulgated laws and/or mandates in the absence of legal authority; enacted and continue to enforce such laws and/or mandates under false pretenses; and intend to [and have] promulgated additional laws and mandates under false pretenses and in the absence of legal authority and by deceiving the public. Without the requested relief, Plaintiffs, their children, and all similarly situated individuals will continue to suffer irreparable harm.

Plaintiffs are not seeking an injunction that would alter the "status quo"; instead, Plaintiffs seek to preserve the *status quo ante*—the status quo before the mandate went into effect and/or the last uncontested status which preceded the pending controversy. As acknowledged by then-Governor Cuomo, the state of emergency that gave rise to the mask mandate is over.

Concerning the New York City mandate, the issue regarding Mayor de Blasio's authority to issue Executive Orders was discussed in *Restaurant Owners Association Rescue, et al v. De Blasio, et al.*, where Judge Colon held:

> "[T]his Court recognizes a State's authority encompasses those limited and enumerated powers pertaining the government to protect the rights of the people—which *may* include reasonable steps to protect their health and welfare. *However, this Court knows of no common law power in New York State granting an individual acting in the capacity as the local Executive branch the "authority" to "protect the public in the event of an emergency."* Index No. 85155/2021, Decision and Order (dated September 10, 2021), p. 5.

Judge Colon went on to note:

> "[t]he current pandemic status, despite its worldwide impact, does not seem to meet the first element necessary to declare a state of emergency under the quoted language of New

3

York City's code ("an act of violence or a flagrant and substantial defiance of or resistance of a lawful exercise of public authority . . .). *Id.* P. 6-7.

The New York City mask mandate is as infirm as the State's mask mandate. Mayor De Blasio lacks the authority to issue such mandates. The New York City mask mandate should fail for the same reasons as the State mask mandate. Continuing to require masks and face coverings, whether for disabled and non-disabled students, students who have been vaccinated and/or students who have been exposed to and recovered from COVID, violates the guaranteed rights protected by the Constitution; the IDEA; § 504 of the Rehabilitation Act; 29 U.S.C. § 794(a); 34 C.F.R. § 104.4(a); Title II of the Americans with Disabilities Act ("ADA"); 42 U.S.C. § 12132; Title XI of the NYS Constitution. As set forth below, there is no continuing emergency, no legal authority for Defendants' mask mandate, and no demonstrative evidence that common masks and/or face coverings are effective against contracting or spreading a virus.

Defendants' mask mandate for all children in attendance at New York State elementary and secondary schools, both public and private, should be declared unconstitutional and enjoined for the reasons set forth below. The mask mandate cannot survive any constitutional standard of review – not strict scrutiny, intermediate scrutiny, or a rational basis test. Apart from the vagueness of the mandate itself, the mask mandate is problematic for numerous other reasons:

i.   Other than mandating a mask, the mandate does not require a specific type of mask that has been proven or found in any way to reduce or prevent the spread/transmission of COVID-19;

ii.  The proposed mask-mandate is ambiguous—for instance, a "mask" or "face covering" is required, but there are no further clarifications as to what type of mask(s) should be worn, which type of masks are effective, which are not, and which type of mask and/or face covering satisfies and/or complies with the mandate;

iii. By its very definition, a "mask" is a medical device. The implementation of a mask-mandate alters the terms of a special education student's Individual Education Plan ("IEP") and would require local educational agencies to follow the procedures and regulations of the IDEA in implementing such a mandate, which Defendants did not do in the instant matter;

iv.  As a mask is worn over the nose and mouth and restricts a student's breathing and form of communication, it qualifies as a "restraint," defined by the federal Office of Civil Rights, and its mandated use on school-aged children is otherwise unlawful;

4

v.   The mandate segregates the public into political and moral factions, infringing on the Plaintiffs' freedoms – political, religious, social, familial, autonomy, and otherwise;

vi.   Defendants' mask mandate is an unconstitutional/unlawful violation and/or infringement of Plaintiffs' rights as its use as proscribed by the mandate is not supported by any credible scientific evidence or evidence that would stand up to the rigid *Frye* (New York) and/or *Daubert* (federal) test(s).

vii.   The current mask mandate requires all school-aged children to wear a mask at all times while attending school. The current mask mandate does not provide an alternative method of educating those school-aged children/students who cannot, or choose not to, comply with said mandate in accordance with the New York State Constitution.

## STATEMENT OF FACTS

In this proposed class action, the primary and predominant class consists of all elementary and secondary school students attending school in New York City and throughout the State of New York who are subject to Defendants' mask mandate. Plaintiffs' proposed subclasses consist of four classes of Students attending school in the State of New: 1) all Students attending school outside New York City with an Individualized Education Program ("IEP"); 2) all Students attending school outside New York City that do not have an IEP (neuro-typical); 3) all Students attending school in New York City with an IEP; and 4) all students attending school in New York City that do not have an IEP (neuro-typical).

The 2019 Coronavirus (COVID-19) disease causes mild to severe respiratory symptoms, including fever, cough, and difficulty breathing. People infected with COVID-19 have had symptoms ranging from those that are mild (like a common cold) to severe pneumonia that requires medical care in a general hospital and can be fatal, with a disproportionate risk of severe illness for older adults and/or those who have underlying severe medical health conditions. On January 30, 2020, the World Health Organization (WHO) designated the COVID-19 outbreak as a Public Health Emergency of International Concern. On a national level, the Secretary of Health and Human Services determined on January 31, 2020, that as a result of confirmed cases of COVID-19 in the United States, a public health emergency existed and had existed since January 27, 2020, nationwide. After that, the situation rapidly evolved throughout the world, with many countries, including the United States, quickly progressing from identifying travel-associated cases to person-to-person transmission among close contacts of travel-

5

associated cases, and finally to widespread community transmission COVID-19. New York State first identified cases on March 1, 2020, and after that became the national epicenter of the outbreak. On March 7, 2020, former Governor of New York State, Andrew Cuomo ("Governor Cuomo"), declared a State Disaster Emergency (Executive Order 202) due to the COVID-19 pandemic ("NYS COVID-19 Disaster Declaration").[2]

Defendants remain steadfast in their belief that a mask mandate is necessary to prevent the spread of and/or reduce potential exposure to the COVID-19 virus, but these allegations lack any supporting scientific basis. When and if tried before a court of law, Defendants' claims will fail all legal standards[3] required to implement such a mandate when balancing the rights of the individual Plaintiffs under federal and state law against a vague and ambiguous mandate.

Governor Cuomo's Executive Order declaring a state of emergency ended on June 24, 2021. However, on March 5, 2021, the New York State Legislature ("N.Y.S. Legislature") stripped Governor Cuomo of his emergency powers by: 1) revoking Governor Cuomo's authority to issue any new directives[4]; 2) allowing the directives in place at that time to continue for another thirty (30) days; however, any new extensions or modifications of directives would require five (5) days-notice to the N.Y.S. Legislature or local elected officials before that extension or modification went into effect; 3) requiring Governor Cuomo to respond publicly to any comments received from the N.Y.S. Legislature or local leaders if a directive was extended; 4) requiring Governor Cuomo to create a searchable database of all executive actions that remained in force to inform lawmakers and the public with the then-current state of the law; and 5) allowing the N.Y.S. Legislature to terminate a state disaster emergency by

---

[2] Complaint at Endnote 9, Governor Cuomo's Executive Order No. 202.
[3] Complaint at Endnote 8, FRYE & ALBERT (list of "scientific evidence" factors).
[4] On March 2, 2021, the N.Y.S. Legislature stripped Governor Cuomo of his emergency powers, with all existing Executive Orders then-in effect to expire within thirty (30) days of the bill's passage (S03537). See, Complaint at Endnote 9.

concurrent resolution.[5] When Governor Hochul took office, she did not possess any emergency powers that the legislature previously granted to Governor Cuomo. In a N.Y. Senate press release, Senate Leader Rob Ortt stated:

> "We are in a state of recovery - not emergency - and it is time for New Yorkers to return to their daily routines and a sense of normalcy. The process has been long. Many lessons have been painful, but it is finally time to move on."[6]

At or about the same time, Carl, Heastie, Speaker of the New York State Assembly, stated:

> "A year ago, as New York was being ravaged by COVID-19, we passed legislation to give the governor temporary emergency powers that would allow the state to nimbly react to a constantly evolving, deadly situation," "These temporary emergency powers were always meant to be that — temporary. By immediately repealing the temporary emergency powers, allowing no new directives to be issued, and bringing transparency and oversight to the standing directives, we can establish better communication and collaboration with our local communities and help preserve the health and wellbeing of New Yorkers as we see the light at the end of the tunnel of this devastating and deadly healthcare crisis."[7]

On May 26, 2021, by and through Executive Order 202 (dated March 7, 2021), Defendants DOH and NYS PHPC enacted and/or updated 8 NYCRR 66-3.1: *Duration and Applicability*, which extended the regulation relative to the Governor's emergency powers and the authorization to declare an emergency.

The provision read:

> "The provision of this Subpart shall apply for the duration of any state disaster emergency declared pursuant to sections 28 and 29-a of the Executive Law[8] related to the outbreak of COVID-19 in New York State. To the extent any provision of this Subpart becomes inconsistent with any Executive Order, the remainder of the provisions in this Subpart shall remain in effect and shall be interpreted to the maximum extent possible as consistent with such Executive Orders."

On June 23, 2021, Defendants DOH and PHPC met and "amended" 8 NYCRR 66-3.1: *Duration and Applicability* to an entirely made over and gutted 8 NYCRR 66-3.1: *Face Coverings*. As an emergency

---

[5] NYS Legislature Bill No. S05357 (March 2, 2021).
[6] https://www.nysenate.gov/newsroom/press-releases/senate-majority-passes-legislation-addressing-governors-emergency-powers
[7] https://pix11.com/news/local-news/cuomo-under-fire/ny-lawmakers-modify-cuomos-emergency-COVID-19-powers-amid-sexual-harassment-allegations/
[8] These provisions were expressly revoked by N.Y.S. Legislature on March 5, 2021, by Bill No. S05357 (March 2, 2021).

Order, this remained effective for ninety (90) days until August 23, 2021. Absent from the "amended"[9]

provision was any trace of the previous regulation. The provision now read, in pertinent part:

> Any person who is over age two and able to medically tolerate a face-covering shall be required to cover their nose and mouth with a mask or face-covering when in a public place and unable to maintain, or when not maintaining, social distance, unless such person is fully vaccinated, meaning two or more weeks have elapsed since such person received the final dose of any COVID-19 vaccine approved by the United States Food and Drug Administration (F.D.A.) or authorized by the F.D.A. for emergency use; provided the person is not present in a pre-kindergarten to twelfth-grade school, public transit, homeless shelter, correctional facility, nursing home, health care setting, or other settings where mask use is otherwise required by federal or state law or regulation.

Defendants' mask mandate is facially unconstitutional and usurps the power of the legislative

branch. Defendants intentionally utilized a section of the code that was expiring and simply rewrote the

section law to circumvent the legislative process of readoption and subjecting the matter to the

contemplation of the legislative bodies. Executive Orders classified as "emergency" are typically

instituted for ninety (90) days before they must be readopted. With the "amendment" passed on June 23,

2021, the "amended" 66-3.1: *Face Coverings* would expire August 26, 2021, as an extension of

Executive Order 202.  On June 24, 2021, in the wake of scandal and political pressure, Governor Cuomo

signed Executive Order 210, rescinding all Executive Orders, including 202 and 205, effective June 25,

2021. Although it remains unclear as to how these subsequent events occurred without proper executive

or legislative authority, Plaintiffs allege, upon information and belief, that the following events occurred

under the misconception that the expiration of Executive Order 202 on June 25, 2021, did not affect the

validity or duration of its arterial regulations (including 8 NYCRR 66-3.1, et seq.).

On August 12, 2021, Defendant Hochul publicly announced her belief that masks should be worn

in schools, despite the then-current regulations allowing students to be exempt from donning a mask:

> "That's just an opinion right now. I don't have the authority to make that the policy, and we're gonna leave it up to the school districts . . . It's not going to be top-down. It's going

---

[9] Black's Law Dictionary defines "amendment" as the correction of an error. Indeed "amendments" do not present themselves by way of insertion of numerous paragraphs and additional provisions unrelated to the previous text.

to be much more collaborative, and I will listen to everyone before I make decisive decisions."[10] [11]

On the same day, Defendants NYS Department of Education ("DOE"), Chancellor Young, and Commissioner Rosa issued a "Health and Safety Guide for the 2021-2022 School Year"[12] (hereinafter, "Health and Safety Guide" or "Guide"), including the following instructions regarding mask mandates in schools.[13]   However, the Health and Safety Guide sets forth a mask-mandate for those students in attendance. The Guide provides that:

- Consistent and correct mask use is particularly important indoors and when physical distancing cannot be maintained in areas of high transmission of COVID-19. When teachers, staff, and students (ages 2 years and older) consistently and correctly wear a mask, they protect others as well as themselves.
- The C.D.C.'s Order regarding masks, issued in January 2021, requires that "[a]ll passengers on public conveyances ... traveling into, within, or out of the United States ... regardless of their vaccination status, are required to wear a mask over their nose and mouth." It applies to all forms of public transportation, including school buses. Passengers and drivers must wear a mask on school buses, including buses operated by public and private school systems, regardless of vaccination status, subject to the exclusions and exemptions in C.D.C.'s Order.
- Masks are recommended for school events and athletics while indoors, per the C.D.C.
- The C.D.C. recommends that people who are not fully vaccinated wear a mask in crowded outdoor settings or during activities involving sustained close contact with other people. Fully vaccinated people might choose to wear a mask in crowded outdoor settings if they or someone in their household is immunocompromised.
- The C.D.C. recommends that schools should have a sufficient supply of masks for students and staff who forget their own or need a replacement, including on buses.
- The Occupational Health and Safety Administration has established masking requirements that apply to school districts."

Absent from the Guide is the authority to implement a mask mandate for students in elementary and/or secondary schools, as well as a scientific or medical basis for radically altering the previous mask mandate, enacted in the height of the pandemic, which expressly excepted children attending elementary

---

[10] https://abc7ny.com/kathy-hochul-lt-governor-ny-gov-lieutenant/10946670/
[11]  https://nypost.com/2021/08/12/ny-governor-in-waiting-kathy-hochul-wants-masks-in-schools/
[12] http://www.nysed.gov/common/nysed/files/programs/back-school/nysed-health-and-safety-guide-for-the-2021-2022-school-year.pdf
[13] *Id.*

and secondary schools. The Guide only references a general need for masking in school and on public transportation and only *recommends* providing masks to students who board the bus without them.

The preceding occurred on the same day Defendant Hochul announced her intention to run for a full term as Governor in 2022. In August 2021, Governor Cuomo descended from his position. Before being sworn in as Governor, Defendant Hochul unilaterally decreed that the then-current mask mandate did not go far enough, that the pandemic and its lingering variant required elementary and secondary school children to all wear masks, at all times, in all schools (public and private) without exception. Defendant Hochul publicly announced that she would implement a state-wide mask mandate without disclosing her decision's scientific and/or medical basis. On August 24, 2021, Defendant Hochul was sworn into office and immediately began efforts to revise 8 NYCRR 66-3.1, which had contained numerous exceptions, including students at school, which was set to expire on August 26, 2021. Within the first fifteen hours of her administration, Defendant Hochul tweeted from her verified account:

> @ GovKathyHochul: "Getting children back to school safely is one of my highest priorities. To that end, I am immediately directing the Department of Health to institute universal masking for anyone entering our schools."[14] (August 24, 2021, at 3:51 PM).

That same day, Defendant Hochul announced that she would be utilizing federal funds to implement her mask mandate and that funds would be used to provide surgical masks to students. Defendant Hochul continues to use federal funds to implement an unlawful and illegal mandate and advocates for the use of non-surgical cloth masks, which is not explicitly mentioned in her mandate. The unlawful mandate requires "masks" or "face coverings" but fails to specify which face coverings are effective and which were not--or put another way, the mandate fails to provide the public with the information necessary to adhere to the mandate (i.e., surgical masks, N95 respirator, bandanas, face masks, toilet paper, etc.) and to avoid incurring the penalties set forth.

---

[14] https://twitter.com/GovKathyHochul/status/1430256476895993863?s=09

On August 26, 2021, and upon information and belief, Defendant PHPC assembled for a meeting. According to the publicly released minutes, the meeting was convened and adjourned without notable results. 8 NYCRR 66-3.1: *Face Coverings* was set to expire at the stroke of midnight. As noted above, 66-3.1 bases its authority in Executive Order 202. On August 27, 2021, the repeal of 8 NYCRR 66-3.1 et seq. becomes effective, and 10 NYCRR 2.60 is amended to require mandatory masking. On the same day, Defendant Commissioner Zucker issued his determination as follows:

"Pursuant to 10 NYCRR 2.61, I hereby issue the following determination, which includes findings of necessity, to support the face masking/covering requirements set forth below:

Findings of necessity: . . . .

Certain settings and areas (e.g., healthcare, schools, and public places located in CDC -identified areas of substantial or high community transmission) pose increased challenges and urgency for controlling the spread of this disease because of the vulnerable populations served, the disproportionate percentage of individuals (e.g., children) who are not yet eligible for the COVID-19 vaccination, and/or the substantial to high levels of community transmission.

The above findings demonstrate the necessity for the implementation of layered prevention strategies, which includes face coverings/masks. COVID-19 spreads through respiratory droplets, and several studies have shown that appropriate face coverings/masks reduce the spray of droplets when worn correctly, fully covering one's nose and mouth . . .

**Face Covering/Masking Requirements[15]**

P-12 school settings: After careful review and consideration of C.D.C. recommendations for face coverings/masks in school settings, I hereby adopt such recommendations, imposing them as requirements, where applicable, until this determination is modified or rescinded.[16]

Accordingly, universal masking of teachers, staff, students, and visitors to P-12 schools over age two and able to medically tolerate a face-covering/mask, regardless of vaccination status, is required until this determination is modified or rescinded. Such requirement is subject to applicable CDC-recommended exceptions.

Updates to the above referenced C.D.C. recommendations will not necessarily require the issuance of a revised or modified determination. However, such C.D.C. recommendations will be continuously monitored by the Department, and updated determinations issued, as appropriate."

On September 15, 2021: Upon information and belief, Defendants DOH and PHPC convened a meeting to discuss the then-expired 8 NYCRR 66-3.1: *Face Coverings* provision. Following the meeting,

---

[15] Defendant Commissioner Zucker included the following footnote #1: "Nothing in this determination shall be interpreted as inconsistent with the Americans with Disabilities Act (ADA), workplace safety guidelines, or applicable federal regulations."

[16] Defendant Commissioner Zucker included the following footnote #2: "Guidance from American Academy of Pediatrics was also reviewed when making a face-covering/masking determinations in school settings, which is consistent with the above referenced CDC recommendations." This footnote included the following hyperlink:
https://www.aap.org/en/pages/2019-novel-coronavirus-COVID-19-infections/clinical-guidance/cloth-face-coverings/

10 NYCRR 2.60: *Face Coverings* for COVID-19 Prevention was newly minted. Defendants rescinded 8 NYCRR 66-3.1 et seq. and retroactively dated its repeal to August 27, 2021.[17] Defendants' failure to post the documents mentioned above on the State's website for the public to view violated state rules and regulations and further illustrates Defendants' deceitful acts and attempts to conceal their illicit behavior. Following the meeting, 10 NYCRR 2.60: *Face Coverings* for COVID-19 Prevention was amended to include a mandatory mask provision, with virtually no exceptions. Students in all elementary and secondary schools would now be required to wear masks in the classrooms, the hallways, on buses, and elsewhere.  Although 10 NYCRR 2.60 was amended at a meeting held on September 15, 2021 (the same meeting at which 8 NYCRR 66-3.1, et seq. was repealed), it became effective retroactively on August 27, 2021 – not coincidentally, the minute following the expiry of the 66-3.1: *Face Masks* amendment on August 26, 2021.

Defendant Hochul lacked the lawful authority to create, amend, or alter an existing regulation or rule, which falls under the power and authority of the Legislature. Even if Defendant Hochul could enact a new regulation creating a more restrictive mask mandate, enacting a new mask mandate would result in two statutory mask mandates – 10 NYCRR 2.60 and 8 NYCRR, 66-3.1, with the same subject matter requiring entirely different mandates in effect on the same day. Defendants implemented the new amendment on the back of the dying one in an attempt to breathe new life into the provision set to expire at midnight on August 26, 2021. To further Defendant Hochul's mask mandate, Defendants created the perception that Executive Order 202 was in effect beyond June 25, 2021 – the day Executive Order 202 was rescinded by Governor Cuomo under Executive Order 210. Defendants made excruciating efforts, including unlawful amendments and non-public meetings, to implement the political (and religious) agenda of Defendant Governor Hochul relating to the mask mandate.

---

[17] Plaintiffs make these allegations upon information and belief, and a review of the history of the regulations on Westlaw and otherwise, as there are no notices, agendas, minutes, or evidence of the meeting, except as Plaintiff claims herein.

Defendants recognize the illegality of the mandate but continue its enforcement and implementation. Defendant NYS DOE, as the State executive agency responsible for overseeing the implementation of the mask mandate, provides the following on the landing page of their website:

> "Please be advised that the COVID-19 Disaster Emergency declared by former Governor Andrew Cuomo, pursuant to Executive Order 202 issued on March 7, 2020, and each successor Executive Order to Executive Order 202 have expired as of June 25, 2021. While the several exceptions and authorizations relevant to the Title VIII statutes and regulations contained within Executive Order 202 and each successor Executive Order to Executive Order 202 have now expired, Title VIII professionals should return to compliance with all Title VIII statutory and regulatory requirements without delay unless specifically suspended or waived pursuant to Executive Order 4."

On September 12, 2021, Defendant Hochul delivered a sermon at Abyssinian Baptist Church in Harlem, where she made her first appearance as the Prophet of all things COVID:

> "Throughout the whole experience of the pandemic, a lot of people prayed to God. . . He inspired the smartest scientists and doctors, and researchers to create a vaccine. God gave us that through men and women so we could be delivered from this pandemic. . . *And all of you have to be, not be just true believers, but our apostles to go out there and spread the word* that we can get this out once and for all if everyone gets vaccinated." (emphasis added).[18]

On September 26, 2021, Governor Hochul again preached from the pulpit, but this time at the Christian Cultural Center in Brooklyn, New York:

> "We are not through the pandemic. I wished we were, but I prayed a lot to God during this time and you know what—God did answer our prayers. He made the smartest men and women, the scientists, the doctors, the researchers—he made them come up with a vaccine. That is from God to us, and we must say thank you, God. Thank you. And I wear my 'vaccinated' necklace all the time to say I'm vaccinated. *All of you, yes, I know you're vaccinated, you're the smart ones, but you know there's people out there who aren't listening to God and what God wants. You know who they are.*
>
> *I need you to be my apostles.* I need you to go out and talk about it and say, we owe this to each other . . ."[19] (emphasis added).

Defendant Hochul's implementation of the mask and vaccine mandates is grounded in the religious tenets of Humanism, consistent with those of Dr. Anthony Fauci. Defendant Hochul's mandates violate the Constitution's Establishment Clause, which requires a separation between Church and State, and

---

[18] https://www.governor.ny.gov/news/video-audio-photos-rush-transcript-governor-hochul-attends-services-abyssinian-baptist-church.

[19] https://www.governor.ny.gov/news/rush-transcript-governor-hochul-attends-service-christian-cultural-center

violate the Supreme Court's holding in *Lynch v. Donnelly* (1984). In utilizing her official position of Governor to "preach" to those she deems her "apostles," Defendant Hochul violated the Establishment Clause. By framing the relief efforts of the COVID-19 pandemic as an "act of God" and urging congregation members to be her "apostles" to further her bidding, Defendant Hochul "entangles" the two, endorsing the message that those congregation members willing to follow her principles are the adherents and "insiders," while those who remain skeptical of the contradictory guidance set forth (further described herein) by Dr. Fauci remain as "outsiders."

Defendant Hochul calls upon her "apostles" to seek out and confront those not sharing in the same view, which borderlines incitement of possible violence, as well as a clear violation C.F.R. §2635.702 (Use of public office for private gain). As set forth in C.F.R. §2635.702(b):

> "Except as otherwise provided in this part, an employee shall not use or permit the use of his Government position or title or any authority associated with his public office in a manner that could reasonably be construed to imply that his agency or the Government sanctions or endorses his personal activities or those of another."

Defendant Hochul lacks the authority to use her public office in this way or, alternatively, lacks the authority to endorse the above messages in a non-secular venue. Utilizing a public office in this way is an abuse of power that offends the Constitution and the very spirit of this nation. This abuse of Defendant Hochul's authority is unlawful under the United States Constitution, federal law, state law, and Supreme Court precedent, including *Marsh v. Chambers*.[20]

Defendants have implemented and are enforcing a mask mandate, which has led to the beginning of vaccine mandates under their religious principles of "Humanism." [See Complaint]. The government's passage of laws in furtherance of religious beliefs violates the separation of church and State guaranteed by the First Amendment. Individuals who do not comply with Defendants' mask and

---

[20] *Marsh v. Chambers*, 463 U.S. 783, 103 S. Ct. 3330, 77 L. Ed. 2d 1019 (1983) (promoting a particular religious expression).

vaccine mandates are shunned from society, unable to enter stores, restaurants, gyms, unable to work. Students cannot be educated at school or partake in school-related functions and activities without being masked and/or vaccinated against COVID-19.

The right to an education is recognized and protected under the New York State Constitution. Mandating that students are masked and/or COVID vaccinated to attend school violates that right. Mask and vaccine mandates have divided the public into separate classes – those who are masked and/or COVID vaccinated and those who are not. Where masking and/or COVID-19 vaccines are required for a student to attend school and school activities in New York State, the government must provide separate but equal facilities and education for those students that the government has excluded from being educated.  The mask and/or COVID vaccine requirements also interfere with the right of the Plaintiff parents to raise their children. The decision to wear a mask and/or vaccinate one's child with the COVID-19 vaccine remains with the Parent and/or the Student, not the government.

## LEGAL ARGUMENT

### A.    LEGAL STANDARD FOR PRELIMINARY INJUNCTION

The purpose of a preliminary injunction is to preserve the relative positions of the parties. *N. Am. Soccer League, LLC v. United States Soccer Fed'n, Inc.*, 883 F.3d 32, 37–38 (2d Cir. 2018) (quoting *Univ. of Texas v. Camenisch*, 451 U.S. 390, 395, 101 S. Ct. 1830, 68 L. Ed. 2d 175 (1981). The "standards which govern consideration of an application for a temporary restraining order ... are the same standards as those which govern a preliminary injunction." *Loc. 1814, Int'l Longshoremen's Ass'n, AFL-CIO v. New York Shipping Ass'n, Inc.*, 965 F.2d 1224, 1228 (2d Cir. 1992).  For a preliminary injunction to issue, the movant must establish: (1) either (a) a likelihood of success on the merits; or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in the movant's favor; and (2) irreparable harm in the absence of the injunction." *Kelly v. Honeywell Int'l, Inc.*, 933 F.3d 173, 183–84 (2d Cir. 2019).

Likewise, under § 12.5 of 1 Civil Practice in the Southern District of New York (2d. ed.), the Court may grant a preliminary injunction if the movant can show irreparable harm by way of: "(1) likelihood of success on the merits; or (2) that there are sufficiently serious questions going to the merits to make them a fair ground for litigation and balance of hardships tipping decidedly toward the party requesting relief." Plaintiffs do not seek an injunction that would alter the "status quo"; instead, Plaintiffs seek to preserve the *status quo ante*, or the status quo before the challenged mandate went into effect. In the federal courts, it has been recognized that "[t]he status quo is the last uncontested status which preceded the pending controversy." *Nat'l Ass'n of Letter Carriers, AFL-CIO v. Sombrotto*, 449 F.2d 915 (2d Cir. 1971); *see also Lepore v. New York News Inc.*, 365 F. Supp. 1387 (S.D.N.Y. 1973).

A movant is held to a higher standard where: (i) an injunction will alter, rather than maintain, the status quo; or (ii) an injunction will provide the movant with substantially all the relief sought, and that relief cannot be undone even if the defendant prevails at a trial on the merits. A mandatory injunction should issue "only upon a clear showing that the moving party is entitled to the relief requested, or *where extreme or very serious damage will result from a denial of preliminary relief*." §12.5 of 1 Civil Practice in the Southern District of New York (2d. ed.) (emphasis added).

Granting Plaintiffs' application will neither burden the Defendants nor harm the general public. The unlawfully imposed regulations pose a grave danger to the procedural and substantive rights of students enrolled in elementary and secondary schools in New York State. Plaintiffs present sufficiently serious questions going to the merits of the case; in the balancing, the equities of potential transmission of COVID-19 against the infringement of the individual rights of both Plaintiffs, their parents, and others so similarly situated, as primary stakeholders in their own and/or student's education to remain free of the governmental imposition of an unlawful mandatory mask mandate, which operates as both a restraint

16

on students and a mechanism to further Defendants' political agenda(s), contrived in secret and promulgated without the proper authority.

All class members seek mandatory and/or prohibitory injunctive relief requesting that the Court:

1. Declare that Defendants' conduct, as described herein, is unlawful;
2. Issue a temporary restraining order ("TRO") enjoining Defendants from further circumventing the legislative process(es) to amend and/or enact statutory regulations;
3. Issue a temporary restraining order preventing Defendants from convening meetings in private, without the requisite public notice or publication(s) pertaining to said meeting(s); and
4. Issue a mandatory injunction against the current State-wide mask mandate and Defendants, allowing students in New York State to attend schools without being required to wear a mask or face covering.

### B.   PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS

A likelihood of success requires a demonstration of a better than fifty percent probability of success. *Abdul Wali v. Coughlin*, 754 F.2d 1015, 1025 (2d Cir. 1985), disapproved on other grounds, *O'Lone v. Est. of Shabazz*, 482 U.S. 342, 349, n.2, 107 S. Ct. 2400, 96 L. Ed. 2d 282 (1987). As set forth below, Plaintiffs have a substantially high likelihood of success on the merits of their federal and state claims.

### C.   THE MASK MANDATE TRIGGERS A "CHANGE IN EDUCATIONAL PLACEMENT" UNDER THE IDEA [28 U.S.C. 1415, ET SEQ.]

In *Honig v. Doe*, 484 U.S. 305, 108 S. Ct. 592, 98 L. Ed. 2d 686 (1988), the Supreme Court noted that in enacting the IDEA, Congress very much meant to strip schools of the *unilateral* authority they had traditionally employed to exclude disabled students, particularly emotionally disturbed students, from school. *Honig*, 484 U.S. at 323; *Johnson ex rel. Johnson v. Special Educ. Hearing Off., State of Cal.*, 287 F.3d 1176, 1181 (9th Cir. 2002); *Drinker by Drinker v. Colonial Sch. Dist.*, 78 F.3d 859, 864 (3d Cir. 1996). A school district's removal of a disabled student from their educational program, or alteration of the student's educational program, for more than ten days in a school year, constitutes a "change in placement," which must be undertaken only within the protective framework of the IDEA.

*Honig*, 484 U.S. at 323; *Parents of Student W. v. Puyallup Sch. Dist., No. 3*, 31 F.3d 1489, 1495 (9th Cir. 1994).

By the terms of the IDEA, a change in placement *may only occur* with the parents' consent or after written notice and the opportunity for a hearing. *Parents of Student W.*, 31 F.3d at 1495. Determining whether there has been a change requires examining the child's IEP. *Gore v. D.C.*, 67 F. Supp. 3d 147 (D.D.C. 2014). Changing the location where a student receives services does not amount to a change in educational placement *if the new setting replicates* the educational program contemplated by the student's original assignment. *D.K. v. D.C.*, 983 F. Supp. 2d 138 (D.D.C. 2013); *James v. D.C.*, 949 F. Supp. 2d 134 (D.D.C. 2013). 357.     A "change in program" is defined as a "change in any one of the components of the [IEP] of a student as described in [8 N.Y.C.R.R.] section 200.4(d)(2)." (8 NYCRR 200.1[g][9]. This includes a change in a student's placement (8 NYCRR 200.4[d][2][xii]).[21]

At the outset of the COVID-19 pandemic in March and April of 2021, school districts across the country requested the Secretary of Education to grant waivers from IDEA requirements and providing a Free Appropriate Public Education ("FAPE") during the coronavirus crisis.[22] While Defendant US DOE provided great flexibility in providing educational services during the coronavirus crisis, there has been no change in federal or state law. In *New York State Ass'n for Retarded Child., Inc. v. Carey*, 466 F. Supp. 479 (E.D.N.Y. 1978), *aff'd,* 612 F.2d 644 (2d Cir. 1979), the Court found that the exclusion of developmentally disabled children who were Hepatitis B carriers from public school programs for which they were otherwise qualified because there was a danger of communication of Hepatitis B among mentally disabled children, which did not exist for normal children, constituted a change in educational

---

[21] Although the IDEA has an "exhaustion" requirement, the Plaintiffs herein are not required to exhaust administrative remedies by alleging a violation of 20 U.S.C. § 1415(j).
[22] https://edsource.org/2020/disability-rights-groups-school-administrators-spar-over-possible-changes-to-special-education-laws/628376

placement. *New York State Ass'n for Retarded Children, Inc.*, 466 F. Supp. 479; *see also Jeffrey S. by Ernest S. v. State Bd. of Educ. of State of Ga.*, 896 F.2d 507, 510 (11th Cir. 1990). Likewise, a charter school's unilateral disenrollment of a disabled student was contrary to her existing IEP and thus constituted a change in placement that violated IDEA's stay-put provision, despite the school's disenrollment of the student before she filed a due process complaint. *R.B. v. Mastery Charter Sch.*, 532 F. App'x 136 (3d Cir. 2013). The student's IEP unequivocally provided that her local education agency was the charter school and that her IEP would be implemented there -- unilateral removal of the student from her school would significantly affect her learning experience. *Id.* When a change in a child's IEP is sought, regardless of whether the party seeking the change is the school district or the parents, the burden of showing that the placement is appropriate rests with the school district. *S.H. v. State-Operated Sch. Dist. of City of Newark*, 336 F.3d 260 (3d Cir. 2003).

i. **Common Masks and Face Coverings Are Not FDA Approved "Medical Devices"**

By its very definition, a "mask" is a medical device. Under federal law, masks (surgical and otherwise) and face coverings are regulated devices and require FDA approval or authorization when used for a medical purpose. Mitigating the spread of an infectious disease is defined as a medical purpose.

None of the masks currently available for COVID-19 are approved or licensed by the federal government for children to use. Masks available to the general public outside of hospitals were made available on a conditional basis through an Emergency Use Authorization ("EUA").[23] By the express terms of their EUA letters and the governing statutes that regulate EUA products, a primary condition is that masks may not be mandated. The EUA letters issued by the FDA clarify that masks, even surgical masks, have not been established as safe or effective for use in mitigating infection. In fact, the FDA has

---

[23] https://www.fda.gov/medical-devices/coronavirus-disease-2019-covid-19-emergency-use-authorizations-medical-devices/personal-protective-equipment-euas#surgicalmasks

labeled masks experimental devices requiring, *inter alia,* that the user must be advised of his right to refuse to use the experimental device or product. *See*, 21 U.S.C. § 360bbb-3(e)(1)(A) ("Section 360bbb-3"). The FDA takes the position that the terms and conditions of EUAs preempt state and local laws. *See*, 21 U.S.C. § 360(k)(a):

> "GENERAL RULE. Except as provided in subsection (b), no State or political subdivision of a State may establish or continue in effect with respect to a device intended for human use any requirement that would impose obligations that are inconsistent with those terms and conditions."

> *See also*, Emergency Use Authorization of Medical Products and Related Authorities: Guidance

for Industry and Other Stakeholders:

> "FDA believes that the terms and conditions of an EUA issued under section 564 preempt state or local law, both legislative requirements and common-law duties, that impose different or additional requirements on the medical product for which the EUA was issued in the context of the emergency declared under section 564…To the extent state or local law may impose requirements different from or in addition to those imposed by the EUA for a particular medical product within the scope of the declared emergency or threat of emergency (e.g., requirements on prescribing, dispensing, administering, or labeling of the medical product), such law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress,' and 'conflicts with the exercise of Federal authority under [§ 564].'"[24]

The Mask EUAs each specify that "emergency use of face masks must be consistent with, and may not exceed, the terms of this letter…."..The Mask EUA's state that the products must not be labeled in such a manner that would misrepresent the product's intended use; for example, the labeling must not state or imply that the product is intended for antimicrobial or antiviral protection or related uses or is for use such as infection prevention or reduction.

In its Enforcement Policy for Face Masks and Respirators During the Coronavirus Disease (COVID-19) Public Health Emergency (Revised)[25], the FDA stated in three instances that masks are not intended to reduce or prevent infection:

---

[24] See guidance at 39-40 available at https://www.fda.gov/regulatory-information/search-fda-guidance-documents/emergency-useauthorization-medical-products-and-related-authorities
[25] FOOD AND DRUG ADMINISTRATION, Enforcement Policy for Face Masks and Respirators During the Coronavirus Disease (COVID-19) Public Health Emergency (Revised May 2020), https://www.fda.gov/media/136449/download.

"The product is not intended for any use that would create an undue risk in light of the public health emergency, for example, the labeling does not include uses for antimicrobial or antiviral protection or related uses or uses for infection prevention or reduction or related uses and does not include particulate filtration claims."

## ii.  Masks and Face Coverings are an Unlawful "Restraint" Harmful to All Students

US DOE's Office of Civil Rights ("OCR") defined the term "restraint" in a letter dated December 28, 2016, which outlined a list of questions and answers as guidance to school districts, concerning the usage of "restraints": "In general, OCR uses the following definitions for mechanical restraint and physical restraint.[26] Mechanical restraint refers to the use of any device or equipment to restrict a student's freedom of movement."[27]  The IDEA includes numerous procedural safeguards "that guarantee parents both an opportunity for meaningful input into all decisions affecting their child's education and the right to seek review of any decisions they think inappropriate." *Honig*, 484 U.S. at 311–12.[28] Defendants blatantly disregarded these procedural safeguards and failed to comply with long-established federal laws and regulations with Plaintiff-Parents by unilaterally, substantially, and materially altering the Students' "status quo" educational program related to the Plaintiff-Students' pendency rights by illegally adding restraints and creating a more restrictive environment. Because the statewide school mask mandate has now been in effect for more than ten cumulative days, Defendants have altered the educational program of the Plaintiff-Students, thus denying them a FAPE under the IDEA. Forcing students to wear masks all day in schools is not only a violation of New York State Law as a deliberately

---

[26] See, e.g., OCR, 2015-16 CRDC School Form, www.ed.gov/ocr/docs/crdc-2015-16-all-schools-form.pdf.

[27] For example, suppose a school relies on law enforcement personnel to handcuff students to obtain compliance (but not for the sole purpose of arrest). In that case, such students are "subjected to mechanical restraint" under OCR's definition. See OCR, 2015-16 CRDC School Form, Section X, www.ed.gov/ocr/docs/crdc-2015-16-all-schools-form.pdf. Further, stakeholders have reported that mechanical restraints such as tape, straps, tie-downs, ropes, weights, weighted blankets, and a wide variety of other devices have been used by educators to attempt to control student behavior. See Council for Children with Behavioral Disorders, Council for Exceptional Children, The Use of Physical Restraint Procedures in School, 2 (July 2009),http://casecec.org/pdf/seclusion/Accepted,%20CCBD%20on%20Use%20of%20Restraint,%207-8-09.pdf

[28] *Susquenita Sch. Dist. v. Raelee S. By & Through Heidi S.*, 96 F.3d 78, 82, 83 (3d Cir. 1996). Accordingly, the stay-put provision "protect[s] handicapped children and their parents during the review process" by "block[ing] school districts from effecting unilateral change in a child's educational program."

21

inappropriate use of restraints, it is a violation of federal Medicaid regulations, a violation of Federal law, and it violates The American Medical Association's Code of Medical Ethics.

The American Medical Association advocates that people "have a fundamental right to be free from unreasonable bodily restraint" and that restraints should only be imposed when "in the best interest of the patient." American Medical Association, Use of Restraints, Code of Medical Ethics, Section E-8.17. More than a decade ago, New York State regulations banned corporal punishment and the use of mechanical restraints. In September 2009, Defendant NYS DOE circulated a memorandum to <u>ALL</u> school personnel and impartial hearing officers "to publicize the regulations and guidance of the New York State Education Department (NYSED) governing the policies relating to the use of restraints and seclusion in schools."

NYSED "[p]rohibit[s] the use of aversive interventions, with limited exceptions [8 NYCRR §§19.5 and 200.22]; Authorize[s] the use of reasonable physical force, including the use of physical restraints only in emergencies in which alternative procedures and methods not involving the use of physical force cannot reasonably be employed [8 NYCRR §§19.5 and 200.22(d)]."[29] Subsequently, Defendant NYS DOE issued a Q&A with guidance specifically for the proper development of IEPs and in the section "Special Needs Related to Special Factors" answered Question #7 as follows:

> "***For students with severe needs, where do items such as harnesses and helmets belong on the new IEP forms?***
>
> If a student needs an intervention that is medically necessary for the treatment or protection of the student (such as a soft helmet for a student with a seizure disorder), these needs could be appropriately identified under the Present Levels of Performance section of the IEP. Devices needed to address special transportation needs of the student would be documented under the 'Special Transportation' section of the IEP. However, a Committee may not recommend, and a school may not use movement limitation, including helmets and harnesses, to address student behavior.[30]

---

[29] http://www.p12.nysed.gov/specialed/publications/policy/BI-909.pdf
[30] Citing to http://www.p12.nysed.gov/specialed/publications/policy/BIattach-909.htm

While "movement limitation" is not further defined, Plaintiffs assert that the term includes, without limitation, the movement of students' mouths, lips, and airways, which are limited, inhibited, and interfered with by the donning of a mask or face covering. Deliberately misusing restraints is a violation of New York State Law and is defined as:

> " 'Deliberate inappropriate use of restraints,' which shall mean the use of a restraint when the technique that is used, the amount of force that is used or the situation in which the restraint is used is deliberately inconsistent with a service recipient's individual treatment plan or behavioral intervention plan, generally accepted treatment practices and/or applicable federal or state laws, regulations or policies, except when the restraint is used as a reasonable emergency intervention to prevent imminent risk of harm to a person receiving services or to any other person.   For purposes of this subdivision, a 'restraint' shall include the use of any manual, pharmacological or mechanical measure or device to immobilize or limit the ability of a person receiving services to freely move his or her arms, legs, or body."[31]

The exceptions to the use of aversion and restraints are so limited, New York State regulations only authorize the use of physical restraints in emergencies where alternative procedures not involving the use of physical force cannot reasonably be used. See, 8 NYCRR 19.5[a][3]; 200.22[d][2][i]).[32]

On May 15, 2012, then-Secretary of Defendant US DOE, issued the following report:

> "As education leaders, our first responsibility must be to ensure that schools foster learning in a safe and healthy environment for all our children, teachers, and staff. To support schools in fulfilling that responsibility, the U.S. Department of Education has developed this document that describes 15 principles for States, school districts, schools, parents, and other stakeholders to consider when developing or revising policies and procedures on the use of restraint and seclusion."

In this report, Principle #7 provides,

> "Restraint or seclusion should never be used in a manner that restricts a child's breathing or harms the child. Prone (i.e., lying face down) restraints or other restraints that restrict breathing should never be used because they can cause serious injury or death. Breathing can also be restricted if loose clothing becomes entangled or tightened or if the child's face is covered by a staff member's body part (e.g., hand, arm, or torso) or through pressure to the abdomen or chest. Any restraint or seclusion technique should be consistent with known medical or other special needs of a child. School districts should be cognizant that certain restraint and seclusion techniques are more restrictive than others, and use the least restrictive technique necessary to end the threat of imminent danger of serious physical harm. A child's ability to communicate (including for those children who use only sign language or other forms of manual communication or assistive technology) also should not be restricted unless less restrictive techniques would not prevent imminent danger of serious

---

[31]  11 N.Y. Soc. Serv. Law § 488(1)(d) (McKinney).

[32] The Centers for Medicare and Medicaid Services (CMS), in their issuance of a final rule related to consumers rights in the hospital setting defined seclusion and restraint as follows: Restraint is any manual method, physical or mechanical device, material, or equipment that immobilizes or reduces the ability of a person to move his or her arms, legs, body, or head freely. 42 C.F.R. § 482.13(e)(1)(i)(A). See also 42 C.F.R. § 483.352.

physical harm to the student or others.  <u>In all circumstances, the use of restraint or seclusion should never harm a child.</u>"[33] (emphasis added).

In December 2016, Defendant US DOE's Office for Civil Rights ("OCR") issued a Fact Sheet detailing a list of Q&A to inform school districts how the use of restraint and seclusion may result in discrimination against students with disabilities in violation of Federal laws, including Section 504 of the Rehabilitation Act of 1973 (Section 504). (Complaint at ¶ 391). In the previously referenced December 28, 2016, Letter from Assistant Secretary for Civil Rights[34], additional questions were posited and answered, which also found that the use of restraints can deny a student's receipt of Section 504 FAPE Services. (Complaint at ¶ 392).

The implementation of a mask mandate fundamentally alters the terms of the Students' IEP, thus violating the IDEA and triggering pendency. Defendants have unilaterally changed the IEPs of all disabled students in attendance at schools within the State of New York by requiring the use of a "medical device" and/or "restraint" (as defined by CDC and the Office of Civil Rights, respectively), which was not part of the Students' IEP. Although seemingly nuanced, the terms of the IDEA are clear--a change to a Student's IEP *in any manner* constitutes a "change in placement" and triggers pendency, or restoration of the "status quo" (i.e. the terms of the IEP before the change). Thus, even if Defendants attempted to implement a mask mandate for those students with qualifying disabilities under the IDEA (in an attempt to mandate masks for all students), Defendants trigger pendency; Defendants must be enjoined from mandating that students protected by the IDEA be subject to the masks mandate until these judicial proceedings have concluded.

---

[33]  https://www2.ed.gov/policy/seclusion/restraints-and-seclusion-resources.pdf
[34]  https://www2.ed.gov/about/offices/list/ocr/letters/colleague-201612-504-restraint-seclusion-ps.pdf

### D.      IDEA 20 U.S.C. § 1415 (J) –AUTOMATIC INJUNCTION (PENDENCY)

IDEA affords extensive procedural rights to parents who believe school districts are failing to fulfill the statutory mandate of a FAPE. For example, IDEA requires a Local Education Agency ("LEA") to give prior written notice of any action proposed by the LEA regarding the provision of a FAPE, mainly where the proposed action results in a change in the placement of a student's educational program – the educational status quo. 20 U.S.C. § 1415(c)(1).

20 U.S.C. § 1415(j), known as the IDEA's stay-put provision, provides in pertinent part, "during the pendency of any proceedings conducted under this section unless the State or local educational agency and the parents otherwise agree, the child shall remain in the then-current educational placement of the child." 20 U.S.C. § 1415(j), 34 C.F.R. § 300.518. The stay-put provision "protects the status quo of a child's educational placement" by preventing "school districts from effecting unilateral change in a child's educational program." *R.B.*, 532 F. App'x at 139–40; *C.H. v. Cape Henlopen Sch. Dist.*, 606 F.3d 59, 72 (3d Cir. 2010); *Susquenita School Dist.*, 96 F.3d at 83; See Honig, passim. See also *Jackson by Thompson v. Franklin Cty. Sch. Bd.*, 765 F.2d 535, 538 (5th Cir. 1985), *abrogated by Honig v. Doe*, 484 U.S. 305, 108 S. Ct. 592, 98 L. Ed. 2d 686 (1988).  A parent may invoke the stay-put provision when a school proposes a change in the child's "then-current educational placement." *Id.*; *See* 20 U.S.C. § 1415(j). Many Courts have referred to § 1415 (j), IDEA's stay-put provision, as providing an automatic injunction. *Ventura de Paulino v. New York City Dep't of Educ.*, 959 F.3d 519, 529 (2d Cir. 2020), *cert. denied,* 141 S. Ct. 1075, 208 L. Ed. 2d 534 (2021), *reh'g denied,* 141 S. Ct. 1530, 209 L. Ed. 2d 262 (2021); *N.D. ex rel. parents acting as guardians ad litem v. Hawaii Dep't of Educ.*, 600 F.3d 1104 (9th Cir. 2010); *Casey K. ex rel. Norman K. v. St. Anne Cmty. High Sch. Dist. No. 302*, 400 F.3d 508 (7th Cir. 2005); *Johnson ex rel. Johnson*, 287 F.3d 1176; *Drinker by Drinker*, 78 F.3d 859; (The U.S. Supreme Court "has emphasized that the provision's text is 'unequivocal' and 'states plainly' that the child

25

'shall' remain in his current educational placement 'during the pendency of any proceedings initiated under the act'").

Where the IDEA's stay-put provision is implicated, the provision triggers the applicability of an automatic injunction designed to maintain the child's educational status quo while the parties' dispute is being resolved – traditional preliminary injunction standards do not apply to a request for an injunction under § 1415(j). *Ventura de Paulino*, 959 F.3d at 529. Due to the automatic nature of the remedy under § 1414 (j), a Court need not apply the standard test for an injunction under Fed. R. Civ. P. 65. *Cronin v. Bd. of Educ. of E. Ramapo Cent. Sch. Dist.*, 689 F. Supp. 197, 202 (S.D.N.Y. 1988), s*ee Cochran v. D.C.*, 660 F. Supp. 314, 319 (D.D.C. 1987)(although traditional preliminary injunction standards were not met, district court found that injunction under stay-put provision would nonetheless issue).

Claims brought under the stay-put provision of the IDEA are evaluated independently from claims brought challenging the inadequacy of an IEP.  *Doe v. E. Lyme Bd. of Educ.*, 790 F.3d 440 (2d Cir. 2015); *Mackey ex rel. Thomas M. v. Bd. of Educ. For Arlington Cent. Sch. Dist.*, 386 F.3d 158 (2d Cir.), *supplemented sub nom. Mackey v. Bd. of Educ. for Arlington Cent. Sch. Dist.*, 112 F. App'x 89 (2d Cir. 2004), *Araujo v. New York City Dep't of Educ.*, No. 20 CIV. 7032 (LGS), 2021 WL 1225503, at *2 (S.D.N.Y. Apr. 1, 2021); *Avaras v. Clarkstown Cent. Sch. Dist.*, No. 15 CV 9679 (NSR), 2018 WL 4103494 (S.D.N.Y. Aug. 28, 2018).

Where, as here, the stay-put provision is invoked or triggered, Courts focus on identifying the student's "then-current educational placement," which typically refers to the child's last agreed-upon educational program before the parent requested a due process hearing to challenge the child's IEP, *Ventura de Paulino*, 959 F.3d at 532, or the program that was in effect before a school district unilaterally changed the student's educational placement – the educational status quo. Under the provision, as long as a parent has initiated any proceeding under § 1415, judicial or administrative, a child is entitled to an

26

injunction against any district-proposed change that would move her from her "then-current educational placement." *V.D. v. State*, 403 F. Supp. 3d 76 (E.D.N.Y. 2019); *citing D.M. v. New Jersey Dep't of Educ.*, 801 F.3d 205, 211 (3d Cir. 2015).  An automatic injunction may issue under the IDEA's stay-put provision in the absence of administrative proceedings. Requiring plaintiffs, such as the Plaintiffs herein, to go through the administrative process to obtain a stay in proceedings would be putting form over substance. *D.M. v. New Jersey Dep't of Educ.*, No. CIV.A. 14-4620 ES, 2014 WL 4271646, at *6 (D.N.J. Aug. 28, 2014), *cited by V.D.*, 403 F. Supp. 3d 76.

As the Court in *D.M.* recognized, the "language of 1415(j) is unequivocal and admits of no exceptions ... stay-put provision is designed to ensure stability and consistency in a disabled child's education when that consistency may otherwise be elusive." *D.M.*, 2014 WL 4271646, at *6.

### E.       FOURTEENTH AMENDMENT VIOLATIONS

#### VIOLATIONS OF DUE PROCESS & PLAINTIFFS' SUBSTANTIVE RIGHTS

#### *PARENTS ARE BEST FIT TO DETERMINE HOW TO PROTECT THEIR CHILDREN – NOT THE STATE*

Parents have a constitutional right to determine how best to raise, nurture, and educate their child or children without undue interference by the state. *Troxel v. Granville*, 530 U.S. 57, 95, 120 S. Ct. 2054, 147 L. Ed. 2d 49 (2000).

The parental right stems from the liberty protected by the Due Process Clause of the Fourteenth Amendment. See, *e.g., Meyer v. Nebraska*, 262 U.S. 390, 399, 401, 43 S. Ct. 625, 67 L. Ed. 1042 (1923); *Pierce v. Soc'y of the Sisters of the Holy Names of Jesus & Mary*, 268 U.S. 510, 534–535, 45 S. Ct. 571, 69 L. Ed. 1070 (1925); *Prince v. Massachusetts*, 321 U.S. 158, 166, 64 S. Ct. 438, 88 L. Ed. 645 (1944); *Stanley v. Illinois*, 405 U.S. 645, 651–652, 92 S. Ct. 1208, 31 L. Ed. 2d 551 (1972); *Wisconsin v. Yoder*, 406 U.S. 205, 232–233, 92 S. Ct. 1526, 32 L. Ed. 2d 15 (1972); *Santosky v. Kramer*, 455 U.S. 745, 753–

754, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982). Had they been decided in recent times, *Pierce and Meyer* may well have been grounded upon First Amendment principles protecting freedom of speech, belief, and religion. *Troxel*, 530 U.S. at 95. Their formulation and subsequent interpretation have been quite different, of course, and they long have been interpreted to have found in Fourteenth Amendment concepts of liberty an independent right of the parent in the "custody, care and nurture of the child," free from state intervention. *Troxel*, 530 U.S. at 95; *Prince*, 321 U.S. 158.

There is a presumption that fit parents act in the best interests of their children. *Troxel*, 530 U.S. at 68. As the Supreme Court recognized in *Troxel*:

> "[O]ur constitutional system long ago rejected any notion that a child is the mere creature of the State and, on the contrary, asserted that parents generally have the right, coupled with the high duty, to recognize and prepare [their children] for additional obligations. ... The law's concept of the family rests on a presumption that parents possess what a child lacks in maturity, experience, and capacity for judgment required for making life's difficult decisions. More important, historically, it has recognized that natural bonds of affection lead parents to act in the best interests of their children." *Parham v. J. R.*, 442 U.S. 584, 602, 99 S. Ct. 2493, 61 L. Ed. 2d 101 (1979) (internal quotation marks and citations omitted).

*Troxel*, 530 U.S. at 68–69.

Mask mandates are NOT necessary to protect our children. As the Supreme Court has recognized and held, parents are best fit to determine how to protect their children – not the state.

The Fourteenth Amendment provides that no State shall "deprive any person of life, liberty, or property, without due process of law." It has long been recognized that the Fourteenth Amendment's Due Process Clause, like its Fifth Amendment counterpart, "guarantees more than fair process." *Washington v. Glucksberg*, 521 U.S. 702, 719, 117 S. Ct. 2258, 138 L. Ed. 2d 772 (1997).

The mask mandate violates pre- and post-deprivation due process. Defendants implemented a mandate covertly, without publishing an agenda, minutes, or notice of same and in the absence of any legislative or other legal authority. Defendants' mask mandate also provides no avenue for post-deprivation due process.

28

Plaintiffs seek to enjoin Defendants from promulgating a "mandatory" mandate instead of leaving the choice to the Parents and Guardians of the students, whom have a primary stakeholder interest in the student's education. For instance, S.J.D. is a student in New York classified with a traumatic brain injury who has received both rounds of the COVID-19 vaccine. Due to S.J.D.'s disability, while she is able to don a mask, she is unable to remove the mask herself in case of an emergency such as aspirations, choking, vomiting, or during a seizure. Accordingly, the mask would only serve as a barrier and poses a danger to S.J.D. as it is highly likely that while covering the nose and mouth, those around her may not be able to notice an impending emergency that would threaten S.J.D.'s life. It is Plaintiffs' position that Defendants should have considered and incorporated provisions for those students with disabilities, as well as those students (disabled and non-disabled) who are fully vaccinated.

As demonstrated herein, the implementation of masks in schools is unfounded, harmful to children and the byproduct of Defendants' political agenda. Then-Governor Cuomo announced on June 25, 2021, that an "emergency" no longer exists. The implementation of the mask mandate violates the rights of Plaintiffs, the students of New York City/New York State, and their parents, as held in *Troxel v. Granville*, 530 U.S. 57, 120 S. Ct. 2054, 147 L. Ed. 2d 49 (2000), citing *Washington v. Glucksberg*, 521 U.S. 702, 117 S. Ct. 2258, 138 L. Ed. 2d 772 (1997).

The Due Process Clause also includes a substantive component that "provides heightened protection against government interference with certain fundamental rights and liberty interests." *Washington v. Glucksberg*, 521 U.S. 702, 117 S. Ct. 2258, 138 L. Ed. 2d 772 (1997). In *Troxel*, 530 U.S. 57, the Supreme Court held that the "liberty of parents and guardians" includes the right "to direct the upbringing and education of children under their control."

"The child is not the mere creature of the State; those who nurture him and direct his destiny have the right, coupled with the high duty, to recognize and prepare him for additional obligations."

*Washington*, 521 U.S. 702, citing *Pierce v. Soc'y of the Sisters of the Holy Names of Jesus & Mary*, 268 U.S. 510, 534–535, 45 S. Ct. 571, 69 L. Ed. 1070 (1925). "It is cardinal with us that the custody, care and nurture of the child reside *first in the parents*, whose primary function and freedom include preparation for obligations the state can neither supply nor hinder." *Troxel*, 530 U.S. at 66, citing *Prince v. Massachusetts*, 321 U.S. 158, 64 S. Ct. 438, 88 L. Ed. 645 (1944) ("It is plain that the interest of a parent in the companionship, care, custody, and management of his or her children 'come[s] to this Court with a momentum for respect lacking when appeal is made to liberties which derive merely from shifting economic arrangements'" (citation omitted)); *Wisconsin v. Yoder*, 406 U.S. 205, 232, 92 S. Ct. 1526, 32 L. Ed. 2d 15 (1972) ("The history and culture of Western civilization reflect a strong tradition of parental concern for the nurture and upbringing of their children. This primary role of the parents in the upbringing of their children is now established beyond debate as an enduring American tradition"); *Quilloin v. Walcott*, 434 U.S. 246, 255, 98 S. Ct. 549, 54 L. Ed. 2d 511 (1978) ("We have recognized on numerous occasions that the relationship between parent and child is constitutionally protected"); *Santosky v. Kramer*, 455 U.S. 745, 753, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982) (discussing "[t]he fundamental liberty interest of natural parents in the care, custody, and management of their child"); "In a long line of cases, we have held that, in addition to the specific freedoms protected by the Bill of Rights, the 'liberty' specially protected by the Due Process Clause includes the righ[t] ... to direct the education and upbringing of one's children" *Glucksburg, supra* (citing *Meyer*, 262 U.S. 390 and *Pierce*).

The mask mandate runs afoul of legal precedent. Plaintiffs have suffered, and continue to suffer, irreparable harm as those students with disabilities' health and welfare are put at risk, while those non-disabled students are harmed by direct infringement upon their civil rights as Americans. As set forth in *Gamble v. United States*, 139 S. Ct. 1960, 204 L. Ed. 2d 322 (2019), "No subjective balancing test can justify such a wholesale disregard of the People's individual rights protected under the Fourteenth

30

Amendment. *Gamble*, 139 S. Ct. at 1988–1989. The choice to place a mask or face covering over the face of one's child in the classroom remains with the Parent and/or the Students themselves, not the government.

###   i.   Conduct Pursuant To Established State Procedures vs. Random Unauthorized Conduct

The mandate in question requires all students to don a mask on school campuses at a topical level. Failure to comply with the mandate results in the student being sent home for the school day, forcing the student to surrender a day of learning. However, the New York State Constitution provides that "[t]he legislature shall provide for the maintenance and support of free common schools, wherein *all children* of this state may be educated." N.Y. Const. art. XI, § 1 (emphasis added).

The mask mandate lacks a post-deprivation remedy for students. In the same vein, assuming *arguendo* that there were proper pre- and post-deprivation remedies, the challenge before the Court stems from what has been recognized by the Supreme Court as "random and unauthorized action." *See Parratt v. Taylor*, 451 U.S. 527, 101 S. Ct. 1908, 68 L. Ed. 2d 420 (1981), *overruled by Daniels v. Williams*, 474 U.S. 327, 106 S. Ct. 662, 88 L. Ed. 2d 662 (1986); *see also Zinermon v. Burch*, 494 U.S. 113, 110 S. Ct. 975, 108 L. Ed. 2d 100 (1990); *Hudson v. Palmer* ("post-deprivation remedies do not satisfy due process where a deprivation of property is caused by conduct pursuant to established state procedure, rather than random and unauthorized action.") As established in *Troxel*, Parents and their students have a property right in education.

In a scenario where a student does not or cannot comply with the current mask mandate, the student will be sent home and deprived of the ability to attend school -- a right that the NY State Constitution expressly affords. In the NY DOE's "Health and Safety Guide for the 2021-2022 School Year" issued by Defendant Chancellor Young and Defendant Rosa on August 12, 2021, there is no guidance pertaining to the education of those students who are turned away at the school door for failure

to adhere to the mask mandate. This underscores the urgent nature of Plaintiffs' request for a Preliminary Injunction as set forth herein.

Without injunctive relief, the educational and individual rights of New York Students and their parents are unnecessarily at risk. It is assumed that Defendants will contend that concerns about public health outweigh the imposition of masks. However, before his resignation, when asked about the mask mandate, Governor Cuomo *himself* admitted: "The Legislature would have to come back, they'd have to pass a law to do that. So, I don't have any legal authority to mandate.  The best I can do is say I strongly recommend that they do that. Additionally, before being sworn in as Governor, Defendant Hochul had stated her position about masks in schools, then acknowledged:

> "That's just an opinion right now. *I don't have the authority to make that the policy*, and we're gonna leave it up to the school districts," Governor Hochul said.  "It's not going to be top-down. It's going to be much more collaborative, and I will listen to everyone before I make decisive decisions." (emphasis added).

More importantly, on June 24, 2021, Governor Cuomo signed Executive Order 210, rescinding all previous Executive Orders, as "it has been determined that Executive Orders 202 through 202.111 and Executive Orders 205 through 205.3 are no longer necessary." [EO 210, June 24, 2021]. Additionally, in the two (2) months following the execution of Executive Order 210, there were no significant upticks in COVID-19 transmission rates, nor can Defendants cite an underlying "emergency" to necessitate the implementation of the challenged mandate.

In anticipation of Defendants' belabored exclamations of a raging pandemic, Plaintiffs assert that there has been much dispute within the scientific community about the term "pandemic," its definition, and its use. For instance, the *Journal of Infectious Diseases* cites, "[u]ses of the term ["pandemic"] by official health agencies, scientists, and the media often seem to be at odds. For example, some argued that a level of explosive transmissibility was sufficient to declare a pandemic. In contrast, others maintained that severity of infection should also be considered." The following are "key features" of a

"pandemic": geographic extension; disease movement; high attack rates and *explosiveness*; *minimal population immunity*; *novelty*; infectiousness; contagiousness; and severity. *Id.* (emphasis added).

According to the NY DOH COVID-19 Vaccine Tracker posted on their website (updated daily), approximately 71.9% of New Yok's total population and approximately 85% of those above age eighteen (18) have been vaccinated mitigate the spread of COVID-19.

As reiterated above, as of June 25, 2021, Governor Cuomo announced that the State of Emergency had ended. Defendant Hochul's mask mandate, implemented through manipulation of Defendants DOH and PHPC to amend and institute new regulations without any authority to do so, is unlawful and must be enjoined.

## F.     NINTH AMENDMENT VIOLATIONS

The Ninth Amendment of the Constitution provides: "The enumeration in the Constitution, of certain rights, shall not be construed to deny or disparage others retained by the people." The Ninth Amendment protects the right to family integrity; the fundamental integrity of the family unit must be preserved absent a showing of a compelling government interest. The Constitution also protects the right to privacy in one's personal autonomy and bodily integrity from government intrusion. The mask mandate violates Plaintiffs' right to privacy and bodily integrity. The "harm" alleged by Defendants is not "compelling." However, the harm to children substantially outweighs any perceived 'benefit' of mask-wearing.

Apart from having no FDA approval as medical devices for the prevention of COVID-19, common masks and face coverings have not been subject to scrutiny under Daubert or Frye. As set forth by the Supreme Court in *Daubert v. Merrell Dow Pharms., Inc.,*[35] there are four main components to

---

[35] *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993).

establish a "theory or technique" as "scientific knowledge": (1) testability; (2) peer review; (3) known or potential rate of error; and (4) general acceptance. *Id.* "Additionally, in the case of a particular scientific technique, the court ordinarily should consider the known or potential rate of error" [see, e.g., *United States v. Smith*, 869 F.2d 348, 353–354 (7th Cir. 1989) (surveying studies of the error rate of spectrographic voice identification technique)], and the existence and maintenance of standards controlling the technique's operation. See *United States v. Williams*, 583 F.2d 1194, 1198 (2d Cir. 1978) (noting professional organizations' standard governing spectrographic analysis).

Plaintiff S.J.D. is a student in New York State who is classified with a traumatic brain injury, a qualifying disability under the IDEA (20 U.S.C. § 1415, et. seq). As such, S.J.D.'s school district must provide S.J.D. with a FAPE by drafting and implementing an IEP each school year. This requirement applies to all students with qualifying disabilities under the IDEA attending school within New York State. Where a disabled student's IEP is unilaterally amended, a "pendency" or "stay-put provision" is triggered upon the passing of the tenth cumulative day of the purported "change." *Infra,* PART D. As outlined in PART VI of Plaintiffs' Complaint, by definition, a "mask" is a medical device that, if required, would alter the IEPs of those disabled students who do not currently have "mask(s)" listed as equipment on the IEP, thus denying the disabled student a FAPE.  Similarly, the definition of a "mask" falls squarely in the Office of Civil Rights' definition of "restraints":

> "In general, OCR uses the following definitions for mechanical restraint and physical restraint. Mechanical restraint refers to the use of any device or equipment to <u>restrict a student's freedom of movement</u>." (emphasis added)

Forcing students to wear masks all day in school is not only a violation of New York State Law as a deliberately inappropriate use of restraints, it is a violation of federal Medicaid regulations, federal laws, and the American Medical Association's ("AMA") Code of Medical Ethics. The AMA advocates that people "have a fundamental right to be free from unreasonable bodily restraint" and that restraints

34

should only be imposed when "in the best interest of the patient." [American Medical Association, Use of Restraints, Code of Medical Ethics, Section E-8.17]. Accordingly, each day students are subjected to an involuntary mask mandate is a violation of the current federal laws protecting students, and especially those students with disabilities protected by the IDEA.

## G.    FIRST AMENDMENT VIOLATIONS

As outlined in the Complaint, Plaintiffs allege that Defendants Hochul, DOH, PHPC, Zucker, and others engaged in conduct prohibited by the First Amendment in the following ways:

1.    Excessive entanglement with religion;

2.    Through false speech made thoughtlessly and/or deliberately;

3.    Implementing a vague and/or ambiguous regulation without clear terms that "man of common intelligence must necessarily guess at its meaning and differ as to its application," as the term "mask" and/or "face covering" remains undefined, yet the regulation imposes a penalty for violation of same (*see Connally v. Gen. Const. Co.*, 269 U.S. 385, 391, 46 S. Ct. 126, 70 L. Ed. 322 (1926));

4.    Interfering with Plaintiff's First Amendment right to freedom of association; and

5.    Interfering with Plaintiff's First Amendment freedom to enter and maintain human relationships.

On September 12, 2021, Defendant Governor Hochul utilized her official position to preach at the Abyssinian Baptist Church in Harlem, New York, where she encouraged the congregation:

> "Throughout the whole experience of the pandemic, a lot of people prayed to God. . . He inspired the smartest scientists and doctors and researchers to create a vaccine. God gave us that through men and women so we could be delivered from this pandemic. . . *And all of you, have to be not be just true believers, <u>but our apostles</u> to go out there and spread the word that we can get this out once and for all, if everyone gets vaccinated*."[36] (emphasis added).

Approximately two weeks later, on September 26, 2021, Defendant Governor Hochul *again* utilizes her title as Governor to deliver a sermon from the pulpit of the Christian Cultural Center in Brooklyn, New York, with a more caustic message:

> "We are not through the pandemic. I wished we were, but I prayed a lot to God during this time and you know what—God did answer our prayers. He made the smartest men and women, the scientists, the doctors, the researchers—he made them come up with a vaccine.

---

[36] https://www.governor.ny.gov/news/video-audio-photos-rush-transcript-governor-hochul-attends-services-abyssinian-baptist-church.

That is from God to us, and we must say thank you, God. Thank you. And I wear my 'vaccinated' necklace all the time to say I'm vaccinated. ***All of you, yes, I know you're vaccinated, you're the smart ones, but you know there's people out there who aren't listening to God and what God wants. You know who they are.***

***I need you to be my apostles.*** I need you to go out and talk about it and say, we owe this to each other . . ." (emphasis added).

The Defendants' mandate and enforcement of students to wear a mask throughout the school day amounts to the endorsement and advancement of religion in violation of the protections set forth in the First Amendment. This type of conduct from a public official is prohibited, as "[e]ndorsement sends a message to non-adherents that they are outsiders, not full members of the political community, and in an accompanying message to adherents that they are insiders, favored members of the political community." Lynch v. Donnelly (1984). Although Humanism is considered "non-theistic" and purports to be rooted in "science," there is no requirement that religion meets any organizational or doctrinal test to qualify for First Amendment protection, as orthodoxy is not an issue. Additionally, the First Amendment "forbids alike preference of religious doctrine or prohibition of theory which is deemed agnostic to particular dogma." *Altman v. Bedford Cent. Sch. Dist.*, 245 F.3d 49 (2d Cir. 2001). Although not named herein as a Defendant, but necessary to note, in an interview with NBC News, the nation's Medical Advisor, Dr. Fauci, responded to criticisms of his management of COVID-19 by stating:

"[i]f you are trying to, you know, get me as a public health official and a scientist, ***you are really attacking not only Anthony Fauci—you are attacking science.*** Moreover, anybody that looks at what is going on clearly sees that."

Plaintiffs assert that this public statement essentially "fueled" Defendants' conduct—with the support of the nation's Medical Advisor, Defendants used this ideology to split the country into two groups: those favored "adherents" that would follow "science" at the behest of government actors (i.e. those "law-abiding citizens"), and those disfavored "non-adherents" who presumptively "attack science" by questioning the validity and consistency of the guidance offered by the government (i.e. "domestic terrorists" *see infra* **PART F**). To give context to the breadth of this abuse of power and its far-reaching effects, Plaintiffs not only cite to the inconsistent guidance given by Dr. Fauci over the

36

course of the last year and a half but remind the Court that upon Dr. Fauci issuing (unfounded) guidance that two masks would be more effective than donning just one, this Court, the following day, implemented a mandatory restriction that two (2) masks must be worn by those entering and working within the Southern District courthouse, despite the CDC's general guidance that "masks" (in the ambiguous context) were ineffective to mitigate the spread and transmission of COVID-19 and the emerging Delta variant. (Complaint, **PART III**, p. 41-43).

Accordingly, Defendants have utilized this misguidance to their advantage in pushing forward an agenda rooted in religion, politics, ambition, and otherwise to perpetuate fear and panic among the American people to cajole them into compliance with Defendants' ideologies. Defendants' acts directly infringe upon the freedom of association, religion, and otherwise by creating the broad-sweeping presumption that those donning the masks are "favored." In contrast, those skeptical of mask usage are painted as "disfavored" and requiring moral intervention, even if they are fully vaccinated.

### H.   PLAINTIFFS ARE SUFFERING AND WILL CONTINUE TO SUFFER IRREPARABLE HARM WITHOUT THE REQUESTED RELIEF

Where plaintiffs allege a constitutional violation, they do not need to prove irreparable harm at this stage of the proceedings. *Overstreet v. Lexington-Fayette Urb. Cty. Gov't*, 305 F.3d 566 (6th Cir. 2002) See *JWJ Indus., Inc. v. Oswego Cty.*, No. 509CV0740NPMDEP, 2009 WL 10722459, at *3 (N.D.N.Y. June 30, 2009); see also, *Brewer v. W. Irondequoit Cent. Sch. Dist.*, 212 F.3d 738, 744–45 (2d Cir. 2000) (citation omitted) (The law is well-settled that plaintiffs sufficiently establish irreparable harm through "the allegation of fourth amendment violations"); *Jolly v. Coughlin*, 76 F.3d 468, 482 (2d Cir. 1996); *Mitchell v. Cuomo*, 748 F.2d 804, 806 (2d Cir. 1984).

Children are the least likely group to contract or spread COVID-19; forcing children to wear masks and face coverings has no benefit and is substantially outweighed by the harms caused. Mask

37

wearing and face coverings are detrimental to the emotional, social, and physical well-being of children. The research below includes all the research cited by the CDC and others who recommend schools mandate the wearing of masks by children in schools, as well as additional research and studies, all of which demonstrate that mandating masks in schools for children has no statistical impact on the spread of COVID-19 and/or has a negative impact on children.[37] According to the American Medical Association:

> "Face masks should be used only by individuals who have symptoms of respiratory infection such as coughing, sneezing, or, in some cases, fever. Face masks should also be worn by healthcare workers, by individuals who are taking care of or are in close contact with people who have respiratory infections, or otherwise as directed by a doctor. Face masks should not be worn by healthy individuals to protect themselves from acquiring respiratory infection because there is no evidence to suggest that face masks worn by healthy individuals are effective in preventing people from becoming ill. Face masks should be reserved for those who need them because masks can be in short supply during periods of widespread respiratory infection. Because N95 respirators require special fit testing, they are not recommended for use by the general public."[38]

A literature review of the seventeen (17) top studies was analyzed and concluded that "None of the studies established a conclusive relationship between mask/respirator use and protection against influenza infection."[39]

## i. Children are Not "Little Adults"

Age-adjusted statistical analysis is conducted because almost all diseases or health outcomes occur at different rates in different age groups.[40] The National Institutes of Health published a review of clinical data in 2017 declaring, "Children are not simply little adults. As a result, ***extrapolating results from adult clinical trials to the treatment of children may be inappropriate and, possibly, harmful.***"[41] (emphasis added)

---

[37] A comparison of studies conducted both inside and outside of the school setting can be found at Complaint, paragraphs 199 – 154.
[38] Journal of the American Medical Association (JAMA); April 21, 2020 Volume 323, Number 15 https://jamanetwork.com/journals/jama/fullarticle/2762694
[39] bin-Reza F et al. The use of mask and respirators to prevent transmission of influenza: A systematic review of the scientific evidence. Resp Viruses 2012;6(4):257-67. https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5779801/
[40] https://www.health.ny.gov/statistics/cancer/registry/age.htm
[41] https://pubmed.ncbi.nlm.nih.gov/29191349/

From the beginning of the COVID-19 pandemic until today, the data and science have continued to demonstrate that children have a significantly low chance of becoming infected with COVID-19, and if infected, the outcomes are not likely to be severe compared to older adults and specific at-risk individuals.[42] "Children are very much adapted to respond — and very well equipped to respond — to new viruses," says Donna Farber, an immunologist at Columbia University in New York City. Even when they are infected with SARS-CoV-2, children are most likely to experience mild or asymptomatic illness."[43] A new model from researchers in Israel found that kids are half as susceptible to COVID-19 compared to adults.[44] As of September 15, 2021, 439 American children ages zero to 17 heartbreakingly died due to COVID-19, representing 0.0666% of the 658,754 total deaths in the United States.[45] Specifically in New York State, there have tragically been 17 children aged zero to nine and 15 children aged ten to 19 who have died due to COVID-19.  This represents 0.0725% of the 44,133[46]total New Yorkers who have passed away due to COVID-19.[47] Children under the age of 15 have a greater chance of being struck by lightning than dying of COVID-19.[48]

Early epidemiologic reports on COVID-19 in children showed they are less likely than adults to be infected and have a severe illness. (Complaint at ¶262). The New England Journal of Medicine, one of the most prestigious peer-reviewed medical journals, published an article outlining the dubious nature of children contracting and transmitting COVID-19 to adults. (Complaint at ¶ 263). In late April 2020, scientists at France's Institute Pasteur, an international research and education institution founded in

---

[42]  https://adc.bmj.com/content/106/5/429
[43] https://www.nature.com/articles/d41586-020-03496-7
[44] https://www.healthline.com/health-news/kids-are-half-as-likely-get-COVID-19-as-adults-heres-what-we-know
[45]  https://www.statista.com/statistics/1191568/reported-deaths-from-covid-by-age-us/
[46] The NYS DOH tracker has not been updated since Defendant Governor Hochul added more than 12,000 additional deaths due to COVID-19, from 43,400 to 55,400, from what former Governor Cuomo and NYS DOH under his leadership had reported: https://www.foxnews.com/politics/kathy-hochul-adds-12k-deaths-to-covid-death-count
[47] https://covid19tracker.health.ny.gov/views/NYS-COVID19-Tracker/NYSDOHCOVID-19Tracker-Fatalities?%3Aembed=yes&%3Atoolbar=no&%3Atabs=n
[48] https://www.telegraph.co.uk/politics/2020/06/09/school-age-children-likely-hit-lightning-die-coronavirus-oxbridge/?fbclid=IwAR0CjevkUPW3TFy8i_QPolumu_O-1ratcMUWJxP4I6EHr8EPFa3FFGB-gpw

1887, with the support of the Hauts-de-France Regional Health Agency and the Amiens Education Authority, carried out an epidemiological survey on 1,340 people linked to primary schools in Crépy-en-Valois, in the Oise department. "The main new finding is that the infected children did not spread the virus to other children or teachers or other school staff." - Arnaud Fontanet, lead author of the study, Head of the Epidemiology of Emerging Diseases Unit at the Institute Pasteur and a Professor at the CNAM.[49] A report by McKinsey and Company, one of the most prominent management consultants globally, notes that children have a much lower risk of contracting COVID-19 than adults. Researchers found that:

> "The most critical question is whether reopening schools will lead to a resurgence of infection among students, staff, and the broader community. The evidence here is still nascent. Children's risk of contracting COVID-19 appears to be lower than that of adults. In China and the United States, the countries with the largest number of confirmed COVID-19 cases, children represent 2 percent of cases. Emerging evidence also suggests that children are more likely to be asymptomatic, less likely to be hospitalized, and much less likely to die if they do develop COVID-19."

The McKinsey report also underscored the importance of in-person schooling:

> "Beyond academics, schools provide important social support, especially to vulnerable students. Indeed, 19 percent of reports of child abuse or neglect in the United States come through education personnel, and school closures have resulted in a steep drop in such reports. This change suggests that school closures have shut down support sources for victims of abuse."[50]

The Journal of Pediatrics, the official peer-reviewed journal of the American Academy of Pediatrics, published a Commentary that explores the scientific complexities of children transmitting COVID-19. The following represent the salient points of the commentary:

a. The authors deduced that children infrequently transit COVID-19 to adults, basing their conclusions on a new study published in Pediatrics, "COVID-19 in Children and the Dynamics of Infection in Families," and four other recent studies that examine COVID-19 transmission by and among children.

b. Referencing cases in China, Japan, France, and Australia, the authors further elaborate that children are not "driving the pandemic." For example, contact tracing of 40 children under 16 years of age with confirmed cases of SARS-CoV-2 at the Geneva University Hospital in Geneva, Switzerland, from March 10 to April 10, were identified along with their infected household contacts.

---

[49] https://www.pasteur.fr/en/press-area/press-documents/COVID-19-primary-schools-no-significant-transmission-among-children-students-teachers
[50] https://www.mckinsey.com/industries/social-sector/our-insights/safely-back-to-school-after-coronavirus-closures

c.  In only 3 cases did children exhibit symptoms of illness before their adult household contacts. In all other cases, the children exhibited symptoms after, or concurrent with, their adult household contacts.

d.  This alludes to the notion that the child was not the primary source of the virus's transmission, therefore more often obtaining COVID-19 from adults, rather than being the transmitters themselves.

e.  This study coincides with investigations performed in China, where 68 children confirmed with COVID-19 were admitted into Qingdao Women's and Children's Hospital from January 20 to February 27, 2020. 65 of these infected cases were household contacts of previously affected adults, which amounts to 95.59% of the total number of cases.

f.  An understanding of these studies demonstrates that the transmission of SARS-CoV-2 in schools is not as profound a predicament as initially considered.

g.  As the authors state, "Almost 6 months into the pandemic, accumulating evidence and collective experience argue that children, particularly school-aged children, are far less important drivers of SARS-CoV-2 transmission than adults."

h.  School re-opening in the fall is imperative to children's well-being and healthy development, the authors say. "Therefore, serious consideration should be paid toward strategies that allow schools to remain open, even during periods of COVID-19 spread. In doing so, we could minimize the potentially profound adverse social, developmental, and health costs that our children will continue to suffer until an effective treatment or vaccine can be developed and distributed or, failing that until we reach herd immunity," the article concludes.[51]

The Indian Journal of Pediatrics published a scientific letter that assesses the intricacies of

transmission of COVID-19 in children, confirming that children account for less than 2% of total

COVID-19 cases, and most develop only mild illness.[52] On June 24, 2020, at an emergency local school

board meeting to discuss reopening schools, Dr. Mark McDonald, a psychiatrist specializing in children

and at-risk youth, stated: "Children are not dying from COVID-19.  Children are not passing the disease

on to adults.  So, the only question is, 'Why are we even having this meeting tonight?'  We're meeting

because we adults are afraid…We are acting as negligent parents.  We are harming our children.  We

are failing them. We must agree to make decisions in the best interest of the children.  If we do not - if,

paralyzed by fear, we continue to act purely out of self-interest - we will ensure an entire generation of

traumatized young adults, consigned to perpetual adolescence and residency in their parents' garages,

---

[51]  https://pediatrics.aappublications.org/content/pediatrics/early/2020/07/08/peds.2020-004879.full.pdf
[52]  https://link.springer.com/article/10.1007/s12098-020-03401-0#author-information

unable to move through life with independence, courage, and confidence.  They deserve better - we owe it to them as parents."[53]

Daniel Horowitz, senior editor of The Conservative Review, wrote an article that compares and contrasts the flu and COVID-19 in children while expounding on research that highlights the deadliness of the flu season to children. "The reality is that every flu season, many more children die from this common ailment than have from COVID-19," Horowitz claimed. "Even those who suffer no serious consequences [of the flu] are often bedridden for a week or longer with high fever, muscle ache, and incessant coughing, unlike COVID-19, where almost every child who develops it is asymptomatic or very mildly symptomatic."

> "… if we are going to limit or modify or schooling and mandate that kids wear suffocating masks all day, shouldn't this be done every year from November to April – by a factor of 10? And given that the flu does linger for all months of the year, at least at the threat level of COVID-19 to children during the off months, if schools are closed for COVID-19, shouldn't they always be closed because of the flu?"[54]

Even vaccination research and protocols separate adults from children and further distinguish various age brackets within children.[55] [56] [57]

The long-term detriments of masking children outweigh the purported benefits of preventing the spread of COVID-19. There are well-established negative Behavioral, Physiological, and Psychological Effects of wearing masks in children. Face masks are proven to be relatively ineffective in preventing the wearer from becoming infected by the virus that causes COVID-19, according to a study of over 6,000 subjects.[58] However, masks do cause significant behavioral, physiological, and psychological effects, especially when masks are mandated among and around children.  A German survey asked

---

[53] https://www.markmcdonaldmd.com/?s=09
[54] https://www.conservativereview.com/news/horowitz-panicmongers-consistent-wed-close-schools-every-flu-season/
[55] https://theconversation.com/kids-arent-just-littler-adults-heres-why-they-need-their-own-clinical-trials-for-a-COVID-19-vaccine-162821
[56] https://www.cedars-sinai.org/blog/COVID-19-vaccine-trials-children.html
[57] https://www.sciencedirect.com/science/article/pii/S0264410X15010634?via%3Dihub
[58] https://www.lifesitenews.com/opinion/study-shows-how-masks-are-harming-children/

20,353 parents if their children (nearly 26,000 children in total) experienced adverse side effects of mask usage. 68% of the parents reported that their children experienced impairments, including 60% reporting irritability, 53% reporting headaches, 50% reporting difficulty concentrating, 42% malaise, 37% reporting learning fatigue, and 38% reporting impaired learning.[59] Other research has shown that extensive wearing of masks decreases oxygen to the brain.  Many children may experience learning impairment, and adults may experience headaches when forced to wear masks because of a lack of oxygen in the bloodstream. The same study showing 81% of healthcare workers who developed mask-related headaches acknowledged that the cause of the headaches was likely "hypoxia or hypercapnia" (decrease in blood oxygen or increase in blood CO2). Many studies have proven that mask usage is related to a significant decrease in blood oxygen levels—up to a 20% decrease in some cases.[60] [61] [62] Furthermore, this decrease in blood oxygen can be incredibly dangerous for children and detrimental to their proper development. The Japan Pediatric Association warns that masks on infants can impair their breathing, increase the burden on their hearts, and increase the risk of heatstroke.[63]

Additionally, Dr. Margarite Griesz-Brison, a German Consultant Neurologist and Neurophysiologist, has warned that all children are at risk of adverse developmental effects when made to wear masks – "Children and adolescents have an extremely active and adaptive immune system, and they need constant interaction with the microbiome of the Earth. Their brain is also incredibly active, as it has so much to learn. The child's brain or the youth's brain is thirsting for oxygen. The more metabolically active the organ is, the more oxygen it requires.  In children and adolescents, every organ is metabolically active."[64] Dr. Griesz-Brison notes that children are more negatively impacted by the

---

[59] https://www.researchsquare.com/article/rs-124394/v2
[60] https://pubmed.ncbi.nlm.nih.gov/15340662/
[61]  https://pubmed.ncbi.nlm.nih.gov/18500410/
[62] https://engineering.stanford.edu/magazine/article/COVID-19-prompts-team-engineers-rethink-humble-face-mask
[63] https://www.japantimes.co.jp/news/2020/05/27/national/masks-children-coronavirus/
[64] https://perma.cc/Q568-Y2H2

lack of oxygen and the inability to interact with pathogens to develop strong immune systems than they are assisted by them. *Id.*

Masks become even more dangerous once they are saturated from saliva, dirt, sweat, or other substances. While completely dry and functioning as intended, masks still reduce the wearer's oxygen intake and increase their take in of $CO_2$. However, masks, as used by the public, are rarely dry and functioning as intended. Research shows that masks become even more dangerous and constricting when they are wet, dirty, or overused. A study of the efficacy of cloth masks versus surgical masks found that cloth masks were inadvisable because "[m]oisture retention, reuse of cloth masks and poor filtration may result in an increased risk of infection."[65] Accordingly, the moisture retention of cloth masks blocks respiration. It increases the $CO_2$ trapped in the mouth-space, further endangering the wearer.

The dangers of this saturation were seen in China when three schoolchildren in different regions died due to respiration-related difficulties while wearing masks during gym class. A report cited the events suggesting that mask saturation may have been a cause for the deaths:

> "Temperatures in China's southern provinces have risen in recent days, with students having gym class during the hottest hours of the day. Yin Zhenhe, a professor in the department of preventative medicine at Yonsei University Hospital in Seoul, told CCTV that once a mask is saturated (from sweat), a person's breathing capability decreases by up to 20%."[66]

COVID-19 deaths have also been connected with secondary fungal infection. A recent study from India found that cloth mask use significantly increases the risk of developing Coronavirus disease-associated mucormycosis ("CAM") (a deadly fungal infection of the lungs seen primarily in COVID-19 patients in India, sometimes referred to as "Black Fungus" infection). "Use of surgical or cloth masks for prolonged periods was found to be associated with an increased risk of CAM."[67]

---

[65] https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4420971/
[66] https://www.thatsmags.com/china/post/31100/student-deaths-lead-schools-to-adjust-rules-on-masks-while-exercising
[67] Umang Arora et al., Novel risk factors for Coronavirus disease-associated mucormycosis (CAM): a case-control study during the outbreak in India, MEDRXIV (forthcoming 2021), available at https://doi.org/10.1101/2021.07.24.21261040.

Ironically, Dr. Anthony Fauci and other scientific and medical professionals published a study in 2008 establishing that most of the deaths in the pandemic of 1918 were not from influenza; instead, the deaths were caused by secondary bacterial infections that developed into pneumonia.[68]

Other studies show that repeated and extensive wearing of masks in children impairs child recognition and language development. The physical dangers that masks pose to children also threaten severe developmental challenges. Child psychologists have studied the relationship between child development of recognition abilities through exposure to adults' facial expressions since long before the COVID-19 pandemic.

Kang Lee, a professor of applied psychology and human development at the University of Toronto, says that children under 12 rely mostly on facial features to recognize people.[69]

David Lewkowicz, a senior scientist at Haskins Laboratories and professor adjunct at the Yale Child Study Center, verifies:

> "There's general agreement now that somewhere between four to five years of age is where the ability to start to perceive faces as holistic objects begins to emerge .... Now, if you imagine that those kids are now living in a world where half the face is blocked, that is clearly going to have an effect on the development of this ability, which is really important for face recognition."[70]

Similarly, Lee suggests that speech recognition is developed in young children through the child's watching of lips and facial movements as well as facial recognition. Lewkowicz has demonstrated this with his research tracking the eye movements of children when watching a woman speak to them:

> "What we discovered, in a nutshell, was that at four months of age babies were really interested in the eyes of the talker. But then, at eight months of age there was a really dramatic shift … where they started to look much more at the mouth region of the person that was talking to them."

---

[68] Morens D.M., et al., Predominant role of bacterial pneumonia as a cause of death in pandemic influenza: implications for pandemic influenza preparedness, 198 J Infect Dis. 962 (2008), available at https://pubmed.ncbi.nlm.nih.gov/18710327/.
[69] https://www.advisory.com/daily-briefing/2020/09/17/masks
[70] https://www.cbc.ca/news/science/children-masks-language-speech-faces-1.5948037

When masks obscure these features of the nose and lips, the communication development of young children can be delayed. Amy Learmonth, professor of Psychology at William Patterson University, concurs that young children need visual cues to learn language and communication skills "because learning a new word when you don't have any is complicated."[71]

Learmonth also warns about the harms that delay in the development of these skills due to the usage of masks in the COVID-19 pandemic can cause: "Anyone who is just a little behind in language development or a little behind in understanding social cues -- what concerns me is that they will fall further behind."

Facial expressions are essential for gathering information about the people you interact with to understand how they feel and guide one's interaction.[72] This interpretive skill is essential to successful emotional and language development in adolescence. Children who are better at reading facial expressions perform better in school, socially and are more popular with their peers.

Alternatively, children less adept at interpreting facial expressions are prone to "peer problems and learning difficulties."[73] Children exhibit more expressive control the older they get – meaning that they try to hide negative emotions from appearing in their facial expressions as they age and understand the effect their facial expressions have on the people around them.[74] The development of these skills lasts through the majority of adolescence, as children only reach an adult-level of facial expression recognition around the age of eleven.[75] [76]

Studies suggest that culture is also vital to the development of a child's face-reading abilities because different cultures read expressions differently based on their cultural context.[77] David

---

[71] https://www.cnn.com/2021/08/11/health/masks-child-development-effects-covid-pandemic-wellness/index.html
[72] https://www.verywellmind.com/understanding-emotions-through-facial-expressions-3024851
[73] https://parentingscience.com/facial-expressions-for-kids/
[74] https://www.jstor.org/stable/1130411
[75] https://pubmed.ncbi.nlm.nih.gov/25492258/
[76] https://pubmed.ncbi.nlm.nih.gov/16472321/
[77] Crivelli C, Jarillo S, Russell JA, Fernández-Dols JM. 2016. Reading emotions from faces in two indigenous societies. J

Lewkowicz of the Yale Child Study Center demonstrates the necessity of facial expressions to child development in a study of lip-reading in babies. Lewkowicz says that babies begin looking at the mouth around 6-8 months old: "they spend a lot of time looking at that person's mouth, trying to master their own native speech, getting not only auditory cues but visual."[78] The fact that very young babies instinctively look for the mouth of the person communicating with them shows how essential seeing the mouth is to communicating with facial expressions.

Kang Lee of the Development Lab at the University of Toronto suggests that reading facial expressions is a part of human evolution:

> "As humans evolved from primates, we shed a lot of facial hair. There's good reason for it—it highlights the eyes and other facial features so we can read important information about another person. By just looking at a face you can see what group or race they belong to, their age, and whether they are male or female."[79]

Lee highlights the importance of the most subtle aspects of facial expression to emotional communication:

> "Once you make social contact, the face also is a source of emotional information. The brain can very efficiently manipulate the facial muscles to convey different kinds of emotions, even extremely subtle changes in our emotions. It's not a surprise that the brain has set aside a special area so we can quickly perceive and process this information."

The information communicated through the face is so important to human communication that an entire section of the brain is dedicated to interpreting the faces around us. When these faces are masked, however, this facial communication essential to human expression is blocked. Facial expressions, and therefore the ability to freely speak and express oneself, is blocked by masks.

In a study by Claus-Christian Carbon, a perceptual psychologist at the University of Bamberg, participants aged 19-87 viewed photos of faces depicting different emotions with medical masks covering their mouths and noses and were asked to identify what emotions they perceived. Participants

---

Exp Psychol Gen. 145(7):830-43.
[78] https://www.nytimes.com/2020/09/14/well/family/Masks-child-development.html
[79] https://dana.org/article/losing-face/

reported that they had difficulty judging the emotions of the faces - especially the "happy" emotions - when the faces were covered with masks. Carbon concluded that masks covering the face make perception of emotion much more difficult even for adults with fully developed facial recognition abilities:

> "If you don't have as much information about the face, it makes sense that processing will be hampered. But what we also saw was that participants had lower confidence in their own perceptual ability when reading those faces. Given that emotional expressions are one of the most efficient ways of communicating to other people, this is something that does have an impact."[80]

A similar experiment was conducted in Wisconsin with children as participants rather than adults. The results of this study found that "participants were less accurate at reading emotions on masked compared to unmasked faces, but their accuracy was still above chance."[81] This means that children, whose facial recognition abilities are still developing, can use context to make educated guesses about what emotion a masked face is expressing; however, their ability to recognize emotion is still considerably hindered when the face is covered.

The effect of this masking is a decrease in the personal ability to share emotions with others, as others have a proven impaired ability to read emotion on masked faces, but also a decrease in child ability to develop emotional health and communication abilities through the essential interaction with facial expressions in their environment. The conclusion to be reached is that masks are detrimental to a child's development, health, and ability to communicate. According to Dr. Michael Unger, a family therapist, and researcher at Dalhousie University:

> "With widespread masking, we may unintentionally be disadvantaging younger children from developing the necessary skills to discern emotions and the neurological changes that make it possible to distinguish one face from another."[82]

Unger cautions:

---

[80] *Id.*
[81] https://pubmed.ncbi.nlm.nih.gov/33362251/
[82] https://www.psychologytoday.com/us/blog/nurturing-resilience/202012/will-wearing-masks-affect-children-s-emotional-development

> "It is likely that younger children are not being exposed to the many different facial expressions which stimulate good neurocognitive development" when they live in a social environment in which the faces and emotions around them are masked and made more difficult to perceive and learn from."

This underdevelopment in younger kids is met with an even more alarming negative emotional effect of masked social communities on older children.

According to Ashley Ruba, a postdoctoral fellow in the Child Emotion Lab at the University of Wisconsin-Madison:

> "People are focused on the mask-wearing as something that will hurt kids, but what may be of more concern is that so many children are isolated from their friends or struggling with virtual school. We don't know yet what may have long-term effects on development or mental health. These are things that we should be looking at carefully as we move forward."[83]

Older children are suffering from a lack of communication and the ability to express themselves when they are kept out of social environments or put in social environments in which they are masked and cannot properly communicate or gauge the emotions of those around them. This physical and emotional isolation has led to increased **child suicide rates in the last year**, with many children citing social isolation as a stressor in their life leading to the decision to commit suicide.[84]

JAMA Pediatrics published a research letter approved by the Ethics Committee of Tongji Medical College and Huazhong University of Science and Technology. Using Hubei Province, China, as its case study, this research investigated the mental health status of children in home confinement during COVID-19. Depression and anxiety symptoms were two driving health risks identified among students in Hubei. A total of 2330 students in grades 2 through 6 in 2 primary schools in Hubei province, of whom 845 were from Wuhan and 1485 were from Huangshi, were invited to complete a survey between February 28 and March 5, 2020. The information included sex, school grade, optimism about the epidemic, whether they worried about being infected by COVID-19, and depressive and anxiety

---

[83] https://dana.org/article/losing-face/
[84] https://www.cbs58.com/news/3-out-of-5-teens-who-died-by-suicide-in-milwaukee-county-last-year-cited-virtual-learning-as-a-stressor

symptoms measured by the Children's Depression Inventory–Short Form (CDI-S) and the Screen for Child Anxiety Related Emotional Disorders, respectively. The study concluded: "22.6% of students reported having depressive symptoms, which is higher than other investigations in primary schools of China (17.2%). During the outbreak of COVID-19, the reduction of outdoor activities and social interaction may have been associated with an increase in children's depressive symptoms. Our study found that 18.9% of students reported anxiety symptoms, which is higher than the prevalence in other surveys."[85] There are many other public health concerns, such as increases in child abuse and neglect[86] [87], malnutrition[88] [89], mental health[90] [91], and increases in alcohol and drug use[92] [93] associated with keeping kids out of school.[94] [95] [96]

Research also reveals that mask-wearing impairs a child's emotional development, which is arguably even more important than the development of recognition and language abilities. According to psychologists, emotional development is dependent on the child's ability to see the communication of emotions through the facial expressions of the adults around them. Kang Lee explains that "face masks obscure the 'facial musculature' people use to communicate 'emotional information.'"

Because of this, "children will likely have problems with 'emotional recognition and social interaction'" as a result of mask mandates during the COVID-19 pandemic.[97] A group of 70 doctors in

---

[85] https://jamanetwork.com/journals/jamapediatrics/fullarticle/2765196
[86] https://www.nytimes.com/2020/06/09/nyregion/coronavirus-nyc-child-abuse.html
[87] https://www.usatoday.com/story/news/nation/2020/05/13/hospitals-seeing-more-severe-child-abuse-injuries-during-coronavirus/3116395001/
[88] https://www.nejm.org/doi/full/10.1056/NEJMp2005638
[89] https://www.forbes.com/sites/alexandrasternlicht/2020/05/06/the-number-of-mothers-reporting-food-insecurity-has-jumped-more-than-200-since-start-of-pandemic/amp/?__twitter_impression=true
[90] https://www.washingtonpost.com/health/2020/05/04/mental-health-coronavirus/
[91] https://www.today.com/parents/mental-load-coronavirus-pandemic-means-moms-take-more-t179021
[92] https://www.cdc.gov/coronavirus/2019-ncov/daily-life-coping/stress-coping/alcohol-use.html
[93] https://www.shatterproof.org/blog/why-COVID-19-perfect-storm-addiction-world
[94] https://www.mckinsey.com/industries/public-sector/our-insights/COVID-19-and-student-learning-in-the-united-states-the-hurt-could-last-a-lifetime
[95] https://www.today.com/parents/parents-children-disabilities-discuss-remote-school-t187677
[96] https://www.nbcnews.com/business/consumer/what-do-working-parents-do-when-coronavirus-closes-local-schools-n1150671
[97] https://www.advisory.com/daily-briefing/2020/09/17/masks

Belgium found this threat to emotional development severe enough to sign a petition asking Ben Weyts, the Minister of Education in Belgium, to repeal his mask mandate in schools. The complaint of these physicians on behalf of children states:

> "The mandatory mouth mask in schools is a major threat to their development. It ignores the essential needs of the growing child. The well-being of children and young people is highly dependent on the emotional connection with others. (…). The aim of education is to create an optimal context so that a maximum development of young people is possible. The school environment must be a safe practice field. The mouth mask obligation, on the other hand, makes the school a threatening and unsafe environment, where emotional connection becomes difficult."[98]

## I.   DIRECT THREATS OF IRREPARABLE HARM

In addition to the threats of irreparable harm mentioned above, Plaintiffs also suffer irreparable harm from the threats made by federal agencies supporting the State in its endeavors to implement mandates. Parents exercising their right to freely speak before school boards to communicate their disagreement with the violations of their right to parent their children as they see fit, have been "flagged" by the FBI and other law enforcement agencies and labeled "domestic terrorists." The President himself recognized:

> "Unfortunately, as you've seen throughout this pandemic, some politicians are trying to turn public safety measures — that is, children wearing masks in school — into political disputes for their own political gain.  We are not going to sit by as governors try to block and intimidate educators protecting our children."[99]

While condemning what he perceives as abuse of power by certain Governors, it would seem that President Biden gives the silent nod to school boards across the country to take control of their districts to restore peace and order. However, in doing so, school boards have seemingly seized the moment to institute their own agendas.

On September 30, 2021, the National School Boards Association ("NSBA"), a lobbying organization representing school boards, sent a letter to President Biden.  In the letter, NSBA informs

---

[98] https://www.world-today-news.com/70-doctors-in-open-letter-to-ben-weyts-abolish-mandatory-mouth-mask-at-school-belgium/
[99] https://www.nytimes.com/2021/08/18/us/politics/biden-masks-schools-civil-rights.html

President Biden that parents who have been attending school board meetings across the country and voicing their disagreement pose threats of violence and should be labeled as "Domestic Terrorists." The NSBA also requested that Biden approve an investigation by the Federal Bureau of Investigation ("FBI") to further investigate these "threats of violence" and allow the United States Justice Department to prosecute those parents under the PATRIOT Act.[100] The NSBA letter included examples of what they believe rise to the level of domestic terrorism and hate crimes by accusing "anti-mask proponents (of) inciting chaos during board meetings." The letter goes on to cite a single instance in which a person was arrested for aggravated battery and disorderly conduct at a board meeting; another person who twice yelled a "Nazi salute in protest of masking requirements"; another person who prompted a school board to call a recess "because of opposition to critical race theory;" another person was arrested in Virginia and "another man was ticketed for trespassing,"[101] while a "third person was hurt," meanwhile someone labeled a "school board as Marxist."  These are the only examples the NSBA cites for over 15,000 school boards across the country that meet monthly throughout the year.

Parents challenging the overreach of local school boards are protected by the free exercise of the First Amendment. Compare, *Nat'l Socialist Party of Am. v. Vill. of Skokie*, 432 U.S. 43, 97 S. Ct. 2205, 53 L. Ed. 2d 96 (1977); *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 89 S. Ct. 733, 21 L. Ed. 2d 731 (1969); *Morse v. Frederick*, 551 U.S. 393, 127 S. Ct. 2618, 168 L. Ed. 2d 290 (2007); *Chaplinsky v. State of New Hampshire*, 315 U.S. 568, 62 S. Ct. 766, 86 L. Ed. 1031 (1942); *R.A.V. v. City of St. Paul, Minn.*, 505 U.S. 377, 112 S. Ct. 2538, 120 L. Ed. 2d 305 (1992).

Within just three (3) business days of President Biden receiving this letter, the Attorney General of the United States of America, Merrick Garland ("Attorney General Garland"), who is the principal

---

[100] https://www.nsba.org/News/2021/federal-assistance-letter
[101] Plaintiffs also question how one can be ticketed for "trespassing" at a public meeting, but includes this example to demonstrate the frivolous nature of the NSBA's assertions.

legal advisor to the President of the United States and chief lawyer of the federal government, issued a formal memorandum[102] about the disgruntled parents to the Director of the FBI, the Director of the Executive Office for U.S. Attorneys, and the Assistant Attorney General of the Criminal Division, requiring them to meet with federal, state and local law enforcement leaders to "discuss strategies for addressing this disturbing trend."[103]

### J.      THE BALANCE OF THE EQUITIES FAVORS PLAINTIFFS

Granting injunctive relief is in the public interest. When challenging government action that affects the exercise of constitutional rights, "[t]he public interest . . . tip[s] sharply in favor of enjoining the" law. See *Klein v. City of San Clemente*, 584 F.3d 1196, 1208 (9th Cir. 2009).

"A balance of equities tipping in favor of the party requesting a preliminary injunction" means a balance of the hardships against the benefits. See, e.g., *Ligon v. City of New York*, 925 F. Supp. 2d 478, 539 (S.D.N.Y. 2013) (characterizing the balancing "hardship imposed on one party" and "benefit to the other" as a "balanc[ing] [of] the equities"); *SmithKline Beecham Consumer Healthcare, L.P. v. Watson Pharms., Inc.*, No. 99 CIV 9214 (DC), 1999 WL 34981557, at *4–5 (S.D.N.Y. Sept. 13, 1999) (considering the harm to defendant and the "benefit" to consumers in balancing the equities); *Arthur v. Associated Musicians of Greater New York, Loc. 802, AFM*, 278 F. Supp. 400, 404 (S.D.N.Y. 1967) (characterizing "balancing the equities" as "requiring plaintiffs to show that the benefit to them if an injunction issues will outweigh the harm to other parties"); *Rosenstiel v. Rosenstiel*, 278 F. Supp. 794, 801–02 (S.D.N.Y. 1967) (explaining that to "balance the equities," the court "will consider the hardship to the plaintiff ..., the benefit to [the] plaintiff ..., and the relative hardship to which a defendant will be subjected") [internal quotation marks omitted].

---

[102] https://www.justice.gov/opa/pr/justice-department-addresses-violent-threats-against-school-officials-and-teachers
[103] https://www.justice.gov/ag/page/file/1438986/download

As set forth above, the enforcement of a mandate created without legal authority and outside of the legislative process violates the Constitution and federal and state laws. The grave harm to Plaintiffs and all students throughout New York State from the continued implementation of the mask mandate is not theoretical but presently occurring. Without the requested injunctive relief, irreparable harm will continue. Granting the requested injunctive relief will cause no harm to Defendants, nor will there be harm to the general public, as there is no scientific evidence that masks or face coverings effectively prevent COVID-19. As borne out above, the scientific evidence affirmatively demonstrates that children are not susceptible to contracting or spreading COVID-19 to others, and commons masks and face coverings do not prevent the spread of COVID-19.

## CONCLUSION

Should the Court grant the Plaintiffs, the relief requested, nothing would prevent elementary and secondary school Students from wearing masks in school, and otherwise, ***when and where they or their parents choose***. Plaintiffs, and parents of other children who believe it would be detrimental to their child's health and/or well-being to wear a mask all day long in school, should be allowed to send their children to school without a mask.

Defendants must be enjoined from enforcing their mask mandates. Defendants' mask mandates were improperly enacted outside of the legislative process, without due process, and lack pre- and post-deprivation remedies. Defendants' mask mandates violate Plaintiffs' Constitutional and statutory rights as set forth herein. The requested injunctive relief is not only appropriate but necessary to preserve the health and well-being of Plaintiffs, their children, and students throughout New York State, both disabled and non-disabled.

Dated: New York, NY
      October 13, 2021

                                                Respectfully submitted,

                                                BRAIN INJURY
                                                RIGHTS GROUP, LTD.

By:     **/S/**

                                              Patrick B. Donohue, Esq.
                                              *Attorneys for Plaintiffs*
                                              300 East 95th Street, Suite 130
                                              New York, NY 10128
                                              (646) 850-5035